# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Evanston Insurance Company

**DEFENDANTS**

EQT Production Company and Seven Point Energy Services. Inc.

**(b)** County of Residence of First Listed Plaintiff  **Cook County, Illinois**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Edward M. Koch and David E. Edwards, White and Williams LLP, 1650 Market St., Ste. 1800, Philadelphia,

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [ ] 2  U.S. Government Defendant
- [ ] 3  Federal Question *(U.S. Government Not a Party)*
- [x] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [x] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [x] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [x] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| | | [ ] 370 Other Fraud | **LABOR** | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards Act | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 380 Other Personal Property Damage | [ ] 720 Labor/Management Relations | | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 385 Property Damage Product Liability | [ ] 740 Railway Labor Act | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | | [ ] 751 Family and Medical Leave Act | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | | | [ ] 790 Other Labor Litigation | [ ] 862 Black Lung (923) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 791 Employee Retirement Income Security Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | [ ] 864 SSID Title XVI | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | [ ] 865 RSI (405(g)) | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | **FEDERAL TAX SUITS** | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 950 Constitutionality of State Statutes |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1  Original Proceeding
- [ ] 2  Removed from State Court
- [ ] 3  Remanded from Appellate Court
- [ ] 4  Reinstated or Reopened
- [ ] 5  Transferred from Another District *(specify)*
- [ ] 6  Multidistrict Litigation - Transfer
- [ ] 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes  [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*  JUDGE _____  DOCKET NUMBER _____

DATE
December 18, 2024

SIGNATURE OF ATTORNEY OF RECORD
*D E Edwards*

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

JS 44A REVISED June, **2009**
IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA
THIS CASE DESIGNATION SHEET MUST BE COMPLETED

**PART A**

This case belongs on the ( ◯ Erie    ◯ Johnstown    ◉ Pittsburgh) calendar.

**1. ERIE CALENDAR -** If cause of action arose in the counties of Crawford, Elk, Erie, Forest, McKean. Venang or Warren, OR any plaintiff or defendant resides in one of said counties.

**2. JOHNSTOWN CALENDAR -** If cause of action arose in the counties of Bedford, Blair, Cambria, Clearfield or Somerset OR any plaintiff or defendant resides in one of said counties.

**3.** Complete if on **ERIE CALENDAR**: I certify that the cause of action arose in_____ County and that the _____resides in_____County.

**4.** Complete if on **JOHNSTOWN CALENDAR**:  I certify that the cause of action arose in _____County and that the_____resides in _____County.

**PART B** (You are to check ONE of the following)

**1.** ◯  This case is related to Number_____     . Short Caption_____._____
**2.** ◉  This case is not related to a pending or terminated case.

DEFINlTIONS OF RELATED CASES:

CIVIL:  Civil cases are deemed related when a case filed relates to property included in another suit or involves the same issues of fact or it grows out of the same transactions as another suit or involves the validity or infringement of a patent involved in another suit EMINENT DOMAIN:  Cases in contiguous closely located groups and in common ownership groups which will lend themselves to consolidation for trial shall be deemed related. HABEAS CORPUS & CIVIL RIGHTS:  All habeas corpus petitions filed by the same individual shall be deemed related. All pro se Civil Rights actions by the same individual shall be deemed related.

**PARTC**

I. CIVIL CATEGORY (Select the applicable category).

1. ◯  Antitrust and Securities Act Cases
2. ◯  Labor-Management Relations
3. ◯  Habeas corpus
4. ◯  Civil Rights
5. ◯  Patent, Copyright, and Trademark
6. ◯  Eminent  Domain
7. ◯  All  other federal question cases
8. ◯  All  personal  and property damage tort cases,  including  maritime,  FELA, Jones Act, Motor vehicle, products liability, assault, defamation,  malicious prosecution, and false arrest
9. ◉  Insurance indemnity, contract and other diversity cases.
10. ◯  Government Collection Cases (shall include HEW Student Loans (Education), V A  0verpayment, Overpayment of Social Security, Enlistment Overpayment (Army, Navy, etc.),   HUD Loans, GAO Loans (Misc. Types), Mortgage Foreclosures, SBA Loans, Civil Penalties and Coal Mine Penalty and Reclamation Fees.)

I certify that to the best of my knowledge the entries on this Case Designation Sheet are true and correct

Date: December 18, 2024                   _D S S Edwards_

_____

ATTORNEY AT LAW

NOTE: ALL SECTIONS OF BOTH ÔŠÞRU MUST BE COMPLETED BEFORE CASE CAN BE PROCESSED.

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b) County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c) Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II. Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**. (See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

**III. Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV. Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V. Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI. Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII. Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII. Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

EVANSTON INSURANCE COMPANY )
)
)
)
v. )    Civil Action No.   GD-21-000920
)
)
)
SEVEN POINT ENERGY SERVICES, INC. )
)

**(Complete either Option 1 or Option 2)**

OPTION 1:  CONSENT TO JURISDICTION BY
UNITED STATES MAGISTRATE JUDGE

In accordance with the provisions of Section 636(c)(1) of Title 28, United States Code, I voluntarily consent to have a United States Magistrate Judge conduct any and all further proceedings in the case, including trial and entry of a final judgment, with direct review by the United States Court of Appeals for the Third Circuit if an appeal is filed.

Date: _____

_____
Signature


Print Name:    _____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

OPTION 2:  DISTRICT JUDGE OPTION

Pursuant to Section 636(c)(2) of Title 28, United States Code, I acknowledge the availability of a United States Magistrate Judge but I elect to have this case randomly assigned to a United States District Judge.

Date: _____DECEMBER 18, 2024_____

_____
Signature


Print Name:    _____DAVID E. EDWARDS_____

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| EVANSTON INSURANCE COMPANY, | : | CIVIL ACTION LAW |
| 10275 West Higgins Road, Suite 750 | : | |
| Rosemont, IL 60018 | : | |
| | : | **DECLARATORY JUDGMENT** |
| *Plaintiff* | : | **COMPLAINT** |
| | : | |
| | : | |
| v. | : | |
| | : | |
| EQT PRODUCTION COMPANY | : | **JURY TRIAL DEMANDED** |
| 625 Liberty Avenue, Suite 1700 | : | |
| Pittsburgh, Pennsylvania 15222 | : | |
| | : | |
| and | : | |
| | : | |
| SEVEN POINT ENERGY SERVICES, | : | |
| INC. | : | |
| 1006 Loop Street #4 | : | |
| Aspinwall, Pennsylvania 15215 | : | |
| | : | |
| *Defendants* | : | |
| | : | |

Plaintiff, Evanston Insurance Company ("Evanston"), by and through its undersigned counsel, brings this action for declaratory relief pursuant to 28 U.S.C. § 2201 (the "Declaratory Judgment Act"), and states as follows:

## I.    <u>INTRODUCTION</u>

1.    Evanston seeks a declaration with respect to the rights, duties, and obligations of the parties under primary and excess insurance policies issued by Evanston to Seven Point Energy Services, Inc. ("Seven Point") with respect to an incident in which underlying plaintiffs/claimants, William Burkey and Tammy Burkey ("Plaintiffs"), suffered injuries when Mr. Burkey, a water truck driver for Seven Point, was injured from a slip and fall at an oil well site owned and/or maintained by EQT Production Company ("EQT").

2.      Upon information and belief, on February 13, 2019 (early in the morning), Mr. Burkey, as an employee of Seven Point was hauling water at an oil/gas well at "The Pettit Pad" on EQT's property in western Pennsylvania.

3.      Plaintiffs filed a civil tort action in the Court of Common Pleas of Allegheny County, Pennsylvania, captioned <u>William J. Burkey and Tammy Burkey v. Equitrans Midstream Corporation, EQT Midstream Corporation – Europa CS, Equitrans Midstream Corporation – Halo CS, EQM Midstream Partners LP, EQT Production Company, Equitrans, Inc., EQT Midstream; EQT Corporation and John Does,</u> assigned Docket Number GD-21-000920 (the "Underlying Action").

4.      The claims against all named defendants except EQT (*i.e.*, EQT Production Company) have been dismissed.

5.      On or about April 30, 2024, EQT filed a Joinder Complaint against Seven Point.

6.      Notice was provided notice to Evanston of the claims in the Underlying Action and requesting a defense for EQT.

7.      Evanston agreed to provide a defense to EQT under a reservation of rights.

8.      While Evanston is presently providing EQT a defense to the Underlying Action subject to a reservation of rights, Evanston brings this action to request that this Court declare that Evanston has no duty to defend or indemnify EQT, and thus, Evanston may withdraw its defense of EQT in the Underlying Action and need not indemnify any judgment or settlement in the Underlying Action entered against EQT.

9.      Evanston is not defending Seven Point for the claims asserted against it by EQT. Nonetheless, Evanston also requests a declaration that Evanston has no duty to defend or indemnify Seven Point for the claims asserted by EQT.

-2-

10.     Among other things, Evanston's Primary Policy (as later defined herein) contains an **EXCLUSION – AIRCRAFT, AUTO OR WATERCRAFT WITH LIMITED NON-OWNED WATERCRAFT EXCEPTION** (set forth below) (the "Auto Exclusion") stating that the Evanston Primary Policy does not apply to "bodily injury" arising out of any auto, including the loading or unloading of an auto.

11.     Further, the Primary Policy provides additional insured coverage for an entity such as EQT, but only for bodily injury liability that are caused in whole or in part by the acts or omissions of Seven Point.  Thus, to the extent that Plaintiffs recover for alleged injuries that were not caused in whole or in part by the acts or omissions of Seven Point, there would be no coverage under the policy for EQT as an additional insured.

12.     The Evanston Excess Policy (as later defined herein) is subject to the same terms, conditions, agreements, exclusions, and definitions as the "underlying insurance."  The Excess Policy also contains an Auto No-Fault and Similar Laws Exclusion.

13.     Upon information and belief, at the time Mr. Burkey slipped and fell he was loading the Seven Point truck such that all the claims in the Underlying Action are excluded from coverage under Evanston's Primary and Excess Policies.

14.     EQT's claims against Seven Point are for breach of contract and failure to obtain required insurance.  Such claims are not for "bodily injury," "property damage," and/or "personal and advertising injury" and, thus, not within the coverage afforded by the Evanston policies issued to Seven Point.

15.     There is no coverage for the claims in the Underlying Action and, accordingly, Evanston has no obligation to defend, to continue to defend, or indemnify the claims in the Underlying Action.

16.     Separately, Evanston has petitioned to intervene in the Underlying Action to propound Special Jury Interrogatories to enable the jury to answer factual questions to assist the parties and this Court to sort out coverage issues.

## II.    **JURISDICTION**

17.     Title 28 U.S.C. § 1332 confers original jurisdiction over all civil matters where the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the claim is between citizens of different states.

18.     This Court has original jurisdiction of this action pursuant to 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

### A.    **THE PARTIES AND THEIR CITIZENSHIP**

19.     There is complete diversity of citizenship between Evanston and both Defendants, EQT and Seven Point.  28 U.S.C. § 1332(a).

20.     Plaintiff Evanston is a corporation organized under the laws of the State of Illinois, with its principal place of business in Illinois.

21.     Evanston is engaged in the business of providing a variety of insurance coverages to various individuals and businesses.

22.     Defendant EQT is, upon information and belief, a citizen of the Commonwealth of Pennsylvania being incorporated under the laws of Pennsylvania with its principal place of business in Pennsylvania.

23.     Upon information and belief, EQT is engaged in the business of producing natural gas.

24.     Defendant Seven Point is, upon information and belief, incorporated under the laws of the State of Ohio with its principal place of business in the Commonwealth of Pennsylvania.

25.     Upon information and belief, Seven Point is engaged in the business of hauling water in connection with the production of natural gas in Western Pennsylvania.

26.     There is complete diversity of citizenship between Plaintiff and all Defendants.

**B.      AMOUNT IN CONTROVERSY**

27.     The amount in controversy exceeds $75,000.00, exclusive of costs and interest.

28.     The Primary Policy provides certain coverage subject to, among other things, a $1 million per occurrence limit.

29.     The Excess Policy provides certain coverage subject to, among other things, a $5 million per occurrence limit.

30.     At issue in this case is whether Evanston has any duty to defend or indemnify EQT and/or Seven Point in an Underlying Action involving injury to a claimant who alleges serious and permanent injuries from a slip and fall on ice at EQT's property while loading water onto a Seven Point truck from an EQT well in Western Pennsylvania.

31.     Defense costs and the damages at issue in the Underlying Action, combined, exceed $75,000.

**III.    <u>VENUE IS PROPER IN THIS COURT</u>**

32.     Venue is proper in the Western District of Pennsylvania under 28 U.S.C. § 1391(b).

33.     This action seeks a declaration with respect to the rights, duties, and obligations of the parties under an insurance policy issued by Evanston to Seven Point with respect to an incident involving Mr. Burkey at an EQT property located in Western Pennsylvania, and which is the

subject of the Underlying Action filed in the Court of Common Pleas of Allegheny County, Pennsylvania.

34.    At issue here is whether: (a) Evanston has any duty to defend (or continue defending) EQT in the Underlying Action pending within the Western District of Pennsylvania; (b) Evanston has any duty to indemnify EQT for any judgment rendered in (or settlement of the Underlying Action in) the Western District; and (c) Evanston has any obligation to defend or indemnify Seven Point for EQT's claims against Seven Point.

35.    Venue is also proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Evanston's claims occurred in the Western District of Pennsylvania.

36.    Plaintiffs' alleged injuries, the Underlying Action, the location of the property where the alleged injuries happened, and the defense Evanston is providing to EQT from which Evanston seeks to withdraw, occurred and/or are still occurring within the Western District.

37.    Further, both Defendants are subject to this Court's personal jurisdiction with respect to this action as the principal place of business of both EQT and Seven Point are in this District.

38.    As such, venue also would be proper under 28 U.S.C. § 1391(b)(3).

IV.    **FACTS COMMON TO ALL COUNTS**

A.    **PLAINTIFFS' ALLEGATIONS IN THE UNDERLYING ACTION**

39.    Plaintiffs filed the Underlying Action against EQT and others on February 1, 2021.

40.    A true and correct copy of the Complaint in the Underlying Action is attached as Exhibit A hereto.

41.     Plaintiffs sued EQT for personal injuries suffered by William Burkey from a slip and fall at an oil well site owned and/or maintained by EQT.

42.     Plaintiffs allege that Mr. Burkey was a water truck driver for Seven Point Energy Services (Complaint ¶20).

43.     Plaintiffs further allege that on February 13, 2019 (early in the morning), Mr. Burkey, as an employee of Seven Point was hauling water at an oil/gas well at "The Pettit Pad" (Complaint ¶21).

44.     Plaintiffs further alleged that there was no lighting in the containment area and Mr. Burkey was unable to see ice in the area (Complaint ¶23).

45.     Mr. Burkey slipped on ice in the containment area, as the ice covered approximately 4 square feet [based on Mr. Burkey's estimate after he fell] (Complaint ¶¶24-27).

46.     Plaintiffs allege that EQT allowed water/ice to accumulate so as to create an unsafe condition (Complaint ¶¶49-50).

47.     Plaintiffs further allege that EQT had a duty to maintain safe conditions for water-removal contractors (Complaint ¶51), including a duty "to ensure that area would be clear of ice and properly lighted" (Complaint ¶52).

48.     Additionally, Plaintiffs allege that EQT had a duty to establish policies and procedures for ice removal and to supervise and enforce those policies and procedures (Complaint ¶53).

49.     Plaintiffs further alleged that ice accumulated in the containment area because EQT failed to maintain the area and inspect it (Complaint ¶53).

**B.    EQT'S JOINDER COMPLAINT**

50.    On or about April 30, 2024, EQT filed a Joinder Complaint against Seven Point.

See Exhibit B attached hereto.

51.    EQT asserts that it had a contract, the Master Services Agreement ("MSA"), with

Seven Point (Joinder Complaint ¶13).

52.    EQT alleges that in the MSA, Seven Point undertook to defend and indemnify MSA

against any claims, including for claims for personal injury by Seven Point's employees (Joinder

Complaint ¶15).

53.    EQT also alleges that in the MSA, Seven Point agreed to obtain workers'

compensation insurance, Commercial General Liability insurance, and Commercial Auto Liability

insurance (Joinder Complaint ¶17).

54.    EQT also alleges that Seven Point was required to name EQT as an additional

insured under Seven Point's insurance policies (Joinder Complaint ¶18).

55.    EQT seeks a declaration that under the terms of the MSA, Seven Point is required

to defend and indemnify EQT regardless of whether there is coverage under the insurance obtained

by Seven Point.  Joinder Complaint, Count I.

56.    In Count II of its Joinder Complaint, EQT alleges that Seven Point has breached

the terms of the MSA by refusing "to unconditionally defend and indemnify EQT with regard to

the Burkey's claims in this action" (Joinder Complaint ¶41).

57.    In Count III of its Joinder Complaint, EQT further alleges that Seven Point

breached its contractual obligation to obtain insurance that covered EQT for the claims asserted in

the Action.

-8-

### C.    THE EVANSTON POLICIES ISSUED TO SEVEN POINT

58.    Evanston issued policy number MKLV2ENV100993 with the policy period of December 28, 2018, to December 28, 2019, which policy provides certain coverage on an occurrence basis as set forth in that policy subject to the terms, conditions, exclusions and provisions of that policy (the "Primary Policy").  A true and correct copy of the Primary Policy is attached hereto as Exhibit C.

59.    The Primary Policy provides certain coverage for damages because of "bodily injury" caused by an "occurrence" (and which injury occurs during the Policy's policy period) subject to a $1 million per occurrence and a $1 million general aggregate limit. CG 00 01 04 13, Coverage A at page 1 of 16 (Exhibit C).

60.    Coverage A also applies to claims for "property damage."  CG 00 01 04 13, Coverage A at page 1 of 16 (Exhibit C).  There is no claim for "property damage" in the Underlying Action.

61.    Coverage B applies to claims for "personal and advertising injury."  CG 00 01 04 13, Coverage B at page 6 of 16 (Exhibit C).  There is no claim for "personal and advertising injury" in the Underlying Action.

62.    Evanston also issued an Excess Liability Policy to Seven Point with policy number MKLV2EUL103021 and a policy period of December 28, 2018, to December 28, 2019 (the "Excess Policy").  A true and correct copy of the Excess Policy is attached hereto as Exhibit D.

63.    The Excess Policy provides certain coverage for damages in excess of and covered by the Primary Policy (and which injury occurs during the Policy's policy period) subject to a $5 million per occurrence and a $5 million general aggregate limit.

64.    By Endorsement on form CG 21 04 11 85, an **EXCLUSION – PRODUCTS-COMPLETED OPERATIONS HAZARD** was added to the Policy – providing that: "This insurance does not apply to bodily injury or property damage included within the 'products-completed operations hazard.'"

65.    The Primary Policy contains an Endorsement to the Commercial General Liability coverage which added to the Policy "**EXCLUSION – AIRCRAFT, AUTO OR WATERCRAFT WITH LIMITED NON-OWNED WATERCRAFT EXCEPTION**" ("Auto Exclusion") which provides:

> Exclusion **2.g.** Aircraft, Auto Or Watercraft under Section I – Coverages, Coverage **A** – Bodily Injury And Property Damage Liability is replaced by the following:
>
> This insurance does not apply to:
>
> **g. Aircraft, Auto Or Watercraft**
>
> > **(1)** "Bodily injury" or "property damage" arising out of any aircraft, "auto" or watercraft; or
> >
> > **(2)** "Bodily injury" or "property damage" arising out of "loading or unloading" of any aircraft, "auto" or watercraft;
>
> whether or not owned, maintained, used, rented, leased, or borrowed by any insured and whether or not hired, contracted, loaned or entrusted to others by any insured.
>
> This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, contracting, screening, training or monitoring of others by any insured.
>
> However, this exclusion does not apply to a watercraft you do not own that is less than 75 feet long and not being used to carry persons or property for a charge.
>
> All other terms and conditions remain unchanged.

MEGL 2301 11 17 (Exhibit C).

-10-

66.    The Primary Policy defined "auto" to mean:

    **a.**    A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

    **b.**    Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

CG 00 01 04 13 at page 13 of 16 (Exhibit C).

67.    The Primary Policy also defines the term "loading or unloading" to mean:

… the handling of property:

    **a.**    After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

    **b.**    While it is in or on an aircraft, watercraft or "auto"; or

    **c.**    While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

But "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

CG 00 01 04 13 at page 14 of 16 (Exhibit C).

68.    The Excess Policy provides in part:

    **1.**    We will pay those sums in excess of the limits shown in the Schedule Of Underlying Insurance that you become legally obligated to pay as damages because of injury to which this insurance applies, provided that the "underlying insurance" also applies, or would apply but for the exhaustion of its applicable Limits Of Insurance.

    **2.**    This policy is subject to the same terms, conditions, agreements, exclusions and definitions as the "underlying insurance", except:

        **a.**    We will have no obligation under this policy with respect to any claim or suit that is settled without our consent; and

**b.** With respect to any provisions to the contrary contained in this policy.

. . .

MAUB 0001 01 15 at page 1 of 2 (Exhibit D).

66.    The Excess Policy contains an Endorsement to that coverage which added to that

Policy "**EXCLUSION – AUTO NO-FAULT AND SIMILAR LAWS**" which provides:

The following is added to Section **II.** Exclusions:

**Auto No-Fault And Similar Laws**

This policy does not apply to:

Any liability payable under or resulting from any no-fault, personal injury protection, uninsured motorists, underinsured motorists or similar law or statute.

MAUB 1665 01 15 (Exhibit D).

**V.    MATTERS IN DISPUTE BETWEEN THE PARTIES**

67.    This is an action for declaratory judgment and relief.

68.    Evanston is providing a defense to EQT in the Underlying Action subject to a full

and complete Reservation of Rights.  See Exhibits E and F.

69.    Discovery in the Underlying Action revealed that:

a)    Mr. Burkey was inside the containment area on EQT's property, known as the "Pettit Pad" at the time of the accident;

b)    Mr. Burkey had just opened the valves on the last two tanks on the truck;

c)    Mr. Burkey was returning to open the pumpkin valve to load water on to the Seven Point truck when he slipped on ice.

-12-

The "pumpkin valve" is what Mr. Burkey testified at deposition that he hooks the truck up to in order to obtain the production water from the tanks.  Dep. William Burkey (11/8/24) at 98-99 (excerpts attached at Exhibit G).

70.    In his deposition, Mr. Burkey confirmed that the accident happened in the process of loading the Seven Point truck:

> From the truck to the pumpkin where I would hook it up.  Then I would go back up and turn my pump on so I had suction.  Then I would walk from there up into the containment, go back to find the production tank that is needed to be pulled from.  Once I get back there, open that valve and then as I was heading back to the pumpkin, the other valve, that's where the incident happened.

Dep. William Burkey (11/8/24) at 133-34.

71.    In its original and supplemental reservation of rights letters to EQT, Evanston advised EQT of provisions and exclusions in the Primary and Excess Policies that bar coverage for the claims asserted against EQT in the Underlying Action.

72.    EQT and Seven Point dispute Evanston's position that the claims asserted by Plaintiffs may not be covered under the Primary and Excess Policies issued to Seven Point.

73.    Seven Point also disputes Evanston's position that the claims asserted by EQT may not be covered under the Primary and Excess Policies issued to Seven Point.

74.    There is no coverage under the Evanston Policies to the extent that EQT is found liable for EQT's own acts or omissions.

75.    There is no coverage for the claims in the Underlying Action for either EQT or Seven Point because Mr. Burkey's claims arise out of the loading of water onto a Seven Point "auto."

76.    There is no coverage for the claims by EQT against Seven Point because such claims are not for "bodily injury," "property damage," or "personal and advertising injury."

-13-

77.     An actual, present and *bona fide* controversy exists between the parties to this action concerning their respective rights, duties, and obligations.

78.     The coverage issues under the Primary and Excess Policies at issue in this action will not be determined in the Underlying Action.

## COUNT I - DECLARATORY JUDGMENT
### (Against EQT)

79.     Evanston realleges and incorporates by reference each of the foregoing paragraphs above as though fully set forth herein.

80.     As noted above, the Primary Policy does not provide coverage to EQT for its own acts and/or omissions.

81.     Additionally, the Primary Policy contains an Auto Exclusion that precludes any duty to defend or indemnify the claims in the Underlying Action.

82.     The Auto Exclusion applies to the loading or unloading of an auto.

83.     The Excess Policy is subject to the same terms, conditions, agreements, exclusions, and definitions as the Primary Policy.

84.     Mr. Burkey was injured while loading or unloading water onto an auto.

85.     Plaintiffs' claims are directed to acts and omissions of EQT, which acts and omissions are not covered under the Primary and Excess Policies.

86.     There is no coverage under the Primary and Excess Policies for the claims against EQT both because the acts and/or omissions complained of are those of EQT and because Plaintiffs' injuries arose out of the loading of an auto.

87.     Evanston has no duty to defend EQT in the Underlying Action.

88.     Evanston has no obligation to indemnify EQT for any judgment (or any settlement) entered against EQT in the Underlying Action.

**WHEREFORE,** Evanston demands judgment be entered in its favor and against EQT and prays that the Court declare:

a.   The rights, duties, and obligations of the parties hereto under the law, contract, and facts herein;

b.   That the Primary and Excess Policies issued by Evanston to Seven Point do not provide coverage for the claims in the Underlying Action to EQT;

c.   That Evanston has no duty to defend EQT in the Underlying Action and may withdraw from the defense of EQT in the Underlying Action;

d.   That Evanston has no duty to indemnify EQT for any damages awarded (or settlement reached) in the Underlying Action; and

e.   That Evanston is awarded its costs of suit and such other and further relief as may be just, fitting, and proper.

## COUNT II - DECLARATORY JUDGMENT
### (Against Seven Point)

89.   Evanston realleges and incorporates by reference each of the foregoing paragraphs above as though fully set forth herein.

90.   As noted above, the Primary Policy and the Excess Policy, which is subject to the same terms, conditions, agreements, exclusions, and definitions as the Primary Policy, applies only to claims for damages for "bodily injury," "property damage," and/or "personal and advertising injury."

91.   The claims asserted by EQT against Seven Point are for declaratory relief (*i.e.*, that the contract between EQT and Seven Point requires Seven Point to defend and indemnify EQT for the claims in the Underlying Action) (Joinder Complaint, Count I).

92.     In Count II of its Joinder Complaint, EQT alleges that Seven Point has breached the terms of the MSA by refusing "to unconditionally defend and indemnify EQT with regard to the Burkey's claims in this action" (Joinder Complaint ⁋41).

93.     In Count III of its Joinder Complaint, EQT further alleges that Seven Point breached its contractual obligation to obtain insurance that covered EQT for the claims asserted in the Action.

94.     EQT does not assert a claim for damages in Count I of its Joinder Complaint.

95.     A claim for breach of contract, Counts II and III, is not a claim for damages for "bodily injury," "property damage," and/or "personal and advertising injury."

96.     There is no coverage for Seven Point for the claims asserted by EQT against Seven Point under the Evanston Policies.

97.     Plaintiffs' claims in the Underlying Action arise out of alleged personal injuries arising out of the loading or unloading of water from EQT's gas well onto a Seven Point truck.

98.     Claims for "bodily injury" arising out of any auto are expressly excluded from coverage by the terms of the Auto Exclusion.

99.     To the extent that Seven Point may be liable to EQT for any judgment or settlement entered in favor of the Plaintiffs against EQT, there is no coverage under the Primary or Excess Policies for any such award by virtue of the Auto Exclusion.

100.    The Court should declare the claims in the Underlying Action are not covered by the Primary or Excess Policies, that Evanston has no duty to defend Seven Point in the Underlying Action, that Evanston has no duty to indemnify Seven Point for any damages awarded (or settlement reached) in the Underlying Action.

-16-

**WHEREFORE,** Evanston demands judgment be entered in its favor and against Seven Point and prays that the Court declare:

a.   The rights, duties, and obligations of the parties hereto under the law, contract, and facts herein;

b.   That the Primary and Excess Policies issued by Evanston to Seven Point do not provide coverage for the claims in the Underlying Action to Seven Point;

c.   That Evanston has no duty to defend Seven Point in the Underlying Action;

d.   That Evanston has no duty to indemnify Seven Point for any damages awarded (or settlement reached) in the Underlying Action; and

e.   That Evanston is awarded its costs of suit and such other and further relief as may be just, fitting and proper.

## DEMAND FOR TRIAL BY JURY

Evanston hereby demands a trial by jury of issues so triable.

Respectfully submitted,

**WHITE AND WILLIAMS LLP**

By:    s/ David E. Edwards
Edward M. Koch, ID #76337
David E. Edwards, ID #67961
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA 19103
(215) 864-7000
koche@whiteandwilliams.com
edwardsd@whiteandwilliams.com

*Attorneys for Plaintiff,*
*Evanston Insurance Company*

Dated:  December 19, 2024

-17-

# EXHIBIT A



**FILED**

2021 FEB -1  PM 3: 44

CIVIL/FAMILY DIVISION
ALLEGHENY COUNTY PA

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

WILLIAM J. BURKEY AND TAMMY
BURKEY, Husband and Wife,

       Plaintiffs,

   vs.

EQUITRANS MIDSTREAM
CORPORATION; EQT MIDSTREAM
CORPORATION - EUROPA CS;
EQUITRANS MIDSTREAM
CORPORATION - HALO CS; EQM
MIDSTEAM PARTNERS LP; EQT
PRODUCTION COMPANY; EQUITRANS,
INC.; EQT MIDSTREAM; EQT
CORPORATION; JOHN DOE 1; JOHN
DOE 2; JOHN DOE 3; AND JOHN DOE,
4;

       Defendants.

CIVIL DIVISION

No.: GD -21- 920

**COMPLAINT IN CIVIL ACTION**

Filed on behalf of plaintiffs, William J.
Burkey and Tammy Burkey

Counsel of Record for these Parties:

PAUL R. ROBINSON, ESQUIRE
PA I.D. No. 65581

BENJAMIN SORISIO, ESQUIRE
PA I.D. No. 85668

MEYER, DARRAGH, BUCKLER,
BEBENEK & ECK, PLLC
U.S. Steel Tower, Suite 4850
600 Grant Street
Pittsburgh, PA 15219
Telephone: (412) 261-6600
Fax: (412) 471-2754
Email: probinson@mdbbe.com
      bsorisio@mdbbe.com

**JURY TRIAL DEMANDED**

**NOTICE TO PLEAD**

**TO: ALL DEFENDANTS**

You are hereby notified to file a written response to
the within COMPLAINT IN CIVIL ACTION within
twenty (20) days from service hereof or a judgment
may be entered against you.

Counsel for plaintiffs, William J. Burkey and
Tammy Burkey

T109666
1 February 2021
15:45:33
GD-21-000920

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| WILLIAM J. BURKEY AND TAMMY BURKEY, Husband and Wife, | CIVIL DIVISION |
| Plaintiffs, | No.: |
| vs. | |
| EQUITRANS MIDSTREAM CORPORATION; EQT MIDSTREAM CORPORATION - EUROPA CS; EQUITRANS MIDSTREAM CORPORATION - HALO CS; EQM MIDSTEAM PARTNERS LP; EQT PRODUCTION COMPANY; EQUITRANS, INC.; EQT MIDSTREAM; EQT CORPORATION; JOHN DOE 1; JOHN DOE 2; JOHN DOE 3; AND JOHN DOE 4, | |
| Defendants. | JURY TRIAL DEMANDED |

## NOTICE TO DEFEND

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NOT FEE.

Lawyer Referral Service
Allegheny County Bar Association
400 Koppers Building
436 Seventh Avenue
Pittsburgh, PA  15219
Telephone:  (412) 261-5555
https://www.getapittsburghlawyer.com/

PLEASE SERVE ALL PAPERS ON:
BENJAMIN SORISIO, ESQUIRE
MEYER, DARRAGH, BUCKLER, BEBENEK & ECK, PLLC
U.S. STEEL TOWER, SUITE 4850
600 GRANT STREET
PITTSBURGH, PA  15219

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| WILLIAM J. BURKEY AND TAMMY BURKEY, Husband and Wife, | CIVIL DIVISION |
| Plaintiffs, | No.: |
| vs. | |
| EQUITRANS MIDSTREAM CORPORATION; EQT MIDSTREAM CORPORATION - EUROPA CS; EQUITRANS MIDSTREAM CORPORATION - HALO CS; EQM MIDSTEAM PARTNERS LP; EQT PRODUCTION COMPANY; EQUITRANS, INC.; EQT MIDSTREAM; EQT CORPORATION; JOHN DOE 1; JOHN DOE 2; JOHN DOE 3; AND JOHN DOE 4, | |
| Defendants. | JURY TRIAL DEMANDED |

## NOTICE TO PLEAD

**TO: ALL DEFENDANTS**

You are hereby notified to file a written response to the within COMPLAINT IN CIVIL ACTION within twenty (20) days from service hereof or a judgment may be entered against you.

_____
Counsel for plaintiffs, William J. Burkey and Tammy Burkey

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| WILLIAM J. BURKEY AND TAMMY BURKEY, Husband and Wife, | CIVIL DIVISION |
| Plaintiffs, | No.: |
| vs. | |
| EQUITRANS MIDSTREAM CORPORATION; EQT MIDSTREAM CORPORATION - EUROPA CS; EQUITRANS MIDSTREAM CORPORATION - HALO CS; EQM MIDSTEAM PARTNERS LP; EQT PRODUCTION COMPANY; EQUITRANS, INC.; EQT MIDSTREAM; EQT CORPORATION; JOHN DOE 1; JOHN DOE 2; JOHN DOE 3 AND JOHN DOE 4, | |
| Defendants. | JURY TRIAL DEMANDED |

### COMPLAINT IN CIVIL ACTION

AND NOW, come plaintiffs, William J. Burkey, and Tammy Burkey, husband and wife, through their counsel, Meyer, Darragh, Buckler, Bebenek & Eck, PLLC, and file this complaint in civil action, alleging as follows:

### PARTIES

1.    Plaintiffs, William J. Burkey and Tammy Burkey, husband and wife, are adult individuals residing at 713 York Run Road, Smithfield, Pennsylvania 15478.

2.    Equitrans Midstream Corporation is a Pennsylvania corporation with its principal place of business located at 625 Liberty Avenue, Pittsburgh, Pennsylvania 15222.

{P1607070.1}

3.    EQT Midstream Corporation – Europa CS is a Pennsylvania corporation with its principal place of business located at 625 Liberty Avenue, Pittsburgh, Pennsylvania 15222.

4.    EQT Midstream Corporation – Halo CS is a Pennsylvania corporation with its principal place of business located at 625 Liberty Avenue, Pittsburgh, Pennsylvania 15222.

5.    EQM Midstream Partners LP is a Pennsylvania corporation with its principal place of business located at 625 Liberty Avenue, Pittsburgh, Pennsylvania 15222.

6.    EQT Production Company is a Pennsylvania corporation with its principal place of business located at 625 Liberty Avenue, Pittsburgh, Pennsylvania 15222.

7.    Equitrans, Inc., is a Pennsylvania corporation with its principal place of business located at 420 Boulevard of the Allies, Pittsburgh, PA 15219.

8.    EQT Midstream is a Pennsylvania corporation with its principal place of business located at 625 Liberty Avenue, Pittsburgh, Pennsylvania 15222

9.    EQT Corporation is a Pennsylvania corporation with its principal place of business located at 625 Liberty Avenue, Pittsburgh, Pennsylvania 15222.

10.    Upon information and belief, John Doe 1, averred herein to be fictitious, is a Pennsylvania corporation that performs general contracting services, including but not limited to, maintenance and safety at oil and gas well pad premises in Pennsylvania.

11.    Upon information and belief, John Doe 2, averred herein to be fictitious, is a Pennsylvania corporation that performs contracting services, including but not limited to, ice and snow removal, at oil and gas well pad premises in Pennsylvania.

12.    Upon information and belief, John Doe 3, averred herein to be fictitious, is a Pennsylvania corporation that performs contracting services, including but not limited to, maintenance and/or lighting on oil and gas well pad premises in Pennsylvania.

13.    Upon information and belief, John Doe 4, averred herein to be fictitious, is a Pennsylvania corporation that performs transportation and water hauling services on oil and gas well pad premises in Pennsylvania.

14.    Plaintiffs have conducted a reasonable search to determine the actual names of John Doe 1, John Doe 2, John Doe 3 and John Doe 4.

## JURISDICTION AND VENUE

15.    Defendants, Equitrans Midstream Corporation, EQT Midstream Corporation – Europa CS, EQT Midstream Corporation – Halo CS, EQM Midstream Partners LP, EQT Production Company, Equitrans, Inc., EQT Midstream, EQT Corporation (hereinafter referred to collectively as "the EQT and Equitran Defendants"), John Doe 1, John Doe 2, John Doe 3, and John Doe 4 all conduct business in a systematic and continuous manner throughout Pennsylvania and/or direct their business activities at Pennsylvania.

16.    At all relevant times, all Defendants conducted business in, and availed themselves of the laws of, the Commonwealth of Pennsylvania.

17.    As more fully alleged below, this cause of action and the transaction and/or occurrence out of which this action arises took place at an oil and gas well pad known as the Pettit Pad located in Greene County, Pennsylvania.

18.    This Court has jurisdiction over Equitrans Midstream Corporation, EQT Midstream Corporation – Europa CS, EQT Midstream Corporation – Halo CS, EQM

Midstream Partners LP, EQT Production Company, Equitrans, Inc., EQT Midstream, EQT Corporation, John Doe 1, John Doe 2, John Doe 3, and John Doe 4 in this action pursuant to 42 Pa.C.S.A. § 931, *et seq.* and §§ 5301 and 5322, *et seq.*

19.    Venue is proper in Allegheny County, Pennsylvania as to all claims herein and as to Equitrans Midstream Corporation, EQT Midstream Corporation – Europa CS, EQT Midstream Corporation – Halo CS, EQM Midstream Partners LP, EQT Production Company, Equitrans, Inc., EQT Midstream, EQT Corporation, John Doe 1, John Doe 2, John Doe 3, and John Doe 4 under 42 Pa.C.S.A. §931, *et seq.* and Pennsylvania Rules of Civil Procedure 1006 and 2179, *et. seq.*

## FACTS

20.    On February 3, 2019, Mr. Burkey was employed as a water truck driver for Seven Point Energy Services, Inc., having its place of business in Waynesburg, Pennsylvania.

21.    On February 3, 2019, at approximately 6:15 a.m., Mr. Burkey, while working in the course of his employment with Seven Point Energy Services, Inc., was performing work for production water hauling at an oil and gas well known as "the Pettit Pad" believed to be located in Sycamore, Greene County, Pennsylvania (hereinafter referred to interchangeably as "the Pettit Pad" and/or "the premises").

22.    On February 3, 2019, while performing his work with all due care, Mr. Burkey entered a containment area at the Pettit Pad.

23.    At all relevant times, there was no lighting in or at the containment area, thus preventing Mr. Burkey from being able to observe the surface conditions at the containment area, including but not limited to, the presence of the accumulation of ice.

24.    Mr. Burkey attached hoses from his truck to a valve within the containment area of the Pettit Pad, including walking on the surface of the containment area.

25.    Mr. Burkey then turned on the valve in the containment area.

26.    Mr. Burkey then walked on the surface of the containment area and slipped and fell on ice which accumulated on the surface of the containment area.

27.    After Mr. Burkey fell on the ice in the containment area, Mr. Burkey observed that the ice on the surface of the containment area covered an area of approximately four (4) square feet of the surface of the containment area.

28.    At all relevant times, the EQT and Equitran Defendants were engaged in the business of owning, leasing, developing, constructing, managing, operating, maintaining and/or performing services for oil and gas wells in Pennsylvania, including the Pettit Pad.

29.    Upon information and belief, John Doe 1 performed general contracting services, including but not limited to, maintenance and safety and snow and ice removal at the Pettit Pad where Mr. Burkey fell, and caused, by its actions or inactions, the ice to accumulate on the surface of the containment area which caused Mr. Burkey's fall.

30.    Upon information and belief, John Doe 2 performed contracting services, including but not limited to, ice and snow removal, at the Pettit Pad where Mr. Burkey fell, and caused, by its actions or inactions, the ice to accumulate on the surface of the containment area which caused Mr. Burkey's fall.

31.    Upon information and belief, John Doe 3 performed contracting services, including but not limited to, maintenance and/or lighting, at the Pettit Pad where Mr. Burkey fell, and caused, by its actions or inactions, Mr. Burkey's fall.

32.    Upon information and belief, John Doe 4 performed transportation and water hauling services at the Pettit Pad where Mr. Burkey fell, and caused, by its actions or inactions, water and/or ice to accumulate on the surface of the containment area which caused Mr. Burkey's fall.

33.    At all relevant times, each Defendant was the principal of, or agent for, one or more of each of the other Defendants.

34.    At all relevant times, including on February 3, 2019, all Defendants were in possession and/or physical control of the premises.

35.    At all relevant times, including on February 3, 2019, all Defendants had a duty to ensure the safety of persons walking upon the premises, including Mr. Burkey.

36.    At all relevant times, including on February 3, 2019, all Defendants had a duty to safeguard, protect, and ensure the safety of persons walking upon the premises, including Mr. Burkey.

37.    Upon information and belief, at all relevant times, John Doe 1 had the EQT and Equitran Defendants' permission to be on the premises to perform its contracting services for the maintenance of the premises, including but not limited to, snow and ice removal.

38.    Upon information and belief, at all relevant times, John Doe 1 had a duty to perform its contracting services for the maintenance of the premises, including but not limited to, snow and ice removal, at the premises.

39.    Upon information and belief, at all relevant times, John Doe 1 had a duty to perform its contracting services safely and reasonably, and to notify or warn other

parties if, by its actions or inactions, it creates a dangerous condition on the premises or allows a dangerous condition to be created.

40.    Upon information and belief, at all relevant times, John Doe 2 had the EQT and Equitran Defendants' permission to be on the premises to perform its contracting services for the maintenance of the premises, including but not limited to, snow and ice removal.

41.    Upon information and belief, at all relevant times, John Doe 2 had a duty to perform its contracting services for the maintenance of the premises, including but not limited to, snow and ice removal, at the premises.

42.    Upon information and belief, at all relevant times, John Doe 2 had a duty to perform its contracting services safely and reasonably, and to notify or warn other parties if, by its actions or inactions, it creates a dangerous condition on the premises or allows a dangerous condition to be created.

43.    Upon information and belief, at all relevant times, John Doe 3 had the EQT and Equitran Defendants' permission to be on the premises to perform its contracting services for the maintenance and lighting of the premises.

44.    Upon information and belief, at all relevant times, John Doe 3 had a duty to perform its contracting services for the maintenance and lighting of the premises.

45.    Upon information and belief, at all relevant times, John Doe 3 had a duty to perform its contracting services safely and reasonably, and to notify or warn other parties if, by its actions or inactions, it creates a dangerous condition on the premises or allows a dangerous condition to be created.

46.    Upon information and belief, at all relevant times, John Doe 4 had the EQT and Equitran Defendants' permission to be on the premises to perform its transportation and water hauling services on the premises.

47.    Upon information and belief, at all relevant times, John Doe 4 had a duty to perform its contracting services for the transportation and water hauling services on the premises.

48.    Upon information and belief, at all relevant times, John Doe 4 had a duty to perform its contracting services safely and reasonably, and to notify or warn other parties if, by its actions or inactions, it creates a dangerous condition on the premises or allows a dangerous condition to be created.

49.    At all relevant times, including on February 3, 2019, all Defendants allowed water to accumulate on the premises, creating an unreasonably hazardous, dangerous and/or unsafe condition on the premises.

50.    At all relevant times, including on February 3, 2019, all Defendants allowed ice to accumulate on the premises, creating an unreasonably hazardous, dangerous and/or unsafe condition on the premises.

51.    At all relevant times, including on February 3, 2019, all Defendants had a duty to ensure third party water-removal contractors, such as Mr. Burkey, could safely access the wastewater valves and equipment.

52.    All Defendants knew or should have known that third party water removal contractors, such as Mr. Burkey, would be accessing the wastewater equipment and valves in the containment area and had a duty to ensure that area would be clear of ice and properly lighted.

53.    Defendants had a duty to establish policies and procedures for ice removal, and to supervise and enforce those procedures to ensure the safety of water removal contractors such as Mr. Burkey.

54.    Mr. Burkey was on the premises for the purpose of the EQT and Equitran Defendants' business on February 3, 2019.

55.    The ice was allowed to accumulate on the premises due to all Defendants' failure to exercise their duty to properly maintain and inspect the premises and keep it clear of ice for business invitees such as Mr. Burkey.

56.    At all relevant times, all Defendants knew of the accumulation of water and ice at the containment area and that there was no lighting in or at the containment area, and with conscious disregard and reckless indifference, recklessly, maliciously and wantonly permitted the dangerous condition to exist which caused Mr. Burkey's fall and injuries.

57.    At all relevant times, Mr. Burkey acted in a reasonable, careful and prudent manner.

58.    As a direct and proximate result of the above-described incident, Mr. Burkey sustained the following injuries:

a.    Cervical injury requiring surgery;

b.    Right shoulder, rotator cuff, biceps and labral tears, requiring surgery;

c.    Fracture of right elbow;

d.    Injury to throat and breathing passageway from neck surgery;

e.    Scarring and disfigurement;

f.    Severe neck pain;

g.    Severe right arm pain;

h.    Severe right shoulder pain;

i.    Severe right elbow pain;

j.    Numbness in right arm and wrist;

k.    Numbness in left arm and wrist;

l.    Chronic cervical and/or neck spasms;

m.    Chronic severe headaches;

n.    Decreased range of motion in right shoulder right elbow and neck;

o.    Bruises and contusions;

p.    Nervousness, confusion, emotional tension, and anxiety; and

q.    Severe, persistent and ongoing chronic pain.

59.    As a direct and proximate result of the above-referenced incident, Mr. Burkey has suffered the following damages, some or all of which may be permanent in nature:

a.    Mr. Burkey has suffered severe pain, suffering, inconvenience, embarrassment, sleeplessness, mental anguish, and emotional and psychological trauma;

b.    Mr. Burkey will continue to have to undergo physical therapy and/or rehabilitation;

c.    Mr. Burkey will likely have to undergo additional surgeries;

d.    Mr. Burkey has been and will be required to expend money for medical treatment and care, hospitalization, medical supplies, surgical appliances, rehabilitation and therapeutic treatment, medicines, and other attendant services;

e.    Mr. Burkey has suffered lost wages;

f.    Mr. Burkey has suffered lost earnings, and Mr. Burkey's earning capacity has been reduced and may be permanently impaired;

g.    Mr. Burkey is unable to enjoy various pleasures of life that he previously enjoyed; and

h.    Mr. Burkey's general health, strength, and vitality have been significantly and negatively impaired.

## COUNT I - NEGLIGENCE

### William J. Burkey v. Equitrans Midstream Corporation, EQT Midstream Corporation – Europa CS, EQT Midstream Corporation – Halo CS, EQM Midstream Partners LP, EQT Production Company, Equitrans, Inc., EQT Midstream and EQT Corporation

60.    Paragraphs 1 through 59 of this complaint are hereby incorporated by reference as if fully set forth.

61.    At all relevant times, the EQT and Equitran Defendants acting through their employees, agents and/or representatives, were in possession and/or actual physical control of the premises upon which the incident complained of herein occurred and were therefore responsible for ensuring that the premises was safe for those walking upon it, including Mr. Burkey.

62.    At all times relevant hereto, the premises — and any dangerous conditions thereon — were under the control of all or some of the EQT and Equitran Defendants and/or their principals, agents, and/or ostensible agents.

63.    Mr. Burkey's injuries and damages are the direct and proximate result of the EQT and Equitran Defendants' negligent conduct, in the following particulars:

a.    In creating the hazardous, dangerous, and/or unsafe condition at or upon the premises;

b.    In permitting the hazardous, dangerous, and/or unsafe condition at or upon the premises to exist when they knew or should have known that same presented a risk of serious bodily injury to persons walking upon the premises;

c.   In failing to remedy the hazardous, dangerous, and/or unsafe condition at or upon the premises when they knew or should have known that same existed;

d.   In designing, constructing, and/or maintaining a work site and premises that was unsafe for use;

e.   In failing to warn invitees, including Mr. Burkey, of the dangerous, hazardous, unsafe, and defective condition of the premises;

f.   In failing to altogether eliminate the dangerous, hazardous, unsafe, and defective condition of the premises;

g.   In failing to cordon off the dangerous condition, provide lighting at the premises or otherwise prevent invitees of the premises from hazardous, unsafe, and defective condition of the premises;

h.   In negligently designing, constructing, maintaining, and operating the premises which directly caused Mr. Burkey's fall and injuries;

i.   In failing to timely, properly, or regularly inspect the premises for defects and/or hazards;

j.   In deviating from the standard of care in the oil and gas industry by failing to provide a safe work site and premises;

k.   In violating federal, state, local and industry safety laws, rules and regulations;

l.   In failing to properly or adequately hire, train and properly or adequately supervise, personnel, contractors and safety professionals for the ownership, leasing, development, management and/or operation of the premises;

m.   In failing to provide a work site and premises that was safe for its intended use;

n.   In failing to exercise reasonable care in their use of the property of co-defendants; and

o.   In failing to abide by all other duties described in this complaint.

64.   At all relevant times, the EQT and Equitrans Defendants knew of the accumulation of water and ice at the containment area and that there was no lighting in

or at the containment area, and with conscious disregard and reckless indifference, recklessly, maliciously and wantonly permitted the dangerous condition to exist which caused Mr. Burkey's fall and injuries.

WHEREFORE, plaintiff, William J. Burkey, demands judgment against Equitrans Midstream Corporation, EQT Midstream Corporation – Europa CS, EQT Midstream Corporation – Halo CS, EQM Midstream Partners LP, EQT Production Company, Equitrans, Inc., EQT Midstream and EQT Corporation in an amount in excess of the jurisdictional limits of compulsory arbitration and punitive damages, together with Court costs, interest and all other relief permitted by the Court.

### COUNT II - NEGLIGENCE

### William J. Burkey v. John Doe 1

65.    Paragraphs 1 through 64 of this complaint are hereby incorporated by reference as if fully set forth.

66.    At all relevant times, John Doe 1, acting through its employees, agents and/or representatives, was on the premises at-issue and with the permission of the owners, the EQT and Equitrans Defendants.

67.    At all relevant times, John Doe 1, acting through its employees, agents and/or representatives, was in possession and/or actual physical control of the premises upon which the incident complained of herein occurred and were therefore responsible for ensuring that the premises was safe for those walking upon it, including Mr. Burkey.

68.    At all times relevant hereto, the premises — and any dangerous conditions thereon — were under the control of John Doe 1 and/or their principals, agents, and/or ostensible agents.

69.     Mr. Burkey's injuries and damages are the direct and proximate result of John Doe 1's negligent conduct, in the following particulars:

a.     In creating the hazardous, dangerous, and/or unsafe condition at or upon the premises;

b.     In permitting the hazardous, dangerous, and/or unsafe condition at or upon the premises to exist when they knew or should have known that same presented a risk of serious bodily injury to persons walking upon the premises;

c.     In failing to remedy the hazardous, dangerous, and/or unsafe condition at or upon the premises when they knew or should have known that same existed;

d.     In designing, constructing, and/or maintaining a work site and premises that was unsafe for use;

e.     In failing to warn invitees, including Mr. Burkey, of the dangerous, hazardous, unsafe, and defective condition of the premises;

f.     In failing to altogether eliminate the dangerous, hazardous, unsafe, and defective condition of the premises;

g.     In failing to cordon off the dangerous condition, provide lighting at the premises or otherwise prevent invitees of the premises from hazardous, unsafe, and defective condition of the premises;

h.     In negligently designing, constructing, maintaining, and operating the premises which directly caused Mr. Burkey's fall and injuries;

i.     In failing to timely, properly, or regularly inspect the premises for defects and/or hazards;

j.     In deviating from the standard of care in the oil and gas industry by failing to provide a safe work site and premises;

k.     In violating federal, state, local and industry safety laws, rules and regulations;

l.     In failing to properly or adequately hire, train and properly or adequately supervise, personnel, contractors and safety professionals for the ownership, leasing, development, management and/or operation of the premises;

m.   In failing to provide a work site and premises that was safe for its intended use;

n.   In failing to exercise reasonable care in their use of the property of co-defendants; and

o.   In failing to abide by all other duties described in this complaint.

70.   At all relevant times, John Doe 1 knew of the accumulation of water and ice at the containment area and that there was no lighting in or at the containment area, and with conscious disregard and reckless indifference, recklessly, maliciously and wantonly permitted the dangerous condition to exist which caused Mr. Burkey's fall and injuries.

WHEREFORE, plaintiff, William J. Burkey, demands judgment against John Doe 1, in an amount in excess of the jurisdictional limits of compulsory arbitration and punitive damages, together with Court costs, interest and all other relief permitted by the Court.

## COUNT III - NEGLIGENCE

### William J. Burkey v. John Doe 2

71.   Paragraphs 1 through 70 of this complaint are hereby incorporated by reference as if fully set forth.

72.   At all relevant times, John Doe 2, acting through its employees, agents and/or representatives, was on the premises at-issue and with the permission of the owners, the EQT and Equitrans Defendants.

73.   At all relevant times, John Doe 2 had possession and/or actual physical control of the premises upon which the incident complained of herein occurred and was

therefore responsible for ensuring that the premises was safe for those walking upon it, including Mr. Burkey.

74.    At all times relevant hereto, the premises — and any dangerous conditions thereon — were under the control of John Doe 2 and/or their principals, agents, and/or ostensible agents.

75.    The Defendant, John Doe 2, caused or allowed water to accumulate in an area where it knew or should have known that Mr. Burkey, and other individuals would be walking to perform their jobs at the pad.

76.    Mr. Burkey's injuries and damages are the direct and proximate result of John Doe 2's negligent conduct, in the following particulars:

    a.    In creating the hazardous, dangerous, and/or unsafe condition at or upon the premises;

    b.    In permitting the hazardous, dangerous, and/or unsafe condition at or upon the premises to exist when they knew or should have known that same presented a risk of serious bodily injury to persons walking upon the premises;

    c.    In failing to remedy the hazardous, dangerous, and/or unsafe condition at or upon the premises when they knew or should have known that same existed;

    d.    In designing, constructing, and/or maintaining a work site and premises that was unsafe for use;

    e.    In failing to warn invitees, including Mr. Burkey, of the dangerous, hazardous, unsafe, and defective condition of the premises;

    f.    In failing to altogether eliminate the dangerous, hazardous, unsafe, and defective condition of the premises;

    g.    In failing to cordon off the dangerous condition, provide lighting at the premises or otherwise prevent invitees of the premises from hazardous, unsafe, and defective condition of the premises;

h.   In negligently designing, constructing, maintaining, and operating the premises which directly caused Mr. Burkey's fall and injuries;

i.   In failing to timely, properly, or regularly inspect the premises for defects and/or hazards;

j.   In deviating from the standard of care in the oil and gas industry by failing to provide a safe work site and premises;

k.   In violating federal, state, local and industry safety laws, rules and regulations;

l.   In failing to properly or adequately hire, train and properly or adequately supervise, personnel, contractors and safety professionals for the ownership, leasing, development, management and/or operation of the premises;

m.   In failing to provide a work site and premises that was safe for its intended use;

n.   In failing to exercise reasonable care in their use of the property of co-defendants; and

o.   In failing to abide by all other duties described in this complaint.

77.   At all relevant times, John Doe 2 knew of the accumulation of water and ice at the containment area and that there was no lighting in or at the containment area, and with conscious disregard and reckless indifference, recklessly, maliciously and wantonly permitted the dangerous condition to exist which caused Mr. Burkey's fall and injuries.

WHEREFORE, plaintiff, William J. Burkey, demands judgment against John Doe 2, in an amount in excess of the jurisdictional limits of compulsory arbitration and punitive damages, together with Court costs, interest and all other relief permitted by the Court.

## COUNT IV - NEGLIGENCE

### William J. Burkey v. John Doe 3

78.    Paragraphs 1 through 77 of this complaint are hereby incorporated by reference as if fully set forth.

79.    At all relevant times, John Doe 3, acting through its employees, agents and/or representatives, was on the premises at-issue and with the permission of the owners, the EQT and Equitrans Defendants.

80.    At all relevant times, John Doe 3 had possession and/or actual physical control of the premises upon which the incident complained of herein occurred and was therefore responsible for ensuring that the premises was safe for those walking upon it, including Mr. Burkey.

81.    At all times relevant hereto, the premises — and any dangerous conditions thereon — were under the control of John Doe 3 and/or their principals, agents, and/or ostensible agents.

82.    The Defendant, John Doe 3, caused or allowed water to accumulate in an area where it knew or should have known that Mr. Burkey, and other individuals would be walking to perform their jobs at the pad.

83.    Mr. Burkey's injuries and damages are the direct and proximate result of John Doe 3's negligent conduct, in the following particulars:

   a.    In creating the hazardous, dangerous, and/or unsafe condition at or upon the premises;

   b.    In permitting the hazardous, dangerous, and/or unsafe condition at or upon the premises to exist when they knew or should have known that same presented a risk of serious bodily injury to persons walking upon the premises;

c.    In failing to remedy the hazardous, dangerous, and/or unsafe condition at or upon the premises when they knew or should have known that same existed;

d.    In designing, constructing, and/or maintaining a work site and premises that was unsafe for use;

e.    In failing to warn invitees, including Mr. Burkey, of the dangerous, hazardous, unsafe, and defective condition of the premises;

f.    In failing to altogether eliminate the dangerous, hazardous, unsafe, and defective condition of the premises;

g.    In failing to cordon off the dangerous condition, provide lighting at the premises or otherwise prevent invitees of the premises from hazardous, unsafe, and defective condition of the premises;

h.    In negligently designing, constructing, maintaining, and operating the premises which directly caused Mr. Burkey's fall and injuries;

i.    In failing to timely, properly, or regularly inspect the premises for defects and/or hazards;

j.    In deviating from the standard of care in the oil and gas industry by failing to provide a safe work site and premises;

k.    In violating federal, state, local and industry safety laws, rules and regulations;

l.    In failing to properly or adequately hire, train and properly or adequately supervise, personnel, contractors and safety professionals for the ownership, leasing, development, management and/or operation of the premises;

m.    In failing to provide a work site and premises that was safe for its intended use;

n.    In failing to exercise reasonable care in their use of the property of co-defendants; and

o.    In failing to abide by all other duties described in this complaint.

84.    At all relevant times, John Doe 3 knew of the accumulation of water and ice at the containment area and that there was no lighting in or at the containment area,

and with conscious disregard and reckless indifference, recklessly, maliciously and wantonly permitted the dangerous condition to exist which caused Mr. Burkey's fall and injuries.

WHEREFORE, plaintiff, William J. Burkey, demands judgment against John Doe 3, in an amount in excess of the jurisdictional limits of compulsory arbitration and punitive damages, together with Court costs, interest and all other relief permitted by the Court.

### COUNT V - NEGLIGENCE

### William J. Burkey v. John Doe 4

85.    Paragraphs 1 through 84 of this complaint are hereby incorporated by reference as if fully set forth.

86.    At all relevant times, John Doe 4, acting through its employees, agents and/or representatives, was on the premises at-issue and with the permission of the owners, the EQT and Equitrans Defendants.

87.    At all relevant times, John Doe 4 had performed transportation and water hauling services on the premises upon which the incident complained of herein occurred and was therefore responsible for ensuring that the premises was safe for those walking upon it, including Mr. Burkey.

88.    At all times relevant hereto, the premises — and any dangerous conditions thereon — were under the control of John Doe 4 and/or their principals, agents, and/or ostensible agents.

89.     The Defendant, John Doe 4, caused or allowed water to accumulate in an area where it knew or should have known that Mr. Burkey, and other individuals would be walking to perform their jobs at the pad.

90.     Mr. Burkey's injuries and damages are the direct and proximate result of John Doe 4's negligent conduct, in the following particulars:

a.     In creating the hazardous, dangerous, and/or unsafe condition at or upon the premises;

b.     In permitting the hazardous, dangerous, and/or unsafe condition at or upon the premises to exist when they knew or should have known that same presented a risk of serious bodily injury to persons walking upon the premises;

c.     In failing to remedy the hazardous, dangerous, and/or unsafe condition at or upon the premises when they knew or should have known that same existed;

d.     In maintaining a work site and premises that was unsafe for use;

e.     In failing to warn invitees, including Mr. Burkey, of the dangerous, hazardous, unsafe, and defective condition of the premises;

f.     In failing to altogether eliminate the dangerous, hazardous, unsafe, and defective condition of the premises;

g.     In failing to cordon off the dangerous condition or otherwise prevent invitees of the premises from hazardous, unsafe, and defective condition of the premises;

h.     In negligently maintaining and operating the premises which directly caused Mr. Burkey's fall and injuries;

i.     In failing to timely, properly, or regularly inspect the premises for defects and/or hazards;

j.     In deviating from the standard of care in the oil and gas industry by failing to provide a safe work site and premises;

k.     In violating federal, state, local and industry safety laws, rules and regulations;

l.    In failing to properly or adequately hire, train and properly or adequately supervise, personnel, contractors and safety professionals for the ownership, leasing, development, management and/or operation of the premises;

m.    In failing to provide a work site and premises that was safe for its intended use;

n.    In failing to exercise reasonable care in their use of the property of co-defendants; and

o.    In failing to abide by all other duties described in this complaint.

91.    At all relevant times, John Doe 4 knew of the accumulation of water and ice at the containment area and that there was no lighting in or at the containment area, and with conscious disregard and reckless indifference, recklessly, maliciously and wantonly permitted the dangerous condition to exist which caused Mr. Burkey's fall and injuries.

WHEREFORE, plaintiff, William J. Burkey, demands judgment against John Doe 4, in an amount in excess of the jurisdictional limits of compulsory arbitration and punitive damages, together with Court costs, interest and all other relief permitted by the Court.

## COUNT VI – NEGLIGENCE/LOSS OF CONSORTIUM
### Tammy Burkey v. All Defendants

92.    Paragraphs 1 through 91 of this complaint are hereby incorporated by reference as if fully set forth.

93.    Plaintiff, Tammy Burkey, is the wife of plaintiff William J. Burkey, who was injured by the negligence, carelessness, recklessness and wantonness of all Defendants as more fully described in Counts I, II, III, IV and V above.

94.    As a direct and proximate result of the negligence and carelessness of all Defendants, wife-plaintiff Tammy Burkey has sustained the following damages:

(a)    She has suffered a loss of consortium;

(b)    She has suffered a great inconvenience, disruption in her daily habits and loss of enjoyment of life;

(c)    She has suffered a loss of society, support, companionship and services of husband-plaintiff William J. Burkey; and

(d)    She has incurred expenses and may in the future incur debt and expenses as a result of the injuries and damages to husband-plaintiff William J. Burkey and seeks recovery of those costs.

WHEREFORE, plaintiff, Tammy Burkey, demands judgment against all Defendants, in an amount in excess of the jurisdictional limits of compulsory arbitration and punitive damages, together with Court costs, interest and all other relief permitted by the Court.

Respectfully submitted,

MEYER, DARRAGH, BUCKLER, BEBENEK & ECK, PLLC

By:_____
PAUL R. ROBINSON, ESQUIRE
BENJAMIN SORISIO, ESQUIRE
Attorney for plaintiffs, William J. Burkey and Tammy Burkey

**VERIFICATION**

I, William J. Burkey, am an adult individual and state that the averments of fact set forth in the foregoing complaint are true and correct to the best of my knowledge, information, and belief.

I understand that the statements herein are made subject to the penalties of 18 Pa.C.S.A. § 4904 relating to unsworn falsification to authorities, which provides that if I make knowingly false averments I may be subject to criminal penalties.

Date: _1-30-21_                           _William J Burkey_
                                          William J. Burkey

{P1607070.1}

## VERIFICATION

I, Tammy Burkey, am an adult individual and state that the averments of fact set forth in the foregoing complaint are true and correct to the best of my knowledge, information, and belief.

I understand that the statements herein are made subject to the penalties of 18 Pa.C.S.A. § 4904 relating to unsworn falsification to authorities, which provides that if I make knowingly false averments I may be subject to criminal penalties.

Date: 1 30-21

Tammy Burkey

{P1607070.1}

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

MEYER, DARRAGH, BUCKLER,
BEBENEK & ECK, PLLC

By: _____
BENJAMIN SORISIO, ESQUIRE
PA I.D. No. 85668

{P1607070.1}

# Supreme Court of Pennsylvania
## Court of Common Pleas
## Civil Cover Sheet
ALLEGHENY _____ County

| For Prothonotary Use Only: |
| --- |
| Docket No: |

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

**S E C T I O N  A**

**Commencement of Action:**
- ☒ Complaint
- ☐ Writ of Summons
- ☐ Petition
- ☐ Transfer from Another Jurisdiction
- ☐ Declaration of Taking

| Lead Plaintiff's Name: WILLIAM J. BURKEY | Lead Defendant's Name: EQUITRANS MIDSTREAM CORPORATION |
| --- | --- |

**Are money damages requested?** ☒ Yes ☐ No

Dollar Amount Requested: (check one)
- ☐ within arbitration limits
- ☒ outside arbitration limits

**Is this a *Class Action Suit*?** ☐ Yes ☒ No    **Is this an *MDJ Appeal*?** ☐ Yes ☒ No

Name of Plaintiff's/Appellant's Attorney: BENJAMIN SORISIO, ESQUIRE

☐ Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)

**S E C T I O N  B**

**Nature of the Case:** Place an "X" to the left of the <u>ONE</u> case category that most accurately describes your **PRIMARY CASE.** If you are making more than one type of claim, check the one that you consider most important.

**TORT** *(do not include Mass Tort)*
- ☐ Intentional
- ☐ Malicious Prosecution
- ☐ Motor Vehicle
- ☐ Nuisance
- ☒ Premises Liability
- ☐ Product Liability *(does not include mass tort)*
- ☐ Slander/Libel/ Defamation
- ☐ Other: _____

**MASS TORT**
- ☐ Asbestos
- ☐ Tobacco
- ☐ Toxic Tort - DES
- ☐ Toxic Tort - Implant
- ☐ Toxic Waste
- ☐ Other: _____

**PROFESSIONAL LIABLITY**
- ☐ Dental
- ☐ Legal
- ☐ Medical
- ☐ Other Professional: _____

**CONTRACT** *(do not include Judgments)*
- ☐ Buyer Plaintiff
- ☐ Debt Collection: Credit Card
- ☐ Debt Collection: Other
  _____
  _____
- ☐ Employment Dispute: Discrimination
- ☐ Employment Dispute: Other
  _____
  _____
- ☐ Other: _____
  _____

**REAL PROPERTY**
- ☐ Ejectment
- ☐ Eminent Domain/Condemnation
- ☐ Ground Rent
- ☐ Landlord/Tenant Dispute
- ☐ Mortgage Foreclosure: Residential
- ☐ Mortgage Foreclosure: Commercial
- ☐ Partition
- ☐ Quiet Title
- ☐ Other: _____

**CIVIL APPEALS**
Administrative Agencies
- ☐ Board of Assessment
- ☐ Board of Elections
- ☐ Dept. of Transportation
- ☐ Statutory Appeal: Other
  _____
  _____
- ☐ Zoning Board
- ☐ Other: _____
  _____

**MISCELLANEOUS**
- ☐ Common Law/Statutory Arbitration
- ☐ Declaratory Judgment
- ☐ Mandamus
- ☐ Non-Domestic Relations Restraining Order
- ☐ Quo Warranto
- ☐ Replevin
- ☐ Other: _____
  _____

*Updated 1/1/2011*

# NOTICE

**Pennsylvania Rule of Civil Procedure 205.5. (Cover Sheet) provides, in part:**

**Rule 205.5.    Cover Sheet**

(a)(1)  This rule shall apply to all actions governed by the rules of civil procedure except the following:

(i)     actions pursuant to the Protection from Abuse Act, Rules 1901 et seq.

(ii)    actions for support, Rules 1910.1 et seq.

(iii)   actions for custody, partial custody and visitation of minor children, Rules 1915.1 et seq.

(iv)    actions for divorce or annulment of marriage, Rules 1920.1 et seq.

(v)     actions in domestic relations generally, including paternity actions, Rules 1930.1 et seq.

(vi)    voluntary mediation in custody actions, Rules 1940.1 et seq.

(2)     At the commencement of any action, the party initiating the action shall complete the cover sheet set forth in subdivision (e) and file it with the prothonotary.

(b)     The prothonotary shall not accept a filing commencing an action without a completed cover sheet.

(c)     The prothonotary shall assist a party appearing pro se in the completion of the form.

(d)     A judicial district which has implemented an electronic filing system pursuant to Rule 205.4 and has promulgated those procedures pursuant to Rule 239.9 shall be exempt from the provisions of this rule.

(e)     The Court Administrator of Pennsylvania, in conjunction with the Civil Procedural Rules Committee, shall design and publish the cover sheet. The latest version of the form shall be published on the website of the Administrative Office of Pennsylvania Courts at www.pacourts.us.

# EXHIBIT B

## IN THE COURT OF COMMON PLEAS OF
## ALLEGHENY COUNTY, PENNSYLVANIA

WILLIAM J. BURKEY and
TAMMY BURKEY,

               Plaintiffs,

         v.

EQUITRANS MIDSTREAM
CORPORATION, et al.,

               Defendants,

         v.

SEVEN POINT ENERGY SERVICES, INC.,

          Additional Defendant.

CIVIL DIVISION

No. GD–21–000920

**JOINDER COMPLAINT AGAINST
ADDITIONAL DEFENDANT SEVEN POINT
ENERGY SERVICES, INC.**

Filed on behalf of Defendant EQT
Production Company

Counsel of Record for Defendant:

Joseph V. Lesinski
Pa. I.D. No. 312796

**MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN**
Union Trust Building
501 Grant Street, Suite 700
Pittsburgh, PA 15219
(412) 803–1140

       — and —

Gregory J. Krock
Pa. I.D. No. 78308
James C. Walls III
Pa. I.D. No. 326841

**McGUIREWOODS LLP**
Tower Two–Sixty
260 Forbes Avenue, Suite 1800
Pittsburgh, PA 15222–3142
(412) 667–6000

**IN THE COURT OF COMMON PLEAS OF**
**ALLEGHENY COUNTY, PENNSYLVANIA**

| | | |
|---|---|---|
| WILLIAM J. BURKEY and<br>TAMMY BURKEY, | ) | CIVIL DIVISION |
| | ) | |
| Plaintiffs, | ) | Case No. GD–21–000920 |
| | ) | |
| v. | ) | |
| | ) | |
| EQUITRANS MIDSTREAM<br>CORPORATION, et al., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SEVEN POINT ENERGY SERVICES, INC., | ) | |
| | ) | |
| Additional Defendant. | ) | |

## NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this Complaint and Notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the Court without further notice for any money claimed in the Complaint or for any other claim or relief requested. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

Lawyer Referral Service
Allegheny County Bar Association
400 Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219
(412) 261–5555

**IN THE COURT OF COMMON PLEAS OF**
**ALLEGHENY COUNTY, PENNSYLVANIA**

| | | |
|---|---|---|
| WILLIAM J. BURKEY and TAMMY BURKEY, | ) | CIVIL DIVISION |
| | ) | |
| Plaintiffs, | ) | Case No. GD–21–000920 |
| | ) | |
| v. | ) | |
| | ) | |
| EQUITRANS MIDSTREAM CORPORATION, et al., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SEVEN POINT ENERGY SERVICES, INC., | ) | |
| | ) | |
| Additional Defendant. | ) | |

**JOINDER COMPLAINT AGAINST ADDITIONAL DEFENDANT**
**SEVEN POINT ENERGY SERVICES, INC.**

Defendant EQT Production Company ("EQT"), by and through its undersigned counsel, and in accordance with Rules 1706.1 and 2252 of the Pennsylvania Rules of Civil Procedure, files a Joinder Complaint Against Additional Defendant Seven Point Energy Services, Inc. and avers as follows:

1.      EQT is a Pennsylvania corporation with a principal place of business at 625 Liberty Avenue, Suite 1700, Pittsburgh, PA 15222.

2.      Upon information and belief, Seven Point Energy Services, Inc. ("Seven Point") is an Ohio corporation with a business address at 1006 Loop Street #4, Aspinwall, PA 15215.

3.      This Court has general personal jurisdiction over Seven Point based on its continuous and systematic contacts with the Commonwealth of Pennsylvania.  In addition, specific personal jurisdiction exists because Seven Point's activities at issue in (and giving rise to) this lawsuit occurred in Pennsylvania.

A.      **The Negligence Claim Against EQT**

4.      On or about February 1, 2021, Plaintiffs William J. Burkey ("Burkey") and Tammy Burkey (collectively, the "Burkeys") filed this lawsuit against EQT and other defendants.  A true and correct copy of the Complaint in Civil Action (the "Complaint") is attached hereto as Exhibit A.

5.      By stipulation dated February 10, 2023, the Burkeys voluntarily dismissed their claims against all defendants other than EQT and four John Doe defendants.

6.      In the Complaint, the Burkeys seek to recover damages for injuries sustained in conjunction with an accident that occurred on February 3, 2019 while Burkey was working on a natural gas well pad known as the "Pettit Pad" (the "Incident").  Complaint, ¶¶ 21–27, 54–59.

7.      At the time of the Incident, Burkey was working in the ordinary course and scope of his employment with Seven Point.  *Id.* at ¶¶ 20–21.

8.      In the Complaint, Burkey asserts a single cause of action against EQT for negligence.  *Id.* at ¶¶ 60–64.  Ms. Burkey asserts a cause of action for loss of consortium.  *Id.* at ¶¶ 90–94.

9.      The Burkeys assert that, because there was no lighting in the containment area of the Pettit Pad, Burkey was unable to observe that water and ice had accumulated on the ground in that containment area.  *Id.* at ¶ 23.  Burkey allegedly slipped and fell on the ice, causing injuries that required surgery.  *Id.* at ¶¶ 26–27, 58.

10.     In Count I of the Complaint, the Burkeys assert that EQT was negligent by (among other actions) creating a dangerous condition, failing to remedy a dangerous condition, and failing to warn Burkey of the supposedly dangerous condition.  *Id.* at ¶ 62(a) through (o).

11.     Without admitting the factual allegations contained in the Complaint, EQT incorporates those allegations by reference as if set forth herein in their entirety.

12.     EQT filed its Answer and New Matter on March 24, 2023 (the "Answer").  A true and correct copy of the Answer is attached hereto as Exhibit B.  EQT incorporates by reference its allegations contained in the Answer as if set forth herein in their entirety.

**B.     The Master Services Agreement with Seven Point**

13.     On or about January 8, 2018, EQT and Seven Point executed a Master Services Agreement (the "MSA") to govern the manner in which Seven Point would provide services for EQT's operations.  A true and correct copy of the MSA is attached hereto as Exhibit C.

14.     In the MSA, EQT (defined as the "Company") engaged Seven Point (defined as "Contractor") as an independent contractor to perform work at EQT's natural gas well sites.

15.     In Article 12 of the MSA, Seven Point agreed to defend and indemnify EQT in conjunction with any personal injury claim(s) asserted by Seven Point's employees.  In particular, Section 12.1 states:

> **12.1     Contractor Indemnity Obligations.**  To the fullest extent permitted by law, Contractor shall defend, indemnify, and hold harmless Company, its parent, subsidiaries, affiliates, co–owners, co–lessees and their partners, directors, officers, employees, agents, successors and assigns ("Indemnitees") from and against any and all claims, demands, causes of action, damages, liabilities, judgments, losses, fines, awards, penalties, costs and expenses, including attorneys' fees and other costs of defense (hereinafter "Claims and Expenses") ***arising out of or resulting from Contractor's Work or other performance under this Agreement*** and/or attributable to: (a) the negligent or willful act or omission of Contractor, its subcontractors, suppliers, employees, agents or invitees, or anyone acting under Contractor's direction or control in connection with the performance of the Work or for whose acts Contractor may be liable; (b) breach by Contractor of any representation or warranty of Contractor; (c) Contractor's failure to comply with any provision of this Agreement or the Contract Documents; (d) ***if Contractor transports or hauls Company property (including loading and unloading), any resulting damage or loss***; or (e) Contractor's failure to comply with Applicable Laws, Safety Rules or Permits (defined below), including without limitation any corrective measures which may be required.

MSA at § 12.1 (emphasis added).

3

16.     In Section 12.4 of the MSA, Seven Point expressly waived any law — including, but not limited to, workers' compensation laws — that would render Seven Point immune from liability for its indemnity obligations.  MSA at § 12.4.  In addition, Seven Point expressly waived any law that would "preclude[] its joinder as an additional defendant in any action by Contractor's or its subcontractor's employees or anyone acting on their behalf in providing the Work." *Id.*

17.     The MSA also required Seven Point to maintain certain insurance policies in conjunction with work performed on EQT's behalf.  *See* MSA at § 11.1 and Schedule A thereto.  In addition to workers' compensation insurance, Seven Point was required to obtain (1) a Commercial General Liability Insurance policy and (2) a Commercial Automobile Liability Insurance policy.  *Id.* at Schedule A, ¶ 1.

18.     Paragraph 3 of Schedule A states that the reason for naming EQT as an additional insured was to ensure that EQT was covered under those policies for any bodily injury arising out of the work that Seven Point performed for EQT.  *Id.* at Schedule A, ¶ 3.

19.     Schedule A expressly states that Seven Point's obligation to obtain insurance was separate and distinct from its obligation to indemnify EQT in accordance with Article 12 of the MSA. *Id.* at Schedule A, ¶ 8.

20.     The MSA expressly states that EQT can recover its costs and attorney's fees in the event that Seven Point or its insurance carrier default under any obligations set forth in Schedule A involving Seven Point's insurance coverage.  *Id.* at Schedule A, ¶ 9.

C.     **The Dispute With Seven Point and Its Insurance Carrier**

21.     Upon being served with process in this lawsuit in February 2021, EQT promptly demanded that Seven Point defend and indemnify EQT in accordance with Article 12 of the MSA.

22.     In May 2021, Evanston Insurance Company ("Evanston") — the insurer who provided the Commercial Liability General Insurance policy to Seven Point as required in

4

Schedule A to the MSA — agreed to defend EQT subject to a reservation of rights. In the reservation, Evanston clarified that it would not be required to indemnify EQT if discovery were to reveal that the Burkeys' injuries were not caused (in whole or in part) by Seven Point's acts or omissions.

23.     Since May 2021, legal counsel appointed by Evanston has been defending EQT in this lawsuit.

24.     In February 2024, Evanston sent a letter to EQT in order to supplement the reservation of rights that it issued nearly three years earlier.

25.     In the supplemental reservation of rights, Evanston asserted that its Commercial General Liability Policy with Seven Point excludes injuries that arise out of the "loading or unloading" of an "auto." Because the task that Seven Point was performing at the time of the Incident involved the hauling of produced water, Evanston asserted that — when Burkey slipped and fell on ice that had accumulated in the containment area — he was "loading or unloading an auto."

26.     In the supplemental reservation of rights, Evanston made clear that the proceeds of its Commercial General Liability Policy with Seven Point will not be available to EQT for its indemnity as required by the MSA.

## COUNT I
## DECLARATORY JUDGMENT
## (CONTRACTUAL INDEMNITY)

27.     EQT incorporates its allegations in Paragraphs 1 through 26 as if set forth herein in their entirety.

28.     In the MSA, Seven Point expressly agreed to defend and indemnify EQT in conjunction with injuries sustained by Seven Point's employees while performing work under the

MSA.

29.    In fact, Seven Point expressly agreed to defend and indemnify EQT for any damage or loss in the event that Seven Point transports or hauls any of EQT's property, including damage associated with the loading and unloading of that property.

30.    In the MSA, Seven Point expressly waived any immunity or other protections that it might otherwise receiver under the workers' compensation laws.

31.    Burkey is a Seven Point employee who allegedly suffered injuries while performing work under the MSA.

32.    The Incident that led to Burkey's alleged injuries resulted in whole or in part from the own actions, inactions, and negligence of Burkey (or his co–workers at Seven Point).

33.    In accordance with the MSA, Seven Point is obligated to defend and indemnify EQT in conjunction with the claims arising out of the Incident.

34.    While Seven Point named EQT as an additional insured under its Commercial General Liability Insurance policy with Evanston, that insurance carrier recently issued a supplemental reservation of rights notice.  The supplemental reservation makes clear that the policy issued by Evanston will not be available to indemnify EQT in the event that it is found liable in this matter.

35.    Since receiving the supplemental reservation of rights, EQT has been unable to resolve the issue with Seven Point.

36.    An actual, immediate, and justiciable controversy exists regarding the scope and extent of Seven Point's indemnity obligations to EQT under the MSA.

37.    Declaratory relief will resolve EQT's dispute with Seven Point and is proper in this case pursuant to the Declaratory Judgment Act.

WHEREFORE, EQT respectfully requests that this Honorable Court enter a judgment in its favor (and against Seven Point) and:

(a)     Declare that Seven Point is required to defend and indemnify EQT in conjunction with all claims arising out of the Incident;

(b)     Declare that the fact that Seven Point named EQT as an additional insured under Seven Point's insurance policy does not negate or limit its independent obligation to defend or indemnify EQT;

(c)     Award EQT its costs, expenses, and reasonable attorney's fees to the maximum extent permitted by law; and

(d)     Award EQT any further relief as the Court may deem to be just and proper.

## COUNT II
## BREACH OF CONTRACT
## (DUTY TO DEFEND AND INDEMNIFY)

38.     EQT incorporates its allegations in Paragraphs 1 through 37 as if set forth herein in their entirety.

39.     In the MSA, Seven Point agreed to defend and indemnify EQT against any personal injury claim(s) asserted by Seven Point's employees, subcontractors, or consultants.  MSA at § 12.1.

40.     Seven Point must defend and indemnify EQT regardless of the cause of the injury, and its obligation to do so is not limited by any under workers' compensation acts, disability benefits acts, or other employee benefit acts.

41.     Despite its obligations under the MSA, Seven Point has refused to unconditionally defend and indemnify EQT with regard to the Burkeys' claims in this action.

42.     Seven Point's refusal to defend and indemnify EQT with regard to the claims at issue in this matter constitutes a material breach of its obligations under the MSA.

43.    EQT has suffered and will continue to suffer damages as a direct and proximate result of Seven Point's breach of the MSA.  Accordingly, EQT is entitled to an award of actual and compensatory damages against Seven Point.

WHEREFORE, EQT respectfully requests that this Honorable Court enter a judgment in its favor (and against Seven Point); award EQT its actual and compensatory damages, pre–judgment and post–judgment interest, and attorney's fees, expenses, and costs to the fullest extent permitted by law; and enter any such further relief this Court may deem just and proper.

### COUNT III
### BREACH OF CONTRACT
### (DUTY TO OBTAIN INSURANCE)

44.    EQT incorporates its allegations in Paragraphs 1 through 43 as if set forth herein in their entirety.

45.    Seven Point agreed to obtain a Commercial General Liability Insurance policy governing its operations, and to name EQT as an additional ensured so that EQT could receive the benefit of that policy.

46.    The MSA made clear that the purpose of obtaining the policy, and naming EQT as an additional insured, was to ensure that EQT would benefit from insurance coverage applicable to "bodily injury" arising out of the "work" that Seven Point performed under the MSA.

47.    Evanston, the insurance carrier that issued the Commercial General Liability Insurance policy to Seven Point, has taken the position that its policy does not apply to the work that Seven Point (and Burkey) was performing at the Pettit Pad.

48.    Accordingly, Seven Point has breached Article 11 and Schedule A to the MSA by failing to obtain the required insurance policies.

8

49.     Under Paragraph 9 of Schedule A, EQT is entitled to recover its costs and attorney's fees as a result of Seven Point's breach.

WHEREFORE, EQT respectfully requests that this Honorable Court enter a judgment in its favor (and against Seven Point); award EQT its actual and compensatory damages, pre–judgment and post–judgment interest, and attorney's fees, expenses, and costs to the fullest extent permitted by law; and enter any such further relief this Court may deem just and proper.

Respectfully submitted,

**McGUIREWOODS LLP**

By: /s/ Gregory J. Krock
    Gregory J. Krock
    Pa. I.D. No. 78308
    James C. Walls III
    Pa. I.D. No. 326841

Tower Two–Sixty
260 Forbes Avenue, Suite 1800
Pittsburgh, PA 15222–3142
(412) 667–6042

Joseph V. Lesinski
Pa. I.D. No. 312796
**MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN**
Union Trust Building
501 Grant Street, Suite 700
Pittsburgh, PA 15219
(412) 803–11140

*Counsel for Defendant EQT Production Company*

DocuSign Envelope ID: 20C31C74-A88C-4CCE-BC20-B6956AFE5264

## VERIFICATION

I, _____Michael Lauderbaugh_____, _____Vice President of EHS_____ for EQT

Corporation, state on behalf of EQT Production Company that the averments of fact made in the

foregoing **Joinder Complaint Against Additional Defendant Seven Point Energy Services,**

**Inc.** are true and correct, based in part upon my personal knowledge and in part upon the basis of

information that I believe to be true.

I understand that averments of fact in said document are made subject to the penalties of

18 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

Date: ___4/30/2024 | 8:59 AM EDT___

DocuSigned by:

*Michael Lauderbaugh*

A8716FCE3A784B8...

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania:  Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non–confidential information and documents.

Submitted by: <u>McGuireWoods LLP</u>

Signature: <u>/s/ Gregory J. Krock</u>

Name: <u>Gregory J. Krock</u>

Attorney No.: <u>Pa. I.D. No. 78308</u>

# EXHIBIT A



**FILED**

2021 FEB -1 PM 3: 44

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
CIVIL/FAMILY DIVISION
ALLEGHENY COUNTY PA

| | |
|---|---|
| WILLIAM J. BURKEY AND TAMMY BURKEY, Husband and Wife, | **CIVIL DIVISION** |
| Plaintiffs, | No.: 6D -21- 920 |
| vs. | **COMPLAINT IN CIVIL ACTION** |
| EQUITRANS MIDSTREAM CORPORATION; EQT MIDSTREAM CORPORATION - EUROPA CS; EQUITRANS MIDSTREAM CORPORATION - HALO CS; EQM MIDSTEAM PARTNERS LP; EQT PRODUCTION COMPANY; EQUITRANS, INC.; EQT MIDSTREAM; EQT CORPORATION; JOHN DOE 1; JOHN DOE 2; JOHN DOE 3; AND JOHN DOE, 4; | Filed on behalf of plaintiffs, William J. Burkey and Tammy Burkey |
| Defendants. | Counsel of Record for these Parties: |

PAUL R. ROBINSON, ESQUIRE
PA I.D. No. 65581

BENJAMIN SORISIO, ESQUIRE
PA I.D. No. 85668

MEYER, DARRAGH, BUCKLER, BEBENEK & ECK, PLLC
U.S. Steel Tower, Suite 4850
600 Grant Street
Pittsburgh, PA 15219
Telephone: (412) 261-6600
Fax: (412) 471-2754
Email: probinson@mdbbe.com
bsorisio@mdbbe.com

**NOTICE TO PLEAD**

**TO: ALL DEFENDANTS**

You are hereby notified to file a written response to the within COMPLAINT IN CIVIL ACTION within twenty (20) days from service hereof or a judgment may be entered against you.

**JURY TRIAL DEMANDED**

Counsel for plaintiffs, William J. Burkey and Tammy Burkey

T109666
1 February 2021
15:45:33
GD-21-000920

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| WILLIAM J. BURKEY AND TAMMY BURKEY, Husband and Wife, | CIVIL DIVISION |
| Plaintiffs, | No.: |
| vs. | |
| EQUITRANS MIDSTREAM CORPORATION; EQT MIDSTREAM CORPORATION - EUROPA CS; EQUITRANS MIDSTREAM CORPORATION - HALO CS; EQM MIDSTEAM PARTNERS LP; EQT PRODUCTION COMPANY; EQUITRANS, INC.; EQT MIDSTREAM; EQT CORPORATION; JOHN DOE 1; JOHN DOE 2; JOHN DOE 3; AND JOHN DOE 4, | |
| Defendants. | JURY TRIAL DEMANDED |

## NOTICE TO DEFEND

You have been sued in court.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff.  You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW.  THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NOT FEE.

Lawyer Referral Service
Allegheny County Bar Association
400 Koppers Building
436 Seventh Avenue
Pittsburgh, PA  15219
Telephone:  (412) 261-5555
https://www.getapittsburghlawyer.com/

PLEASE SERVE ALL PAPERS ON:
BENJAMIN SORISIO, ESQUIRE
MEYER, DARRAGH, BUCKLER, BEBENEK & ECK, PLLC
U.S. STEEL TOWER, SUITE 4850
600 GRANT STREET
PITTSBURGH, PA  15219

{P1607070.1}

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| WILLIAM J. BURKEY AND TAMMY BURKEY, Husband and Wife, | CIVIL DIVISION |
| Plaintiffs, | No.: |
| vs. | |
| EQUITRANS MIDSTREAM CORPORATION; EQT MIDSTREAM CORPORATION - EUROPA CS; EQUITRANS MIDSTREAM CORPORATION - HALO CS; EQM MIDSTEAM PARTNERS LP; EQT PRODUCTION COMPANY; EQUITRANS, INC.; EQT MIDSTREAM; EQT CORPORATION; JOHN DOE 1; JOHN DOE 2; JOHN DOE 3; AND JOHN DOE 4, | |
| Defendants. | JURY TRIAL DEMANDED |

## NOTICE TO PLEAD

**TO:  ALL DEFENDANTS**

You are hereby notified to file a written response to the within COMPLAINT IN CIVIL ACTION within twenty (20) days from service hereof or a judgment may be entered against you.

_____
Counsel for plaintiffs, William J. Burkey and Tammy Burkey

{P1607070.1}

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| WILLIAM J. BURKEY AND TAMMY BURKEY, Husband and Wife, | CIVIL DIVISION |
| Plaintiffs, | No.: |
| vs. | |
| EQUITRANS MIDSTREAM CORPORATION; EQT MIDSTREAM CORPORATION - EUROPA CS; EQUITRANS MIDSTREAM CORPORATION - HALO CS; EQM MIDSTEAM PARTNERS LP; EQT PRODUCTION COMPANY; EQUITRANS, INC.; EQT MIDSTREAM; EQT CORPORATION; JOHN DOE 1; JOHN DOE 2; JOHN DOE 3 AND JOHN DOE 4, | |
| Defendants. | JURY TRIAL DEMANDED |

## COMPLAINT IN CIVIL ACTION

AND NOW, come plaintiffs, William J. Burkey, and Tammy Burkey, husband and wife, through their counsel, Meyer, Darragh, Buckler, Bebenek & Eck, PLLC, and file this complaint in civil action, alleging as follows:

### PARTIES

1.      Plaintiffs, William J. Burkey and Tammy Burkey, husband and wife, are adult individuals residing at 713 York Run Road, Smithfield, Pennsylvania 15478.

2.      Equitrans Midstream Corporation is a Pennsylvania corporation with its principal place of business located at 625 Liberty Avenue, Pittsburgh, Pennsylvania 15222.

3.      EQT Midstream Corporation – Europa CS is a Pennsylvania corporation with its principal place of business located at 625 Liberty Avenue, Pittsburgh, Pennsylvania 15222.

4.      EQT Midstream Corporation – Halo CS is a Pennsylvania corporation with its principal place of business located at 625 Liberty Avenue, Pittsburgh, Pennsylvania 15222.

5.      EQM Midstream Partners LP is a Pennsylvania corporation with its principal place of business located at 625 Liberty Avenue, Pittsburgh, Pennsylvania 15222.

6.      EQT Production Company is a Pennsylvania corporation with its principal place of business located at 625 Liberty Avenue, Pittsburgh, Pennsylvania 15222.

7.      Equitrans, Inc., is a Pennsylvania corporation with its principal place of business located at 420 Boulevard of the Allies, Pittsburgh, PA 15219.

8.      EQT Midstream is a Pennsylvania corporation with its principal place of business located at 625 Liberty Avenue, Pittsburgh, Pennsylvania 15222

9.      EQT Corporation is a Pennsylvania corporation with its principal place of business located at 625 Liberty Avenue, Pittsburgh, Pennsylvania 15222.

10.     Upon information and belief, John Doe 1, averred herein to be fictitious, is a Pennsylvania corporation that performs general contracting services, including but not limited to, maintenance and safety at oil and gas well pad premises in Pennsylvania.

11.     Upon information and belief, John Doe 2, averred herein to be fictitious, is a Pennsylvania corporation that performs contracting services, including but not limited to, ice and snow removal, at oil and gas well pad premises in Pennsylvania.

12. Upon information and belief, John Doe 3, averred herein to be fictitious, is a Pennsylvania corporation that performs contracting services, including but not limited to, maintenance and/or lighting on oil and gas well pad premises in Pennsylvania.

13. Upon information and belief, John Doe 4, averred herein to be fictitious, is a Pennsylvania corporation that performs transportation and water hauling services on oil and gas well pad premises in Pennsylvania.

14. Plaintiffs have conducted a reasonable search to determine the actual names of John Doe 1, John Doe 2, John Doe 3 and John Doe 4.

### JURISDICTION AND VENUE

15. Defendants, Equitrans Midstream Corporation, EQT Midstream Corporation – Europa CS, EQT Midstream Corporation – Halo CS, EQM Midstream Partners LP, EQT Production Company, Equitrans, Inc., EQT Midstream, EQT Corporation (hereinafter referred to collectively as "the EQT and Equitran Defendants"), John Doe 1, John Doe 2, John Doe 3, and John Doe 4 all conduct business in a systematic and continuous manner throughout Pennsylvania and/or direct their business activities at Pennsylvania.

16. At all relevant times, all Defendants conducted business in, and availed themselves of the laws of, the Commonwealth of Pennsylvania.

17. As more fully alleged below, this cause of action and the transaction and/or occurrence out of which this action arises took place at an oil and gas well pad known as the Pettit Pad located in Greene County, Pennsylvania.

18. This Court has jurisdiction over Equitrans Midstream Corporation, EQT Midstream Corporation – Europa CS, EQT Midstream Corporation – Halo CS, EQM

Midstream Partners LP, EQT Production Company, Equitrans, Inc., EQT Midstream, EQT Corporation, John Doe 1, John Doe 2, John Doe 3, and John Doe 4 in this action pursuant to 42 Pa.C.S.A. § 931, *et seq.* and §§ 5301 and 5322, *et seq.*

19.    Venue is proper in Allegheny County, Pennsylvania as to all claims herein and as to Equitrans Midstream Corporation, EQT Midstream Corporation – Europa CS, EQT Midstream Corporation – Halo CS, EQM Midstream Partners LP, EQT Production Company, Equitrans, Inc., EQT Midstream, EQT Corporation, John Doe 1, John Doe 2, John Doe 3, and John Doe 4 under 42 Pa.C.S.A. §931, *et seq.* and Pennsylvania Rules of Civil Procedure 1006 and 2179, *et. seq.*

## **FACTS**

20.    On February 3, 2019, Mr. Burkey was employed as a water truck driver for Seven Point Energy Services, Inc., having its place of business in Waynesburg, Pennsylvania.

21.    On February 3, 2019, at approximately 6:15 a.m., Mr. Burkey, while working in the course of his employment with Seven Point Energy Services, Inc., was performing work for production water hauling at an oil and gas well known as "the Pettit Pad" believed to be located in Sycamore, Greene County, Pennsylvania (hereinafter referred to interchangeably as "the Pettit Pad" and/or "the premises").

22.    On February 3, 2019, while performing his work with all due care, Mr. Burkey entered a containment area at the Pettit Pad.

23.    At all relevant times, there was no lighting in or at the containment area, thus preventing Mr. Burkey from being able to observe the surface conditions at the containment area, including but not limited to, the presence of the accumulation of ice.

24.    Mr. Burkey attached hoses from his truck to a valve within the containment area of the Pettit Pad, including walking on the surface of the containment area.

25.    Mr. Burkey then turned on the valve in the containment area.

26.    Mr. Burkey then walked on the surface of the containment area and slipped and fell on ice which accumulated on the surface of the containment area.

27.    After Mr. Burkey fell on the ice in the containment area, Mr. Burkey observed that the ice on the surface of the containment area covered an area of approximately four (4) square feet of the surface of the containment area.

28.    At all relevant times, the EQT and Equitran Defendants were engaged in the business of owning, leasing, developing, constructing, managing, operating, maintaining and/or performing services for oil and gas wells in Pennsylvania, including the Pettit Pad.

29.    Upon information and belief, John Doe 1 performed general contracting services, including but not limited to, maintenance and safety and snow and ice removal at the Pettit Pad where Mr. Burkey fell, and caused, by its actions or inactions, the ice to accumulate on the surface of the containment area which caused Mr. Burkey's fall.

30.    Upon information and belief, John Doe 2 performed contracting services, including but not limited to, ice and snow removal, at the Pettit Pad where Mr. Burkey fell, and caused, by its actions or inactions, the ice to accumulate on the surface of the containment area which caused Mr. Burkey's fall.

31.    Upon information and belief, John Doe 3 performed contracting services, including but not limited to, maintenance and/or lighting, at the Pettit Pad where Mr. Burkey fell, and caused, by its actions or inactions, Mr. Burkey's fall.

32.    Upon information and belief, John Doe 4 performed transportation and water hauling services at the Pettit Pad where Mr. Burkey fell, and caused, by its actions or inactions, water and/or ice to accumulate on the surface of the containment area which caused Mr. Burkey's fall.

33.    At all relevant times, each Defendant was the principal of, or agent for, one or more of each of the other Defendants.

34.    At all relevant times, including on February 3, 2019, all Defendants were in possession and/or physical control of the premises.

35.    At all relevant times, including on February 3, 2019, all Defendants had a duty to ensure the safety of persons walking upon the premises, including Mr. Burkey.

36.    At all relevant times, including on February 3, 2019, all Defendants had a duty to safeguard, protect, and ensure the safety of persons walking upon the premises, including Mr. Burkey.

37.    Upon information and belief, at all relevant times, John Doe 1 had the EQT and Equitran Defendants' permission to be on the premises to perform its contracting services for the maintenance of the premises, including but not limited to, snow and ice removal.

38.    Upon information and belief, at all relevant times, John Doe 1 had a duty to perform its contracting services for the maintenance of the premises, including but not limited to, snow and ice removal, at the premises.

39.    Upon information and belief, at all relevant times, John Doe 1 had a duty to perform its contracting services safely and reasonably, and to notify or warn other

parties if, by its actions or inactions, it creates a dangerous condition on the premises or allows a dangerous condition to be created.

40.    Upon information and belief, at all relevant times, John Doe 2 had the EQT and Equitran Defendants' permission to be on the premises to perform its contracting services for the maintenance of the premises, including but not limited to, snow and ice removal.

41.    Upon information and belief, at all relevant times, John Doe 2 had a duty to perform its contracting services for the maintenance of the premises, including but not limited to, snow and ice removal, at the premises.

42.    Upon information and belief, at all relevant times, John Doe 2 had a duty to perform its contracting services safely and reasonably, and to notify or warn other parties if, by its actions or inactions, it creates a dangerous condition on the premises or allows a dangerous condition to be created.

43.    Upon information and belief, at all relevant times, John Doe 3 had the EQT and Equitran Defendants' permission to be on the premises to perform its contracting services for the maintenance and lighting of the premises.

44.    Upon information and belief, at all relevant times, John Doe 3 had a duty to perform its contracting services for the maintenance and lighting of the premises.

45.    Upon information and belief, at all relevant times, John Doe 3 had a duty to perform its contracting services safely and reasonably, and to notify or warn other parties if, by its actions or inactions, it creates a dangerous condition on the premises or allows a dangerous condition to be created.

46.     Upon information and belief, at all relevant times, John Doe 4 had the EQT and Equitran Defendants' permission to be on the premises to perform its transportation and water hauling services on the premises.

47.     Upon information and belief, at all relevant times, John Doe 4 had a duty to perform its contracting services for the transportation and water hauling services on the premises.

48.     Upon information and belief, at all relevant times, John Doe 4 had a duty to perform its contracting services safely and reasonably, and to notify or warn other parties if, by its actions or inactions, it creates a dangerous condition on the premises or allows a dangerous condition to be created.

49.     At all relevant times, including on February 3, 2019, all Defendants allowed water to accumulate on the premises, creating an unreasonably hazardous, dangerous and/or unsafe condition on the premises.

50.     At all relevant times, including on February 3, 2019, all Defendants allowed ice to accumulate on the premises, creating an unreasonably hazardous, dangerous and/or unsafe condition on the premises.

51.     At all relevant times, including on February 3, 2019, all Defendants had a duty to ensure third party water-removal contractors, such as Mr. Burkey, could safely access the wastewater valves and equipment.

52.     All Defendants knew or should have known that third party water removal contractors, such as Mr. Burkey, would be accessing the wastewater equipment and valves in the containment area and had a duty to ensure that area would be clear of ice and properly lighted.

53.     Defendants had a duty to establish policies and procedures for ice removal, and to supervise and enforce those procedures to ensure the safety of water removal contractors such as Mr. Burkey.

54.     Mr. Burkey was on the premises for the purpose of the EQT and Equitran Defendants' business on February 3, 2019.

55.     The ice was allowed to accumulate on the premises due to all Defendants' failure to exercise their duty to properly maintain and inspect the premises and keep it clear of ice for business invitees such as Mr. Burkey.

56.     At all relevant times, all Defendants knew of the accumulation of water and ice at the containment area and that there was no lighting in or at the containment area, and with conscious disregard and reckless indifference, recklessly, maliciously and wantonly permitted the dangerous condition to exist which caused Mr. Burkey's fall and injuries.

57.     At all relevant times, Mr. Burkey acted in a reasonable, careful and prudent manner.

58.     As a direct and proximate result of the above-described incident, Mr. Burkey sustained the following injuries:

a.     Cervical injury requiring surgery;

b.     Right shoulder, rotator cuff, biceps and labral tears, requiring surgery;

c.     Fracture of right elbow;

d.     Injury to throat and breathing passageway from neck surgery;

e.     Scarring and disfigurement;

f.     Severe neck pain;

g.      Severe right arm pain;

h.      Severe right shoulder pain;

i.      Severe right elbow pain;

j.      Numbness in right arm and wrist;

k.      Numbness in left arm and wrist;

l.      Chronic cervical and/or neck spasms;

m.      Chronic severe headaches;

n.      Decreased range of motion in right shoulder right elbow and neck;

o.      Bruises and contusions;

p.      Nervousness, confusion, emotional tension, and anxiety; and

q.      Severe, persistent and ongoing chronic pain.

59.    As a direct and proximate result of the above-referenced incident, Mr. Burkey has suffered the following damages, some or all of which may be permanent in nature:

a.      Mr. Burkey has suffered severe pain, suffering, inconvenience, embarrassment, sleeplessness, mental anguish, and emotional and psychological trauma;

b.      Mr. Burkey will continue to have to undergo physical therapy and/or rehabilitation;

c.      Mr. Burkey will likely have to undergo additional surgeries;

d.      Mr. Burkey has been and will be required to expend money for medical treatment and care, hospitalization, medical supplies, surgical appliances, rehabilitation and therapeutic treatment, medicines, and other attendant services;

e.      Mr. Burkey has suffered lost wages;

f.      Mr. Burkey has suffered lost earnings, and Mr. Burkey's earning capacity has been reduced and may be permanently impaired;

g.    Mr. Burkey is unable to enjoy various pleasures of life that he previously enjoyed; and

h.    Mr. Burkey's general health, strength, and vitality have been significantly and negatively impaired.

## COUNT I - NEGLIGENCE

**William J. Burkey v. Equitrans Midstream Corporation, EQT Midstream Corporation – Europa CS, EQT Midstream Corporation – Halo CS, EQM Midstream Partners LP, EQT Production Company, Equitrans, Inc., EQT Midstream and EQT Corporation**

60.    Paragraphs 1 through 59 of this complaint are hereby incorporated by reference as if fully set forth.

61.    At all relevant times, the EQT and Equitran Defendants acting through their employees, agents and/or representatives, were in possession and/or actual physical control of the premises upon which the incident complained of herein occurred and were therefore responsible for ensuring that the premises was safe for those walking upon it, including Mr. Burkey.

62.    At all times relevant hereto, the premises — and any dangerous conditions thereon — were under the control of all or some of the EQT and Equitran Defendants and/or their principals, agents, and/or ostensible agents.

63.    Mr. Burkey's injuries and damages are the direct and proximate result of the EQT and Equitran Defendants' negligent conduct, in the following particulars:

a.    In creating the hazardous, dangerous, and/or unsafe condition at or upon the premises;

b.    In permitting the hazardous, dangerous, and/or unsafe condition at or upon the premises to exist when they knew or should have known that same presented a risk of serious bodily injury to persons walking upon the premises;

c.      In failing to remedy the hazardous, dangerous, and/or unsafe condition at or upon the premises when they knew or should have known that same existed;

d.      In designing, constructing, and/or maintaining a work site and premises that was unsafe for use;

e.      In failing to warn invitees, including Mr. Burkey, of the dangerous, hazardous, unsafe, and defective condition of the premises;

f.      In failing to altogether eliminate the dangerous, hazardous, unsafe, and defective condition of the premises;

g.      In failing to cordon off the dangerous condition, provide lighting at the premises or otherwise prevent invitees of the premises from hazardous, unsafe, and defective condition of the premises;

h.      In negligently designing, constructing, maintaining, and operating the premises which directly caused Mr. Burkey's fall and injuries;

i.      In failing to timely, properly, or regularly inspect the premises for defects and/or hazards;

j.      In deviating from the standard of care in the oil and gas industry by failing to provide a safe work site and premises;

k.      In violating federal, state, local and industry safety laws, rules and regulations;

l.      In failing to properly or adequately hire, train and properly or adequately supervise, personnel, contractors and safety professionals for the ownership, leasing, development, management and/or operation of the premises;

m.      In failing to provide a work site and premises that was safe for its intended use;

n.      In failing to exercise reasonable care in their use of the property of co-defendants; and

o.      In failing to abide by all other duties described in this complaint.

64.      At all relevant times, the EQT and Equitrans Defendants knew of the accumulation of water and ice at the containment area and that there was no lighting in

or at the containment area, and with conscious disregard and reckless indifference, recklessly, maliciously and wantonly permitted the dangerous condition to exist which caused Mr. Burkey's fall and injuries.

WHEREFORE, plaintiff, William J. Burkey, demands judgment against Equitrans Midstream Corporation, EQT Midstream Corporation – Europa CS, EQT Midstream Corporation – Halo CS, EQM Midstream Partners LP, EQT Production Company, Equitrans, Inc., EQT Midstream and EQT Corporation in an amount in excess of the jurisdictional limits of compulsory arbitration and punitive damages, together with Court costs, interest and all other relief permitted by the Court.

## COUNT II - NEGLIGENCE

### William J. Burkey v. John Doe 1

65.    Paragraphs 1 through 64 of this complaint are hereby incorporated by reference as if fully set forth.

66.    At all relevant times, John Doe 1, acting through its employees, agents and/or representatives, was on the premises at-issue and with the permission of the owners, the EQT and Equitrans Defendants.

67.    At all relevant times, John Doe 1, acting through its employees, agents and/or representatives, was in possession and/or actual physical control of the premises upon which the incident complained of herein occurred and were therefore responsible for ensuring that the premises was safe for those walking upon it, including Mr. Burkey.

68.    At all times relevant hereto, the premises — and any dangerous conditions thereon — were under the control of John Doe 1 and/or their principals, agents, and/or ostensible agents.

69.     Mr. Burkey's injuries and damages are the direct and proximate result of

John Doe 1's negligent conduct, in the following particulars:

a.     In creating the hazardous, dangerous, and/or unsafe condition at or upon the premises;

b.     In permitting the hazardous, dangerous, and/or unsafe condition at or upon the premises to exist when they knew or should have known that same presented a risk of serious bodily injury to persons walking upon the premises;

c.     In failing to remedy the hazardous, dangerous, and/or unsafe condition at or upon the premises when they knew or should have known that same existed;

d.     In designing, constructing, and/or maintaining a work site and premises that was unsafe for use;

e.     In failing to warn invitees, including Mr. Burkey, of the dangerous, hazardous, unsafe, and defective condition of the premises;

f.     In failing to altogether eliminate the dangerous, hazardous, unsafe, and defective condition of the premises;

g.     In failing to cordon off the dangerous condition, provide lighting at the premises or otherwise prevent invitees of the premises from hazardous, unsafe, and defective condition of the premises;

h.     In negligently designing, constructing, maintaining, and operating the premises which directly caused Mr. Burkey's fall and injuries;

i.     In failing to timely, properly, or regularly inspect the premises for defects and/or hazards;

j.     In deviating from the standard of care in the oil and gas industry by failing to provide a safe work site and premises;

k.     In violating federal, state, local and industry safety laws, rules and regulations;

l.     In failing to properly or adequately hire, train and properly or adequately supervise, personnel, contractors and safety professionals for the ownership, leasing, development, management and/or operation of the premises;

m.     In failing to provide a work site and premises that was safe for its intended use;

n.     In failing to exercise reasonable care in their use of the property of co-defendants; and

o.     In failing to abide by all other duties described in this complaint.

70.     At all relevant times, John Doe 1 knew of the accumulation of water and ice at the containment area and that there was no lighting in or at the containment area, and with conscious disregard and reckless indifference, recklessly, maliciously and wantonly permitted the dangerous condition to exist which caused Mr. Burkey's fall and injuries.

WHEREFORE, plaintiff, William J. Burkey, demands judgment against John Doe 1, in an amount in excess of the jurisdictional limits of compulsory arbitration and punitive damages, together with Court costs, interest and all other relief permitted by the Court.

## COUNT III - NEGLIGENCE

### William J. Burkey v. John Doe 2

71.     Paragraphs 1 through 70 of this complaint are hereby incorporated by reference as if fully set forth.

72.     At all relevant times, John Doe 2, acting through its employees, agents and/or representatives, was on the premises at-issue and with the permission of the owners, the EQT and Equitrans Defendants.

73.     At all relevant times, John Doe 2 had possession and/or actual physical control of the premises upon which the incident complained of herein occurred and was

therefore responsible for ensuring that the premises was safe for those walking upon it, including Mr. Burkey.

74.    At all times relevant hereto, the premises — and any dangerous conditions thereon — were under the control of John Doe 2 and/or their principals, agents, and/or ostensible agents.

75.    The Defendant, John Doe 2, caused or allowed water to accumulate in an area where it knew or should have known that Mr. Burkey, and other individuals would be walking to perform their jobs at the pad.

76.    Mr. Burkey's injuries and damages are the direct and proximate result of John Doe 2's negligent conduct, in the following particulars:

a.    In creating the hazardous, dangerous, and/or unsafe condition at or upon the premises;

b.    In permitting the hazardous, dangerous, and/or unsafe condition at or upon the premises to exist when they knew or should have known that same presented a risk of serious bodily injury to persons walking upon the premises;

c.    In failing to remedy the hazardous, dangerous, and/or unsafe condition at or upon the premises when they knew or should have known that same existed;

d.    In designing, constructing, and/or maintaining a work site and premises that was unsafe for use;

e.    In failing to warn invitees, including Mr. Burkey, of the dangerous, hazardous, unsafe, and defective condition of the premises;

f.    In failing to altogether eliminate the dangerous, hazardous, unsafe, and defective condition of the premises;

g.    In failing to cordon off the dangerous condition, provide lighting at the premises or otherwise prevent invitees of the premises from hazardous, unsafe, and defective condition of the premises;

h.  In negligently designing, constructing, maintaining, and operating the premises which directly caused Mr. Burkey's fall and injuries;

i.  In failing to timely, properly, or regularly inspect the premises for defects and/or hazards;

j.  In deviating from the standard of care in the oil and gas industry by failing to provide a safe work site and premises;

k.  In violating federal, state, local and industry safety laws, rules and regulations;

l.  In failing to properly or adequately hire, train and properly or adequately supervise, personnel, contractors and safety professionals for the ownership, leasing, development, management and/or operation of the premises;

m.  In failing to provide a work site and premises that was safe for its intended use;

n.  In failing to exercise reasonable care in their use of the property of co-defendants; and

o.  In failing to abide by all other duties described in this complaint.

77.  At all relevant times, John Doe 2 knew of the accumulation of water and ice at the containment area and that there was no lighting in or at the containment area, and with conscious disregard and reckless indifference, recklessly, maliciously and wantonly permitted the dangerous condition to exist which caused Mr. Burkey's fall and injuries.

WHEREFORE, plaintiff, William J. Burkey, demands judgment against John Doe 2, in an amount in excess of the jurisdictional limits of compulsory arbitration and punitive damages, together with Court costs, interest and all other relief permitted by the Court.

## COUNT IV - NEGLIGENCE

### William J. Burkey v. John Doe 3

78.    Paragraphs 1 through 77 of this complaint are hereby incorporated by reference as if fully set forth.

79.    At all relevant times, John Doe 3, acting through its employees, agents and/or representatives, was on the premises at-issue and with the permission of the owners, the EQT and Equitrans Defendants.

80.    At all relevant times, John Doe 3 had possession and/or actual physical control of the premises upon which the incident complained of herein occurred and was therefore responsible for ensuring that the premises was safe for those walking upon it, including Mr. Burkey.

81.    At all times relevant hereto, the premises — and any dangerous conditions thereon — were under the control of John Doe 3 and/or their principals, agents, and/or ostensible agents.

82.    The Defendant, John Doe 3, caused or allowed water to accumulate in an area where it knew or should have known that Mr. Burkey, and other individuals would be walking to perform their jobs at the pad.

83.    Mr. Burkey's injuries and damages are the direct and proximate result of John Doe 3's negligent conduct, in the following particulars:

   a.    In creating the hazardous, dangerous, and/or unsafe condition at or upon the premises;

   b.    In permitting the hazardous, dangerous, and/or unsafe condition at or upon the premises to exist when they knew or should have known that same presented a risk of serious bodily injury to persons walking upon the premises;

c.    In failing to remedy the hazardous, dangerous, and/or unsafe condition at or upon the premises when they knew or should have known that same existed;

d.    In designing, constructing, and/or maintaining a work site and premises that was unsafe for use;

e.    In failing to warn invitees, including Mr. Burkey, of the dangerous, hazardous, unsafe, and defective condition of the premises;

f.    In failing to altogether eliminate the dangerous, hazardous, unsafe, and defective condition of the premises;

g.    In failing to cordon off the dangerous condition, provide lighting at the premises or otherwise prevent invitees of the premises from hazardous, unsafe, and defective condition of the premises;

h.    In negligently designing, constructing, maintaining, and operating the premises which directly caused Mr. Burkey's fall and injuries;

i.    In failing to timely, properly, or regularly inspect the premises for defects and/or hazards;

j.    In deviating from the standard of care in the oil and gas industry by failing to provide a safe work site and premises;

k.    In violating federal, state, local and industry safety laws, rules and regulations;

l.    In failing to properly or adequately hire, train and properly or adequately supervise, personnel, contractors and safety professionals for the ownership, leasing, development, management and/or operation of the premises;

m.    In failing to provide a work site and premises that was safe for its intended use;

n.    In failing to exercise reasonable care in their use of the property of co-defendants; and

o.    In failing to abide by all other duties described in this complaint.

84.    At all relevant times, John Doe 3 knew of the accumulation of water and ice at the containment area and that there was no lighting in or at the containment area,

and with conscious disregard and reckless indifference, recklessly, maliciously and wantonly permitted the dangerous condition to exist which caused Mr. Burkey's fall and injuries.

WHEREFORE, plaintiff, William J. Burkey, demands judgment against John Doe 3, in an amount in excess of the jurisdictional limits of compulsory arbitration and punitive damages, together with Court costs, interest and all other relief permitted by the Court.

**COUNT V - NEGLIGENCE**

**William J. Burkey v. John Doe 4**

85.    Paragraphs 1 through 84 of this complaint are hereby incorporated by reference as if fully set forth.

86.    At all relevant times, John Doe 4, acting through its employees, agents and/or representatives, was on the premises at-issue and with the permission of the owners, the EQT and Equitrans Defendants.

87.    At all relevant times, John Doe 4 had performed transportation and water hauling services on the premises upon which the incident complained of herein occurred and was therefore responsible for ensuring that the premises was safe for those walking upon it, including Mr. Burkey.

88.    At all times relevant hereto, the premises — and any dangerous conditions thereon — were under the control of John Doe 4 and/or their principals, agents, and/or ostensible agents.

89.     The Defendant, John Doe 4, caused or allowed water to accumulate in an area where it knew or should have known that Mr. Burkey, and other individuals would be walking to perform their jobs at the pad.

90.     Mr. Burkey's injuries and damages are the direct and proximate result of John Doe 4's negligent conduct, in the following particulars:

    a.     In creating the hazardous, dangerous, and/or unsafe condition at or upon the premises;

    b.     In permitting the hazardous, dangerous, and/or unsafe condition at or upon the premises to exist when they knew or should have known that same presented a risk of serious bodily injury to persons walking upon the premises;

    c.     In failing to remedy the hazardous, dangerous, and/or unsafe condition at or upon the premises when they knew or should have known that same existed;

    d.     In maintaining a work site and premises that was unsafe for use;

    e.     In failing to warn invitees, including Mr. Burkey, of the dangerous, hazardous, unsafe, and defective condition of the premises;

    f.     In failing to altogether eliminate the dangerous, hazardous, unsafe, and defective condition of the premises;

    g.     In failing to cordon off the dangerous condition or otherwise prevent invitees of the premises from hazardous, unsafe, and defective condition of the premises;

    h.     In negligently maintaining and operating the premises which directly caused Mr. Burkey's fall and injuries;

    i.     In failing to timely, properly, or regularly inspect the premises for defects and/or hazards;

    j.     In deviating from the standard of care in the oil and gas industry by failing to provide a safe work site and premises;

    k.     In violating federal, state, local and industry safety laws, rules and regulations;

{P1607070.1}

l.      In failing to properly or adequately hire, train and properly or adequately supervise, personnel, contractors and safety professionals for the ownership, leasing, development, management and/or operation of the premises;

m.      In failing to provide a work site and premises that was safe for its intended use;

n.      In failing to exercise reasonable care in their use of the property of co-defendants; and

o.      In failing to abide by all other duties described in this complaint.

91.      At all relevant times, John Doe 4 knew of the accumulation of water and ice at the containment area and that there was no lighting in or at the containment area, and with conscious disregard and reckless indifference, recklessly, maliciously and wantonly permitted the dangerous condition to exist which caused Mr. Burkey's fall and injuries.

WHEREFORE, plaintiff, William J. Burkey, demands judgment against John Doe 4, in an amount in excess of the jurisdictional limits of compulsory arbitration and punitive damages, together with Court costs, interest and all other relief permitted by the Court.

## COUNT VI – NEGLIGENCE/LOSS OF CONSORTIUM

### Tammy Burkey v. All Defendants

92.      Paragraphs 1 through 91 of this complaint are hereby incorporated by reference as if fully set forth.

93.      Plaintiff, Tammy Burkey, is the wife of plaintiff William J. Burkey, who was injured by the negligence, carelessness, recklessness and wantonness of all Defendants as more fully described in Counts I, II, III, IV and V above.

94.    As a direct and proximate result of the negligence and carelessness of all Defendants, wife-plaintiff Tammy Burkey has sustained the following damages:

(a)    She has suffered a loss of consortium;

(b)    She has suffered a great inconvenience, disruption in her daily habits and loss of enjoyment of life;

(c)    She has suffered a loss of society, support, companionship and services of husband-plaintiff William J. Burkey; and

(d)    She has incurred expenses and may in the future incur debt and expenses as a result of the injuries and damages to husband-plaintiff William J. Burkey and seeks recovery of those costs.

WHEREFORE, plaintiff, Tammy Burkey, demands judgment against all Defendants, in an amount in excess of the jurisdictional limits of compulsory arbitration and punitive damages, together with Court costs, interest and all other relief permitted by the Court.

Respectfully submitted,

MEYER, DARRAGH, BUCKLER,
BEBENEK & ECK, PLLC

By: _____

PAUL R. ROBINSON, ESQUIRE
BENJAMIN SORISIO, ESQUIRE
Attorney for plaintiffs, William J.
Burkey and Tammy Burkey

## VERIFICATION

I, William J. Burkey, am an adult individual and state that the averments of fact set forth in the foregoing complaint are true and correct to the best of my knowledge, information, and belief.

I understand that the statements herein are made subject to the penalties of 18 Pa.C.S.A. § 4904 relating to unsworn falsification to authorities, which provides that if I make knowingly false averments I may be subject to criminal penalties.

Date: 1-30-21

William J. Burkey

{P1607070.1}

## VERIFICATION

I, Tammy Burkey, am an adult individual and state that the averments of fact set forth in the foregoing complaint are true and correct to the best of my knowledge, information, and belief.

I understand that the statements herein are made subject to the penalties of 18 Pa.C.S.A. § 4904 relating to unsworn falsification to authorities, which provides that if I make knowingly false averments I may be subject to criminal penalties.

Date: 1 30-21

Tammy Burkey

{P1607070.1}

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania:  Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

MEYER, DARRAGH, BUCKLER,
BEBENEK & ECK, PLLC

By:_____

BENJAMIN SORISIO, ESQUIRE
PA I.D. No. 85668

# Supreme Court of Pennsylvania
## Court of Common Pleas
## Civil Cover Sheet
_____ALLEGHENY_____ County

| For Prothonotary Use Only: | |
|---|---|
| Docket No: | |

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

**S E C T I O N  A**

**Commencement of Action:**
- ☒ Complaint
- ☐ Writ of Summons
- ☐ Petition
- ☐ Transfer from Another Jurisdiction
- ☐ Declaration of Taking

| Lead Plaintiff's Name: WILLIAM J. BURKEY | Lead Defendant's Name: EQUITRANS MIDSTREAM CORPORATION |
|---|---|

**Are money damages requested?** ☒ Yes   ☐ No

Dollar Amount Requested: (check one)
- ☐ within arbitration limits
- ☒ outside arbitration limits

**Is this a *Class Action Suit*?** ☐ Yes   ☒ No

**Is this an *MDJ Appeal*?** ☐ Yes   ☒ No

Name of Plaintiff/Appellant's Attorney: BENJAMIN SORISIO, ESQUIRE

☐ Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)

**S E C T I O N  B**

**Nature of the Case:** Place an "X" to the left of the **ONE** case category that most accurately describes your **PRIMARY CASE.** If you are making more than one type of claim, check the one that you consider most important.

**TORT** *(do not include Mass Tort)*
- ☐ Intentional
- ☐ Malicious Prosecution
- ☐ Motor Vehicle
- ☐ Nuisance
- ☒ Premises Liability
- ☐ Product Liability *(does not include mass tort)*
- ☐ Slander/Libel/ Defamation
- ☐ Other: _____

**MASS TORT**
- ☐ Asbestos
- ☐ Tobacco
- ☐ Toxic Tort - DES
- ☐ Toxic Tort - Implant
- ☐ Toxic Waste
- ☐ Other: _____

**PROFESSIONAL LIABLITY**
- ☐ Dental
- ☐ Legal
- ☐ Medical
- ☐ Other Professional: _____

**CONTRACT** *(do not include Judgments)*
- ☐ Buyer Plaintiff
- ☐ Debt Collection: Credit Card
- ☐ Debt Collection: Other
  _____
  _____
- ☐ Employment Dispute: Discrimination
- ☐ Employment Dispute: Other
  _____
  _____
- ☐ Other: _____

**REAL PROPERTY**
- ☐ Ejectment
- ☐ Eminent Domain/Condemnation
- ☐ Ground Rent
- ☐ Landlord/Tenant Dispute
- ☐ Mortgage Foreclosure: Residential
- ☐ Mortgage Foreclosure: Commercial
- ☐ Partition
- ☐ Quiet Title
- ☐ Other: _____

**CIVIL APPEALS**
Administrative Agencies
- ☐ Board of Assessment
- ☐ Board of Elections
- ☐ Dept. of Transportation
- ☐ Statutory Appeal: Other
  _____
  _____
- ☐ Zoning Board
- ☐ Other: _____
  _____

**MISCELLANEOUS**
- ☐ Common Law/Statutory Arbitration
- ☐ Declaratory Judgment
- ☐ Mandamus
- ☐ Non-Domestic Relations Restraining Order
- ☐ Quo Warranto
- ☐ Replevin
- ☐ Other: _____
  _____

*Updated 1/1/2011*

# NOTICE

**Pennsylvania Rule of Civil Procedure 205.5. (Cover Sheet) provides, in part:**

### Rule 205.5.    Cover Sheet

(a)(1)   This rule shall apply to all actions governed by the rules of civil procedure except the following:

> (i)      actions pursuant to the Protection from Abuse Act, Rules 1901 et seq.

> (ii)     actions for support, Rules 1910.1 et seq.

> (iii)    actions for custody, partial custody and visitation of minor children, Rules 1915.1 et seq.

> (iv)    actions for divorce or annulment of marriage, Rules 1920.1 et seq.

> (v)     actions in domestic relations generally, including paternity actions, Rules 1930.1 et seq.

> (vi)    voluntary mediation in custody actions, Rules 1940.1 et seq.

(2)     At the commencement of any action, the party initiating the action shall complete the cover sheet set forth in subdivision (e) and file it with the prothonotary.

(b)     The prothonotary shall not accept a filing commencing an action without a completed cover sheet.

(c)     The prothonotary shall assist a party appearing pro se in the completion of the form.

(d)     A judicial district which has implemented an electronic filing system pursuant to Rule 205.4 and has promulgated those procedures pursuant to Rule 239.9 shall be exempt from the provisions of this rule.

(e)     The Court Administrator of Pennsylvania, in conjunction with the Civil Procedural Rules Committee, shall design and publish the cover sheet.  The latest version of the form shall be published on the website of the Administrative Office of Pennsylvania Courts at www.pacourts.us.

# EXHIBIT B

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

| | |
|---|---|
| WILLIAM J. BURKEY and<br>TAMMY BURKEY, husband and wife, | CIVIL DIVISION |
| Plaintiffs, | No.  GD-21-000920 |
| v. | |
| EQUITRANS MIDSTREAM<br>CORPORATION; EQT MIDSTREAM<br>CORPORATION – EUROPA CS;<br>EQUITRANS MIDSTREAM<br>CORPORATION – HALO CS; EQM<br>MIDSTREAM PARTNERS LP; EQT<br>PRODUCTION COMPANY; EQUITRANS,<br>INC.; EQT MIDSTREAM; EQT<br>CORPORATION; JOHN DOE 1; JOHN<br>DOE 2; JOHN DOE 3; AND JOHN DOE 4, | **ANSWER AND NEW MATTER**<br><br>Filed on behalf of Defendant EQT Production<br>Company<br><br>Counsel of Record for these Parties:<br><br>Joseph V. Lesinski, Esquire<br>Pa. I.D. No. 312796 |
| Defendants. | MARSHALL DENNEHEY WARNER<br>COLEMAN & GOGGIN<br>Union Trust Building<br>501 Grant Street, Suite 700<br>Pittsburgh, PA  15219 |

TO THE WITHIN NAMED PARTY:

You are hereby notified to file a written
response to the enclosed New Matter within
twenty (20) days from service hereof or a
judgment may be entered against you.

jvlesinski@mdwcg.com

412-803-1140 – phone
412-803-1188 - fax

By:

JOSEPH V. LESINSKI, ESQUIRE

**TRIAL BY JURY OF TWELVE DEMANDED**

## IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

WILLIAM J. BURKEY and
TAMMY BURKEY, husband and wife,

        Plaintiffs,

    v.

EQUITRANS MIDSTREAM
CORPORATION; EQT MIDSTREAM
CORPORATION – EUROPA CS;
EQUITRANS MIDSTREAM
CORPORATION – HALO CS; EQM
MIDSTREAM PARTNERS LP; EQT
PRODUCTION COMPANY; EQUITRANS,
INC.; EQT MIDSTREAM; EQT
CORPORATION; JOHN DOE 1; JOHN DOE
2; JOHN DOE 3; AND JOHN DOE 4,

        Defendants.

CIVIL DIVISION

No.  GD-21-000920

### <u>ANSWER AND NEW MATTER</u>

AND NOW, comes the Defendant EQT Production Company (hereinafter "Defendant EQT"), by and through its undersigned counsel of record, Marshall, Dennehey, Warner, Coleman & Goggin, P.C. and Joseph V. Lesinski, Esquire, and for its Answer and New Matter to Plaintiffs' Complaint, states and avers as follows:

1.      After reasonable investigation, Defendant EQT is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 1 of Plaintiffs' Complaint, and the same are therefore denied.

2.      The averments contained in Paragraph 2 of Plaintiffs' Complaint are directed to another party and therefore, no response is required from Defendant EQT.

3.      The averments contained in Paragraph 3 of Plaintiffs' Complaint are directed to another party and therefore, no response is required from Defendant EQT.

4.      The averments contained in paragraph 4 of Plaintiffs' Complaint are directed to another party and therefore, no response is required from Defendant EQT.

5.      The averments contained in paragraph 5 of Plaintiffs' Complaint are directed to another party and therefore, no response is required from Defendant EQT.

6.      Admitted.

7.      The averments contained in paragraph 7 of Plaintiffs' Complaint are  directed to another party and therefore, no response is required from Defendant EQT.

8.      The averments contained in paragraph 8 of Plaintiffs' Complaint are  directed to another party and therefore, no response is required from Defendant EQT.

9.      Defendant EQT Corporation has been dismissed from this matter and therefore,no response is required from Defendant EQT Production Company.  .

10.      The averments contained in paragraph 10 of Plaintiffs' Complaint are directed to another party and therefore, no response is required from Defendant EQT.  To the extent that the averments contained in Paragraph 11 are deemed to be directed towards Defendant EQT, the same are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

11.      The averments contained in paragraph 11 of Plaintiffs' Complaint are directed to another party and therefore, no response is required from Defendant EQT.  To the extent that the averments contained in Paragraph 11 are deemed to be directed towards Defendant EQT, the same are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

12.     The averments contained in paragraph 12 of Plaintiffs' Complaint are directed to another party and therefore, no response is required from Defendant EQT.  To the extent that the averments contained in Paragraph 13 are deemed to be directed towards Defendant EQT, the same are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

13.     The averments contained in paragraph 13 of Plaintiffs' Complaint are directed to another party and therefore, no response is required from Defendant EQT.  To the extent that the averments contained in Paragraph 13 are deemed to be directed towards Defendant EQT, the same are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

14.     After reasonable investigation, Defendant EQT is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 14 of Plaintiffs' Complaint, and the same are therefore denied.

15.     The averments contained in Paragraph 15 of Plaintiffs' Complaint constitute conclusions of law to which no response is required.  To the extent that a response is deemed necessary and to the extent the averments contained in Paragraph 15 are directed towards Defendant EQT, the same are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

16.     To the extent Paragraph 16 of Plaintiffs' Complaint attempts to incorporate other portions thereof, Defendants EQT incorporates other portions of this Answer as if fully set forth herein.  By way of further response, after reasonable investigation, Defendant EQT admits that it conducted business in Pennsylvania.

17.     Defendant EQT is without knowledge or information sufficient to form a belief as to the truth of the averment in Paragraph 17 of Plaintiffs' Complaint regarding where the

alleged occurrence took place and the same is therefore denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e).

18.     The averments contained in Paragraph 18 of Plaintiffs' Complaint constitute conclusions of law to which no response is required.  To the extent that a response is deemed necessary and to the extent the averments contained in Paragraph 18 are directed towards Defendant EQT, the same are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

19.     The averments contained in Paragraph 19 of Plaintiffs' Complaint constitute conclusions of law to which no response is required.  To the extent that a response is deemed necessary and to the extent the averments contained in Paragraph 19 are directed towards Defendant EQT, the same are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

20.     After reasonable investigation, Defendant EQT is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 20 of Plaintiffs' Complaint and the same are therefore denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e).  Strict proof is demanded at the time of trial.

21.     After reasonable investigation, Defendant EQT is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 21 of Plaintiffs' Complaint and the same are therefore denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e).  Strict proof is demanded at the time of trial.

22.     After reasonable investigation, Defendant EQT is without knowledge or information sufficient to form a belief as to the truth of the allegation that Mr. Burkey entered a containment area at the Pettit Pad on February 3, 2019.  The remaining averments contained in Paragraph 22 of Plaintiffs' Complaint constitute conclusions of law to which no response is

required.  To the extent a response to these remaining averments is deemed necessary, the same are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e).  Strict proof is demanded at the time of trial.

23.    The averments contained in Paragraph 23 of Plaintiffs' Complaint are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

24.    After reasonable investigation, Defendant EQT is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 24 of Plaintiffs' Complaint and the same are therefore denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e).  Strict proof is demanded at the time of trial.

25.    After reasonable investigation, Defendant EQT is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 25 of Plaintiffs' Complaint and the same are therefore denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e).  Strict proof is demanded at the time of trial.

26.    The averments contained in Paragraph 26 of Plaintiffs' Complaint are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

27.    The averments contained in Paragraph 27 of Plaintiffs' Complaint are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

28.    The averments contained in Paragraph 28 are admitted in part and denied in part. It is admitted that Defendant EQT was engaged in the business of owning, developing, and operating oil and gas wells (including wells located in Pennsylvania).  It is further agreed that EQT owned and operated the Pettit Pad.  The remaining averments contained in Paragraph 28 of

Plaintiffs' Complaint are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

29.    After reasonable investigation, Defendant EQT is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 29 of Plaintiffs' Complaint and the same are therefore denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e).  Strict proof is demanded at the time of trial.

30.    After reasonable investigation, Defendant EQT is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 30 of Plaintiffs' Complaint and the same are therefore denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e).  Strict proof is demanded at the time of trial.

31.    After reasonable investigation, Defendant EQT is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 31 of Plaintiffs' Complaint and the same are therefore denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e).  Strict proof is demanded at the time of trial.

32.    After reasonable investigation, Defendant EQT is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 32 of Plaintiffs' Complaint and the same are therefore denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e).  Strict proof is demanded at the time of trial.

33.    The averments contained in Paragraph 33 of Plaintiffs' Complaint constitute conclusions of law to which no response is required.  To the extent a response is deemed necessary, said averments are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

34.    The averments contained in Paragraph 34 of Plaintiffs' Complaint constitute conclusions of law to which no response is required.  To the extent a response is deemed

necessary, said averments are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

35.    The averments contained in Paragraph 35 of Plaintiffs' Complaint constitute conclusions of law to which no response is required.  To the extent a response is deemed necessary, said averments are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

36.    The averments contained in Paragraph 36 of Plaintiffs' Complaint constitute conclusions of law to which no response is required.  To the extent a response is deemed necessary, said averments are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

37.    The averments contained in Paragraph 37 are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

38.    To the extent the averments contained in Paragraph 38 are directed towards Defendant EQT, the same are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

39.    The averments contained in Paragraph 39 are directed towards an entity other than Defendant EQT and therefore, no response is required.  To the extent the averments contained in Paragraph 39 are deemed to be directed towards Defendant EQT, the same are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

40.    To the extent the averments contained in Paragraph 40 are directed towards Defendant EQT, the same are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

41.     The averments contained in Paragraph 41 are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

42.     The averments contained in Paragraph 42 are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

43.     The averments contained in Paragraph 43 are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

44.     The averments contained in Paragraph 44 are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

45.     The averments contained in Paragraph 45 are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

46.     The averments contained in Paragraph 46 are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

47.     The averments contained in Paragraph 47 are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

48.     The averments contained in Paragraph 48 are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

49.     The averments contained in Paragraph 49 of Plaintiffs' Complaint are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

50.     The averments contained in Paragraph 50 of Plaintiffs' Complaint are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

51.     The averments contained in Paragraph 51 of Plaintiffs' Complaint constitute conclusions of law to which no response is required.  To the extent a response is deemed

necessary, said averments are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

52.      The averments contained in Paragraph 52 of Plaintiffs' Complaint constitute conclusions of law to which no response is required.  To the extent a response is deemed necessary, said averments are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

53.      The averments contained in Paragraph 53 of Plaintiffs' Complaint constitute conclusions of law to which no response is required.  To the extent a response is deemed necessary, said averments are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

54.      The averments contained in Paragraph 54 of Plaintiffs' Complaint are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

55.      The averments contained in Paragraph 55 of Plaintiffs' Complaint constitute conclusions of law to which no response is required.  To the extent a response is deemed necessary, said averments are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

56.      The averments contained in Paragraph 56 of Plaintiffs' Complaint regarding conscious disregard, reckless indifference, maliciousness and wantonness have been stricken from the Complaint pursuant to a stipulation of counsel filed on August 5, 2021.  To the extent a response to Paragraph 56 is deemed necessary, all averments are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

57.      The averments contained in Paragraph 57 of Plaintiffs' Complaint constitute conclusions of law to which no response is required.  To the extent a response is deemed

necessary, said averments are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

58.     The averments contained in Paragraph 58 of Plaintiffs' Complaint are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

59.     The averments contained in Paragraph 59 of Plaintiffs' Complaint are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

## COUNT I – NEGLIGENCE

### WILLIAM J. BURKEY V. EQUITRANS MIDSTREAM CORPORATION, EQT MIDSTREAM CORPORATION - EUROPA CS, EQT MIDSTREAM CORPORATION - HALO CS, EQM MIDSTREAM PARTNERS LP, EQT PRODUCTION COMPANY, EQUITRANS, INC., EQT MIDSTREAM AND EQT CORPORATION

60.     In response to the averments contained in Paragraph 60, Defendant EQT incorporates Paragraphs 1 through 59 of its Answer as if fully set forth herein.

61.     The averments of fact contained in Paragraph 61 of Plaintiffs' Complaint are admitted in part and denied in part.  It is admitted that, at all relevant times, Defendant EQT was in possession and control of the Petit Well Pad.  It is denied that Defendant EQT was in exclusive possession or control of the Petit Well Pad.  To the contrary, contractors and subcontractors retained to perform services on the Petit Well Pad also exercised possession and control over the premises.  The remaining averments contained in Paragraph 61 of Plaintiffs' Complaint constitute conclusions of law to which no response is required.  To the extent a response is deemed necessary, said averments are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

62.    = The averments contained in Paragraph 62 of Plaintiffs' Complaint constitute conclusions of law to which no response is required.  To the extent a response is deemed necessary, said averments are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial. It is specifically denied that a dangerous condition existed on the premises and that any individuals in possession or control of premises were acting as agents for Defendant EQT.

63.    The averments contained in Paragraph 63 of Plaintiffs' Complaint constitute conclusions of law to which no response is required.  To the extent a response is deemed necessary and to the extent the averments contained in Paragraph 63 are directed to Defendant EQT, said averments are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.  It is specifically denied the Defendant EQT was negligent in any manner whatsoever.

64.    The averments contained in Paragraph 64 of Plaintiffs' Complaint regarding conscious disregard, reckless indifference, maliciousness and wantonness have been stricken from the Complaint pursuant to a stipulation of counsel filed on August 5, 2021.  To the extent a response to Paragraph 64 is deemed necessary, all averments are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

WHEREFORE, Defendant EQT Production Company denies that it is liable to Plaintiffs in any sum or sums whatsoever and demands judgment in its favor with costs of suit.

## COUNT II - NEGLIGENCE
## WILLIAM J. BURKEY V. JOHN DOE 1

65.    In response to the averments contained in Paragraph 65, Defendant EQT incorporates Paragraphs 1 through 64 of its Answer as if fully set forth herein.

66.    The averments contained in Paragraph 66 are directed towards another Defendant and therefore, no response is required from Defendant EQT.  To the extent a response is deemed necessary, and to the extent the averments contained in Paragraph 66 are directed towards Defendant EQT, said averments are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

67.    The averments contained in Paragraph 67 are directed towards another Defendant and therefore, no response is required from Defendant EQT.  To the extent a response is deemed necessary, and to the extent the averments contained in Paragraph 67 are directed towards Defendant EQT, said averments are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

68.    The averments contained in Paragraph 68 are directed towards another Defendant and therefore, no response is required from Defendant EQT.  To the extent a response is deemed necessary, and to the extent the averments contained in Paragraph 68 are directed towards Defendant EQT, said averments are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

69.    The averments contained in Paragraph 69 are directed towards another Defendant and therefore, no response is required from Defendant EQT.  To the extent a response is deemed necessary, and to the extent the averments contained in Paragraph 69 are directed towards Defendant EQT, said averments are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

70.    The averments contained in Paragraph 70 are directed towards another Defendant and therefore, no response is required from Defendant EQT.  To the extent a response is deemed necessary, and to the extent the averments contained in Paragraph 70 are directed towards

Defendant EQT, said averments are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

WHEREFORE, Defendant EQT Production Company denies that it is liable to Plaintiffs in any sum or sums whatsoever and demands judgment in its favor with costs of suit.

## COUNT III - NEGLIGENCE

### WILLIAM J. BURKEY V. JOHN DOE 2

71.    In response to the averments contained in Paragraph 71, Defendant EQT incorporates Paragraphs 1 through 70 of its Answer as if fully set forth herein.

72.    The averments contained in Paragraph 72 are directed towards another Defendant and therefore, no response is required from Defendant EQT.  To the extent a response is deemed necessary, and to the extent the averments contained in Paragraph 72 are directed towards Defendant EQT, said averments are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

73.    The averments contained in Paragraph 73 are directed towards another Defendant and therefore, no response is required from Defendant EQT.  To the extent a response is deemed necessary, and to the extent the averments contained in Paragraph 73 are directed towards Defendant EQT, said averments are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

74.    The averments contained in Paragraph 74 are directed towards another Defendant and therefore, no response is required from Defendant EQT.  To the extent a response is deemed necessary, and to the extent the averments contained in Paragraph 74 are directed towards Defendant EQT, said averments are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

75.     The averments contained in Paragraph 75 are directed towards another Defendant and therefore, no response is required from Defendant EQT.  To the extent a response is deemed necessary, and to the extent the averments contained in Paragraph 75 are directed towards Defendant EQT, said averments are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

76.     The averments contained in Paragraph 76 are directed towards another Defendant and therefore, no response is required from Defendant EQT.  To the extent a response is deemed necessary, and to the extent the averments contained in Paragraph 76 are directed towards Defendant EQT, said averments are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

77.     The averments contained in Paragraph 77 are directed towards another Defendant and therefore, no response is required from Defendant EQT.  To the extent a response is deemed necessary, and to the extent the averments contained in Paragraph 77 are directed towards Defendant EQT, said averments are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

WHEREFORE, Defendant EQT Production Company denies that it is liable to Plaintiffs in any sum or sums whatsoever and demands judgment in its favor with costs of suit.

## COUNT IV - NEGLIGENCE

### WILLIAM J. BURKEY V. JOHN DOE 3

78.     In response to the averments contained in Paragraph 78, Defendant EQT incorporates Paragraphs 1 through 77 of its Answer as if fully set forth herein.

79.     The averments contained in Paragraph 79 are directed towards another Defendant and therefore, no response is required from Defendant EQT.  To the extent a response is deemed

necessary, and to the extent the averments contained in Paragraph 79 are directed towards Defendant EQT, said averments are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

80.    The averments contained in Paragraph 80 are directed towards another Defendant and therefore, no response is required from Defendant EQT.  To the extent a response is deemed necessary, and to the extent the averments contained in Paragraph 80 are directed towards Defendant EQT, said averments are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

81.    The averments contained in Paragraph 81 are directed towards another Defendant and therefore, no response is required from Defendant EQT.  To the extent a response is deemed necessary, and to the extent the averments contained in Paragraph 81 are directed towards Defendant EQT, said averments are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

82.    The averments contained in Paragraph 82 are directed towards another Defendant and therefore, no response is required from Defendant EQT.  To the extent a response is deemed necessary, and to the extent the averments contained in Paragraph 82 are directed towards Defendant EQT, said averments are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

83.    The averments contained in Paragraph 83 are directed towards another Defendant and therefore, no response is required from Defendant EQT.  To the extent a response is deemed necessary, and to the extent the averments contained in Paragraph 83 are directed towards Defendant EQT, said averments are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

84.     The averments contained in Paragraph 84 are directed towards another Defendant and therefore, no response is required from Defendant EQT.  To the extent a response is deemed necessary, and to the extent the averments contained in Paragraph 84 are directed towards Defendant EQT, said averments are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

WHEREFORE, Defendant EQT Production Company denies that it is liable to Plaintiffs in any sum or sums whatsoever and demands judgment in its favor with costs of suit.

## COUNT V - NEGLIGENCE

### WILLIAM J. BURKEY V. JOHN DOE 4

85.     In response to the averments contained in Paragraph 85, Defendant EQT incorporates Paragraphs 1 through 84 of its Answer as if fully set forth herein.

86.     The averments contained in Paragraph 86 are directed towards another Defendant and therefore, no response is required from Defendant EQT.  To the extent a response is deemed necessary, and to the extent the averments contained in Paragraph 86 are directed towards Defendant EQT, said averments are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

87.     The averments contained in Paragraph 87 are directed towards another Defendant and therefore, no response is required from Defendant EQT.  To the extent a response is deemed necessary, and to the extent the averments contained in Paragraph 87 are directed towards Defendant EQT, said averments are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

88.     The averments contained in Paragraph 88 are directed towards another Defendant and therefore, no response is required from Defendant EQT.  To the extent a response is deemed

necessary, and to the extent the averments contained in Paragraph 88 are directed towards Defendant EQT, said averments are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

89.     The averments contained in Paragraph 89 are directed towards another Defendant and therefore, no response is required from Defendant EQT.  To the extent a response is deemed necessary, and to the extent the averments contained in Paragraph 89 are directed towards Defendant EQT, said averments are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

90.     The averments contained in Paragraph 90 are directed towards another Defendant and therefore, no response is required from Defendant EQT.  To the extent a response is deemed necessary, and to the extent the averments contained in Paragraph 90 are directed towards Defendant EQT, said averments are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

91.     The averments contained in Paragraph 91 are directed towards another Defendant and therefore, no response is required from Defendant EQT.  To the extent a response is deemed necessary, and to the extent the averments contained in Paragraph 91 are directed towards Defendant EQT, said averments are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.

WHEREFORE, Defendant EQT Production Company denies that it is liable to Plaintiffs in any sum or sums whatsoever and demands judgment in its favor with costs of suit.

## <u>COUNT VI - NEGLIGENCE/LOSS OF CONSORTIUM</u>

### <u>TAMMY BURKEY V. ALL DEFENDANTS</u>

92.     In response to the averments contained in Paragraph 92, Defendant EQT incorporates Paragraphs 1 through 91 of its Answer as if fully set forth herein.

93.     The averments contained in Paragraph 93 of Plaintiffs' Complaint are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.  By way of further response, Defendant EQT states that all allegations of conscious disregard, reckless indifference, maliciousness and wantonness have been stricken from the Complaint pursuant to a stipulation of counsel filed on August 5, 2021.

94.     The averments contained in Paragraph 94 of Plaintiffs' Complaint are denied pursuant to Pennsylvania Rule of Civil Procedure 1029(e) and strict proof is demanded at the time of trial.  Defendant EQT specifically denies that it was negligent or careless in any manner whatsoever.

WHEREFORE, Defendant EQT Production Company denies that it is liable to Plaintiffs in any sum or sums whatsoever and demands judgment in its favor with costs of suit.

## <u>NEW MATTER</u>

95.     In the event it is established that Plaintiffs sustained the injuries and damages as alleged in their Complaint, which is denied for the reasons set forth in the preceding paragraphs of this Answer, then in that event, said injuries and damages were due to the acts and/or omissions of persons and/or individuals other than Defendant EQT, which acts and/or omissions are independent, intervening and superseding, and for which Defendant EQT are not liable or responsible.

96.     Mr. Burkey's employer, Seven Point Energy Services, Inc. ("Seven Point") entered into a Master Services Agreement with Defendant EQT dated as of January 8, 2018 (the "MSA").

97.     The MSA governed the services that Seven Point and its employees would provide to Defendant EQT, including (but not limited to) services at the Petit Well Pad.

98.     In Section 9.2 of the MSA, Seven Point represented and warranted that it would familiarize itself with the conditions affecting the project sites at which it would perform work. Mr. Burkey was therefore required to familiarize himself with the conditions that affected the Petit Well Pad before commencing his work.

99.     Section 9.6 of the MSA states that "Contractor will inspect all surfaces prior to commencing work" and "Contractor shall inform Company immediately should any surface/subsurface be unacceptable to commence or continue the Work. Contractor's start of the Work constitutes Contractor's acceptance of the existing surface and conditions." Accordingly, Mr. Burkey was required to inspect the area of the Petit Well Pad on which he performed his work. By commencing work, Mr. Burkey accepted the conditions existing on that well pad.

100.     Section 9.22 of the MSA, entitled "Hazards," states as follows:

> For any services, Contractor shall examine all Worksites and surrounding areas and all particulars relating to services, making all investigation necessary for a full understanding of all difficulties and hazards which may be encountered in the performance of services and ensure that all identified difficulties and hazards are suitably addressed prior to commencement of services. Company shall accept no responsibility for the failure of Contractor to gain a full understanding of any difficulties and hazards and shall not be liable for any increase in compensation, cost or expense to Contractor for Contractor's failure to reasonably anticipate difficulties and hazards that may be encountered.

Accordingly, Mr. Burkey was responsible for examining the area of the Petit Well Pad on which he performed work (including the area around the containment area) to identify any potential hazards. Defendant EQT is not responsible for his failure to do so.

101. The rights of the Plaintiffs' in this action are governed, diminished, and/or barred by the contributory and/or comparative negligence of the Plaintiffs and Defendant EQT claims all of the benefits of the provisions of the Pennsylvania Comparative Negligence Act as set forth in Paragraph 42 Pa.C.S.A. §7102 *et seq.* and states the same as an affirmative defense herein.

102. There is no causal relationship between any damages claimed by the Plaintiffs in any wrongful acts or omissions on the part of Defendant EQT, which acts or omissions are expressly denied herein.

103. To the extent revealed in discovery, Plaintiffs' claims are barred by Plaintiffs' voluntary assumption of a known risk.

104. Defendant EQT had no duty to inspect and/or remedy the alleged defective condition set forth in Plaintiffs' Complaint and therefore, cannot be found liable or responsible for the Plaintiffs' incident.

105. Plaintiff's claims are barred by Workers' Compensation Immunity under 77 Pa.C.S.A. § 481.

106. Plaintiff's claims are barred by the Statutory Employer Doctrine and Statutory Employer Immunity.

107. Plaintiff's injuries, if any, were caused by the acts or omissions of third parties over which Defendant EQT had no control, and/or no obligation to control, including but not limited to Plaintiff's employer Seven Point.

108.    At all times relevant to the Complaint, Plaintiff's employer was an independent contractor and possessed, controlled and supervised the area in which Plaintiff s accident is alleged to have occurred, thereby barring recovery.

109.    The acts and/or omissions alleged by Plaintiff to have caused the accident and injuries complained of are the acts and/or omissions of an independent contractor for which Defendant EQT cannot be held liable.

110.    Any and all claims of the Plaintiffs' are barred by the applicable statute of limitations, *laches, estoppel* and/or waiver.

111.    Plaintiff has failed to state a claim or claims upon which relief may be granted.

WHEREFORE, Defendant EQT Production Company denies that it is liable to Plaintiffs in any sum or sums whatsoever and demands judgment in its favor with costs of suit.

Respectfully submitted,

**MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN**

BY:    _____

_____
Joseph V. Lesinski, Esquire
*Attorney for Defendant EQT Production Company*

DocuSign Envelope ID: F81079B2-2A73-4BE1-BBBD-55B90C880920

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing **ANSWER AND NEW MATTER** has been served upon the below listed counsel of record via electronic mail and/or U.S. Mail, postage pre-paid, this _____ day of February, 2023, as follows:

Paul Robinson, Esquire
Benjamin Sorisio, Esquire
Meyer Darragh Buckler Bebenek & Eck
US Steel Tower, Suite 4850
600 Grant Street
Pittsburgh, PA 15219
probinson@mdbbe.com
bsorisio@mdbbe.com

**MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN**

BY: _____
Joseph V. Lesinski, Esquire
*Attorney for Defendant  EQT Production
Company*

## **VERIFICATION**

I, _____Michael Lauderbaugh_____, am the _____Vice President of EHS____for EQT

Corporation and am authorized to execute this Verification on behalf of EQT Production

Company. I hereby verify that the facts set forth in the foregoing **ANSWER AND NEW**

**MATTER** are true and correct to the best of my knowledge, information and belief.  If the above

statements are not true, the deponent is subject to the penalties of 18 Pa.C.S. § 4904 relating to

unsworn falsification to authorities.

DocuSigned by:

_Michael Lauderbaugh_
_____
A8718FCE3A784B8...

DATE: ___3/24/2023 | 9:45 AM EDT___

**DocuSign**

## Certificate Of Completion

Envelope Id: F81079B22A724BF1BBBD55B90C880920                           Status: Completed
Subject: Complete with DocuSign: EQT - Answer Final (3-23-23 JVL) (152478950_1).DOCM
Source Envelope:
Document Pages: 24                    Signatures: 1                     Envelope Originator:
Certificate Pages: 2                  Initials: 0                       Jeffrey Roberts
AutoNav: Enabled                                                        625 Liberty Ave Ste 1700
EnvelopeId Stamping: Enabled                                            Pittsburgh, PA  15222
Time Zone: (UTC-05:00) Eastern Time (US & Canada)                      JDRoberts@eqt.com
                                                                       IP Address: 67.20.231.88

## Record Tracking

Status: Original                      Holder: Jeffrey Roberts          Location: DocuSign
        3/23/2023 6:14:01 PM                  JDRoberts@eqt.com

| Signer Events | Signature | Timestamp |
|---|---|---|
| Michael Lauderbaugh<br>Mike.Lauderbaugh@eqt.com<br>Vice President of EHS<br>EQT Corporation<br>Security Level: Email, Account Authentication (None) | *Michael Lauderbaugh*<br>A8716FCE3A784B8...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 136.226.49.9 | Sent: 3/23/2023 6:15:40 PM<br>Viewed: 3/24/2023 9:42:55 AM<br>Signed: 3/24/2023 9:45:52 AM |
| **Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Carrie Wolf<br>cwolf@eqt.com<br>Sr Paralegal<br>EQT Corporation<br>Security Level: Email, Account Authentication (None) | **COPIED** | Sent: 3/23/2023 6:15:40 PM |
| **Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | | |
| Lesinski, Joseph V.<br>jvlesinski@mdwcg.com<br>Security Level: Email, Account Authentication (None) | **COPIED** | Sent: 3/23/2023 6:15:41 PM<br>Viewed: 3/23/2023 6:18:30 PM |
| **Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | | |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 3/23/2023 6:15:41 PM |
| Certified Delivered | Security Checked | 3/24/2023 9:42:55 AM |
| Signing Complete | Security Checked | 3/24/2023 9:45:52 AM |
| Completed | Security Checked | 3/24/2023 9:45:52 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

# EXHIBIT C

**MASTER SERVICES AGREEMENT**

**BETWEEN**

**EQT Production Company**

**AND**

**Seven Point Energy Services, Inc.**

**EFFECTIVE** ___January___ __8_____, **20**__18____

## TABLE OF CONTENTS

**ARTICLE 1 – DEFINITIONS**

1.1    Purchase Order

1.2    Work

1.3    Project

1.4    Contract Documents

1.5    Company

1.6    Affiliate

1.7    Delivery Point

1.8    Equipment

1.9    Material

1.10    Permits

1.11    Pick-Up Point

1.12    Worksite

1.13    Contractor

**ARTICLE 2 – CONTRACT DOCUMENTS**

2.1    Scope

2.2    Priority

2.3    Term

2.4    Authorized Representative

**ARTICLE 3 – PAYMENT**

3.1    Invoices/Payments

3.2    Withholding Payments

3.3    Acceptance of Final Payment

3.4    Payment to Subcontractors and Suppliers

3.5    Setoff

**ARTICLE 4 – CHANGES**

4.1    Changes in the Work

4.2    Change Orders

4.3    Adjustment Methods

**ARTICLE 5 – SCHEDULE OF WORK**

5.1    Time is of the Essence

5.2    Delays, Force Majeure

**ARTICLE 6 – TERMINATION**

6.1     Project Termination for Convenience

6.2     Project Termination for Default

**ARTICLE 7 – BONDS**

7.1     Performance Bonds

**ARTICLE 8 – CONTRACTOR WARRANTY**

8.1     Warranty of Work

8.2     Equipment Warranty

**ARTICLE 9 – CONTRACTOR REPRESENTATIONS**

9.1     Contractor Skill and Judgment

9.2     Local Conditions

9.3     Review of Contract Documents

9.4     Licensing of Contractor

9.5     Materials to be Furnished

9.6     Quality of Work

9.7     Documentation

9.8     Waiver of Lien Rights

9.9     Use of Company's Equipment

9.10     Provisions for Inspection, Audit

9.11     Cleanup

9.12     Protection of the Work

9.13     Non-Contracted Services

9.14     Property Owner Claims

9.15     Uncovering and Correction of Work

9.16     Substitutions

9.17     Contractor Personnel

9.18     Performance of Services

9.19     Contract Carrier Status

9.20     No Commingling of Materials

9.21     Drivers

9.22     Hazards

9.23     Records

9.24     Treatment and Disposal Facilities

9.25     Characterization and Sampling

**ARTICLE 10 – LIMITATION OF ACTION**

10.1    Limitation of Action

**ARTICLE 11 – INSURANCE**

11.1    Insurance Requirements

**ARTICLE 12 – INDEMNITY**

12.1    Contractor Indemnity Obligations

12.2    Intellectual Property Indemnity

12.3    Counsel for Indemnitees

12.4    Waiver and Additional Defendant Joinder

12.5    Care, Custody and Control – Acceptance and Risk of Loss

**ARTICLE 13 – LABOR RELATIONS**

13.1    Labor Harmony

**ARTICLE 14 – COMPLIANCE WITH LAWS**

14.1    Applicable Laws

14.2    Environmental Compliance

14.3    Safety Compliance

14.4    Other Laws

14.5    Affirmative Action Notice

14.6    Certifications

14.7    Required Notices to Company

14.8    Governmental Reporting Requirements

14.9    Protection of Personal Information

14.10    Additional Environmental, Health and Safety Responsibilities and Liabilities

**ARTICLE 15 – CONFIDENTIALITY**

15.1    Confidentiality Obligations

15.2    Use of Company's Name

15.3    Injunctive Relief

**ARTICLE 16 – RELATIONSHIP OF PARTIES**

16.1    Independent Contractor

16.2    No Agency

16.3    Persons Hired by Contractor

**ARTICLE 17 – TAXES**

17.1    Taxes and Withholding

**ARTICLE 18 – DISPUTE RESOLUTION**

18.1     Dispute Resolution

18.2     Joint Defense

**ARTICLE 19 – GENERAL PROVISIONS**

19.1     Governing Law

19.2     No Third Party Beneficiaries

19.3     Amendments

19.4     Survival of Provisions

19.5     Pennsylvania Act 7 Waiver

19.6     Counterparts

19.7     No Implied Waivers

19.8     Severability

19.9     Entirety of Agreement

19.10    Assignment and Subcontracting

19.11    Notices

19.12    Headings

19.13    Financial Disclosure

19.14    Records Retention

19.15    Supplier Diversity

19.16    Code of Conduct

**Schedule A     Insurance Requirements**

## **MASTER SERVICES AGREEMENT**

THIS MASTER SERVICES AGREEMENT is made and entered into as of the _8__ day of ___January___ 20_18_, by and between EQT Production Company, a Delaware corporation, having a business address at 625 Liberty Avenue, Suite 1700, Pittsburgh, PA 15222(EQT Production Company or "Company"), and Seven Point Energy Services, Inc., a Pennsylvania corporation, having a business address at 1006 Loop Street #4, Aspinwall, PA 15215 ("Contractor").  The parties collectively shall be referred to as "Parties" and individually as "Party."

**WHEREAS,** for the regular conduct of its work and business, Company requires and Contractor is willing to provide, the Work described below.

In consideration of the mutual promises, undertakings and covenants contained herein and contained in any Purchase Order executed by the Parties, and intending to be legally bound hereby, the Parties hereto agree and covenant as follows:

### **ARTICLE 1 – DEFINITIONS**

The following definitions apply in addition to the other definitions in this Agreement:

**1.1     Purchase Order**.  The term "Purchase Order" means the order(s) of purchase issued by the Company to the Contractor and identifying the Project, project number, project location, scope of work, and any applicable specifications, drawings, company requirements, completion date, fixed price, guaranteed maximum price or unit prices and/or any other terms specific to a Project to be performed under the Contract Documents.

**1.2     Work**.  The term "Work" means the services required of Contractor by the Purchase Order, whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations.  It contemplates the complete performance of the Work as may be reasonably inferred from specifications, drawings, or other Company requirements referenced in the Purchase Order and other Contract Documents.

**1.3     Project**.  The term "Project" is the location where the Work is performed under the Purchase Order and which may include other services by Company or by separate contractors.

**1.4     Contract Documents**.  The term "Contract Documents" is defined in Section 2.1.

**1.5     Company**.    The term "Company" means EQT Production Company and any Affiliate of EQT Corporation ("EQT") that issues one or more Purchase Orders for Work under this Agreement that are accepted pursuant to Section 2.1 hereof.

**1.6     Affiliate**.    The term "Affiliate" includes any corporation, partnership, limited liability company, or other domestic or foreign entity wholly-owned or controlled by EQT Corporation.

**1.7     Delivery Point.** The term "Delivery Point" means the specific delivery point(s) described in the Contract Documents.

**1.8     Equipment.**  The term "Equipment" means any facilities, equipment, personal protective equipment, machinery, tools, instruments, apparatus, appliances, computers, communication apparatus, software, electronics, vehicles, parts, structures, temporary structures, vessels, tanks, trailers, rentals and other goods, including items rented by Company from Contractor, used in association with the provision of services hereunder.

**1.9     Material.**  The term "Material" means materials and/or equipment to be transported by Contractor, its subcontractors and agents from the Pick-up Point to the Delivery Point as described in the Contract Documents and through final disposition at the destination facility (as defined in the Purchase Order or other Contract Documents).

**1.10     Permits.**  The term "Permits" means all permits, consents, approvals, authorizations, certificates, licenses, and similar instruments issued by the proper authorities or other person(s) that may be applicable to or are required in association with the delivery of or provision of the services by the Contractor.

**1.11     Pick-up Point.** The term "Pick-up Point" means the specific pick-up point(s) as described in the Contract Documents.

**1.12    Worksite.** The term "Worksite" means any place(s) owned, occupied or controlled by Company or where Materials are to be picked up or services are to be conducted by Contractor as may be further described in the Contract Documents.

**1.13    Contractor.** The term "Contractor" means Contractor and its subcontractors, and each of their respective personnel who are in any way involved with the services or any other matters arising under this Agreement, and shall also include persons who are the successors of Contractor and its subcontractors, in addition to any invitees of Contractor (and means all such parties collectively and each of them individually).

## ARTICLE 2 – CONTRACT DOCUMENTS

**2.1    Scope**.

2.1.1      The Parties acknowledge that from time to time, Company may request that Contractor perform work and services on one or more of its projects.  The Company and Contractor agree that, in the event, Company desires to engage Contractor to perform work and services in connection with one or more such projects and desires to accept Contractor's bid or price quotation for the scope of work, Company shall issue a Purchase Order containing a scope of work to be performed at any identified Project.   Company and Contractor agree that, with respect to every Project awarded to Contractor, all Work performed by Contractor shall be in accordance with and governed by the Purchase Order issued by the Company to Contractor to which this Agreement is incorporated, this Master Services Agreement, and all bills of lading, specifications, drawings, schedules, riders, exhibits, supplements, amendments, addenda, standards and other conditions referenced therein (collectively hereinafter defined and referred to as the "Contract Documents"). ANY SUCH PURCHASE ORDER(S) ISSUED BY THE COMPANY OR PURSUANT TO SECTION 2.1.2 SHALL BE DEEMED ACCEPTED BY CONTRACTOR ACCORDING TO ITS TERMS UPON THE DATE OF ISSUANCE (UNLESS CONTRACTOR NOTIFIES COMPANY TO THE CONTRARY IN WRITING WITHIN THREE (3) BUSINESS DAYS OF RECEIPT) OR, IF EARLIER, UPON CONTRACTOR'S ACKNOWLEDGEMENT, COMMITMENT OR BEGINNING OF PERFORMANCE.

2.1.2      Any Affiliate may issue one or more Purchase Orders for Work under this Agreement and upon acceptance of any such Purchase Orders in accordance with clause 2.1.1. hereof:

(A)       Contractor shall be deemed to have entered into a separate and enforceable Master Services Agreement identical to this Agreement (excluding any Contract Documents specific to the Work for EQT Production Company but between such Affiliate and Contractor and such Master Services Agreement shall be incorporated into the Purchase Orders issued by Affiliate.

(B)       Each Affiliate shall be liable to Contractor only for the obligations, and may exercise against Contractor only the rights set forth under each Purchase Order issued by such Affiliate and accepted by Contractor.

(C)       Contractor shall be liable to such Affiliate only for the obligations, and may exercise against such Affiliate, only such rights set forth under Purchase Orders issued by such Affiliate and accepted by Contractor.

(D)       The address for notices to any such Affiliate shall be set forth in the first Purchase Order issued by such Affiliate and if not so set forth shall be to the attention of the Procurement Director of such Affiliate at EQT Plaza, 625 Liberty Avenue, Suite 1700, Pittsburgh, PA 15222-3111, with a copy to the General Counsel at the same address.

(E)       Unless otherwise expressly stated therein or agreed to in writing by such Affiliate and Contractor, no amendment to this Master Services Agreement shall constitute an amendment to such Affiliate's Master Services Agreement and,

(F)       Without limiting the generality of the foregoing, (i) Contractor hereby agrees that it may not, as to any Purchase Order issued by such Affiliate and accepted by Contractor, exercise any right or remedy against EQT Production Company or any of EQT's other affiliates as a result of any breach or violation of the Contract Documents of the Purchase Order-issuing Affiliate including, without limitation, bringing suit against EQT Production Company or any of EQT's other Affiliates and (ii) such Affiliate hereby agrees that it may not, as to any Purchase Order issued by any of its Affiliates and accepted by Contractor, exercise any right or remedy against Contractor.

**2.2    Priority**. Wherever possible, the Contract Documents are to be read as cumulative and complementary. However, to the extent that any provisions of any of the Contract Documents are or may be inconsistent, the Contract Documents shall be interpreted and applied in the following order of priority: (a) the provisions of this Agreement, including Schedule A, except to the extent specifically superseded by a provision in the Purchase Order or another

Contract Document issued by the Company; (b) the Purchase Order issued by Company; (c) the schedules and other documents attached to and incorporated into the Purchase Order; (d) the schedules and other documents attached to and incorporated into this Agreement; and (e) the remaining Contract Documents under and made a part of this Agreement.

**2.3    Term**.  This Master Services Agreement is effective as of the date first above written and, unless earlier terminated in accordance with Article 6, below, shall have a primary term of three (3) years and shall continue thereafter on a contract-year to contract-year basis.  Purchase Orders may be issued at any time during the term of this Agreement and, subject to Article 6, remain in effect until the Work to be performed under the Purchase Order is completed.  The term of this Agreement and such other applicable Contract Documents shall be extended for such periods beyond its expiration date as may be necessary to complete the Work under any then outstanding Purchase Order.

**2.4    Authorized Representative.**  If the Company designates one or more persons to be its Authorized Representative(s) when on-site at a Project and/or for other off-site Project related matters, Contractor shall contact only such person(s) for instructions, orders and/or directions, except as may be may otherwise provided herein or in an emergency.

## ARTICLE 3 – PAYMENT

**3.1    Invoices/Payments.**  Contractor may invoice Company on a monthly basis, such invoice providing sufficient detail to support Contractor's request for payment for the services and materials supplied and indicating the applicable Purchase Order Number.  Company reserves the right to review and approve, in whole or in part, any invoice for payment from Contractor.  Unless otherwise specified by Company or expressly indicated on the Purchase Order, Company shall pay all approved amounts within thirty (30) days after Company receives Contractor's invoice, subject to any applicable retainage, conditions, or other adjustments.  Company may elect to condition payment(s) on Final Completion of the Work by the completion date, if any, identified in the Purchase Order or other Contract Documents.  Final Completion of the Work means the date Company agrees Contractor's Work is fully complete, satisfactory and acceptable in accordance with the Contract Documents, and the Contractor has completed all items on any punch lists issued by the Company, including all required Project warranties and other documentation.

**3.2    Withholding Payments**.  Contractor agrees that payments may be withheld by Company by reason of:

**(A)**    Defective work not remedied.

**(B)**    Claims filed against Company by third parties relating to Contractor's Work.

**(C)**    Failure of Contractor to make payment to subcontractors and material suppliers.

**(D)**    Evidence that the Work cannot be completed for the unpaid balance of the Purchase Order price.

**(E)**    Damages or losses incurred by Company for which Contractor is required to indemnify Company.

**(F)**    Reasonable evidence that the Work will not be completed within the agreed time period and that the unpaid balance, if any, will not be adequate to cover the Company's damages for the anticipated delay.

**(G)**    Contractor's failure to carry out the Work in accordance with the Contract Documents to the satisfaction of Company.

**3.3    Acceptance of Final Payment**.  Final payment shall constitute a waiver of all claims by the Contractor relating to the Contractor's Work, but shall in no way relieve the Contractor of liability for warranty obligations or for faulty or defective Work appearing after final payment.

**3.4    Payment to Subcontractors and Suppliers.**  Contractor shall promptly pay all of its subcontractors, suppliers, materialmen, and other persons engaged in or about the performance of the Work.  In the event Contractor fails to make prompt payment of any sums due to its subcontractors, suppliers, materialmen or other persons for work done or materials furnished, then in addition to all other rights granted to Company under the Contract Documents or by law, Company shall have the right, but not the duty, to retain out of any payment due or to become due to Contractor an amount sufficient to discharge all sums claimed or demanded by said subcontractors, suppliers, materialmen or other persons engaged by the Contractor.  Contractor hereby specifically empowers and authorizes Company to pay to said subcontractors, suppliers, materialmen or other persons engaged by Contractor all sums

claimed for materials sold or labor performed out of the monies due or to become due, but exercise of the rights and authority granted hereunder shall be at the sole discretion of Company.

**3.5     Setoff**.   Company shall have the right to set off any amounts which may become payable to Company or its affiliates from Contractor under the Purchase Order and the other Contract Documents for a Project, or any other contract between all or some of these parties, against any amounts which Company may owe to Contractor under a Purchase Order or other Contract Documents for this Project or any other Projects.

## ARTICLE 4 – CHANGES

**4.1     Changes in the Work.**

**4.1.1**     Changes in the Work may be accomplished without invalidating the Contract Documents by Change Order issued by the Company at any time. No changes are to be made, however, except upon a written Change Order issued from the Company to Contractor, and the Company shall not be held liable to Contractor for any extra labor, materials, or equipment furnished in the absence thereof, or for any extra work necessitated by any action or omission of Contractor or a third party.

**4.1.2**     A Change Order shall be binding and deemed accepted by Contractor according to its terms upon the date of issuance (unless Contractor notifies Company to the contrary in writing within three (3) business days of receipt) or, if earlier, upon Contractor's acknowledgement, commitment or beginning of performance.

**4.1.3**     Changes in the Work required by Change Orders shall be performed under applicable provisions of the Contract Documents and the Contractor shall proceed promptly, unless otherwise directed in the Change Order.

**4.2     Change Orders.**

**4.2.1**     A Change Order is a written directive or other instrument prepared and issued by the Company stating:

**(A)**     A change in the scope of work;

**(B)**     The amount of the adjustment to price, utilizing, as applicable, any unit rates set forth in the Purchase Order or other Contract Documents, or another method listed in Section 4.3; and/or

**(C)**     The extent of the adjustment, if any, to the Project end date.

**4.3     Adjustment Methods.**

**4.3.1**     The price for a Change Order may be based on one of the following methods:

**(A)**     Mutual acceptance of a lump sum properly itemized and supported by sufficient substantiating data to permit evaluation;

**(B)**     Unit rates, if any, stated in the Purchase Order or otherwise agreed upon;

**(C)**     To facilitate a determination, Company may require Contractor to submit within five (5) days of request a firm proposal for review for performance of a Change Order; and/or

**(D)**     As provided in Section 4.3.2.

**4.3.2**     If the Contractor and Company disagree with the method for determining the price for the changed Work, the method and the adjustment shall be determined on the basis of reasonable expenditures and savings relating to the change, including a reasonable allowance for overhead and profit, as calculated by the Company from the components set forth below, unless otherwise provided in this Agreement.  Contractor shall keep and present, in such form as the Company may prescribe, an itemized accounting, together with appropriate supporting data, for such purposes.

**(A)**     Costs of labor, including social security and unemployment insurance, fringe benefits required by agreement or custom and workers' compensation insurance.

**(B)**      Costs of materials, supplies and equipment, including cost of transportation, whether incorporated or consumed;

**(C)**     Rental costs of machinery and equipment, exclusive of hand tools;

**(D)**    Costs of premiums for all bonds and insurance, permit fees, and sales, use or similar taxes related to the changed Work; and

**(E)**    Additional costs of supervision and field office personnel directly attributable to the changed Work.

**(F)**    Ten (10%) percent overhead and five (5%) profit on all permitted costs.

**4.3.3**    Amounts not in dispute for such changes in the Work shall be invoiced by Contractor accompanied by a Change Order indicating the Parties' agreement with part or all of such costs. Costs that remain in dispute shall be subject to the dispute resolution procedures provided in Article 18.

## ARTICLE 5 - SCHEDULE OF WORK

**5.1    Time Is of the Essence**. With respect to performance on the part of Contractor, time is of the essence. Contractor shall perform its Work so that the entire Project may be completed in accordance with the Contract Documents, completion date and schedule of work, if any, identified in the Purchase Order. The Company shall have the right to decide the time, order and priority in which the various portions of Work shall be performed and all other matters relative to the timely and orderly conduct of the Contractor's Work.

**5.2    Delays, Force Majeure**. Any delays for which the Contractor will be entitled to an extension of time for completion will only be delays caused by conditions over which the Contractor has no control or delays due to the Company. Extensions of time will only be granted pursuant to the procedures for Change Orders set forth in Article 4. Contractor acknowledges that it shall not be entitled to receive or make any claims for compensation for delays, acceleration, inefficiency or other type of impact resulting from any delays encountered by Contractor. Contractor acknowledges that such delay claims shall be fully compensated by an extension of time to complete the Work regardless of when granted.

## ARTICLE 6 - TERMINATION

**6.1    Project Termination for Convenience**. The Company shall have the right to terminate or suspend the Work or any part thereof under any Purchase Order and/or such other applicable Contract Documents, for its convenience and without cause, at any time, by providing forty-eight (48) hours prior written notice to Contractor. Upon receipt of such notice, Contractor shall immediately cease performance of the Work except as may be authorized by the Company as being necessary to preserve or protect Work previously performed. In the event of termination or suspension under this Section, Contractor shall be entitled to a percentage of the Purchase Order price for the Project Work reflecting the percentage of Project Work actually completed in accordance with the Contract Documents prior to the effective date of such termination or suspension. Payment of the sums hereunder from Company to Contractor shall be subject to any conditions precedent or charges set forth in the Contract Documents. The rights and remedies set forth above are the sole and exclusive remedies of Contractor in the event of a termination or suspension without default and Company shall have no other liability to Contractor on account of or for any damages, including lost profits for work performed or not performed, arising out of such termination or suspension.

**6.2    Project Termination for Default.**

**6.2.1**    Contractor shall be deemed in default under and in breach of the Contract Documents whenever Contractor shall:

**(A)**    Suffer voluntary or involuntary bankruptcy.

**(B)**    Make a general assignment for the benefit of its creditors.

**(C)**    Become insolvent however evidenced or have a receiver appointed for it on account of insolvency.

**(D)**    Fail to supply sufficient labor and materials or to make adequate provision for the timely performance of the Work for the Project.

**(E)**    Fail to make prompt payment when due to its subcontractors and suppliers for material or labor.

**(F)**    Fail to comply with any requirement or provision of the Contract Documents.

**(G)**    Violate or allow a violation of any law or regulation applicable to the performance of its Work.

**(H)**    Violate Company's safety, environmental, controlled substances or other applicable rules and policies.

**(I)**     Fail to provide Company with adequate assurances as of the timeliness or quality of its performance within two (2) days after receipt of a written demand from Company for such assurances.

**(J)**     Permit any performance, security or insurance policy required to be maintained by the Contract Documents to be suspended or canceled without Contractor's providing immediate replacement coverage; or upon the insolvency of the issuing financial or insurance institution, to fail to provide an immediate replacement performance, security or insurance policy.

**6.2.2**     In the event of a default by Contractor under Paragraph 6.2.1 above, Company shall have the right:

**(A)**     To remedy the Contractor's deficiency and deduct the cost therefore  from any payment then or thereafter due to the Contractor;

**(B)**     To terminate the Purchase Order and/or such other applicable Contract Documents for the Work or any part thereof and take possession of all materials, tools, equipment and appliances and complete the Work by whatever method the Company deems expedient. Contractor hereby specifically authorizes Company to undertake and charge the cost thereof to Contractor of Company (1) completing the Work itself with labor and materials priced at the prevailing rates with proper allowances for profit and overhead; (2) agreeing with others, through one or more contracts, to finish the Work at such prices and on such terms and conditions as Company deems advisable in its sole discretion; or (3) to finish a portion of the Work itself and to contract with others to finish the remaining portion of the Work.

**(C)**     To pursue any other remedy provided under the Contract Documents or available at law or equity and recover all expenses incurred by Company arising from Contractor's default, including without limitation, all reasonable attorneys' fees and expenses.  Exercise by Company of any such remedy or right shall not be an election of remedies nor restrict Company's right to assert any other available right or remedy, nor operate to relieve Contractor of further liability and any and all damages, including consequential damages, sustained by reason of Contractor's default, unless and only to the extent expressly provided otherwise in the Contract Documents.

**6.2.3**     In the event Contractor is declared in default, Contractor grants Company a security interest in all of its tools, equipment and materials on the Project site for completion of the Project Work and as security for any damages the Company may incur as a result of Contractor's default. In the event of termination under Section 6.2, the Contractor shall promptly assign and transfer to the Company, as directed by Company, all subcontracts, orders and commitments which the Company may request be transferred or assigned, to mitigate the Company's damages, and Contractor shall execute and deliver all such documents and take all such action as the Company may require to fully vest in the Company the right of the Contractor in and to the same.

**6.2.4**     Contractor shall be liable to the Company for the Company's actual and reasonable costs in excess of the unpaid portion of the Purchase Order price, as may be amended by Change Order, incurred by the Company or any party acting on the Company's behalf in completing the Project Work.  Contractor shall be liable to Company for all costs incurred as a result of accelerated or expedited methods in order to meet the original schedule completion dates, or otherwise mitigate any delay caused by such default and all legal fees and additional expenses incurred as a result of Contractor's default.  Company shall be entitled to withhold further payments to the Contractor unless and until the Company determines that the Contractor is entitled to further payments. Upon completion of the Project Work by the Company or third parties, the total cost of the Work and/or cost impact of Contractor's default shall be determined; and the Company shall give Contractor notice of said amount.  If such costs and damages exceed the unpaid balance of the Purchase Order price as amended, the Contractor shall pay the difference to the Company.  If a court of competent jurisdiction or arbitrator shall determine that Company's termination for default was wrongful, or in breach of the Contract Documents, Contractor agrees that said termination shall convert to and be deemed a termination without default consistent with the terms of Section 6.1.

## ARTICLE 7 – BONDS

**7.1     Performance Bonds.**     Company shall have the right to require Contractor to furnish bonds covering the faithful performance of the Work and the payment of obligations arising thereunder in such sums as the Company may designate.  If the requirement for said bonds was not part of the scope of the Purchase Order, the costs to secure said bonds shall be agreed upon by Change Order.  Upon the request of Company or any person or entity appearing to be a potential beneficiary of bonds covering payment of obligations arising under the Work, Contractor shall promptly furnish a copy of the bond(s) or permit a copy to be made by any such potential beneficiary.

## ARTICLE 8 – CONTRACTOR WARRANTY

**8.1     Warranty of Work.** Contractor warrants its Work against all deficiencies and defects in materials and/or workmanship and as required in the Contract Documents. Contractor shall guaranty or warrant its Work for a period of no less than one (1) year from the date of substantial completion of its Work. In addition, any manufacturer's warranties shall be assigned to the Company if permitted by manufacturer. If such assignment is not permitted by manufacturer, Contractor shall require any such manufacturers to comply with all warranty obligations granted to Contractor for the benefit of the Company.

**8.2     Equipment Warranty.** Contractor represents and warrants that the Equipment:

**(A)**     Shall be suitable for the particular Work and/or transportation required and fit for any special requirements related to the specific Work or Materials transported;

**(B)**     Shall be maintained and used in accordance with manufacturer's specifications and recommendations and good engineering and operational practices, and Contractor shall make maintenance records available to Company upon request;

**(C)**     Complies with specifications for equipment for such Work and/or transportation prescribed by any Applicable Laws, including those of the Federal Motor Carrier Safety Administration and OSHA. All trailers or cargo compartments shall be equipped so as to be capable of being placarded with placards identifying the Materials being delivered, where required by Applicable Laws or other Company requirements. The placards shall be of the size and dimensions specified by the facility where the Materials are loaded, or by Applicable Law;

**(D)**     Shall be uncontaminated, clean, and in good appearance on the exterior. The interior of bulk trailers shall be free of incompatible materials or materials which would contaminate the Materials and leak proof; and cargo compartments for packaged goods shall be clean, dry, leak proof, and odor free; and

**(E)**     Shall be fully inspected with equipment certifications available to Company upon request.

## ARTICLE 9 - CONTRACTOR REPRESENTATIONS

**9.1     Contractor Skill and Judgment.** Contractor agrees to furnish its best skill and judgment when discharging its obligations hereunder and to complete the Work in a good, workmanlike, safe, expeditious and economical manner, free from defects.

**9.2     Local Conditions.** Contractor accepts and is familiar or has familiarized itself with:

**(A)**     The conditions affecting construction at the Project site where the Work is to be performed.

**(B)**     The work to be performed by other contractors on the Project relating to the Work, either in nature or relevant in connection with the time for performance of the Work;

**(C)**     Contractor acknowledges all excavation is unclassified and includes excavation and removal of all materials encountered whatever in nature.

**(D)**     Contractor shall give Company immediate notice, confirmed in writing, before disturbing any unknown or unexpected subsurface or hidden archeological, historic, or other similar condition encountered by Contractor during the progress of the Work.

**9.3     Review of Contract Documents.** Contractor has reviewed the Contract Documents in detail and represents that there are no areas of ambiguity, confusion or conflict and Contractor is fully familiar with all terms, general and specific conditions and obligations of the Contract Documents. Contractor enters into the Purchase Order and Contract Documents based upon its own independent investigation of all such matters and not based on any discussions, statements or representations of the Company.

**9.4     Licensing of Contractor.** Contractor is properly licensed by the applicable public agencies to perform the Work as required by all applicable laws and regulations.

**9.5     Materials to Be Furnished.** All materials furnished and used in connection with the Work shall be new, of good quality and approved by the Company. Contractor shall cause all materials and other parts of the Work to be readily available as and when required or needed for or in connection with the construction, furnishing and equipping of the Project or the Work.

**9.6      Quality of Work.**  Contractor will comply with the Contract Documents as they may be modified, will complete the Work in a good and workmanlike manner free from defects and will use the skill and judgment customarily utilized in the trade of Contractor in performing the Work.  The Work will at all times meet the approval of the Company. Contractor will inspect all surfaces prior to commencing work.  Contractor will not commence work until deficiencies and other surface/subsurface conditions that would adversely affect the integrity of Contractor's completed Work have been corrected.  Contractor shall inform Company immediately should any surface/subsurface be unacceptable to commence or continue the Work.  Contractor's start of the Work constitutes Contractor's acceptance of the existing surfaces and conditions.

**9.7      Documentation.**  Contractor represents that the information on all documentation furnished by Contractor to Company in connection with the Work, including bills of lading, invoices and Contract Documents, is true and accurate.

**9.8      Waiver of Lien Rights.**   To the extent permitted by applicable law, Contractor covenants, promises and agrees that no mechanic's or materialman's liens or claims of any kind shall be filed or maintained on the real property of the Project or any part thereof; provided, however, that the aforesaid waiver of Contractor's right to file a mechanic's lien shall be effective only to the extent that payment is actually received by Contractor for Work performed by Contractor. Additionally, Contractor shall submit to Company upon request with each pay application or invoice, including the final pay application or invoice, for itself and for each subcontractor, if any, conditional and unconditional waivers provided by Company for progress and final payments.  In the event that any mechanics liens or claims are filed by anyone in relation to the Work of the Contractor, Contractor shall have same discharged within five (5) days after receipt of notice thereof from Company.  Upon failure of Contractor to do so, Company may have said liens or claims discharged and the expense thereof, including any obligation assumed, deposit, bond, indemnity or otherwise, plus attorneys' fees shall be paid by Contractor and may be deducted by Company from any amounts due to Contractor.

**9.9      Use of Company's Equipment.**   The following terms apply to any specifications, drawings, designs, schematics, technical information, data, commodities, equipment, vehicles, material, patterns, tools, dies, gauges, test equipment, custom goods or components or other property or premises that are supplied by Company to Contractor (hereinafter "Company-Furnished Property"). Contractor, its agents, employees, subcontractors or suppliers shall not use Company-Furnished Property, including Company's equipment, including any vehicles without the express written permission of the Company's designated representative.  If Contractor or any of its agents, employees, suppliers or lower-tiered subcontractor utilize any machinery, equipment, tools, scaffolding, hoists, lifts or similar items owned, leased or under the control of the Company, with or without permission, Contractor shall defend and indemnify Company as provided in Article 12 herein for any loss or damage, including personal injury or death, which may arise from such use.  Contractor acknowledges that it is using any such Company equipment, "as is", and that there are no express or implied representations or warranties from Company to Contractor relating to the condition or fitness for any use of Company's equipment.  Contractor agrees to abide by the following:

**(A)  Title.**  Title to Company-Furnished Property shall remain with Company. Contractor shall segregate and clearly mark Company-Furnished Property to show Company's ownership and shall preserve Company's title thereto free and clear of all encumbrances. Contractor shall, if requested by Company, submit to Company an itemized inventory showing the description and location of each item of Company-Furnished Property. Company shall have the right to enter Contractor's premises to inspect Company-Furnished Property.

**(B)  Right of Removal.**  Should Contractor fail to perform the duties imposed upon it by this Section or should Company at any time have reason to believe that its title to or right to the possession of any Company-Furnished Property is threatened, Company shall have the right to enter upon Contractor's premises and remove such property, including all copies thereof.

**(C)  Return or Disposal.**  Upon completion or termination of this Agreement or, for Company-Furnished Property related to a specific Purchase Order, Contractor shall segregate all Company-Furnished Property and shall return it to Company or otherwise dispose of it as Company may direct.

**(D)  Abandonment.**  Company reserves the right to abandon Company-Furnished Property at no additional cost to Company upon issuance of written notification to Contractor of such intent.

**(E)  Maintenance.**  Contractor shall, at its expense, perform all maintenance, repairs and replacements necessary with respect to Company-Furnished Property so that the same may remain suitable for the use contemplated hereby

and may be returned to Company in as good condition as when received, except for reasonable wear and tear or consumption of materials necessarily resulting from their use.

**(F)  Notice of Defects.**  Contractor shall give Company prompt written notice of any Company-Furnished Property which upon delivery is found to be defective.  The correction or replacement of such defective property shall be accomplished at Company's written direction.

**(G) Risk of Loss.**  Upon delivery to Contractor, the risk of loss or damage to Company-Furnished Property shall be upon Contractor.  Risk of loss or damage shall transfer to Company when such property is returned to Company.

**9.10     Provision for Inspection, Audit.**  Contractor shall notify Company when portions of the Contractor's Work are ready for inspection.  Contractor shall, at all times, furnish the Company and its representatives adequate facilities for inspecting materials at the site or any place where materials under the Contract Documents may be in the course of preparation, process, manufacture, or treatment.  Contractor shall furnish to Company in such detail and as often as required, full reports regarding all aspects of the Contractor's Work irrespective of the location of such Work, including but not limited to, a list of all equipment being used or used (including description of equipment and serial numbers for equipment used or being used by Contractor and subcontractors) and payroll details (list of each employee participating in the performance, including employees of any subcontractors, along with copies of time cards, time sheets or other similar records for each employee of Contractor and its subcontractors).  Contractor shall provide such other access to its facilities and books and records, and those of its subcontractors and suppliers, as Company may request for inspection and/or audit purposes to obtain the information reasonably necessary to verify Contractor's required performance under the Contract Documents. Contractor shall reimburse Company for any and all expenses and damages arising from such inspection and/or audit, if Company reasonably determines that it paid for Work that was not performed, was performed incorrectly, was partially performed or other similar irregularities or fraudulent acts or omissions related to the Work or if Contractor breached its obligations hereunder.  Contractor shall also defend, indemnify and hold Company harmless from any and all third party Claims and Expenses (defined below) that may arise from the foregoing.

**9.11     Cleanup.**  In addition to its own cleaning obligations, Contractor shall follow Company's cleanup directions and, at all times, keep the Project free from debris and unsafe conditions resulting from Contractor's Work and keep all buildings or premises broom clean.  If Contractor fails to immediately commence cleanup duties within twenty-four (24) hours after receipt from Company of written notice of non-compliance, Company may implement such safety or cleanup measures without further notice and deduct the cost thereof from any amounts due or to become due Contractor.

**9.12     Protection of the Work.**  The Contractor shall take necessary precautions to properly protect the Contractor's Work, the work of others and Company-supplied materials from damage caused by Contractor's operations.  Contractor assumes all risk and responsibility for theft or damage to materials, including pipe and related materials supplied by Company and delivered to the Project site.  Should the Contractor cause or be responsible for damage to the work or property of Company or others, Contractor shall promptly remedy such damage or theft to the satisfaction of Company or Company may so remedy and deduct the cost thereof from any amounts due or to become due Contractor.

**9.13     Non-Contracted Services.**  Contractor agrees, except as otherwise provided in the Contract Documents, that no claim for non-contracted construction services rendered or materials furnished shall be valid or made. For such permitted claims, the Contractor shall provide Company notice:

**(A)**     Prior to furnishing of the services or materials, except in an emergency affecting the safety of persons or property;

**(B)**     In writing of such claim within three (3) days of furnishing such services or materials; and if Contractor fails to comply strictly with the requirements to timely notify Company in writing of any claims for non-contracted services, Contractor agrees that it waives all rights in respect thereto and shall not be entitled to make or file any such claim.

**9.14     Property Owner Claims.**  Restoration of property owned by third parties must be performed as soon as practical and in strict conformance with the Contract Documents. Contractor shall notify Company, in writing, immediately upon receiving notice of any claims for damages by third party property owners.

**9.15     Uncovering and Correction of Work.**  If a portion of the Work is covered contrary to the Company's request or to requirements in the Contract Documents, Contractor shall, if required in writing by Company, uncover said Work

for the Company's examination and be replaced at the Contractor's expense without changing the contract time.  If a portion of the Work has been covered for which the Company has not specifically requested to examine prior to being covered, Company may request to inspect such Work and it shall be uncovered by the Contractor.  If such Work is in accordance with the Contract Documents, the costs of uncovering and replacement shall, by appropriate Change Order, be at the Company's expense.  If such Work is not in accordance with the Contract Documents, correction shall be at the Contractor's expense unless the condition was caused by the Company or separate contractor, in which event, the Company shall be responsible for payment of such costs.

**9.16    Substitutions.**  Contractor shall make no substitutions in Contractor's Work unless permitted in the Contract Documents and only then upon first receiving all approvals required thereunder for substitutions.

**9.17    Contractor Personnel.** Contractor shall make available a sufficient number of trained and qualified personnel to complete the Work, and shall increase its work force as required and/or directed by the Company for the purpose of complying with the Schedule of Work.  Costs associated with such increase in work force shall be borne by the Contractor.  All personnel used by Contractor in the performance of the Work shall be skilled and qualified by training and experience to perform their assigned tasks.  At the request of the Company, personnel deemed by the Company to be unqualified or otherwise objectionable due to performance or other reasons, such as non-compliance with Applicable Laws, Safety Rules, or other requirements of the Contract Documents, shall be excluded from the Project.

**9.18    Performance of Services.**

**(A)**    If Contractor is acting as a broker, Contractor represents and warrants that it is duly registered with the US Department of Transportation as a broker pursuant to 49 USC § 13904.  Contractor further represents and warrants that it and each of its hauling subcontractors is, and each shall be, a motor carrier under 49 U.S.C. § 13102(14), is duly registered with the US Department of Transportation pursuant to 49 U.S.C. §§ 13902 and 13905, and maintains valid security measures pursuant to 49 U.S.C. § 13906.

**(B)**    Company may specify, from time to time, health, safety and environmental requirements in addition to those provided, or may supplement them with additional detail, and reserves the right to supplement or amend those requirements from time to time, with Contractor promptly and reasonably addressing all deficiencies.  Company reserves the right to audit the compliance program adopted by Contractor and observe compliance or non-compliance of Contractor, its Equipment and personnel with the Contract Documents and Applicable Laws.

**(C)**    Contractor affirms that it shall maintain a Federal Motor Carrier Safety Administration (FMCSA) safety rating of "Satisfactory".  Where there is any change in the regulatory safety rating of Contractor, it agrees to immediately notify Company.  Contractor shall comply with, and nothing in the Contract shall be construed as waiving Contractor's compliance with, all statutory registrations, insurance and/or safety requirements under Applicable Law.

**9.19    Contract Carrier Status**.  Without waiving or excusing Contractor's obligation to comply with all statutory registrations, insurance and/or safety requirements, the Parties intend that the contractual arrangement be that of contract motor carrier and for the terms and conditions of the Contract to take precedence over any terms and conditions which might apply to a shipper and common carrier.  Any use of form bills of lading, or other freight documents referring to "common carriers" and/or "tariffs", shall not alter the relationship hereunder.  The rules, rates and charges herein will apply to the exclusion of all other rules, rates or charges published between the same points, and the same routes, in Contractor's tariffs or publications, if any, except to the extent such tariffs are relevant to establishing the reasonable rates for shipments not otherwise specified by the Parties.

**9.20    No Commingling of Materials.** Contractor shall not commingle Materials with other materials or property of Company or other shippers without Company's prior written consent.

**9.21    Drivers.**  Contractor, its subcontractors and agents's drivers shall:

**(A)**    Be courteous and present a neat appearance;

**(B)**    Comply with all operational procedures for the Worksite or other loading or unloading facilities;

**(C)**    Provide driver abstracts, permits and tickets to Company upon request;

**(D)**    When on the Worksite or third party facilities loading or unloading the Materials, or when entering into and exiting such property, drivers shall minimize interference with the operations and shall take all necessary precautions to protect the premises and all persons and property thereon from damage or injury;

**(E)**      Comply with all applicable laws, including, but not limited to transportation laws such as speed limits, night hauling limitations, and road weights.

**9.22      Hazards.** For any services, Contractor shall examine all Worksites and surrounding areas and all particulars relating to services, make all investigations necessary for a full understanding of all difficulties and hazards which may be encountered in the performance of services and ensure that all identified difficulties and hazards are suitably addressed prior to commencement of services.  Company shall accept no responsibility for the failure of Contractor to gain a full understanding of any difficulties and hazards and shall not be liable for any increase in compensation, cost or expense to Contractor for Contractor's failure to reasonably anticipate difficulties and hazards that may be encountered.

**9.23      Records**.  Contractor is responsible to maintain complete and accurate records (including bills of lading, manifests, and, if appropriate, waste profile sheets) of the chain of custody and control of Materials hauled hereunder.

**9.24      Treatment and Disposal Facilities**.  Contractor shall deliver Materials only to suitably licensed and/or permitted treatment or disposal facilities that are authorized to accept, store, treat, recycle and/or dispose of the Materials being delivered and which have been pre-approved by the Company.

**9.25      Characterization and Sampling**.  The Company may require Contractor to provide characterization and/or sampling results for Materials to be delivered to any Company Worksites.

## ARTICLE 10 – LIMITATION OF ACTION

**10.1      Limitation of Action.**  Any action resulting from any breach of contract on the part of Company as to the performance of a Purchase Order or this Agreement shall be deemed settled and forgiven in full unless commenced within one (1) year after the cause of action has accrued.

## ARTICLE 11 - INSURANCE

**11.1      Insurance Requirements.** Contractor shall comply with the insurance requirements contained in Schedule A hereto, incorporated herein by reference.

## ARTICLE 12 – INDEMNITY

**12.1      Contractor Indemnity Obligations.**   To the fullest extent permitted by law, Contractor shall defend, indemnify, and hold harmless Company, its parent, subsidiaries, affiliates, co-owners, co-lessees and their partners, directors, officers, employees, agents, successors and assigns ("Indemnitees") from and against any and all claims, demands, causes of action, damages, liabilities, judgments, losses, fines, awards, penalties, costs and expenses, including attorneys' fees and other costs of defense (hereinafter "Claims and Expenses") arising out of or resulting from Contractor's Work or other performance under this Agreement and/or attributable to: (a) the negligent or willful act or omission of Contractor, its subcontractors, suppliers, employees, agents or invitees, or anyone acting under Contractor's direction or control in connection with the performance of the Work or for whose acts Contractor may be liable; (b) breach by Contractor of any representation or warranty of Contractor; (c) Contractor's failure to comply with any provision of this Agreement or the Contract Documents; (d) if Contractor transports or hauls Company property (including loading and unloading), any resulting damage or loss; or (e) Contractor's failure to comply with Applicable Laws, Safety Rules or Permits (defined below), including without limitation any corrective measures which may be required.

**12.2      Intellectual Property Indemnity.**  Contractor's indemnity obligations under section 12.1 shall apply to and include any infringement or claim of infringement by the Work or any part thereof of any patent, copyright, trade secret or other third-party intellectual property right.  Contractor agrees to pay all royalties and license fees which may be due upon the inclusion of any patented or otherwise infringing materials in the Contractor's Work.  At its sole option, Company may be represented by and actively participate through its own counsel in any such infringement suit or proceeding, and the costs of such representation shall be paid by Contractor.  Without in any way limiting Company's rights and Contractor's obligations, in the event that the Work or any part of the Work is held to constitute infringement or its use is enjoined, Contractor shall, at Company's option and Contractor's sole expense, in a timely manner:  (a) procure for Company a license or other right to continue using the affected Work; (b) replace the affected Work with a substantially equivalent non-infringing property; or (c) modify the Work or part of the Work so it becomes non-infringing but is substantially, functionally equivalent.

**12.3    Counsel for Indemnitees.**  Contractor's defense of the Indemnitees under this Article 12 shall be undertaken with counsel acceptable to the Indemnitee or Indemnitees represented; provided that Company may hire its own counsel in defense of Claims and Expenses at the sole cost of Contractor to the extent a conflict of interest exists, as reasonably determined by Company, and Company will not settle or pay a final award of Claims and Expenses that directly affects Contractor without obtaining Contractor's prior approval.

**12.4    Waiver and Additional Defendant Joinder.**  Contractor's obligations under this Article 12 shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by Contractor pursuant to any applicable workers' compensation, disability or other employee benefit law, program or policy ("Employee Benefit Laws") and Contractor's indemnity obligations above shall include all Claims and Expenses arising from injuries or death of Contractor's or its subcontractors' employees or anyone acting on their behalf in providing the Work. Contractor hereby expressly waives the immunity provisions in the Employee Benefit Laws that prohibit its contribution or indemnity obligations as required by this Article 12 or precludes its joinder as an additional defendant in any action by Contractor's or its subcontractors' employees or anyone acting on their behalf in providing the Work.

**12.5    Care, Custody and Control – Acceptance and Risk of Loss.**

**A)**    The Materials shall be deemed to be accepted by Contractor at the time of the first to occur of the following: (a) Contractor has signed shipping papers, bills of lading or manifests which accompany the Materials; (b) Contractor has taken possession of the Materials; (c) Contractor has removed the Materials from the relevant Pick-up Point; and (d) Contractor has mixed the Materials with any other material; or (e) the Material passes from the Pick-up Point loading facility's last permanently installed connection of its loading equipment.

**(B)**    At and from the time that Contractor accepts the Material as provided herein, all title, and all future risk of loss, responsibility and all other incidents of ownership, custody and control of the Material shall transfer to, vest in, and be borne solely by Contractor.

## ARTICLE 13 - LABOR RELATIONS

**13.1    Labor Harmony.**  Contractor shall employ only such labor at a Project as can work in harmony with other trades and personnel on the Project and shall not cause dissension among any other workers or cause any work stoppages.  If a work stoppage occurs on the job, whether by workers employed by Contractor, its subcontractors or by others because of matters relating to Contractor's Work, Company shall have the right to terminate this Agreement in accordance with the procedures set forth in Article 6.  In any event, and in addition to any remedies set forth herein, Contractor shall be responsible to Company for all losses, damages and expenses incurred by Company as a result of any such work stoppage.

## ARTICLE 14 - COMPLIANCE WITH LAWS

**14.1    Applicable Laws.**  Contractor shall comply, and shall cause all of its subcontractors and agents to comply, with all statutes, rules, regulations, ordinances, requirements, judgments, decrees, and orders of each federal, state and local governmental authority, agency or court having jurisdiction over the Work, Contractor or the site where the Work will be performed (collectively, and including all licensing, permitting, or similar requirements thereunder, the "Applicable Laws"), including, but not limited to, the Fair Labor Standards Act of 1938 (29 U.S.C.  §§ 201-219), the Contract Work Hours and Safety Standards Act (40 U.S.C. §§ 327-332), Environmental Laws, all laws restraining the use of convict labor, the Americans with Disabilities Act, and Worker's Compensation Laws.  The term "Environmental Laws" shall mean all laws relating to pollution or protection of human health or the environment, or any threatened release or transportation of any hazardous material, including, but not limited to, Comprehensive Environmental Response, Compensation and Liability Act of 1980, Resource Conservation and Recovery Act, Clean Air Act, Toxic Substances Control Act, Safe Drinking Water Act, Hazardous Materials Transportation Act, and rules and regulations promulgated thereunder, and any state or local law equivalent.

**14.2    Environmental Compliance.**  Without limiting the generality of Section 14.1, Contractor shall not cause or permit a violation of any state or federal Environmental Laws, or perform Work in a manner that will subject a site to any remedial obligation under any Applicable Law.  Contractor shall take all steps necessary to determine that no Hazardous Materials as defined below – including hazardous wastes or Hazardous Materials in solid wastes – are disposed of or otherwise released, spilled, or discharged by Contractor, its employees, subcontractors or agents, except as may be specifically permitted by  Applicable Laws and the Contract Documents.  Contractor shall not cause or permit the disposal or other release, spill or discharge of any Hazardous Material.  Contractor shall keep or cause

the site to be kept free of Hazardous Material and shall remove the same (or if removal is not permitted by Applicable Laws, shall take all actions required by Applicable Laws) promptly upon discovery at Contractor's sole expense. Hazardous Materials shall include, but not be limited to:

**(A)**  polychlorinated biphenyls ("PCB");

**(B)**  asbestos or asbestos containing materials ("ACM");

**(C)**  any material or substance, whether solid, liquid or gaseous, that  is listed, defined, or regulated as a "hazardous, substance," "hazardous waste," "hazardous material," "oil," "brine," "pollutant," carcinogen, toxic substance or contaminant, or is otherwise regulated in or pursuant to any local, state or federal Environmental Laws;

**(D)**  materials, substances, chemicals or wastes as from time to time listed or defined by OSHA or the United States Environmental Protection Agency ("EPA") as hazardous, toxic, carcinogenic or contaminated;

**(E)**  health hazard or hazardous chemical or material as defined by OSHA in 29 C.F.R. 1910.1000 or 1910.1200 or as otherwise classified by Applicable Laws;

**(F)**  material, substance, chemical or waste subject to any right to know or hazardous communication requirements promulgated or issued by applicable governmental authority; and

**(G)**  explosives.

**14.3  Safety Compliance.**  The safety of the general public, including Contractor's employees and Company's employees, shall at all times be paramount and protected by Contractor in the performance of the Work. During performance of the Work, Contractor shall be responsible for the prevention of accidents and injury in the vicinity of or connected with Contractor's Work.  Without limiting the generality of Section 14.1, Contractor shall comply with the Federal Occupational Safety and Health Act of 1970, as amended ("OSHA"). Contractor shall comply with all health and safety standards established by the Company and any applicable site-specific safety plans, including without limitation any Company published contractor safety program, provided to Contractor (collectively "Safety Rules") and which Safety Rules are incorporated herein by reference.  Prior to commencement of Contractor's Work, Contractor shall provide to Company its current accident safety rating (Notice of Violations/Citations and Three-Year Incident Rate History).  Upon request, Contractor shall also provide a copy of its safety policy, material safety data sheets and all other requested safety related documents. Company reserves the right to order Contractor to stop Work on any part of the Work which Company deems unsafe until corrective measures satisfactory to the Company have been completed.   Absent advance written project-specific consent from Company, the possession or use of firearms, ammunition or weapons by Contractor is prohibited at all Company job sites, offices, or locations.  Company may direct the immediate removal from the site of any employee, subcontractor or agent of Contractor it deems is working in an unsafe manner or is not complying with OSHA, any other Applicable Laws, or the Safety Rules or does not possess the necessary training to perform the Work in a legally safe manner.  Contractor shall not bring on to the site equipment that is not properly guarded, in good working condition, or in compliance with OSHA, any other Applicable Laws or the Safety Rules. Contractor shall immediately remove from the site equipment not in compliance with the same or as directed by Company.

**14.4  Other Laws.**  Without limiting the generality of Section 14.1, Contractor and each of its subcontractors and agents shall comply with:

(a) the United States Department of Transportation, Minimum Federal Safety Standards, Title 49, Code of Federal Regulation, Part 192 ("DOT"), and The Guide for Gas Transmission and Distribution Piping Systems (hereinafter referred to as "ASME"), to the extent applicable;

(b) the Motor Carrier Safety Regulations of the DOT as set forth in Title 49 of the C.F.R., Chapter 3; and

(c) all requirements of the United States Department of Transportation's ("DOT") Drug and Alcohol Testing Program pursuant to Title 49, C.F.R., Parts 192 and 199 during the term of this Agreement, if applicable, with respect to its' employees, subcontractors, suppliers, agents or invitees or any party acting under Contractor's direction or control in connection with the performance of the Work or for whose acts Contractor may be liable; and further

(i) conduct legitimate and adequate criminal background checks reasonably satisfactory to Company based upon the scope of the Work prior to commencement of the Work and during the term of this Agreement;

(ii)  retain all original records (or legible copies thereof ) connected to such drug testing and background checks as legally required or if not legally required, until one (1) year after the expiration or termination of this Agreement or as required by Company; and

(iii)  upon request of Company and subject to applicable law, furnish Company copies of any results of the mandated testing and completed background checks.

**14.5     Affirmative Action Notice.**  Company is a federal government contractor and, as such, the provisions of 41 CFR § 60-1.4(a) are, if applicable, incorporated by reference. In addition, this Contractor and subcontractors shall abide by the requirements of 41 CFR § 60-300.5(a) and 41 CFR § 60-741.5(a). These regulations prohibit, respectively, discrimination against qualified protected veterans and qualified individuals on the basis of disability, and require affirmative action by covered prime contractors and subcontractors to employ and advance in employment qualified protected veterans and qualified individuals with disabilities.

**14.6     Certifications.**  Upon request, Contractor shall certify that it is in compliance with all Applicable Laws and Safety Rules.

**14.7     Required Notices to Company.**  Contractor shall immediately notify Company of the occurrence of:

**(A)** Any incident, release, spill, discharge, accident, action, loss, or existence of any unsafe or other condition which involves or could involve personal injury, environmental harm, or property damage or loss relating to the site, the Company, or the Work.

**(B)** Any potential, actual or pending site inspection, investigation, request for information, or inquiry by any person or governmental authority.

If notice is first given orally, Contractor shall provide written notice to Company as soon as possible, but no later than forty-eight (48) hours after providing oral notice.

**14.8     Governmental Reporting Requirements.**  Unless specified in the Contract Documents or otherwise required by Applicable Laws, Contractor shall not undertake to report for Company to any federal, state or local public agencies or officials any condition at the site, nor act as Company's agent with respect to any Applicable Laws or governmental inspection.  Company shall notify each appropriate agency or official, as required, of the existence of any condition at the site that creates an obligation to notify, and Contractor shall assist Company with any such notice requirements.  Contractor shall report to all federal, state or local public agencies or officials, as required, of the existence of a non-Company site that creates an obligation to notify such agency or official.

**14.9     Protection of Personal Information.**  Contractor shall, and shall cause its permitted subcontractors and agents to maintain technical, operational and organizational measures to protect the confidentiality of Personal Information (as defined below) in conformity with this Agreement and Applicable Laws.  If Contractor becomes aware of any unauthorized, unlawful and/or unintended use, access, disclosure, loss or destruction of Personal Information (each, a "Privacy Event"), or Contractor has a reasonable belief that substantial risk of a Privacy Event exists, Contractor shall promptly provide written notice thereof to, and identify individuals potentially affected thereby for Company.  For purposes of this paragraph, "Personal Information" means any information, whether in electronic or paper records, provided by Company or its agents or collected by Contractor for Company and/or its agents, that includes:  (a) an individual's last name and one or more of (i) such individual's Social Security number, drivers' license number or other state or federal identification number, (ii) such individual's bank, brokerage or other financial account number, or (iii) such individual's credit or debit card number; (b) an individual's username or email address in combination with a password or security question and answer that would permit account access; or (c) such other information as may be included in the definition of "personal information" (or similar term) under applicable state law.

**14.10     Additional Environment, Health and Safety Responsibilities and Liabilities.**

**(A)     Management of Materials.**  Contractor shall manage (including collection, transportation, handling, storage, treatment, recycling, reuse or disposal) all Materials in accordance with Applicable Laws.  Materials shall only be transported to the Delivery Point that is approved in writing by Company.  In the event that any Materials are not accepted by or cannot be delivered to such Delivery Point, Contractor shall contact Company immediately for further instructions, and Company shall, in its discretion, designate an alternative site for delivery.  Contractor shall fully document on the bill of lading or manifest the ultimate delivery point of the Material.  Contractor shall use ordinary care to keep the Materials in a secure condition pending further instructions from Company.  Contractor certifies that Contractor's employees (including drivers) have been, and they shall be, fully and properly trained and instructed in

the proper methods of collecting, transporting, handling, storing, treating, recycling, reusing and/or disposing of the Materials.

**(B)      Environmental Incidents**.   Contractor shall be fully responsible for any release or threatened release of Materials that Contractor is collecting, transporting, handling, storing, treating, recycling, reusing and/or disposing hereunder, or arising out of any violation of Applicable Laws relating to Contractor's collection, transport, handling, storage, treatment, recycling, reuse and/or disposal of the Materials.  If, in the course of the transportation of Materials or performance of the services by Contractor, there is any spill, discharge, release or threat of release of Materials, fuels, lubricants, motor oils or other pollutants, hazardous substances or regulated substances (as any of the aforementioned terms is defined by Applicable Laws) or other environmental incident involving Materials being managed in accordance with this Agreement, Contractor shall immediately notify Company and shall commence and carry out cleanup or other action to stabilize, mitigate and remedy the consequences thereof in accordance with Applicable Laws, directions from authorities and to Company's satisfaction, and shall pay all costs and expenses associated therewith.  Contractor shall, after consultation with Company, notify all persons required by Applicable Laws to be notified.  Any cleanup and response actions shall be completed as may be directed and to the satisfaction of Company.  At Company's sole option and discretion, Company may undertake, at any time, all or any portion of such cleanup or response action, and, upon Company's demand, Contractor shall provide prompt reimbursement to Company of the costs and expenses of any such measures taken.  Contractor trucks shall be equipped with a spill kit acceptable to Company.  Contractor certifies that Contractor's employees (including drivers) and subcontractors (as the case may be) have been, and they shall be, fully and properly trained and instructed in the proper methods of collection, transport, handling, storage, treatment, recycling, reuse and/or disposal of the Materials.

**(C)      Hazard Communication.**  Upon request, Company or its suppliers shall provide to Contractor Material Safety Data Sheets (to the extent available and/or applicable to the Materials) which include health, safety and other hazard communication information consistent with Applicable Laws for Materials loaded, handled and/or transported by Contractor. Contractor shall read such information and shall implement policies and practices relating to such Materials to ensure compliance with Applicable Law.   Contractor acknowledges that Contractor understands governmental and other relevant standards relating to the Materials and its constituents and will implement them. Contractor shall disseminate appropriate health and safety information to all personnel that Contractor foresees may be exposed to the Materials in the course of delivering the services.

## ARTICLE 15 - CONFIDENTIALITY

**15.1      Confidentiality Obligations.**  Contractor shall keep confidential and not, either during or after the performance of the Work, except as required in the course of performance of the Work or with the prior written consent of the Company, communicate or divulge to, or use for the benefit of Contractor or any other person, firm, association or corporation, any confidential or proprietary information of Company, including but not limited to the Contract Documents and information concerning (i) technical information in respect to the products and services of Company, including any inventions, discoveries, improvements, processes, business methods, product design information, patents and applications for patents, copyrightable work, software, including object and source code, and related trade secrets; and (ii) business information in respect to the products and services of the Company, including the names and contact information for the existing and potential customers of Company, market research and studies, future plans, business affairs, pricing, margins, discounts and costs (the "Confidential Information").   Contractor acknowledges and agrees that the Confidential Information of Company may include information that it develops as well as information that it learns from Company. All records, files, memoranda, reports, price lists, customer lists, drawings, plans, sketches, documents, software, including object and source code, equipment, and the like, relating to the business of the Company, which Contractor shall use or prepare or come into contact with, shall remain the sole property of Company and shall be returned to Company upon request or termination of Contractor's Work, together with all copies thereof.

**15.2      Use of Company's Name.**  Contractor may not use Company's name in advertisements, news releases, publicity statements, web sites, interviews, articles, brochures, client listings or other advertising or marketing materials without the prior written consent of Company.

**15.3      Injunctive Relief.**  Contractor agrees that, in the event of a breach or violation of this Article, the Company will not be adequately compensated by money damages.  Accordingly, Contractor expressly agrees that, upon such a breach or violation, the Company, in addition to all other remedies, shall be entitled as a matter of right to injunctive relief without the necessity of posting a bond or other security.   In the event a court in which relief is sought under the

foregoing provisions of this Agreement should determine that any of the above prohibitions are unreasonable, such provisions and related prohibitions shall be modified to conform with whatever said court shall consider reasonable.

## ARTICLE 16 - RELATIONSHIP OF PARTIES

**16.1    Independent Contractor.**  It is understood by the Parties that Contractor is an independent contractor with respect to Company, and not an employee or agent of Company.  Company will not provide fringe benefits, including health insurance benefits, paid vacation, or any other employee benefits, for the benefit of Contractor or its personnel. In acting as an independent contractor, Contractor as such is not eligible for unemployment or workman's compensation. Contractor is responsible for all applicable payroll and government taxes.

**16.2    No Agency.**    Contractor has no authority to act for or on behalf of Company as agent or otherwise unless expressly authorized in writing by the Company.  Contractor is not authorized to bind Company in any manner or to incur any obligation, expenditure or liability on behalf of or against Company, or to make any representation or warranty on behalf of Company, without the prior written authorization of the Company.

**16.3    Persons Hired by Contractor.**  It is further understood and agreed that all persons hired or assigned by Contractor to perform labor or services for the Work required under this Agreement are, and shall remain during the performance of this Agreement, Contractor's employees for all purposes, including without limitation for the purposes of worker's compensation.  It is further understood and agreed that from time to time and as the circumstances may require, the Authorized Representative of Company may direct any employee or employees of Contractor to a particular work site or location, or may provide instructions concerning the tasks to be performed by them, but no such instruction or directions shall be construed by Contractor to constitute control of the manner or method of the performance of the employee's work, nor shall any such instructions or directions constitute the employee to be the employee of Company for any purpose, and Contractor agrees to indemnify and hold harmless Company from any and all claims which are or may be asserted against Company by the employee as a result of any such directions or instructions.

## ARTICLE 17 - TAXES

**17.1    Taxes and Withholding.**  Contractor is responsible for and shall assume liability for payment and withholding of any tax, federal, state, municipal or other, imposed by reason of the performance of the Work hereunder, including but not limited to those with respect to the Contractor's receipts or income and those with respect to compensation, wages, or other remuneration for any work to be performed by Contractor or its employees under this Agreement and shall pay direct to the state in which the Work is to be performed all sales and use taxes for materials furnished by the Contractor in connection with its prosecution of the Work.  Contractor shall further comply with the governmental regulations with respect to all of the foregoing taxes, including the filing of all necessary reports and returns.

## ARTICLE 18 - DISPUTE RESOLUTION

**18.1    Dispute Resolution.**  Contractor agrees any dispute, controversy or claim arising out of or relating to the rights and obligations under the Contract Documents shall be settled upon Company's request in its sole discretion by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association or similar rules.  Such arbitration shall be held in Allegheny County, Pennsylvania.  Contractor agrees to submit to the jurisdiction of the arbitration panel at such venue.  The award rendered by the arbitrator(s) shall be final, and judgment upon the arbitration award may be entered in any court having jurisdiction thereof.  Contractor irrevocably agrees to submit to the exclusive jurisdiction of the Court of Common Pleas of Allegheny County, Pennsylvania or the United States District Court for the Western District of Pennsylvania if the Company chooses to resolve any disputes by litigation.    Contractor shall proceed diligently with any undisputed Work under the Contract Documents notwithstanding the existence of any dispute, controversy or claim, and during the pendency of any dispute resolution process as set forth in this Section. Notwithstanding the foregoing, in the event that Company is sued or subjected to any other action or proceedings relating to Contractor's Work at the Project in any other state or forum, Company shall have the right to join Contractor and prosecute its claims, or any one or more of them, against Contractor in such other suit, action or proceeding.

**18.2    Joint Defense.**  Should the Parties both be named as defendants in any third-party claim or cause of action arising out of or relating to the Work or the Project, then, at the Company's sole discretion, prior to the filing or submission of any response to the claim or cause of action or as soon thereafter as reasonably practicable, Contractor and the Company will cooperate with each other in the joint defense of their common interests to the extent permitted by law, and will enter into an agreement for joint defense of the action.

## ARTICLE 19 - GENERAL PROVISIONS

**19.1     Governing Law.**  The Contract Documents shall be construed, interpreted and enforced in accordance with and shall be governed by the laws of the Commonwealth of Pennsylvania, excluding its conflict of law rules.

**19.2     No Third-Party Beneficiaries.**  The Contract Documents shall create no rights in any party other than Company and Contractor; and no other party is intended to be a third-party beneficiary of the Contract Documents, except as specifically indicated herein.

**19.3     Amendments.**  No modification or amendment to the Purchase Order or Contract Documents shall be effective or binding upon Company unless and until a separate document is signed or otherwise issued by Company in accordance with the provisions hereof.  Any terms or conditions contained in any of Contractor's documents purporting to supersede or amend the Contract Documents shall be of no force or effect unless such documents are expressly agreed to and countersigned by Company.

**19.4     Survival of Provisions**.  In order that the Parties hereto may fully exercise their respective rights, perform their respective obligations hereunder arising from the performance of the Work under the Contract Documents, such provisions of the Contract Documents required to ensure such exercise or performance shall survive the termination of any Purchase Order or the Contract Documents.

**19.5     Pennsylvania Act 7 Waiver.**  To the extent permitted by law, for any Project to be performed in Pennsylvania, Contractor irrevocably waives all disclosures, notices, rights, claims and benefits under Act 7 of 1994 of the General Assembly of the Commonwealth of Pennsylvania known as the Contractor and Subcontractor Payment Act, and Contractor agrees that none of the terms and provisions of said Act shall apply to the Project or Subcontractor's Work at the Project.

**19.6     Counterparts.**  This Agreement may be executed by the Parties hereto in separate counterparts with the same effect as if the Parties thereto had signed the same document.  All such counterparts shall be deemed an original, shall be construed together and shall constitute one and the same instrument.

**19.7     No Implied Waivers.**  Company's failure to require strict performance in a particular instance shall not be deemed a waiver of any term or condition of the Contract Documents.  To be effective, a waiver of any term of the Contract Documents must be made in writing and signed by Company.  Otherwise, Contractor shall not be relieved from its duty to comply strictly with all of its obligations hereunder; nor shall it prejudice or prevent Company from requiring strict adherence in the future.

**19.8     Severability.**  The provisions of the Contract Documents shall be severable in the event that any of the provisions hereof are held by a court of competent jurisdiction to be invalid, void or otherwise unenforceable and the remaining provisions shall remain enforceable to the fullest extent permitted by law.  Furthermore, to the fullest extent permitted, the provisions of the Contract Documents shall be construed to give effect to the intent manifested by any provision held invalid, void or otherwise unenforceable.

**19.9     Entirety of Agreement.**  The Purchase Order and Contract Documents as executed by the respective fully authorized representatives of Company and Contractor constitute the entire agreement between the Parties hereto with respect to the matters dealt with herein, and there are no oral, electronic or written understandings, representations or commitments of any kind, express or implied, and all prior or contemporaneous oral, electronic or written understandings are superseded.  Neither Party shall have the right to pursue any claim or action regarding express or implied representations made prior to the effective date of this Agreement or which are not part of this Agreement.

**19.10     Assignment and Subcontracting**.  Contractor shall not assign any of its rights under the Contract Documents, including the Purchase Order, or subcontract any portion, in whole or in part, to any other party without the written consent of Company.  Any purported assignment or subcontract in violation thereof shall be voidable by Company.  Company reserves the right to assign, in whole or in part, the Purchase Order and all other related Contract Documents to any third party, including, without limitation to successor, affiliated or related companies.  This Agreement shall inure to and be binding upon the Parties hereto and their successors and permitted assigns.

**19.11     Notices.**  All notices required under the Contract Documents shall be in writing, and shall be delivered by personal or courier delivery, electronic mail, facsimile transmission or by certified or registered mail, return receipt

requested and shall be deemed given upon receipt.    Notices shall be sent to the following persons or any other persons subsequently designated by the Parties:

Company:    EQT Production Company
625 Liberty Avenue, Suite 1700
Pittsburgh, PA  15222-3111
Contact:  Procurement Director
cc:  General Counsel

Contractor:    Seven Point Energy Services, Inc.
1006 Loop Street #4
Aspinwall, PA 15215
Contact: General Counsel

**19.12    Headings.** Captions and headings in this Agreement are for reference only and do not constitute a part of the substance of this Agreement.

**19.13    Financial Disclosure.** As requested by Company, Contractor shall provide its quarterly and annual balance sheets and related statements of operations, income, cash flows and changes in shareholder's equity, each prepared in accordance with generally accepted accounting principles and accompanied by an officer's certificate that such financial statements fairly present the financial condition and results of operations of the reporting entity.

**19.14    Records Retention.** Contractor will maintain complete and accurate records of the Work provided and performed under this Agreement and any Purchase Order for a period of five (5) years following the termination of this Agreement, or longer if required by Company or by law.  Such records shall be made available to Company for review upon reasonable notice.

**19.15    Supplier Diversity.** As requested by Company, Contractor shall provide Company any information reasonably requested by Company regarding its supplier diversity program, if any, including without limitation, the name of the diverse suppliers with whom Contractor currently does business, the amount of spend that Contractor has with diverse suppliers, whether Contractor requires its diverse suppliers to be certified as a diverse business enterprise, and other similar information related to Contractor's supplier diversity program.

**19.16    Code of Conduct.** Contractor shall comply with Company's Code of Business Conduct and Ethics ("Code of Conduct") as applicable and updated from time to time, which is available for download from the Investors section of Company's website, unless Contractor has its own code or similar document ("Code"). If Contractor has a Code, Contractor represents and warrants that:

**(A)** its Code complies with US Federal Sentencing Guidelines and all other applicable incentives and standards issued by a governmental body dealing with an effective ethics and compliance program, and any amendments thereto,

**(B)** its Code complies with all applicable laws,

**(C)** Contractor shall promptly provide Company a copy of its Code, including any amendments thereto upon Company's request,

**(D)** Contractor shall promptly provide any information reasonably requested by Company regarding the enforcement and effectiveness of Contractor's Code, and

**(E)** during the term of this Agreement, Contractor's Code shall be in compliance with this Article 19.16 and if any time such is not the case, Contractor shall comply with Company's Code of Conduct until Contractor's Code meets the requirements of this Article 19.16.

**IN WITNESS WHEREOF**, the Parties hereto have caused this Master Services Agreement to be duly authorized and executed as of the day and year first above written.

**CONTRACTOR**

**Seven Point Energy Services, Inc.**

Signature: _____ JOE GIORDANO _____

Print Name: _____ JOE GIORDANO _____

Title: _____ manager _____

**COMPANY**

**EQT Production Company**

Signature: _____ David M. Elkin _____

Print Name: _____ David Elkin _____

Title: _____ SVP Asset Optimization _____

DocuSign Envelope ID: 0C973092-A259-4B4E-8D6B-54FDBC1D1757

## SCHEDULE A

## INSURANCE REQUIREMENTS

**1.    Coverage Required.**  Unless otherwise specified in writing by Company, Contractor shall carry the following minimum coverages during the term of this Agreement. Contractor shall require its subcontractors to carry the same minimum level of coverages outlined below:

**(A)**    Workers' compensation insurance with statutory limits in full compliance with the workers' compensation and occupational disease act of every state in which the Work is to be performed; and employer's liability insurance with limits of liability of not less than one million dollars ($1,000,000.00) each accident. If work is being performed in West Virginia, policy should contain West Virginia Broad Form Employers Liability Endorsement.

**(B)**    Insurance Services Office (ISO) Commercial General Liability Insurance form CG 00 01 10 01 or equivalent, including Premises and Operations, Products and Completed Operations, Blanket Contractual Liability (including coverage for "third-party-over action" claims through the exception to the employer's liability exclusion thereby providing coverage for liability assumed under an insured contract), Stop-Gap for monopolistic workers' compensation states, Property Damage, Independent Contractors, Personal and Advertising Injury, Broad Form Property Damage, Cross Liability or a Separation of Interests provision (with policy coverage applying separately to each insured), Time Element Sudden and Accidental Pollution, Underground, Explosion and Collapse as well as Care, Custody and Control coverages with a combined single limit of not less than five million dollars ($5,000,000.00) per occurrence, including primary and excess liability policies. In addition, if applicable based on the scope of work, remove the asbestos exclusion for abatement work, remove the lead based paint exclusion for abatement work, broaden the definition of insured contract to include work within 50 feet of a railroad.

**(C)**    ISO Commercial Automobile Liability Insurance covering all owned, hired, and non-owned automobiles with a Bodily Injury and Property Damage combined single limit of not less than five million dollars ($5,000,000.00) each accident including primary and excess liability policies.    Policy shall contain provisions for Blanket Contractual Liability (including coverage for "third-party-over action" claims through the exception to the employer's liability exclusion thereby providing coverage for liability assumed under an insured contract) and Cross Liability or a Separation of Interests provision (with policy coverage applying separately to each insured).  If hauling hazardous substances for the Company, Contractor must procure and maintain MCS-90 Endorsement and ISO CA 99 48 03 06 Pollution Liability for Covered Autos or similar provision.  If transporting or hauling assets for the Company, Contractor must procure and maintain Motor Truck Cargo coverage equal to the replacement cost of the cargo.

**2.    Rating.**  All insurance coverages are placed with insurance carriers that have a minimum AM Best rating of A.

**3.    Additional Insured.**  The policies required by Subsections 1(B) and 1(C) above shall be endorsed to name Company, its parent company, subsidiaries and affiliates as additional insureds. The Commercial General Liability and Excess policies must include ISO CG 20 10 11 85 Additional Insured Endorsement, or the combination of ISO CG 20 10 07 04 Additional Insured – Owners, Lessees or Contractors – Scheduled Person or Organization and CG 20 37 07 04 Additional Insured – Owners, Lessees or Contractors – Completed Operations Endorsements, or similar provision for Ongoing-Operations and Products-Completed Operations Hazard coverage. This insurance shall apply to "bodily injury" or "property damage" arising out of "your work" and "your product" included in the "products completed operations hazard" as required by written contract and shall afford said coverage for all completed operations, products and work, completed while the policy is in effect, until one year after the expiration of the statute of limitations for any claims arising from or based upon Contractor's completed operations. The insurance shall be equally available to any and all "additional insureds" designated on the certificate of insurance issued to said "additional insureds" and shall provide a duty to defend.

**4.    Primary Coverage.**  For any claims related to Contractor's Work, the he coverages required by this Schedule A shall be primary and non-contributory.  Any insurance or self-insurance maintained by Company, its parent, subsidiaries and affiliates shall be excess of Contractor's insurance until all of Contractor's applicable and available insurance, including umbrella and excess liability policies, is exhausted.  The intent is for Contractor's insurance policies to be primary regardless of any "Other Insurance" or other methods of sharing language contained in Contractor's insurance policy or policies.  Contractor shall waive all rights of subrogation and contribution against all additional insureds.  Contractor shall be solely responsible for any deductible or self-insured retention under its insurance.

**5.      Waiver of Subrogation.**  To the extent permitted by law, all policies required by this Schedule A shall contain a waiver of subrogation in favor of Company, its parent, subsidiaries and affiliates.

**6.      Insurance Certificates, Endorsements, Policies.**  Prior to commencing the Work, and at each subsequent renewal, Contractor shall provide Company with:

**(A)**      Certificates of Insurance specifically evidencing the coverages required by this Schedule A, stating the policy numbers and the inception and expiration dates of all policies and providing for thirty (30) days' prior written notice to Company by certified mail, return receipt requested, of any cancellation, non-renewal, or material alteration of any policy;

**(B)**      copies of the additional insured endorsements, the waiver of subrogation endorsement and the primary/non-contributory endorsements required by Section 3, 4, and 5 above; or

**(C)**      a letter from Contractor's insurance broker confirming that all of the requirements of this Schedule A have been met.

The failure of Company to pursue or obtain any certificate of insurance, endorsement or the broker's letter or to point out any non-compliance of any certificate of insurance, endorsement or broker's letter shall not constitute a waiver of any of the requirements of this Schedule A or relieve Contractor of any of its obligations hereunder.

Upon Company's request at any time, Contractor shall provide Company with copies of any or all of the policies required by Section 1 above.

**7.      Failure to Comply.**  In the event that the insurance policies secured by Contractor do not comply with these Insurance Requirements, then Company shall have the right to suspend the Work until all provisions of these Insurance Requirements have been complied with or to terminate the Agreement, at Company's sole discretion.

**8.      Distinct Obligation.**  The requirements of this Schedule A are intended to be a separate and distinct obligation of Contractor.  Therefore, the provisions of this Schedule A shall be enforceable and Contractor shall be bound thereby regardless of whether the indemnity provisions of Article 12 of this Agreement are determined to be enforceable in the jurisdiction where the Work is being performed.

**9.      Remedies on Default.**  In the event Contractor or its insurance carrier defaults on any obligation under this Schedule A or the policies required by this Schedule A, Contractor agrees that it will be liable for all reasonable expenses and attorneys' fees incurred by Company to enforce the provisions of this Schedule A or of the policies.

**10.      Performance Obligations.**  Company's acceptance of insurance submitted by Contractor does not relieve or decrease in any way the liability of Contactor for performance or failure to perform under this Agreement.



## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: 0C973002A2594B4E8D6BE4FDBC1D1757 | | Status: Completed |
| Subject: Please DocuSign this Master Srvs. Agt btw Seven Points Energy and EQT Production Company | | |
| Source Envelope: | | |
| Document Pages: 26 | Signatures: 2 | Envelope Originator: |
| Certificate Pages: 2 | Initials: 0 | Lisa Spaniel |
| AutoNav: Enabled | | 625 Liberty Ave Ste 1700 |
| EnvelopeId Stamping: Enabled | | Pittsburgh, PA  15222 |
| Time Zone: (UTC-05:00) Eastern Time (US & Canada) | | lspaniel@eqt.com |
| | | IP Address: 216.109.111.217 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Lisa Spaniel | Location: DocuSign |
|      1/4/2018 \| 12:11 PM |     lspaniel@eqt.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| JOE GIORDANO<br>jgiordano5@gmail.com<br>manager<br>Security Level: Email, Account Authentication<br>(None) | *JOE GIORDANO*<br>163457B84A86474...<br><br>Using IP Address: 50.5.238.88 | Sent: 1/4/2018 \| 12:17 PM<br>Viewed: 1/5/2018 \| 6:43 AM<br>Signed: 1/5/2018 \| 6:43 AM |
| **Electronic Record and Signature Disclosure:**<br>   Not Offered via DocuSign | | |
| David M. Elkin<br>DElkin@eqt.com<br>SVP Asset Optimization<br>Security Level: Email, Account Authentication<br>(None) | *David M. Elkin*<br>0965A414E44D439...<br><br>Using IP Address: 198.140.164.252 | Sent: 1/5/2018 \| 6:43 AM<br>Viewed: 1/5/2018 \| 7:36 AM<br>Signed: 1/5/2018 \| 7:36 AM |
| **Electronic Record and Signature Disclosure:**<br>   Not Offered via DocuSign | | |
| Lisa Spaniel<br>LSpaniel@eqt.com<br>Contract Administrator<br>EQT Corporation<br>Security Level: Email, Account Authentication<br>(None) | **Completed**<br><br>Using IP Address: 198.140.164.51 | Sent: 1/5/2018 \| 7:36 AM<br>Viewed: 1/8/2018 \| 1:04 PM<br>Signed: 1/8/2018 \| 1:04 PM |
| **Electronic Record and Signature Disclosure:**<br>   Not Offered via DocuSign | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 1/5/2018 | 7:36 AM |
| Certified Delivered | Security Checked | 1/8/2018 | 1:04 PM |
| Signing Complete | Security Checked | 1/8/2018 | 1:04 PM |
| Completed | Security Checked | 1/8/2018 | 1:04 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing **Joinder Complaint Against Additional Defendant Seven Point Energy, Inc.** was served via electronic mail on the 30th day of April 2024 upon the following counsel of record:

Paul R. Robinson
Benjamin Sorisio
Nicholas J. Indovina
MEYER DARRAGH BEBENEK & ECK, PLLC
US Steel Tower, Suite 4850
600 Grant Street
Pittsburgh, PA 15219
**Counsel for Plaintiffs**

/s/ Gregory J. Krock
Gregory J. Krock

# EXHIBIT C

**A STOCK COMPANY**



## EVANSTON INSURANCE COMPANY

4521 Highwoods Parkway
Richmond, VA

**INSURANCE POLICY**

**Coverage afforded by this policy is provided by the Company (Insurer) and named in the Declarations.**

In **Witness Whereof**, the company (insurer) has caused this policy to be executed and attested and countersigned by a duly authorized representative of the company (insurer) identified in the Declarations.

| | |
|---|---|
| **Secretary** | **President** |

IL 09 10 07 02

# PENNSYLVANIA NOTICE

An Insurance Company, its agents, employees, or service contractors acting on its behalf, may provide services to reduce the likelihood of injury, death or loss. These services may include any of the following or related services incident to the application for, issuance, renewal or continuation of, a policy of insurance:

**1.** Surveys;

**2.** Consultation or advice; or

**3.** Inspections.

The "Insurance Consultation Services Exemption Act" of Pennsylvania provides that the Insurance Company, its agents, employees or service contractors acting on its behalf, is not liable for damages from injury, death or loss occurring as a result of any act or omission by any person in the furnishing of or the failure to furnish these services.

The Act does not apply:

**1.** If the injury, death or loss occurred during the actual performance of the services and was caused by the negligence of the Insurance Company, its agents, employees or service contractors;

**2.** To consultation services required to be performed under a written service contract not related to a policy of insurance; or

**3.** If any acts or omissions of the Insurance Company, its agents, employees or service contractors are judicially determined to constitute a crime, actual malice, or gross negligence.

---

**Instruction to Policy Writers**

Attach the Pennsylvania Notice to all new and renewal certificates insuring risks located in Pennsylvania.

---

© ISO Properties, Inc., 2001

**MARKEL**®

ENVIRONMENTAL

## EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EMERGENCY RESPONSE HOTLINE

# 1-855-44CLAIM

# (1-855-442-5246)

Markel has established an emergency response hotline for immediate reporting of pollution events or other events requiring emergency response.

Immediate reporting of such events ensures timely notice to us of pollution claims as well as other claims that may require immediate response.

Please use the hotline to notify us immediately of any situation you encounter that may lead to a pollution claim. When calling, identify yourself as a Markel Policyholder.

Using the hotline may help you to fulfill some of your responsibilities to us. Reimbursement of "emergency response costs" is conditioned on timely reporting by use of the emergency response hotline. Please refer to the policy for full details.

# CLAIMS REPORTING NOTICE

In addition to the above you must also report in writing any "Occurrence", Offense, Incident, "Claim", or "Suit", to:

Markel - Claims
P.O. Box 2009
Glen Allen, VA  23058-2009

Email:  newclaims@markelcorp.com

Fax: (855) 662-7535

**PLEASE REFER TO THE POLICY FOR ANY NOTICE AND REPORTING PROVISIONS AND/OR DUTIES IN THE EVENT OF AN "OCCURRENCE, OFFENSE, INCIDENT, "CLAIM" OR "SUIT".**



# PRIVACY NOTICE

We are committed to safeguarding your privacy. We understand your concerns regarding the privacy of your nonpublic personal information. No nonpublic personal information is required to be collected when you visit our websites; however, this information may be requested in order to provide the products and services described. We do not sell nonpublic personal information to non-affiliated third parties for marketing or other purposes. We only use and share this type of information with non-affiliated third parties for the purposes of underwriting insurance, administering your policy or claim and other purposes as permitted by law, such as disclosures to insurance regulatory authorities or in response to legal process. Notwithstanding the foregoing, we may use this information for the purpose of marketing our own products and services to you.

We collect nonpublic personal information about you from the following sources:

- Information we receive from you on applications or other forms;

- Information about your transactions with us, our affiliates, or others; and/or

- Information we receive from consumer reporting agencies and inspection reports.

We do not disclose any nonpublic personal information about our customers/claimants or former customers/claimants to anyone, except as permitted by law.

We may disclose nonpublic personal information about you to the following types of third parties:

- Service providers, such as insurance agents and/ or brokers and claims adjusters; and/or

- Other non-affiliated third parties as permitted by law.

We restrict access to nonpublic personal information about our customers/claimants to those individuals who need to know that information to provide products and services to our customers/claimants or as permitted by law. We maintain physical, electronic, and procedural safeguards to guard your nonpublic personal information.

*Residents of California:*

You may request to review and make corrections to recorded non-public personal information contained in our files. A more detailed description of your rights and practices regarding such information is available upon request. Please contact your agent/broker for instructions on how to submit a request to us.

POLICY NUMBER: MKLV2ENV100993



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## COMMON POLICY SURPLUS LINES NOTIFICATION
## SUPPLEMENT TO DECLARATIONS



**MARKEL®**

# EVANSTON INSURANCE COMPANY

## ENVIRONMENTAL COMMON POLICY DECLARATIONS

**THE COVERAGE PROVIDED BY ONE OR MORE COVERAGE FORMS OR INSURING AGREEMENTS INCLUDED IN THIS POLICY MAY BE WRITTEN AS CLAIMS-MADE AND REPORTED COVERAGE. CLAIMS-MADE AND REPORTED COVERAGE REQUIRES THAT A CLAIM BE FIRST MADE AGAINST YOU AND REPORTED TO US DURING THE POLICY PERIOD OR ANY APPLICABLE EXTENDED REPORTING PERIOD WE PROVIDE.**

POLICY NUMBER:    MKLV2ENV100993                RENEWAL OF POLICY:   MKLV2ENV100533

Named Insured and Mailing Address (No., Street, Town or City, County, State, Zip Code)
Seven Point Energy Services, Inc.
222 Elm Drive
Unit #1 & 2
Waynesburg, PA 15370

Policy Period: From 12/28/2018 to 12/28/2019, at 12:01 A.M. Standard Time at your mailing address shown above.

Form of Business:
☐ Individual                      ☐ Partnership          ☐ Joint Venture
☐ Limited Liability Company    ☒ Organization, including Corporation (but not incl. Partnership, Joint Venture or LLC)

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

Coverage is provided for the following only if indicated with an "X" in the checkbox(es) below:

|  |  | Claims-Made | Occurrence | Premium |
|---|---|---|---|---|
| ☒ | Commercial General Liability | ☐ | ☒ | INCLUDED |
| ☒ | Contractor's Pollution Liability | ☒ | ☐ | INCLUDED |
| ☐ | Owners And Contractors Protective Liability (Monoline Coverage) | Not applicable | ☐ | EXCLUDED |
| ☐ | Products-Completed Operations Liability (Monoline Coverage) | ☐ | ☐ | EXCLUDED |
| ☐ | Professional Liability | ☐ | Not applicable | EXCLUDED |
| ☐ | Site Pollution And Environmental | ☐ | Not applicable | EXCLUDED |
| ☐ | Terrorism Risk Insurance Act (TRIA): |  |  | EXCLUDED |
|  | **Advance And Deposit Premium:** |  |  | ███ |
|  | Other Charge (Specify): |  |  | $ |
|  | Other Charge (Specify): |  |  | $ |
|  | Inspection Fee (100% Fully Earned): |  |  | $ |
|  | **GRAND TOTAL (Including all charges and fees):** |  |  | ███ |

| **Producer Number, Name and Mailing Address** |
|---|
| 210273 |
| CRC Insurance Services, Inc. |
| 5555 Triangle Parkway, Suite 400 |
| Norcross, GA 30092 |

| Combined General Aggregate Limit Of Insurance | $7,000,000 |
|---|---|
| The amount shown above is the most we will pay under all coverage parts attached to this policy | |

| Audit Period (Indicated by an "X" in the checkbox(es) below): |
|---|
| ☐ Flat ☒ Annual ☐ Semi-Annual ☐ Quarterly ☐ Monthly |
| |

| **Endorsements** |
|---|
| Forms and Endorsements applying to this Coverage Form and made part of this policy at time of issue: |
| **SEE FORMS SCHEDULE MDIL 1001 ATTACHED** |

**These Declarations, together with the Common Policy Conditions, Supplemental Declaration(s), Coverage Form(s), and any Endorsements(s) complete the above numbered policy.**

_Bryn W. Sakas_

| _____ | _____02/04/2019_____ |
|---|---|
| **Countersigned By** | **Countersignature Date** |



POLICY NUMBER: MKLV2ENV100993

# EVANSTON INSURANCE COMPANY

# FORMS SCHEDULE

| FORM NUMBER | FORM NAME |
|---|---|
| MJIL 1000 08 10 | Policy Jacket |
| IL 09 10 07 02 | Pennsylvania Notice |
| MPEI 2000 12 15 | Emergency Response Hotline |
| MPIL 1007 03 14 | Privacy Notice |
| MPIL 1039 01 12 | Common Policy Surplus Lines Notification Supplement To Declarations |
| MDEI 2014 11 17 | Environmental Common Policy Declarations |
| MDIL 1001 08 11 | Forms Schedule |
| IL 00 21 09 08 | Nuclear Energy Liability Exclusion Endorsement (Broad Form) |
| IL 12 01 11 85 | Limits of Insurance and Deductible |
| MEEI 2210 11 17 | Amended Fines And Penalties Exclusion |
| MEEI 2211 05 16 | Waiver Of Transfer Of Rights Of Recovery |
| MEEI 2219 11 17 | Audit Rate |
| MEEI 2226 06 18 | Self-Insured Retention |
| MEEI 2273 11 17 | Worldwide Coverage |
| MEEI 2274 05 16 | Automatic Primary & NonContributory Insurance |
| MEEI 2284 11 17 | Separate Aggregate Limits Of Insurance |
| MEEI 2303 11 17 | Exclusion - Breach Of Contract |
| MEEI 2308-NY 11 17 | New York Exclusion - Designated State |
| MEEI 2309 11 17 | Exclusion - Mold And Legionella |
| MEEI 2346 11 17 | Exclusion Of Certified Acts Of Terrorism |
| MEEI 2421-PA 11 17 | Pennsylvania Changes - Cancellation Or Nonrenewal |
| MEEI 2541 11 17 | Primary And Non-Contributory - Other Insurance Condition - Oil And Gas Industry |
| MEEI 2562 11 17 | Application Warranty |
| MEEI 2564 11 17 | Unintentional Failure To Disclose All Hazards |
| MEGL 1331 11 15 | Exclusion - Separately Insured Projects (Wrap-Ups) |
| MEGL 1671 05 16 | Exclusion - Punitive Or Exemplary Damages |
| MEIL 1200 10 16 | Service of Suit |
| MEIL 1225 10 11 | Changes - Civil Union |
| MPIL 1083 04 15 | U.S. Treasury Department's Office Of Foreign Assets Control ("OFAC") Advisory Notice To Policyholders |
| MDGL 1008 08 11 | Commercial General Liability Coverage Part Declarations |
| CG 00 01 04 13 | Commercial General Liability Coverage Form |
| CG 04 35 12 07 | Employee Benefits Liability Coverage |
| CG 20 37 04 13 | Additional Insured - Owners, Lessees or Contractors - Completed Operations |
| CG 21 36 03 05 | Exclusion - New Entities |
| CG 21 47 12 07 | Employment-Related Practices Exclusion |
| CG 21 49 09 99 | Total Pollution Exclusion Form |
| CG 24 17 10 01 | Contractual Liability - Railroads |
| CG 33 70 03 05 | Silica or Silica-Related Dust Exclusion |
| MEEI 0017 11 17 | Common Policy Conditions |
| MEEI 2344 11 17 | Exclusion - Communicable Disease |
| MEEI 2345 11 17 | Exclusion - Insured Versus Insured |

**MDIL 1001 08 11**                                                                 **Page 1 of 2**

| | |
|---|---|
| MEEI 2350 11 17 | Exclusion - Nanotubes Or Nanotechnology |
| MEEI 2351 11 17 | Exclusion - Professional Services |
| MEEI 2355 11 17 | Exclusion - Asbestos |
| MEEI 2356 11 17 | Exclusion - Lead |
| MEGL 1378 05 16 | Exclusion - Aircraft Products and Grounding |
| MEGL 1394 05 16 | Exclusion - Intellectual Property Hazard |
| MEGL 1397 07 10 | Exclusion - Aircraft, Auto Or Watercraft |
| MEGL 1809 05 16 | Underground Resources and Equipment Coverage (Non-Class Specific) |
| MEGL 2301 11 17 | Exclusion - Aircraft, Auto Or Watercraft With Non-Owned Watercraft Exception |
| MGL 1213 07 12 | Data Breach Coverage - Occurrence(Claim Expenses Within Limit) |
| MDEI 2015 11 17 | Contractor's Pollution Liability Supplemental Declarations |
| MEEI 0006 11 17 | Contractor's Pollution Liability Coverage Form (Claims-Made And Reported Coverage) |
| CG 21 67 12 04 | Fungi Or Bacteria Exclusion |
| CG 21 96 03 05 | Silica Or Silica-Mixed Dust Exclusion |
| MEIL 1247 08 15 | Minimum Earned And Minimum Retained Premium |
| MIL 1214 09 17 | Trade or Economic Sanctions |

INTERLINE
IL 00 21 09 08

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
**(Broad Form)**

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

1. The insurance does not apply:

   **A.** Under any Liability Coverage, to "bodily injury" or "property damage":

   **(1)** With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

   **(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   **B.** Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

   **C.** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

   **(1)** The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(b)** has been discharged or dispersed therefrom;

   **(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

   **(3)** The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

2. As used in this endorsement:

   "Hazardous properties" includes radioactive, toxic or explosive properties.

   "Nuclear material" means "source material", "special nuclear material" or "by-product material".

© ISO Properties, Inc., 2007

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

**(a)** Any "nuclear reactor";

**(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

**(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

 © ISO Properties, Inc., 2007

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# POLICY CHANGES

Policy Change
Number A

| POLICY NUMBER<br><br>MKLV2ENV100993 | POLICY CHANGES EFFECTIVE<br>12/28/2018 | COMPANY<br><br>EVANSTON INSURANCE COMPANY |
|---|---|---|
| NAMED INSURED<br>SEVEN POINT ENERGY SERVICES, INC. | | AUTHORIZED REPRESENTATIVE<br>210273<br>CRC INSURANCE SERVICES, INC. |

| COVERAGE PARTS AFFECTED:<br>COMMERCIAL GENERAL LIABILITY COVERAGE FORM |
|---|

| CHANGES |
|---|

**SCHEDULE**

**LIMITS OF INSURANCE AND DEDUCTIBLE**

| All Customer's Property In Any One Occurrence: | $1,000,000 Each Occurrence |
|---|---|
| General Aggregate Limit: | $1,000,000 Each Occurrence |
| Deductible: | $10,000 Each Occurrence |

The following changes apply only to the coverage provided by this endorsement.

**A.** Paragraph **1.** Insuring Agreement of Section **I** – Coverages, Coverage **A** – Bodily Injury And Property Damage Liability is replaced by the following:

**1. Insuring Agreement – Bailment**

   **a.** We will pay those sums, in excess of the deductible shown in the Schedule of this endorsement, that the insured becomes legally obligated to pay as damages because of "property damage" to "customer's property" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "property damage" to "customer's property" to which this insurance does not apply.

    We may, at our discretion, investigate any "occurrence" and settle any "suit" that may result. But:

    **(1)** The amount we will pay for damages is limited as described in the Schedule of this endorsement and in Section **III** – Limits Of Insurance; and

    **(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under this endorsement.

    No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

   **b.** This insurance applies to "property damage" to "customer's property" only if:

    **(1)** The "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

    **(2)** The "property damage" occurs during the policy period;

    **(3)** The "property damage" arises out of "your work"; and

    **(4)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew

that the "property damage" to "customer's property" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "property damage" to "customer's property" occurred, then any continuation, change or resumption of such "property damage" to "customer's property" during or after the policy period will be deemed to have been known prior to the policy period.

   **(5)** This insurance is required by written contract signed and executed prior to the commencement of operations.

**c.** In the event the "property damage" to "customer's property" continues to take place during multiple policy periods of policies issued by us, all claims or "suits" arising out of such "property damage" to "customer's property" will be deemed to take place during the earliest period during which the "property damage" to "customer's property" commenced.

**B.** Paragraph **2.** Exclusions of Section I – Coverages, Coverage **A** – Bodily Injury And Property Damage Liability is amended as follows:

**1.** The following is added to Exclusion **j.** Damage To Property:

"Property damage" to:

**(7)** "Customer's property" consisting of furs or fur garments while in storage or for which a storage charge is made, nor for storage charges thereon that are accrued but uncollectible due to loss or damage;

**(8)** Shipments of "customer's property" by mail or parcel post;

**(9)** Theft of "customer's property" while being held on or in the insured's vehicle overnight; unless:

   **(a)** The theft results from forced entry into or exit from a locked building in which such vehicle is garaged;

   **(b)** There is visible evidence of the forced entry; and

   **(c)** The theft is promptly reported to the police.

**(10)** Wear, tear, gradual deterioration, moth, vermin, inherent vice or latent defect of, in or to "customer's property";

**(11)** Disappearance or shortage of "customer's property" disclosed upon taking inventory;

**(12)** Delay, loss of use or loss of market value of "customer's property" while in the insured's care, custody or control;

**(13)** Infidelity of insured's "employees" or persons to whom the "customer's property" is entrusted; or

**(14)** Seizure, confiscation or destruction of "customer's property":

   **(a)** Under quarantine or customs regulations; or

   **(b)** By order of any government or public authority, except destruction by order of public authority to prevent spread of fire or explosion.

**(15)** Contraband or property in the course of illegal trade.

**2.** Paragraph **(4)** in Exclusion **j.** Damage To Property is deleted in its entirety.

**C.** Paragraph **2.a.(2)** of Section  II – Who Is An Insured is replaced by the following:

**2.** Each of the following is also an insured:

**a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

**(2)** "Property Damage" to property:

   **(a)** Owned, occupied or used by; or

**(b)** Rented to

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**D.** Section **III** – Limits Of Insurance is replaced by the following:

**1.** The Limits Of Insurance shown in the Schedule of this endorsement and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits".

**2.** The General Aggregate Limit shown in the Schedule of this endorsement is the most we will pay for damages under Coverage **A** because of "property damage" to "customer's property", except damages because of "property damage" to "customer's property" included in the "products-completed operations hazard".

**3.** The Products-Completed Operations Aggregate Limit shown in the Declarations page is the most we will pay under Coverage **A** for damages because of "property damage" to "customer's property" included in the "products-completed operations hazard".

**4.** Subject to **2.** above, the All Customer's Property In Any One Occurrence Limit shown in the Schedule of this endorsement is the most we will pay for damages under Coverage **A** because of all "property damage" to "customer's property" arising out of any one "occurrence".

The Limits Of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**E.** Section **V** – Definitions is amended as follows:

**1.** Definition **17.** "Property damage" is replaced by the following:

**17.** "Property damage" means physical injury to "customer's property".

**2.** The following definition is added:

"Customer's property" means tangible personal property of others accepted or held by you for the performance of work or service thereon, including:

**a.** The storage of such personal property of others at premises you own, rent, lease, operate or use; and

**b.** The transportation of such personal property of others in any "auto", watercraft or aircraft you own, hire or lease.

**F.** Section **VI** – Deductible Liability Insurance is added as follows:

The deductible stated in the Schedule of this endorsement applies to damages for all "property damage" to "customer's property".

**1.** Our obligation to pay damages on your behalf for "property damage" to "customer's property" applies only to the amount of damages in excess of the deductible amount stated in the Schedule of this endorsement.

**2.** The deductible amount applies to all damages arising out of "property damage" to "customer's property" as the result of any one "occurrence", regardless of the number of persons or organizations who sustain damages because of that "occurrence".

All other terms and conditions remain unchanged.

Copyright, Insurance Services Office, Inc.,    1983
Copyright, ISO Commercial Risk Services, Inc.,    1983

_____
Authorized Representative Signature

Copyright, Insurance Services Office, Inc.,   1983
Copyright, ISO Commercial Risk Services, Inc.,   1983

**IL 12 01 11 85**   ☐

ENVIRONMENTAL



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDED FINES AND PENALTIES EXCLUSION

This endorsement modifies insurance provided under the following:

CONTRACTOR'S POLLUTION LIABILITY COVERAGE FORM

Exclusion **7.** Fines And Penalties under Section **II** – Exclusions is replaced by the following:

**7.   Fines And Penalties**

Punitive damages, exemplary damages, multiplied damages, fines or penalties. However, this exclusion does not apply to punitive damages where punitive damages are insurable by law.

All other terms and conditions remain unchanged.

**ENVIRONMENTAL**



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US WRITTEN CONTRACT LIMITATION

This endorsement modifies insurance provided under the following, where indicated by an "X" in the checkbox(es) below:

☒ COMMERCIAL GENERAL LIABILITY COVERAGE FORM
☒ CONTRACTOR'S POLLUTION LIABILITY COVERAGE FORM
☐ PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

**SCHEDULE**

| Name Of Person Or Organization: |
| --- |
| Any person(s) or organization(s) with whom the insured agrees, in a written contract, signed by both parties and executed prior to the commencement of operations to provide a waiver of transfer of rights of recovery. |

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Transfer Of Rights Of Recovery Against Others To Us condition of the Coverage Form(s) indicated above:

We waive any right of recovery we may have against the person or organization shown in the Schedule of this endorsement because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a written contract with that person or organization and included in the "products-completed operations hazard". This waiver applies only to the person or organization shown in the Schedule of this endorsement. This waiver will not apply to "occurrences" resulting from the sole negligence of the person or organization shown in the Schedule of this endorsement.

All other terms and conditions remain unchanged.

**ENVIRONMENTAL**
POLICY NUMBER: MKLV2ENV100993

**MARKEL®**

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AUDIT RATE

This endorsement modifies insurance provided under the following, where indicated by an "X" in the checkbox(es) below:

☒ COMMERCIAL GENERAL LIABILITY COVERAGE FORM
☒ CONTRACTOR'S POLLUTION LIABILITY COVERAGE FORM
☐ OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
☐ PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM
☐ PROFESSIONAL LIABILITY COVERAGE FORM
☐ SITE POLLUTION AND ENVIRONMENTAL COVERAGE FORM

## SCHEDULE

| ☒ GROSS RECEIPTS | | |
|---|---|---|
| **Rate Per $1,000 Of Gross Receipts** | **Estimated Gross Receipts** | **Description** |
| ■ | $18,000,000 | ■ per $1,000 of upcoming year revenues to be assessed for revenues greater than $19,800,000 - Truckers |

| ☐ EACH PIPELINE MILE (OIL AND GAS INDUSTRY) | | |
|---|---|---|
| **Rate Per Mile** | **Estimated Miles Of Pipeline** | **Description** |
| | | |

| ☐ EACH WELL (OIL AND GAS INDUSTRY) | | |
|---|---|---|
| **Rate Per Well** | **Estimated Number Of Wells** | **Description/Type Of Well** |
| | | Operated Wells (Producing/Shut-In/Plugged & Abandoned) |
| | | Operated Wells To Be Drilled |
| | | Non-Operated Wells (Producing/Shut-In/Plugged & Abandoned) < 25% Interest |
| | | Non-Operated Wells (Producing/Shut-In/Plugged & Abandoned) 25% - 50% Interest |
| | | Non-Operated Wells (Producing/Shut-In/Plugged & Abandoned) > 50% Interest |
| | | Non-Operated Wells To Be Drilled < 25% Interest |
| | | Non-Operated Wells To Be Drilled 25% - 50% Interest |
| | | Non-Operated Wells To Be Drilled > 50% Interest |
| | | Saltwater Disposal Wells |

**SCHEDULE (Continued)**

☐ **OTHER BASIS (DESCRIBE):**

| Rate Per | Estimated Exposure | Description |
|---|---|---|

The following is added to the Premium Audit condition:

**Audit Rate**

**(1)** If Gross Receipts is selected in the Schedule of this endorsement:

This policy is auditable at the Rate Per $1,000 Of Gross Receipts shown in the Schedule of this endorsement in excess of the Estimated Gross Receipts shown in the Schedule of this endorsement.

For the purpose of this endorsement, gross receipts means the total amounts charged by the insured, subsidiaries, affiliates, and concessionaires of the insured or by others trading under the insured's name for:

**(a)** All goods or products sold or distributed;

**(b)** Operations or services performed during the policy period;

**(c)** Rentals; and

**(d)** Dues or fees;

Less:

**(a)** Sales or excise taxes which are collected and submitted to a governmental division;

**(b)** Credits for repossessed merchandise and products returned;

**(c)** Allowances for damaged and spoiled goods;

**(d)** Finance charges for items sold on installments;

**(e)** Royalty income from patent rights or copyrights which are not product sales; and

**(f)** Intercompany sales.

**(2)** If Each Pipeline Mile is selected in the Schedule of this endorsement:

This policy is auditable at the Rate Per Mile shown in the Schedule this endorsement in excess of the Estimated Miles Of Pipeline shown in the Schedule of this endorsement.

**(3)** If Each Well is selected in the Schedule of this endorsement:

This policy is auditable at the Rate Per Well shown in the Schedule of this endorsement in excess of the Estimated Number Of Wells shown in the Schedule of this endorsement.

**(4)** If Other Basis is selected and described in the Schedule of this endorsement:

This policy is auditable at the rate per exposure shown in the Schedule of this endorsement in excess of the Estimated Exposure shown in the Schedule of this endorsement.

All other terms and conditions remain unchanged.

ENVIRONMENTAL
POLICY NUMBER: MKLV2ENV100993

**MARKEL®**

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SELF-INSURED RETENTION

This endorsement modifies insurance provided under the following, where indicated by an "X" in the checkbox(es) below:

☒ COMMERCIAL GENERAL LIABILITY COVERAGE FORM
☐ PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

**SCHEDULE**

| COVERAGE | SELF-INSURED RETENTIONS | |
|---|---|---|
| | Each Claim | Each Occurrence Or Offense |
| **Commercial General Liability:** | $10,000 | |
| **Products/Completed Operations Liability:** | | |
| **Other:** None | | |

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

**A.** The following is added to Section **III** – Limits Of Insurance:

**Self-Insured Retention**

**a.** You agree to assume the Self-Insured Retention shown in the Schedule of this endorsement. Our obligation to pay damages under this insurance and the limit of liability shown in the Declarations will apply in excess of the self-insured retention.

**b.** Regardless of whether or not there is any other insurance, whether or not collectible, applicable to an "occurrence", offense, claim or "suit" within the self-insured retention, you must make actual payment of the full self-insured retention before the limits of insurance will apply. Compliance with this clause is a condition precedent for coverage under this insurance. We will make no payments of any type in the event you fail to comply with this clause.

**c.** You will not incur costs other than adjusting expenses without our written consent in the event of any "occurrence", offense, claim or "suit" which appears likely to exceed the self-insured retention.

**d.** We have the right and duty in all cases to assume control of the investigation, defense or settlement of any "occurrence", offense, claim or "suit". When we exercise this right, the following apply:

**(1)** You will remain responsible for the cost of all damages and supplementary payments within the self-insured retention;

**(2)** At our request, you will advance to us any portion of the applicable self-insured retention that we deem reasonable to pay for any "occurrence", offense, claim or "suit";

**(3)** If you have paid to us all or part of the applicable self-insured retention and the total amount of damages and supplementary payments that we pay for that "occurrence", offense, claim or "suit" is less than the applicable self-insured retention, then we will reimburse you the amount you paid in excess of the amount we pay; and

Includes copyrighted material of Insurance Services Office, Inc.,
with its permission.

**(4)** We will have the sole and absolute right to settle the claim or "suit" for any amount we deem reasonable, including any amount within the self-insured retention. Although we agree to attempt to advise and consult with you prior to making any settlement, we will have no obligation to obtain your consent or the consent of any other insured, to any settlement we make that requires payment from you of any amount within the self-insured retention. You and any other insured hereby waive any claim or defense against us resulting from our entering into any such settlement without your approval.

**e.** If an Each Claim Self-Insured Retention is shown in the Schedule of this endorsement, the self-insured retention applies separately to each claim for damages because of "bodily injury", "property damage" or "personal and advertising injury".

**f.** If an Each Occurrence Or Offense Self-Insured Retention amount is shown in the Schedule of this endorsement, the self-insured retention applies to damages because of "bodily injury", "property damage" or "personal and advertising injury" as the result of any one "occurrence" or offense.

**B.** Only with respect to provisions included in this Self-Insured Retention endorsement, the following is added to the Cancellation Common Policy Condition:

In the event you fail or refuse to pay any amount owed within the applicable self-insured retention, we may cancel this insurance upon 30 days prior written notice to the first Named Insured. Any notice of cancellation sent by us to the first Named Insured will be deemed notice to each insured. If we cancel this insurance because of your failure or refusal to pay any amount within the applicable self-insured retention, we will have no responsibility for any "occurrence", offense, claim or "suit" reported to us after the effective date of cancellation.

All other terms and conditions remain unchanged.

ENVIRONMENTAL



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# WORLDWIDE COVERAGE

This endorsement modifies insurance provided under the following, where indicated by an "X" in the checkbox(es) below:

☒ COMMERCIAL GENERAL LIABILITY COVERAGE FORM
☒ CONTRACTOR'S POLLUTION LIABILITY COVERAGE FORM
☐ PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM
☐ PROFESSIONAL LIABILITY COVERAGE FORM
☐ SITE POLLUTION AND ENVIRONMENTAL COVERAGE FORM

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

**A.** The following are added to the Conditions section:

**Currency Provision**

The limits of insurance and premiums shown in this policy are in either United States of America or Canadian currency, contingent upon country of issuance.

Any payments we make will be in either United States of America or Canadian currency for the applicable limits of insurance.

At our sole option and upon your request, we may make payment in the currency requested. In doing so we will convert the value of applicable payment to the currency requested at the prevailing rate of exchange in effect at the time you became legally obligated to pay such sums. Upon converting the currency, we will apply all other terms and conditions of this insurance to determine the amount of our final obligation, but in no event will we pay more than the applicable Limits Of Insurance shown in the Declarations.

**Joint Duties In A Non-Admitted Jurisdiction**

For "loss" or "damages" arising in a "non-admitted jurisdiction", you must report such "claim" for "loss" or "damages" to an office of ours located within the United States of America or, with our prior written consent, to our local branch or affiliate office. We have the right, but not the duty, to investigate, defend or settle such "claims" or "suits" for "loss" or "damages". If we do not exercise the right to investigate, defend or settle such "claims" or "suits" for "loss" or "damages", you may, under our supervision and with our approval:

**a.** Make such investigation and defense as is reasonably necessary; and

**b.** Effect settlement of such "claims" for "loss" or "damages".

We will reimburse you for the reasonable cost of such actions, subject to all other terms and conditions of the policy.

This insurance will not serve as proof of insurance in any country where non-admitted insurance is prohibited by applicable local law or without our prior written consent.

We may issue, at our sole discretion, proof of insurance documents to a third party upon your request, but we are not obligated to do so.

**B.** The Definitions section is amended as follows:

**1.** The definition of "coverage territory" is replaced by the following:

"Coverage territory" means anywhere in the world except Afghanistan, Angola, Cuba, Haiti, Iran, Iraq, Libya, North Korea and any nation that is subject to trade or economic sanctions by the U.S. Treasury Department's Office of Foreign Assets Control (OFAC) or that does not maintain ongoing diplomatic relations with the United States of America.

**2.** The following definition is added:

"Non-admitted jurisdiction" means a jurisdiction where we are not licensed or permitted by law to issue insurance or are prevented by law or otherwise from investigating, defending or settling any "claims" or "suits".

All other terms and conditions remain unchanged.

ENVIRONMENTAL
POLICY NUMBER: MKLV2ENV100993

**MARKEL**®

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AUTOMATIC PRIMARY AND NON-CONTRIBUTORY INSURANCE

This endorsement modifies insurance provided under the following, where indicated by an "X" in the checkbox below:

☒ COMMERCIAL GENERAL LIABILITY COVERAGE FORM
☒ CONTRACTOR'S POLLUTION LIABILITY COVERAGE FORM
☐ OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
☐ PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

**SCHEDULE**

| |
|---|
| **Person Or Organization:** |
| Any additional insured with whom you agree in a written contract signed by both parties and executed prior to the commencement of operations to provide Primary and Non-Contributory status under this insurance. |

With respect to the coverage provided by this endorsement, the following is added to the Other Insurance condition of the Coverage Form(s) indicated above:

**Primary And Non-Contributory**

This insurance is primary to, and will not seek contribution from, any other insurance available to the Person Or Organization shown in the Schedule of this endorsement. However, this does not apply to any "claim", "suit" or "pollution condition" resulting from the sole negligence of the Person Or Organization shown in the Schedule of this endorsement.

All other terms and conditions remain unchanged.

ENVIRONMENTAL



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SEPARATE AGGREGATE LIMITS OF INSURANCE

This endorsement modifies insurance provided under the following, where indicated by an "X" in the checkbox(es) below:

☒ COMMERCIAL GENERAL LIABILITY COVERAGE FORM
☒ CONTRACTOR'S POLLUTION LIABILITY COVERAGE FORM
☐ PROFESSIONAL LIABILITY COVERAGE FORM
☐ SITE POLLUTION AND ENVIRONMENTAL COVERAGE FORM

**A.** Common Policy Condition **F.** Non-Cumulative Shared General Aggregate is deleted in its entirety.

**B.** The aggregate limits shown in the Declarations of each Coverage Form apply separately to each of those Coverage Forms.

All other terms and conditions remain unchanged.

ENVIRONMENTAL



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – BREACH OF CONTRACT

This endorsement modifies insurance provided under the following, where indicated by an "X" in the checkbox(es) below:

☒ COMMERCIAL GENERAL LIABILITY COVERAGE FORM
☒ CONTRACTOR'S POLLUTION LIABILITY COVERAGE FORM
☐ OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
☐ PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM
☐ PROFESSIONAL LIABILITY COVERAGE FORM
☐ SITE POLLUTION AND ENVIRONMENTAL COVERAGE FORM

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Exclusions section:

This insurance does not apply to:

**Breach Of Contract**

"Bodily injury", "property damage", "personal and advertising injury", "damages", "loss", "defense costs" or supplementary payments in any way involving an actual or alleged breach of contract. As used in this endorsement, contract includes, but is not limited to, a written, express, oral, implied in law or implied in fact contract.

All other terms and conditions remain unchanged.

**MARKEL®**

**ENVIRONMENTAL**
POLICY NUMBER: MKLV2ENV100993

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## NEW YORK EXCLUSION – DESIGNATED STATE

This endorsement modifies insurance provided under the following, where indicated by an "X" in the checkbox(es) below:

☒ COMMERCIAL GENERAL LIABILITY COVERAGE FORM
☐ CONTRACTOR'S POLLUTION LIABILITY COVERAGE FORM
☐ PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM
☐ PROFESSIONAL LIABILITY COVERAGE FORM

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Exclusions section:

This insurance does not apply to:

**The State Of New York**

"Bodily injury", "property damage", "personal and advertising injury", "loss", "damages" or supplementary payments in any way involving your operations or "your work" performed by you or on your behalf in the state of New York, including the rendering of or failure to render any "professional services" by you or on your behalf.

This exclusion applies even if the "claims" against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured.

All other terms and conditions remain unchanged.

**ENVIRONMENTAL**



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – MOLD AND LEGIONELLA

This endorsement modifies insurance provided under the following, where indicated by an "X" in the checkbox(es) below:

☒ CONTRACTOR'S POLLUTION LIABILITY COVERAGE FORM
☐ PROFESSIONAL LIABILITY COVERAGE FORM

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations may or may not be defined in all Coverage Forms.

**A.** The following changes apply to all Coverage Forms indicated by an "X" in the checkbox(es) above:

The following exclusion is added to Section **II** – Exclusions:

This insurance does not apply to:

**Mold And Legionella**

"Loss" or "damages" caused by or arising out of your operations, "your work", "your product" or the rendering of or failure to render "professional services" in any way related to "mold" or legionella.

**B.** The following changes apply only to the **CONTRACTOR'S POLLUTION LIABILITY COVERAGE FORM**, if indicated by an "X" in the checkbox above:

**1.** The final sentence of Exclusion **1.** Communicable Disease under Section **II** – Exclusions is deleted in its entirety.

**2.** The final sentence of Definition **23.** "Pollutants" under the Definitions section is deleted in its entirety.

**C.** The following definition is added to Section **VII** – Definitions in the **PROFESSIONAL LIABILITY COVERAGE FORM**, if indicated by an "X" in the checkbox above:

"Mold" means any permanent or transient fungus, mold, mildew or mycotoxin or any of the spores, scents or by-products produced or released by fungus.

All other terms and conditions remain unchanged.

ENVIRONMENTAL



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION OF CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following, where indicated by an "X" in the checkbox(es) below:
☐ COMMERCIAL EXCESS LIABILITY POLICY
☒ COMMERCIAL GENERAL LIABILITY COVERAGE FORM
☒ CONTRACTOR'S POLLUTION LIABILITY COVERAGE FORM
☐ OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
☐ PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM
☐ SITE POLLUTION AND ENVIRONMENTAL COVERAGE FORM

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

**A.** The following is added to the Exclusions section:

This insurance does not apply to:

**Terrorism**

"Any injury or damage" arising, directly or indirectly, out of a "certified act of terrorism".

**B.** The following definitions are added:

**1.** For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Form to which this endorsement is attached, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "cleanup costs", "business interruption expense", "product withdrawal expense", "emergency response costs", "defense expenses" and supplementary payments.

**2.** "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Reinsurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**a.** The act resulted in insured "loss" in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**b.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**C.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Form.

All other terms and conditions remain unchanged.

ENVIRONMENTAL



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PENNSYLVANIA CHANGES – CANCELLATION OR NONRENEWAL

This endorsement modifies insurance provided under the following, where indicated by an "X" in the checkbox(es) below:

☒ COMMERCIAL GENERAL LIABILITY COVERAGE FORM
☒ CONTRACTOR'S POLLUTION LIABILITY COVERAGE FORM
☐ OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
☐ PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM
☐ PROFESSIONAL LIABILITY COVERAGE FORM
☐ SITE POLLUTION AND ENVIRONMENTAL COVERAGE FORM

Common Policy Condition **A.** Cancellation Or Nonrewewal is replaced by the following:

**A. Cancellation Or Nonrenewal**

   **1. Cancellation**

      **a.** This policy may be cancelled by the first Named Insured by surrender thereof to us or any of our authorized representatives or by mailing to us written notice stating when thereafter the cancellation will be effective.

      **b.** If we decide to cancel, we will mail or deliver to the first Named Insured shown in the Declarations written notice of cancellation stating the reason not less than:

         **(1)** 15 days prior to cancellation if we cancel for non-payment of premium or material misrepresentation or fraud which affects insurability of risk; or

         **(2)** 60 days prior to cancellation if we cancel for any of the following reasons:

            **(a)** Loss of or a substantial decrease in reinsurance certified by the Commissioner as affecting in-force policies;

            **(b)** A condition, factor or loss experience material to insurability has changed substantially or a substantial condition, factor or loss experience material to insurability has become known during the policy period; or

            **(c)** Material failure to comply with policy terms, conditions or contractual duties.

         New policies in effect for less than 60 days may be cancelled for any valid underwriting reason.

      **c.** If notice is mailed, it must be sent by first class or registered mail. Certificate of mailing will be sufficient proof of notice.

      **d.** If the policy is cancelled by us, any unearned premium will be returned to the first Named Insured within 10 business days after the effective date of cancellation. If the policy is cancelled by the first Named Insured, any unearned premium must be returned to the first Named Insured within 30 days after the effective date of cancellation.

   **2. Nonrenewal**

      This policy may be nonrenewed by mailing or delivering written notice of nonrenewal to the first Named Insured, at the address shown in the Declarations, stating the reason for nonrenewal and when, not less than 60 days thereafter, such nonrenewal will be effective.

3. **Increase of Premium**

   Notice of increase in renewal premium must be given not less than 30 days prior to policy renewal date.

All other terms and conditions remain unchanged.

ENVIRONMENTAL



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PRIMARY AND NON-CONTRIBUTORY – OTHER INSURANCE CONDITION – OIL AND GAS INDUSTRY

This endorsement modifies insurance provided under the following, where indicated by an "X" in the checkbox(es) below:

☒ COMMERCIAL GENERAL LIABILITY COVERAGE FORM
☒ CONTRACTOR'S POLLUTION LIABILITY COVERAGE FORM
☐ PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Other Insurance Condition and supersedes any provision to the contrary:

**Primary And Noncontributory Insurance**

This insurance is primary to and will not seek contribution from any other insurance available to an additional insured under your policy provided that:

**(1)** The additional insured is a Named Insured under such other insurance; and

**(2)** You have agreed in writing in a contract or agreement, signed by both parties and executed prior to the commencement of operations, that this insurance would be primary and would not seek contribution from any other insurance available to the additional insured.

Coverage provided by this endorsement to such additional insured will not apply to any "claim", "loss" or liability resulting from the sole negligence of the additional insured. However, this sole negligence provision does not apply if the written contract requiring primary and non-contributory status also requires deletion of this provision.

All other terms and conditions remain unchanged.

---

**MEEI 2541 11 17**       Includes copyrighted material of Insurance Services Office, Inc.,       **Page 1 of 1**
with its permission.

ENVIRONMENTAL



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## APPLICATION WARRANTY

This endorsement modifies insurance provided under the following, where indicated by an "X" in the checkbox(es) below:

☒ COMMERCIAL GENERAL LIABILITY COVERAGE FORM
☒ CONTRACTOR'S POLLUTION LIABILITY COVERAGE FORM
☐ OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
☐ PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM
☐ PROFESSIONAL LIABILITY COVERAGE FORM
☐ SITE POLLUTION AND ENVIRONMENTAL COVERAGE FORM

The following Common Policy Condition is added:

**Application Warranty**

You warrant that the information contained in the application for the policy to which this endorsement is attached is true and that it forms the basis of and is incorporated into this policy.

All other terms and conditions remain unchanged.

**MEEI 2562 11 17**            Includes copyrighted material of Insurance Services Office, Inc.,            **Page 1 of 1**
with its permission.

ENVIRONMENTAL



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# UNINTENTIONAL FAILURE TO DISCLOSE ALL HAZARDS

This endorsement modifies insurance provided under the following, where indicated by an "X" in the checkbox(es) below:

☒ COMMERCIAL GENERAL LIABILITY COVERAGE FORM
☒ CONTRACTOR'S POLLUTION LIABILITY COVERAGE FORM
☐ PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM
☐ PROFESSIONAL LIABILITY COVERAGE FORM
☐ SITE POLLUTION AND ENVIRONMENTAL COVERAGE FORM

The following is added to the Representations Condition:

However, if you unintentionally fail to disclose all such hazards prior to the effective date of this Coverage Form, we will not deny coverage under this Coverage Form because of such failure.

All other terms and conditions remain unchanged.



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – OPERATIONS COVERED BY A CONSOLIDATED (WRAP-UP) INSURANCE PROGRAM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to Paragraph **2.** Exclusions under Bodily Injury And Property Damage Liability coverage:

This insurance does not apply to:

**Wrap-up Operations**

"Bodily injury" or "property damage" arising out of your ongoing operations or your operations included within the "products-completed operations hazard" at any location where a consolidated (wrap-up) insurance program has been provided by the prime contractor, project manager or owner of the construction project in which you are involved.

This exclusion applies whether or not the consolidated (wrap-up) insurance program:

**(1)** Provides coverage identical to that provided by this Coverage Form;

**(2)** Has limits adequate to cover all claims or "suits"; or

**(3)** Remains in effect.

For the purposes of this endorsement, consolidated (wrap-up) insurance program includes an owner-controlled insurance program and any other job or project specific insurance program.

All other terms and conditions remain unchanged.

**COMMERCIAL GENERAL LIABILITY**



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – PUNITIVE OR EXEMPLARY DAMAGES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
LIQUOR LIABILITY COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM


The following exclusion is added:

This insurance does not apply to:

**Punitive Damages**

**(1)**  Punitive, exemplary, multiplied or other non-compensatory damages;

**(2)**  Fines, penalties or sanctions imposed by law; or

**(3)**  Defense costs related to any of the above.


All other terms and conditions remain unchanged.



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SERVICE OF SUIT

Except with respect to any policy issued in any state in which the Insurer is licensed as an admitted insurer to transact business, it is agreed that in the event of the failure of the Company to pay any amount claimed to be due hereunder, the Company, at the request of the Named Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such court. Nothing in this clause constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon Secretary, Legal Department, Markel Service, Incorporated, Ten Parkway North, Deerfield, Illinois 60015, and that in any suit instituted against the Company upon this policy, the Company will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner or Director of Insurance or other official specified for that purpose in the statute, or his/her successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Named Insured or any beneficiary hereunder arising out of this policy, and hereby designates the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CHANGES – CIVIL UNION

All references to "spouse" or "family member" in any Coverage Part or policy form made part of this insurance shall include a party to a civil union or domestic partnership law recognized under any applicable statute.

All other terms and conditions remain unchanged.



# EVANSTON INSURANCE COMPANY

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.



# EVANSTON INSURANCE COMPANY

# COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATIONS

POLICY NUMBER: MKLV2ENV100993                    ☒ "X" If Supplemental Declarations Is Attached

| RETROACTIVE DATE | |
|---|---|
| THIS INSURANCE DOES NOT APPLY TO "BODILY INJURY", "PROPERTY DAMAGE" OR "PERSONAL AND ADVERTISING INJURY" WHICH OCCURS BEFORE THE RETROACTIVE DATE, IF ANY, SHOWN BELOW. | |
| RETROACTIVE DATE: | NONE |
| | (ENTER DATE OR "NONE" IF NO RETROACTIVE DATE APPLIES) |

| LIMITS OF INSURANCE | | |
|---|---|---|
| General Aggregate Limit (other than Products/Completed Operations) | $2,000,000 | |
| Products/Completed Operations Aggregate Limit | $2,000,000 | |
| Personal and Advertising Injury Limit | $1,000,000 | Any One Person or Organization |
| Each Occurrence Limit | $1,000,000 | |
| Damage to Premises Rented to You Limit | $50,000 | Any One Premises |
| Medical Expense Limit | $5,000 | Any One Person |

| ALL PREMISES YOU OWN, RENT OR OCCUPY | |
|---|---|
| Loc. No. | ADDRESS OF ALL PREMISES YOU OWN, RENT OR OCCUPY |
| 1 | 222 Elm Drive, Unit #1 & 2, Waynesburg, PA, 15370 |
| 2 | 113 Baker Dr., Waynesburg, PA, 15370 |
| 3 | 393 Jefferson Rd., Waynesburg, PA, 15370 |

## CLASSIFICATION AND PREMIUM

| Loc. No. | Code No. Classification | Rating Basis | Premium Basis | Other Basis | Rate Pr/Co | Rate All Other | Advance Premium Pr/Co | Advance Premium All Other |
|---|---|---|---|---|---|---|---|---|
| 1 | 99793 - Truckers | Gross Revenues/Sales | $18,000,000 | | INCLUDED | INCLUDED | INCLUDED | INCLUDED |
| 2 | 99793 - Truckers | Gross Revenues/Sales | $18,000,000 | | INCLUDED | INCLUDED | INCLUDED | INCLUDED |
| 3 | 99793 - Truckers | Gross Revenues/Sales | $18,000,000 | | INCLUDED | INCLUDED | INCLUDED | INCLUDED |

| *(a) Area  *(c) Total Cost  *(m) Admissions  *(p) Payroll  *(s) Gross Sales  (u) Units *(r) Gross Receipts  (e) Each  (o) Other:<br><br>Premium Basis identified with a "*" is per 1000 of selected basis. | **Total Advance Premium** | **$** | **INCLUDED** |
|---|---|---|---|

**These declarations, together with the Common Policy Conditions and Coverage Form(s) and any Endorsement(s), complete the above numbered policy.**

| FORMS AND ENDORSEMENTS |
|---|
| SEE FORMS SCHEDULE - MDIL 1001 |

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** – Definitions.

## SECTION I – COVERAGES

### COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

**b.** This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

**(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

© Insurance Services Office, Inc., 2012

**2. Exclusions**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

**(a)** The supervision, hiring, employment, training or monitoring of others by that insured; or

**(b)** Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph **(1), (2)** or **(3)** above.

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages. For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

**(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

**(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

**(i)** Any insured; or

**(ii)** Any person or organization for whom you may be legally responsible; or

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

**(i)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

**(ii)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 26 feet long; and

**(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of:

**(a)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

**(b)** The operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

© Insurance Services Office, Inc., 2012

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **III** – Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

However, this exclusion does not apply to liability for damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III** – Limits Of Insurance.

## COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

**c. Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g. Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h. Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of web sites for others; or

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a., b.** and **c.** of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-related**

Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**p. Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

**COVERAGE C – MEDICAL PAYMENTS**

**1. Insuring Agreement**

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

**(1)** On premises you own or rent;

**(2)** On ways next to premises you own or rent; or

**(3)** Because of your operations;

provided that:

**(a)** The accident takes place in the "coverage territory" and during the policy period;

**(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

**(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

**(1)** First aid administered at the time of an accident;

**(2)** Necessary medical, surgical, X-ray and dental services, including prosthetic devices; and

**(3)** Necessary ambulance, hospital, professional nursing and funeral services.

**2. Exclusions**

We will not pay expenses for "bodily injury":

**a. Any Insured**

To any insured, except "volunteer workers".

**b. Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c. Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

**d. Workers' Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e. Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

**f. Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

**g. Coverage A Exclusions**

Excluded under Coverage **A.**

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B**

**1.** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

**a.** All expenses we incur.

**b.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**c.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

**e.** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

**f.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

 © Insurance Services Office, Inc., 2012

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

**(1)** Agrees in writing to:

**(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

**(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

**(c)** Notify any other insurer whose coverage is available to the indemnitee; and

**(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(2)** Provides us with written authorization to:

**(a)** Obtain records and other information related to the "suit"; and

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

**SECTION II – WHO IS AN INSURED**

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**2.** Each of the following is also an insured:

**a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

**(1)** "Bodily injury" or "personal and advertising injury":

**(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

**(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

**(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph **(1)(a)** or **(b)** above; or

**(d)** Arising out of his or her providing or failing to provide professional health care services.

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by;

**(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**b.** Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**c.** Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III – LIMITS OF INSURANCE**

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits".

**2.** The General Aggregate Limit is the most we will pay for the sum of:

**a.** Medical expenses under Coverage **C;**

**b.** Damages under Coverage **A,** except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

**c.** Damages under Coverage **B.**

 © Insurance Services Office, Inc., 2012

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

**4.** Subject to Paragraph **2.** above, the Personal And Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

**5.** Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

**a.** Damages under Coverage **A;** and

**b.** Medical expenses under Coverage **C**

because of all "bodily injury" and "property damage" arising out of any one "occurrence".

**6.** Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

**7.** Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**

**1. Bankruptcy**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

**2. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

**a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

**(1)** How, when and where the "occurrence" or offense took place;

**(2)** The names and addresses of any injured persons and witnesses; and

**(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

**b.** If a claim is made or "suit" is brought against any insured, you must:

**(1)** Immediately record the specifics of the claim or "suit" and the date received; and

**(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4.Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

**b. Excess Insurance**

**(1)** This insurance is excess over:

**(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(i)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(ii)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(iii)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(iv)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability.

**(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

a. The statements in the Declarations are accurate and complete;

b.    Those statements are based upon representations you made to us; and

c.    We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.**    As if each Named Insured were the only Named Insured; and

**b.**    Separately to each insured against whom claim is made or "suit" is brought.

**8.  Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9.  When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

**1.**  "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.**    Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.**    Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.**  "Auto" means:

**a.**    A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

**b.**    Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**3.**  "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4.**  "Coverage territory" means:

**a.**    The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.**    International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

**c.**    All other parts of the world if the injury or damage arises out of:

**(1)**    Goods or products made or sold by you in the territory described in Paragraph **a.** above;

**(2)**    The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

**(3)**    "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph **a.** above or in a settlement we agree to.

**5.**  "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**6.**  "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

**7.**  "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

**8.**  "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

**a.**    It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.**    You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

© Insurance Services Office, Inc., 2012

9. "Insured contract" means:

   **a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   **b.** A sidetrack agreement;

   **c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   **d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   **e.** An elevator maintenance agreement;

   **f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

   Paragraph **f.** does not include that part of any contract or agreement:

   **(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

   **(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

   **(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

   **(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

   **(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

   **a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

   **b.** While it is in or on an aircraft, watercraft or "auto"; or

   **c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

   but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

   **a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

   **b.** Vehicles maintained for use solely on or next to premises you own or rent;

   **c.** Vehicles that travel on crawler treads;

   **d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

   **(1)** Power cranes, shovels, loaders, diggers or drills; or

   **(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

   **e.** Vehicles not described in Paragraph **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

   **(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

   **(2)** Cherry pickers and similar devices used to raise or lower workers;

   **f.** Vehicles not described in Paragraph **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

© Insurance Services Office, Inc., 2012

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

**(1)** Equipment designed primarily for:

    **(a)** Snow removal;

    **(b)** Road maintenance, but not construction or resurfacing; or

    **(c)** Street cleaning;

**(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

**(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

    **a.** False arrest, detention or imprisonment;

    **b.** Malicious prosecution;

    **c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

    **d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

    **e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

    **f.** The use of another's advertising idea in your "advertisement"; or

    **g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**15.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**16.** "Products-completed operations hazard":

    **a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

    **(1)** Products that are still in your physical possession; or

    **(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

        **(a)** When all of the work called for in your contract has been completed.

        **(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

        **(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

    Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

    **b.** Does not include "bodily injury" or "property damage" arising out of:

    **(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

    **(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

    **(3)** Products or operations for which the classification, listed in the Declarations or in a policy Schedule, states that products-completed operations are subject to the General Aggregate Limit.

**17.** "Property damage" means:

    **a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    **b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**18.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**19.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**20.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**21.** "Your product":

**a.** Means:

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(a)** You;

**(b)** Others trading under your name; or

**(c)** A person or organization whose business or assets you have acquired; and

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

**a.** Means:

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

**(2)** The providing of or failure to provide warnings or instructions.

POLICY NUMBER: MKLV2ENV100993

**COMMERCIAL GENERAL LIABILITY**
**CG 04 35 12 07**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EMPLOYEE BENEFITS LIABILITY COVERAGE

**THIS ENDORSEMENT PROVIDES CLAIMS-MADE COVERAGE.**
**PLEASE READ THE ENTIRE ENDORSEMENT CAREFULLY.**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Coverage | Limit Of Insurance | | Each Employee Deductible | Premium |
|---|---|---|---|---|
| **Employee Benefits Programs** | $1,000,000 | **each employee** | $1,000 | $    Included |
| | $1,000,000 | **aggregate** | | |
| **Retroactive Date:** | N/A | | | |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | | | | |

**A.** The following is added to **Section I – Coverages:**

**COVERAGE – EMPLOYEE BENEFITS LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of any act, error or omission, of the insured, or of any other person for whose acts the insured is legally liable, to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages to which this insurance does not apply. We may, at our discretion, investigate any report of an act, error or omission and settle any "claim" or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Paragraph **D.** (Section **III** – Limits Of Insurance); and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments.

**b.** This insurance applies to damages only if:

**(1)** The act, error or omission, is negligently committed in the "administration" of your "employee benefit program";

**(2)** The act, error or omission, did not take place before the Retroactive Date, if any, shown in the Schedule nor after the end of the policy period; and

**(3)** A "claim" for damages, because of an act, error or omission, is first made against any insured, in accordance with Paragraph **c.** below, during the policy period or an Extended Reporting Period we provide under Paragraph **F.** of this endorsement.

**c.** A "claim" seeking damages will be deemed to have been made at the earlier of the following times:

**(1)** When notice of such "claim" is received and recorded by any insured or by us, whichever comes first; or

**CG 04 35 12 07**          © ISO Properties, Inc., 2006          **Page 1 of 6**    ☐

**(2)** When we make settlement in accordance with Paragraph **a.** above.

A "claim" received and recorded by the insured within 60 days after the end of the policy period will be considered to have been received within the policy period, if no subsequent policy is available to cover the claim.

**d.** All "claims" for damages made by an "employee" because of any act, error or omission, or a series of related acts, errors or omissions, including damages claimed by such "employee's" dependents and beneficiaries, will be deemed to have been made at the time the first of those "claims" is made against any insured.

## 2. Exclusions

This insurance does not apply to:

**a. Dishonest, Fraudulent, Criminal Or Malicious Act**

Damages arising out of any intentional, dishonest, fraudulent, criminal or malicious act, error or omission, committed by any insured, including the willful or reckless violation of any statute.

**b. Bodily Injury, Property Damage, Or Personal And Advertising Injury**

"Bodily injury", "property damage" or "personal and advertising injury".

**c. Failure To Perform A Contract**

Damages arising out of failure of performance of contract by any insurer.

**d. Insufficiency Of Funds**

Damages arising out of an insufficiency of funds to meet any obligations under any plan included in the "employee benefit program".

**e. Inadequacy Of Performance Of Investment/Advice Given With Respect To Participation**

Any "claim" based upon:

**(1)** Failure of any investment to perform;

**(2)** Errors in providing information on past performance of investment vehicles; or

**(3)** Advice given to any person with respect to that person's decision to participate or not to participate in any plan included in the "employee benefit program".

**f. Workers' Compensation And Similar Laws**

Any "claim" arising out of your failure to comply with the mandatory provisions of any workers' compensation, unemployment compensation insurance, social security or disability benefits law or any similar law.

**g. ERISA**

Damages for which any insured is liable because of liability imposed on a fiduciary by the Employee Retirement Income Security Act of 1974, as now or hereafter amended, or by any similar federal, state or local laws.

**h. Available Benefits**

Any "claim" for benefits to the extent that such benefits are available, with reasonable effort and cooperation of the insured, from the applicable funds accrued or other collectible insurance.

**i. Taxes, Fines Or Penalties**

Taxes, fines or penalties, including those imposed under the Internal Revenue Code or any similar state or local law.

**j. Employment-Related Practices**

Damages arising out of wrongful termination of employment, discrimination, or other employment-related practices.

**B.** For the purposes of the coverage provided by this endorsement:

**1.** All references to Supplementary Payments – Coverages **A** and **B** are replaced by Supplementary Payments – Coverages **A, B** and **Employee Benefits Liability.**

**2.** Paragraphs **1.b.** and **2.** of the Supplementary Payments provision do not apply.

**C.** For the purposes of the coverage provided by this endorsement, Paragraphs **2.** and **3.** of **Section II – Who Is An Insured** are replaced by the following:

**2.** Each of the following is also an insured:

**a.** Each of your "employees" who is or was authorized to administer your "employee benefit program".

**b.** Any persons, organizations or "employees" having proper temporary authorization to administer your "employee benefit program" if you die, but only until your legal representative is appointed.

**c.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Endorsement.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if no other similar insurance applies to that organization. However:

   **a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier.

   **b.** Coverage under this provision does not apply to any act, error or omission that was committed before you acquired or formed the organization.

**D.** For the purposes of the coverage provided by this endorsement, **Section III – Limits Of Insurance** is replaced by the following:

**1. Limits Of Insurance**

   **a.** The Limits of Insurance shown in the Schedule and the rules below fix the most we will pay regardless of the number of:

      **(1)** Insureds;

      **(2)** "Claims" made or "suits" brought;

      **(3)** Persons or organizations making "claims" or bringing "suits";

      **(4)** Acts, errors or omissions; or

      **(5)** Benefits included in your "employee benefit program".

   **b.** The Aggregate Limit is the most we will pay for all damages because of acts, errors or omissions negligently committed in the "administration" of your "employee benefit program".

   **c.** Subject to the Aggregate Limit, the Each Employee Limit is the most we will pay for all damages sustained by any one "employee", including damages sustained by such "employee's" dependents and beneficiaries, as a result of:

      **(1)** An act, error or omission; or

      **(2)** A series of related acts, errors or omissions

      negligently committed in the "administration" of your "employee benefit program".

      However, the amount paid under this endorsement shall not exceed, and will be subject to, the limits and restrictions that apply to the payment of benefits in any plan included in the "employee benefit program".

The Limits of Insurance of this endorsement apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations of the policy to which this endorsement is attached, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits Of Insurance.

**2. Deductible**

   **a.** Our obligation to pay damages on behalf of the insured applies only to the amount of damages in excess of the deductible amount stated in the Schedule as applicable to Each Employee. The limits of insurance shall not be reduced by the amount of this deductible.

   **b.** The deductible amount stated in the Schedule applies to all damages sustained by any one "employee", including such "employee's" dependents and beneficiaries, because of all acts, errors or omissions to which this insurance applies.

   **c.** The terms of this insurance, including those with respect to:

      **(1)** Our right and duty to defend any "suits" seeking those damages; and

      **(2)** Your duties, and the duties of any other involved insured, in the event of an act, error or omission, or "claim"

      apply irrespective of the application of the deductible amount.

   **d.** We may pay any part or all of the deductible amount to effect settlement of any "claim" or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as we have paid.

**E.** For the purposes of the coverage provided by this endorsement, Conditions **2.** and **4.** of **Section IV – Commercial General Liability Conditions** are replaced by the following:

**2. Duties In The Event Of An Act, Error Or Omission, Or "Claim" Or "Suit"**

   **a.** You must see to it that we are notified as soon as practicable of an act, error or omission which may result in a "claim". To the extent possible, notice should include:

      **(1)** What the act, error or omission was and when it occurred; and

(2) The names and addresses of anyone who may suffer damages as a result of the act, error or omission.

**b.** If a "claim" is made or "suit" is brought against any insured, you must:

(1) Immediately record the specifics of the "claim" or "suit" and the date received; and

(2) Notify us as soon as practicable.

You must see to it that we receive written notice of the "claim" or "suit" as soon as practicable.

**c.** You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim" or "suit";

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation or settlement of the "claim" or defense against the "suit"; and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of an act, error or omission to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation or incur any expense without our consent.

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under this endorsement, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

**b. Excess Insurance**

(1) This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis that is effective prior to the beginning of the policy period shown in the Schedule of this insurance and that applies to an act, error or omission on other than a claims-made basis, if:

(a) No Retroactive Date is shown in the Schedule of this insurance; or

(b) The other insurance has a policy period which continues after the Retroactive Date shown in the Schedule of this insurance.

(2) When this insurance is excess, we will have no duty to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

(3) When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of the total amount that all such other insurance would pay for the loss in absence of this insurance; and the total of all deductible and self-insured amounts under all that other insurance.

(4) We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Schedule of this endorsement.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limits of insurance to the total applicable limits of insurance of all insurers.

**F.** For the purposes of the coverage provided by this endorsement, the following Extended Reporting Period provisions are added, or, if this endorsement is attached to a claims-made Coverage Part, replaces any similar Section in that Coverage Part:

**EXTENDED REPORTING PERIOD**

**1.** You will have the right to purchase an Extended Reporting Period, as described below, if:

    **a.** This endorsement is canceled or not renewed; or

    **b.** We renew or replace this endorsement with insurance that:

        **(1)** Has a Retroactive Date later than the date shown in the Schedule of this endorsement; or

        **(2)** Does not apply to an act, error or omission on a claims-made basis.

**2.** The Extended Reporting Period does not extend the policy period or change the scope of coverage provided. It applies only to "claims" for acts, errors or omissions that were first committed before the end of the policy period but not before the Retroactive Date, if any, shown in the Schedule. Once in effect, the Extended Reporting Period may not be canceled.

**3.** An Extended Reporting Period of five years is available, but only by an endorsement and for an extra charge.

You must give us a written request for the endorsement within 60 days after the end of the policy period. The Extended Reporting Period will not go into effect unless you pay the additional premium promptly when due.

We will determine the additional premium in accordance with our rules and rates. In doing so, we may take into account the following:

    **a.** The "employee benefit programs" insured;

    **b.** Previous types and amounts of insurance;

    **c.** Limits of insurance available under this endorsement for future payment of damages; and

    **d.** Other related factors.

The additional premium will not exceed 100% of the annual premium for this endorsement.

The Extended Reporting Period endorsement applicable to this coverage shall set forth the terms, not inconsistent with this Section, applicable to the Extended Reporting Period, including a provision to the effect that the insurance afforded for "claims" first received during such period is excess over any other valid and collectible insurance available under policies in force after the Extended Reporting Period starts.

**4.** If the Extended Reporting Period is in effect, we will provide an extended reporting period aggregate limit of insurance described below, but only for claims first received and recorded during the Extended Reporting Period.

The extended reporting period aggregate limit of insurance will be equal to the dollar amount shown in the Schedule of this endorsement under Limits of Insurance.

Paragraph **D.1.b.** of this endorsement will be amended accordingly. The Each Employee Limit shown in the Schedule will then continue to apply as set forth in Paragraph **D.1.c.**

**G.** For the purposes of the coverage provided by this endorsement, the following definitions are added to the **Definitions** Section:

**1.** "Administration" means:

    **a.** Providing information to "employees", including their dependents and beneficiaries, with respect to eligibility for or scope of "employee benefit programs";

    **b.** Handling records in connection with the "employee benefit program"; or

    **c.** Effecting, continuing or terminating any "employee's" participation in any benefit included in the "employee benefit program".

However, "administration" does not include handling payroll deductions.

**2.** "Cafeteria plans" means plans authorized by applicable law to allow employees to elect to pay for certain benefits with pre-tax dollars.

**3.** "Claim" means any demand, or "suit", made by an "employee" or an "employee's" dependents and beneficiaries, for damages as the result of an act, error or omission.

**4.** "Employee benefit program" means a program providing some or all of the following benefits to "employees", whether provided through a "cafeteria plan" or otherwise:

    **a.** Group life insurance, group accident or health insurance, dental, vision and hearing plans, and flexible spending accounts, provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to those "employees" who satisfy the plan's eligibility requirements;

    **b.** Profit sharing plans, employee savings plans, employee stock ownership plans, pension plans and stock subscription plans, provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to all "employees" who are eligible under the plan for such benefits;

    **c.** Unemployment insurance, social security benefits, workers' compensation and disability benefits;

    **d.** Vacation plans, including buy and sell programs; leave of absence programs, including military, maternity, family, and civil leave; tuition assistance plans; transportation and health club subsidies; and

    **e.** Any other similar benefits designated in the Schedule or added thereto by endorsement.

**H.** For the purposes of the coverage provided by this endorsement, Definitions **5.** and **18.** in the **Definitions** Section are replaced by the following:

    **5.** "Employee" means a person actively employed, formerly employed, on leave of absence or disabled, or retired. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

    **18.** "Suit" means a civil proceeding in which damages because of an act, error or omission to which this insurance applies are alleged. "Suit" includes:

        **a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

        **b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

© ISO Properties, Inc., 2006

POLICY NUMBER:  MKLV2ENV100993

**COMMERCIAL GENERAL LIABILITY**
**CG 20 37 04 13**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – COMPLETED OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Additional Insured Person(s) Or Organization(s) | Location And Description Of Completed Operations |
|---|---|
| As required by written contract signed by both parties and executed prior to commencement of operations. | N/A |

| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |
|---|

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury" or "property damage" caused, in whole or in part, by "your work" at the location designated and described in the Schedule of this endorsement performed for that additional insured and included in the "products-completed operations hazard".

However:

**1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

**2.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.** Required by the contract or agreement; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

© Insurance Services Office, Inc., 2012

**COMMERCIAL GENERAL LIABILITY**
**CG 21 36 03 05**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – NEW ENTITIES

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

Paragraph **3.** of **Section II – Who Is An Insured** does not apply.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I – Coverage A – Bodily Injury And Property Damage Liability:**

This insurance does not apply to:

"Bodily injury" to:

**(1)** A person arising out of any:

  **(a)** Refusal to employ that person;

  **(b)** Termination of that person's employment; or

  **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a), (b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to:

"Personal and advertising injury" to:

**(1)** A person arising out of any:

  **(a)** Refusal to employ that person;

  **(b)** Termination of that person's employment; or

  **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a), (b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

  © ISO Properties, Inc., 2006   ☐

**COMMERCIAL GENERAL LIABILITY**
**CG 21 49 09 99**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# TOTAL POLLUTION EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion f. under Paragraph 2., Exclusions of Section I – Coverage A – Bodily Injury And Property Damage Liability is replaced by the following:

This insurance does not apply to:

**f.    Pollution**

**(1)**   "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**(2)**   Any loss, cost or expense arising out of any:

**(a)**   Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

**(b)**   Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

POLICY NUMBER: MKLV2ENV100993

**COMMERCIAL GENERAL LIABILITY**
**CG 24 17 10 01**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CONTRACTUAL LIABILITY – RAILROADS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Scheduled Railroad: | Designated Job Site: |
|---|---|
| Where required by written contract signed by both parties and executed prior to the commencement of operation. | Where required by written contract signed by both parties and executed prior to the commencement of operations. |

 (If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

With respect to operations performed for, or affecting, a Scheduled Railroad at a Designated Job Site, the definition of "insured contract" in the Definitions section is replaced by the following:

9. "Insured Contract" means:

    a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

    b. A sidetrack agreement;

    c. Any easement or license agreement;

    d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

    e. An elevator maintenance agreement;

    f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

(1) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

    (a) Preparing, approving or failing to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

    (b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage;

(2) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in Paragraph **(1)** above and supervisory, inspection, architectural or engineering activities.

COMMERCIAL GENERAL LIABILITY
CG 33 70 03 05

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# SILICA OR SILICA-RELATED DUST EXCLUSION

This endorsement modifies insurance provided under the following:

OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverages Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**SILICA OR SILICA-RELATED DUST**

**a.** "Bodily injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, or ingestion of, "silica" or "silica-related dust".

**b.** "Property damage" arising, in whole or in part, out of the actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

**c.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**B.** The following definitions are added to the **Definitions** Section:

**1.** "Silica" means silicon dioxide (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.

**2.** "Silica-related dust" means a mixture or combination of silica and other dust or particles.

 © ISO Properties, Inc., 2004



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# COMMON POLICY CONDITIONS

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations may or may not be defined in all Coverage Forms.

All Coverage Forms included in this policy are subject to the following additional conditions:

**A. Cancellation Or Nonrenewal**

   **1.** This policy may be cancelled by the first Named Insured by surrender thereof to us or any of our authorized representatives or by mailing to us written notice stating when thereafter the cancellation will be effective.

   **2.** If we decide to cancel or not to renew this policy, we will mail or deliver to the first Named Insured shown in the Declarations written notice of cancellation or nonrenewal not less than:

   **a.** 10 days prior to cancellation if we cancel for non-payment of premium;

   **b.** 30 days prior to cancellation if we cancel for any other reason; or

   **c.** 30 days prior to nonrenewal.

   **3.** If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy. Notice to or knowledge by any agent or by any other person will not effect a waiver or change in any part of this policy or estop us from asserting any right under the terms of this policy.

**C. Choice Of Law**

Unless otherwise expressly endorsed in the policy, the laws of New York, without giving effect to its conflicts of law principles, govern all matters arising out of or relating to this policy and all of the transactions it contemplates, including, without limitation, its formation, validity, interpretation, construction, performance and enforcement.

**D. Examination Of Your Books and Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to 3 years afterward.

**E. Inspections And Surveys**

   **1.** We have the right to:

   **a.** Make inspections and surveys at any time;

   **b.** Give you reports on the conditions we find; and

   **c.** Recommend changes.

   **2.** We are not obligated to make any inspections, surveys, reports or recommendations, and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do

not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

    **a.**  Are safe or healthful; or

    **b.**  Comply with laws, regulations, codes or standards.

  **3.**  Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

  **4.**  Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

**F.**  **Non-Cumulative Shared General Aggregate**

The Combined General Aggregate Limit Of Insurance, if any, shown in the Declarations is the most we will pay under all Insuring Agreements for the sum of all "loss", "damages", "defense costs" and supplementary payments, as applicable.

However, this provision does not apply to:

  **1.**  Supplementary payments paid under the Commercial General Liability Coverage Form;

  **2.**  "Bodily injury" and "property damage" included in the "products-completed operations hazard"; or

  **3.**  Supplementary payments because of the "products-completed operations hazard",

unless altered by endorsement issued by us.

**G.**  **Notice And Reporting Provisions**

In addition to all other duties of the insured in the event of a "pollution condition", "occurrence", offense, act, error or omission, "claim" or "suit", you must report any spill or release immediately.

Notice to your insurance agent or broker does not constitute notice to us, or any other person or entity acting on our behalf, for purposes of the receipt of notice.

**H.**  **Premiums**

The first Named Insured shown in the Declarations:

  **1.**  Is responsible for the payment of all premiums; and

  **2.**  Will be the payee for any return premiums we pay.

**I.**  **Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual Named Insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

**J.**  **Two Or More Insuring Agreements, Coverage Forms Or Policies Issued By Us**

If more than one Insuring Agreement, Coverage Form or policy issued to you by us or any company affiliated with us applies to the same "claim", the aggregate maximum limit of insurance under all of the Insuring Agreements, Coverage Forms or policies will not exceed the highest applicable limit of insurance under any one Insuring Agreement, Coverage Form or policy. This condition does not apply to:

  **1.**  Any Insuring Agreement, Coverage Form or policy issued by us or an affiliated company specifically to apply as excess insurance over this policy; or

  **2.**  Any Insuring Agreement covering "crisis management costs" or "emergency response costs".

ENVIRONMENTAL



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – COMMUNICABLE DISEASE

This endorsement modifies insurance provided under the following, where indicated by an "X" in the checkbox(es) below:

☒ COMMERCIAL GENERAL LIABILITY COVERAGE FORM
☐ OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
☐ PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following exclusion is added to the Exclusions section:

This insurance does not apply to:

**Communicable Disease**

"Bodily injury", "property damage" or "personal and advertising injury" due to the presence of a communicable disease, which means an illness, sickness, physical condition, or an interruption or disorder of bodily functions, systems, or organs that is transmissible by infection or contagion directly or indirectly through human contact or contact with human fluids, waste or similar agents.

All other terms and conditions remain unchanged.

**ENVIRONMENTAL**

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – INSURED VERSUS INSURED

This endorsement modifies insurance provided under the following, where indicated by an "X" in the checkbox(es) below:

☒ COMMERCIAL GENERAL LIABILITY COVERAGE FORM
☐ OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
☐ PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

The following exclusion is added to the Exclusions section:

This insurance does not apply to:

**Insured Versus Insured**

Any claim made by or behalf of an insured against any other insured or former insured. However, this exclusion does not apply with respect to claims against any insured made by any additional insured when required by a written indemnification contract or agreement.

All other terms and conditions remain unchanged.

ENVIRONMENTAL



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – NANOTUBES OR NANOTECHNOLOGY

This endorsement modifies insurance provided under the following, where indicated by an "X" in the checkbox(es) below:

☒ COMMERCIAL GENERAL LIABILITY COVERAGE FORM
☐ OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
☐ PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

**A.** The following exclusion is added:

This insurance does not apply to:

**Nanotubes Or Nanotechnology**

**(1)** "Bodily injury", "property damage" or "personal and advertising injury" in any way involving the actual, alleged, threatened or suspected existence, inhalation, or ingestion of, physical exposure to, or absorption of "nanotubes" or "nanotechnology" or any substance containing "nanotubes" or "nanotechnology", either alone or in combination with other substances;

**(2)** "Bodily injury", "property damage", including devaluation of real or personal property, or "personal and advertising injury" in any way involving the actual, alleged, threatened or suspected existence, manufacture, storage, processing, use, sale, installation, removal, disposal, distribution, transportation, handling of or contact with "nanotubes" or "nanotechnology" or any substance containing "nanotubes" or "nanotechnology", either alone or in combination with other substances; or

**(3)** Any loss, cost or expense arising out of any claim or "suit" by or on behalf of any private party or governmental authority for damages, or any fine or penalty in any way involving any request, demand, order, directive, or statutory or regulatory requirement that any insured or others test for, monitor, abate, clean up, remove, contain, treat, detoxify, neutralize, remediate, dispose of, or in any way respond to, or assess the effects of, "nanotubes" or "nanotechnology" or any substance containing "nanotubes" or "nanotechnology", either alone or in combination with other substances.

This exclusion applies to any goods or products manufactured, sold, handled, distributed or disposed of by any party, as well as to:

**(1)** Any warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of such goods or products; and

**(2)** The providing of or failure to provide warnings or instructions related to such goods or products.

**B.** The following definitions are added:

"Nanotubes" means hollow cylinders of carbon atoms or carbon fibers or any type or form of "nanotechnology" which contain remarkable strength and electrical properties used in any products, goods or materials including, but not limited to, any single or multi-walled tube-shaped material having a diameter measuring on the nanometer scale or a fullerene molecule having a cylindrical or toroidal shape.

"Nanotechnology" means engineering at a molecular or atomic level or the science of manipulating materials on an atomic or molecular scale.

All other terms and conditions remain unchanged.

**ENVIRONMENTAL**



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – PROFESSIONAL SERVICES

This endorsement modifies insurance provided under the following, where indicated by an "X" in the checkbox(es) below:

☒ COMMERCIAL GENERAL LIABILITY COVERAGE FORM
☐ OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
☐ PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following exclusion is added:

This insurance does not apply to:

**Professional Services**

"Bodily injury", "property damage" or "personal and advertising injury" arising out of any alleged or actual act, error or omission in the rendering of or failure to render professional services or a professional opinion, by you or anyone else for whom you are legally liable, whether or not a fee is charged for the service or opinion.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or failure to render professional services or professional opinion.

All other terms and conditions remain unchanged.

ENVIRONMENTAL



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – ASBESTOS

This endorsement modifies insurance provided under the following, where indicated by an "X" in the checkbox(es) below:

☒ COMMERCIAL GENERAL LIABILITY COVERAGE FORM
☐ OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
☐ PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

The following exclusion is added to the Exclusions section:

This insurance does not apply to:

**Asbestos**

**(1)** Asbestos, asbestos fibers, abestiform talc or any material or substance containing asbestos, asbestos fibers or asbestiform talc or any asbestos related "bodily injury" or "property damage", or exposure to asbestos, asbestos fibers or asbestiform talc in any form, or manifestation of any asbestos related "bodily injury" including, but not limited to, asbestosis mesothelioma and bronchogenic carcinoma;

**(2)** Any alleged act, error, omission or duty involving asbestos, asbestos fibers, asbestiform talc or any material or substance containing asbestos, asbestos fibers or asbestiform talc, its use, exposure, presence, existence, detection, removal, elimination or avoidance; or

**(3)** The use, exposure, presence, existence, detection, removal, elimination or avoidance of asbestos, asbestos fibers, asbestiform talc or any material or substance containing asbestos, asbestos fibers or asbestiform talc in any environment, building or structure.

All other terms and conditions remain unchanged.

ENVIRONMENTAL



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – LEAD

This endorsement modifies insurance provided under the following, where indicated by an "X" in the checkbox(es) below:

☒ COMMERCIAL GENERAL LIABILITY COVERAGE FORM
☐ OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
☐ PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following exclusion is added to the Exclusions section:

This insurance does not apply to:

**Lead**

**(1)** "Bodily injury", "property damage" or "personal and advertising injury" arising out of or contributed to in any way by lead, paint containing lead or any other material or substance containing lead;

**(3)** Any loss, cost or expense or damages arising out of any request, demand or order that any insured or others test for, monitor, clean up, remove, abate, contain, treat, detoxify or neutralize lead, paint containing lead or any other material or substance containing lead or in any way respond to, or assess the effects of lead; or

**(3)** Any loss, cost or expense or damages arising out of any claim or "suit" relating to, testing for, monitoring, cleaning up, removing, abating, containing, treating, detoxifying or neutralizing lead, paint containing lead or any other material or substance containing lead, or in any way responding to, or assessing the effects of lead.

The addition of this exclusion does not imply that other provisions including, but not limited to any pollution exclusion, do not also exclude coverage for lead related injury, damage, expense, cost, loss, liability or legal obligation.

All other terms and conditions remain unchanged.

**COMMERCIAL GENERAL LIABILITY**

**MARKEL®**

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – AIRCRAFT PRODUCTS AND GROUNDING

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

**A.** The following is added to Paragraph **2.** Exclusions under Section **I** – Coverages, Coverage **A** – Bodily Injury And Property Damage Liability and Coverage **B** – Personal And Advertising Injury Liability:

This insurance does not apply to

**Aircraft Products And Grounding**

Liability arising out of or in any way involving "aircraft products" or the "grounding" of any aircraft, missile or spacecraft.

**B.** The following are added to the Definitions section:

"Aircraft products":

**a.** Means:

**(1)** Aircraft, missiles or spacecraft and their ground support or control equipment;

**(2)** Any other goods or products, other than those specified in Paragraph **a.(1)** above, manufactured, sold, handled or distributed by the insured, or any services provided or recommended by the insured or by others trading under the insured's name for use in the manufacture, repair, operation, maintenance or use of any item specified in Paragraph **a.(1)** above; and

**(3)** Any goods, products or spare parts furnished, installed or used in connection with any item specified in Paragraph **a.(1)** above, including but not limited to:

**(a)** Ground handling tools and equipment;

**(b)** Training aids, instruction manuals or blueprints;

**(c)** Engineering or other data or advice; or

**(d)** Service or labor relating to such aircraft or articles.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of your "aircraft product", and

**(2)** The providing of or failure to provide warnings or instructions.

"Grounding" means the withdrawal of one or more aircraft, missile or spacecraft from the flight operations or the imposition of speed, passenger or load restrictions on any aircraft, missile or spacecraft because of the existence or alleged or suspected existence of any defect, fault or condition in an "aircraft product" affecting the safe operation of such aircraft, missile or spacecraft.

A "grounding" is deemed to commence on the date of an accident or "occurrence" which discloses such condition, or on the date an aircraft, missile or spacecraft is first withdrawn from service because of such condition, whichever occurs first.

All other terms and conditions remain unchanged.

**COMMERCIAL GENERAL LIABILITY**



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – INTELLECTUAL PROPERTY HAZARD

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

**A.** Paragraph **2.** Exclusions under Section **I** – Coverages, Coverage **B** – Personal And Advertising Injury Liability is amended as follows:

  **1.** Exclusion **i.** Infringement Of Copyright, Patent, Trademark Or Trade Secret is deleted in its entirety.

  **2.** The following exclusion is added:

  This insurance does not apply to:

  **Intellectual Property Hazard**

  "Personal and advertising injury" in any way involving:

  **(1)** "Intellectual property hazard";

  **(2)** A non-disclosure agreement;

  **(3)** A non-compete agreement; or

  **(4)** A non-solicitation agreement.

**B.** The Definitions section is amended as follows:

  **1.** Paragraphs **d.**, **e.**, **f.**, and **g.** of Definition **14.** "personal and advertising injury" are deleted in their entirety.

  **2.** The following definition is added:

  "Intellectual property hazard" means:

  **a.** Infringement, in any manner, of a copyright, patent, trademark, service mark, trade dress, title or slogan, service name, trade name or copyright joint ownership or other intellectual property rights;

  **b.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, services or claims;

  **c.** Piracy or unfair competition;

  **d.** Oral or written publication, in any manner, of material that violates a person's right to privacy;

  **e.** The use of another's style of doing business, intellectual property, trade secrets, or market share agreements;

  **f.** The use of another's advertising idea in your "advertisement";

  **g.** Violations of the Lanham Act (15 USC §1051-1141N); and

  **h.** Violations of the Computer Fraud and Abuse Act (CFAA) (18 USC §1030), including violations of any regulations implementing the CFAA, and any similar state or federal law or regulation.

All other terms and conditions remain unchanged.



COMMERCIAL GENERAL LIABILITY

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – AIRCRAFT, AUTO OR WATERCRAFT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Paragraph **g.** Aircraft, Auto Or Watercraft of Section **I – Coverages, Coverage A** Bodily Injury And Property Damage Liability, **2.** Exclusions is deleted in its entirety and replaced with the following:

**g.  Aircraft, Auto Or Watercraft**

**(1)**  "Bodily injury" or "property damage" arising out of any aircraft, "auto" or watercraft; or

**(2)**  "Bodily injury" or "property damage" arising out of the "loading or unloading" of any aircraft, "auto" or watercraft;

whether or not owned, maintained, used, rented, leased, or borrowed by any insured and whether or not hired, contracted, loaned or entrusted to others by any insured.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, contracting, screening, training or monitoring of others by any insured.

All other terms and conditions remain unchanged.

**COMMERCIAL GENERAL LIABILITY**
POLICY NUMBER: MKLV2ENV100993

# MARKEL®

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## UNDERGROUND RESOURCES AND EQUIPMENT COVERAGE (NON-CLASS SPECIFIC)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

**SCHEDULE**

| | |
|---|---|
| Underground Resources Damage | $25,000 Aggregate Limit |
| Underground Equipment Damage | $25,000 Aggregate Limit |

**A.** The following is added to Exclusion **2.j.** Damage To Property under Section **I** – Coverages, Coverage **A** – Bodily Injury And Property Damage Liability:

Paragraphs **(4)**, **(5)** and **(6)** of this exclusion do not apply to any "underground resources damage" or "underground equipment damage". A separate limit of insurance applies to "underground resources damage" and "underground equipment damage" as described in Paragraph **C.** of this endorsement.

**B.** The following are added to Paragraph **2.** Exclusions under Section **I** – Coverages, Coverage **A** – Bodily Injury And Property Damage Liability:

This insurance does not apply to:

**Oil, Gas Or Water Well**

Any costs or expense incurred by you or at your request or by or at the request of any "co-owner of the working interest" in connection with controlling or bringing under control any oil, gas or water well.

**Damages Claimed By Co-owner**

Damages claimed by any "co-owner of the working interest".

**C.** With respect to "underground resources damage" and "underground equipment damage", the following is added to Section **III** – Limits Of Insurance:

Subject to the General Aggregate Limit shown in the Declarations:

**a.** The Underground Resources Damage Aggregate Limit shown in the Schedule of this endorsement is the most we will pay under Coverage **A** for the sum of all "underground resources damage" arising out of operations performed by you or on your behalf; and

**b.** The Underground Equipment Damage Aggregate Limit shown in the Schedule of this endorsement is the most we will pay under Coverage **A** for the sum of all "underground equipment damage" arising out of operations performed by you or on your behalf.

**D.** The following is added to Condition **2.** Duties In The Event Of Occurrence, Offense, Claim Or Suit under Section **IV** – Commercial General Liability Conditions:

Upon the "occurrence" of a blow-out or cratering of any oil, gas or water well resulting from or in connection with operations performed by you or on your behalf, you must, at your own cost and expense, promptly and diligently take whatever steps are necessary or legally required of you or any other person to bring such well under control.

**E.** The following are added to the Definitions section:

"Co-owner of the working interest" means any person or organization that is, with you, a co-owner, joint venturer or mining partner in mineral properties who:

**a.** Participates in the operating expense of such properties; or

**b.** Has the right to participate in the control, development or operation of such properties.

"Underground equipment damage" means "property damage" to any casing, pipe, bit, tool, pump or other drilling or well servicing machinery or equipment located beneath the surface of the earth in any such well or hole or beneath the surface of any body of water.

"Underground resources damage" means "property damage" to any of the following:

**a.** Oil, gas, water or other mineral substances which have not been reduced to physical possession above the surface of the earth or above the surface of any body of water; or

**b.** Any well, hole, formation, strata or area in or through which exploration for, or production of, any substance is carried on.

All other terms and conditions remain unchanged.

COMMERCIAL GENERAL LIABILITY



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – AIRCRAFT, AUTO OR WATERCRAFT
# WITH LIMITED NON-OWNED WATERCRAFT EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Exclusion **2.g.** Aircraft, Auto Or Watercraft under Section **I –** Coverages, Coverage **A** – Bodily Injury And Property Damage Liability is replaced by the following:

This insurance does not apply to:

**g.  Aircraft, Auto Or Watercraft**

**(1)**  "Bodily injury" or "property damage" arising out of any aircraft, "auto" or watercraft; or

**(2)**  "Bodily injury" or "property damage" arising out of the "loading or unloading" of any aircraft, "auto" or watercraft;

whether or not owned, maintained, used, rented, leased, or borrowed by any insured and whether or not hired, contracted, loaned or entrusted to others by any insured.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, contracting, screening, training or monitoring of others by any insured.

However, this exclusion does not apply to a watercraft you do not own that is less than 75 feet long and not being used to carry persons or property for a charge.

All other terms and conditions remain unchanged.



COMMERCIAL GENERAL LIABILITY
POLICY NUMBER: MKLV2ENV100993

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## DATA BREACH COVERAGE - OCCURRENCE
## (CLAIM EXPENSES WITHIN LIMIT)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
PRODUCTS-COMPLETED OPERATIONS LIABILITY COVERAGE FORM

### SCHEDULE

### LIMITS OF INSURANCE

| | | |
|---|---|---|
| **A.** | Data Breach and Privacy Liability Coverage - Each Claim | $25,000 |
| **B.** | Data Breach Loss To Insured Coverage - Each Data Breach | $25,000 |
| **C.** | Breach Mitigation Expense Coverage - Each Data Breach | $25,000 |
| **D.** | Total Annual Aggregate | $25,000 |

**I.  COVERAGE**

The following are added to **SECTION I – COVERAGES** :

**A.  Data Breach and Privacy Liability**

We will pay those sums the insured is legally obligated to pay as "damages" and "fines" resulting from a "data breach" which first occurs during the policy period in the "coverage territory". We will have the right and duty to defend the insured against any "claim" seeking those "damages" and/or "fines". However, we will have no duty to defend the insured against any "claim" seeking "damages" and/or "fines" for a "data breach" to which this insurance does not apply. We may, at our discretion, investigate any "data breach" and settle any "claim" that may result. But:

**1.**  The amount we will pay for "damages", "fines" and "claim expenses" is limited as described in **SECTION III – LIMITS OF INSURANCE**; and

**2.**  Our right and duty to defend ends when we have used up the applicable limits of insurance in the payment of "damages", "fines", and/or "claim expenses".

This applies only if:

1. The entirety of the "data breach" happens during the policy period; and

2. Prior to the effective date of this insurance, no insured had knowledge of, or reasonably could have foreseen, that a "data breach" or any computer security incident, intrusion, breach, compromise, theft, loss, or unauthorized use of your "data storage device" was likely.

**B. Data Breach Loss to Insured**

We will reimburse the insured for "loss" which results directly from a covered "data breach" which first occurs during the policy period and which is reported to us according to the terms of this endorsement; however:

1. Prior to the effective date of this insurance, any past or current insured had no knowledge that such "data breach" had occurred in whole or in part. If such party knew prior to the policy period that the "data breach" had occurred, then any continuation, change or resumption of such "data breach" during or after the policy period will be deemed to have been known prior to the policy period.

2. "Data breach" which occurs during the policy period and was not known to you or any past or current insured prior to the policy period will include any continuation, charge or resumption of that "data breach" after the end of the policy period; and

3. "Data breach" will be deemed to have been known to have occurred at the earliest time you or any past or current insured:

   a. Reported all, or any part, of the "data breach" to us, any other insurer, or any insurance representative;

   b. Incurred "loss" or "breach mitigation expense" because of the "data breach"; or

   c. Became aware by any other means that "data breach" had occurred or had begun to occur.

**C. Breach Mitigation Expense**

Subject to our written consent, we will reimburse you for the actual, reasonable cost you incur for "breach mitigation expense" which results directly from a covered "data breach". The "data breach" must first occur during the policy period and be reported to us according to the terms of this endorsement. However:

1. The entirety of the "data breach" must occur during the policy period; and

2. Prior to the effective date of this insurance, you or any past or current insured had no knowledge that such "data breach" involving:

   a. Your "data storage device"; or

   b. The "data storage device" of a third party responsible for storing and securing your data;

   had occurred in whole or in part and which may have led any of the parties to conclude that incurring such expenses was likely.

   If any such party knew prior to the policy period that such "data breach" had occurred, then any continuation, change or resumption of such "data breach" during or after the policy period will be deemed to have been known prior to the policy period; and

3. "Data breach" will be deemed to have occurred at the earliest time you or any past or current insured:

   a. Reported all, or any part, of a "data breach" to us, any other insurer, or any insurance representative;

   b. Incurred the "loss" or "breach mitigation expense" because of the "data breach"; or

   c. Became aware by any other means that "data breach" had occurred or had begun to occur.

   If the reimbursable expenses covered under this insurance become part of a judgment, award or settlement, those expenses will not be paid under Coverage **C**. Breach Mitigation Expense.

**D.** We will reimburse the insured under Coverages **B** and **C** above within sixty (60) days after:

1. We receive your sworn proof of loss according to Section **IV** below, Data Breach Coverage Duties In The Event Of Loss; and

2. We have come to an agreement with the insured regarding all items and amounts submitted to us under the applicable coverages.

## II. EXCLUSIONS

**A.** As respects all coverages provided under this endorsement only, we will not pay for any "claim", "loss", or "breach mitigation expense":

1. Caused by access to your "data storage device" by any government, governmental agency or sub-agency, or any agents while acting on behalf of such entity(ies);

2. Based upon or arising out of "bodily injury", "property damage", or "personal and advertising injury";

3. Based upon, arising out of, or any way involving any actual or alleged violation of any law, whether statutory, regulatory or common law, respecting any of the following activities:

    **a.** Antitrust;

    **b.** Business competition;

    **c.** Unfair trade practices; or

    **d.** Tortious interference in another's business or contractual relationships;

4. Based upon, arising out of, or in any way involving conduct of the insured or at the insured's direction that is intentional, willful, dishonest, or fraudulent or that constitutes a willful violation of any statute or regulation. This exclusion shall not apply to:

    **a.** Your vicarious liability for the intentional, willful, dishonest or fraudulent conduct of another insured or for the conduct of another insured that constitutes a willful violation of any statute or regulation; or

    **b.** "Claim expenses" incurred until an allegation is adjudicated through a finding by a trier of fact to be intentional, willful, dishonest or fraudulent, or a willful violation of any statute or regulation;

5. Brought by, in the name of, or on behalf of any insured. This exclusion shall not apply to any "claim" arising out of a "data breach" to the personal information of any insured that is in your care, custody or control;

6. Based upon, arising out of, or in any way involving your insolvency, receivership, bankruptcy, or liquidation or that of any of your subsidiaries whether or not included in the description of Who Is An Insured;

7. Based upon or arising out of any warranties or guarantees whether express, implied or otherwise; or any cost estimates;

8. Based upon or arising out of any conversion, misappropriation, or commingling of funds or property;

9. Based upon or arising out of any inability or failure of any party to pay or collect monies;

10. Based upon or arising out of infringement or inducement of infringement of patent or trade secret; or

11. Based upon, arising out of, or in any way involving an act, error or omission in the performance of professional services rendered or that should have been rendered by you or by any person or organization for whose acts, errors or omissions you are legally responsible.

**B.** As respects all coverages provided under this endorsement only, paragraph **2.b. Exclusions** of **SECTION I – COVERAGES** is replaced by the following:

**Contractual Liability**

We will not pay for any "claim", "loss", or "breach mitigation expense" based upon or arising out of liability of others you assume under any contract or agreement. This exclusion shall not apply to liability you would have in the absence of such contract or agreement;

**C.** As respects Coverage **A.** Data Breach and Privacy Liability only, we will not pay for any "claim" made by any person or organization which you or any parent organization, subsidiary, division or affiliated organization operate, manage or own, in whole or in part.

**D.** As respects Coverage **B.** Data Breach Loss to Insured only, this coverage does not apply to "loss":

1. Caused by theft, physical damage, or destruction of your "data storage device" or any part thereof. This exclusion shall not apply to destruction of programs, electronic data, and media caused by a "data breach";

**2.** Based upon or arising out of theft, or alleged theft, of money, securities, bonds, or similar financial instruments with monetary value caused or contributed to by any fraudulent, dishonest or criminal act committed by any person who is your past or current principal, partner, officer, director, trustee, shareholder or "employee" at the time of the "data breach", whether acting alone or in collusion with others; or

**3.** Of the value of trade secrets, confidential processing methods or other confidential or proprietary information.

## III. LIMITS OF INSURANCE

As respects coverage provided by this endorsement only, **SECTION III – LIMITS OF INSURANCE** is replaced by the following:

Regardless of the number of insureds, "claims" made or "suits" brought; or persons or organizations making "claims" or bringing "suits".

**A.** The most we will pay for each covered "claim", including "damages", "fines", and "claim expenses", under Coverage **A.** Data Breach and Privacy Liability is the Each Claim limit shown in the Schedule of this endorsement. All incidents of "data breach" that are discovered at the same time or that arise from the same cause or from a series of similar causes shall be considered one "data breach". All theft of "private data" caused by any person or in which that person is involved, whether the result of a single act or series of related acts, shall be considered a single incident of "data breach".

**B.** The most we will pay for each covered "data breach" under Coverage **B.** Data Breach Loss to Insured is the Each Data Breach limit shown in the Schedule of this endorsement. More than one "loss" arising out of a single "data breach" shall be considered a single "loss".

**C.** The most we will pay for each covered "data breach" under Coverage **C.** Breach Mitigation Expense is the Each Data Breach limit shown in the Schedule of this endorsement. All "breach mitigation expenses" arising out of a single "data breach" or a series of related acts shall be treated as a single "data breach".

**D.** The Total Annual Aggregate limit shown in the Schedule of this endorsement is the most we will pay for the sum of all "loss", "breach mitigation expense", "claims", "fines", and "claim expenses" paid under all coverages on this endorsement in any one policy period.

**E.** The payment of "claim expenses" will reduce the applicable Limits of Insurance shown in the Schedule above. We shall have no obligation to pay any "damages" or to defend or continue to defend any "claim" or to pay "claim expenses" after the applicable Limits of Liability have been exhausted by payment of "damages" and/or "claim expenses". We will have the right to withdraw from the further defense of any "claim" under this coverage by tendering control of the defense to you.

**F.** More than one "claim" arising out of a single "data breach" shall be.treated as a single "claim". Only one Data Breach and Privacy Liability Coverage Each Claim Limit will apply to such "claims" regardless of:

**1.** The number or type of claimants involved;

**2.** The number of persons responsible for the "data breach";

**3.** The factual allegations alleged;

**4.** The theories of recovery asserted;

**5.** The period of time during which the "data breach" or series of related acts occurred; and

**6.** The number of policy periods over which the "data breach" or series of related acts occurred.

## IV. CONDITIONS

As respects insurance provided under Coverages **B.** and **C.** above, the following Condition is added to **SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS** :

**Data Breach Coverage Duties In The Event Of Loss**

You must see that the following are done in the event of any "loss":

**1.** Notify the police if a law may have been broken.

**2.** Give us prompt notice of the "data breach".

3. As soon as possible, give us a description of how, when and what elements of your or a third party's "data storage device" was impacted by the "data breach".

4. Take all reasonable steps to protect your "data storage device" from further "data breach".

5. As often as may be reasonably required, permit us to inspect your "data storage device" and examine your books and records related to the incurred "loss".

7. As respects Coverage **B.**, send us a signed, sworn proof of loss containing the information we request to investigate the "claim". You must do this within 60 days after our request. We will supply you with the necessary forms.

8. As respects Coverage **C.**, submit satisfactory written proof of "breach mitigation expenses" to us within one (1) year after the expiration or cancellation date of this coverage.

9. Comply with any "security breach notice law" to which you become subject by reason of any "data breach".

## V.  DEFINITIONS

A. The following definitions in the **DEFINITIONS** Section of the Coverage Form are replaced by the following, but only as respects coverage provided by this endorsement:

3. "Bodily injury" means injury, sickness or disease sustained by a person, including death resulting from any of these; however, "bodily injury" does not include humiliation or the infliction of emotional distress arising solely from a "data breach".

17. "Property damage" means physical injury to tangible property, including all resulting loss of use of that property or loss of use of tangible property that is not physically injured; however, damage to, corruption of or inability to access data, software and computer networks shall not be considered to be loss of use of tangible property.

B. The following definitions are added to **SECTION V – DEFINITIONS (Occurrence form)** and in **SECTION VI – DEFINITIONS (Claims-Made form)**, but only as respects coverage provided by this endorsement:

1. "Breach mitigation expense" means expenses incurred by you with our prior written consent for:

a. The services of a public relations professional, or other publicity expenses that are recommended by a public relations professional to respond to any actual adverse publicity in the media, that is the result of a "data breach";

b. Expenses, including but not limited to notification to affected parties and related legal fees, that are incurred to comply with a "security breach notice law" and that are the result of a "data breach"; and

c. Expenses associated with voluntarily providing "credit monitoring services" to parties and individuals affected by a "data breach".

2. "Claim" means your receipt of:

a. A written demand for "damages";

b. The service of "suit" or institution of arbitration proceedings against you; or

c. Any administrative proceeding initiated or written notice of the institution of a charge against you by any official administrator or enforcer of laws or regulations relating to the use, transfer or storage of electronic communications or data storage systems, including any investigation, conciliation meeting or hearing;

all as a result of a "data breach".

3. "Claim expenses" means reasonable and necessary expenses incurred by either you, with our written consent, or us, in the defense of that portion of any "claim" covered by this endorsement. "Claim expenses" include:

a. Costs of investigation;

b. Court costs, costs of bonds to release attachments and similar bonds, but without any obligation by us to apply for or furnish any such bonds; and

c. Costs of appeals.

"Claim expenses" shall not include:

**a.** Salary, wages, overhead, or benefit expenses of or associated with your "employees" or officials or our "employees" or officials; or

**b.** Salary, wages, administration, overhead, benefit expenses, or charges of any kind attributable to any in-house counsel or captive out-of-house counsel utilized by you or us.

4. "Credit monitoring services" means any variation of the following services, if warranted, and you offer to provide them to affected parties who enroll in such services:

**a.** A credit report;

**b.** Credit monitoring;

**c.** Credit score;

**d.** Public records monitoring;

**e.** Fraud monitoring; or

**f.** Other monitoring that may proactively assist in notification of the misuse of an individual's identity or personal information.

5. "Damages" means the monetary portion of any judgment, award or settlement, including punitive damages where insurable. "Damages" shall not include:

**a.** Multiplied portions of damages in excess of actual damages, including trebling of damages;

**b.** The cost of any modifications or changes to your security measures, procedures, software or hardware required or agreed to by you to satisfy a judgment, award or settlement;

**c.** Any cost required to repair, build or modify property to comply with any award by a court, administrative order, arbitration award or any similar judgment;

**d.** Taxes, criminal or civil fines, or attorneys' fees imposed upon a party other than an insured, other penalties imposed by law or "fines";

**e.** Sanctions;

**f.** Matters which are insurable under the law; or

**g.** The return, withdrawal, reduction, restitution or payment of any fees, profits or charges for services or consideration and/or any expenses paid to you.

6. "Data breach" means the loss, theft, accidental release or accidental publication of "private data" entrusted to you as respects one or more affected parties if such loss, theft, accidental release, or accidental publication has or could reasonably result in the fraudulent use of such information. This definition is subject to the following provisions:

**a.** "Data breach" includes disposal or abandonment of "private data" without appropriate safeguards such as shredding or destruction; however:

**(1)** Your failure to use appropriate safeguards must be accidental and not intentional, reckless or deliberate.

**(2)** Such disposal or abandonment must take place during the time period for which this Data Breach Coverage is effective.

**b.** "Data breach" includes situations where there is a reasonable cause to suspect that such "private data" has been stolen, accidentally released or accidentally published, even if there is no firm proof.

7. "Data storage device" means:

**a.** Any wired, wireless, radio, electromagnetic, photo-optical or photo-electronic facility for the transmission of electronic communications;

**b.** Any electronic data processing system, network or related electronic equipment for the storage of such communications; and

**c.** Any computer.

8. "Fines" means civil fines and penalties assessed against the insured by any official administrator or enforcer of laws or regulations relating to the use, transfer or storage of electronic communications or data storage systems as a result of a "claim" subject to coverage under Coverage **A**. Data Breach and Privacy Liability above.

9. "Forensic expense" means reasonable and necessary costs you incur to engage the services of a third party computer security expert to determine the existence and cause of any "data breach".

10. "Loss" means:

    **a.** Reasonable and necessary costs incurred by you to restore, as soon as is reasonably practicable, your "data storage device" to the condition that existed prior to a "data breach", including reconstruction of programs, electronic data and media which form a part of your "data storage device"; and

    **b.** "Forensic expense".

    "Loss" shall not include:

    **a.** Any cost or charges associated with building, modifying or upgrading your "data storage device" or any software, security measures or procedures;

    **b.** Any cost required to repair, build or modify tangible property to comply with any legal or binding award or order by a court, other official administrator or enforcer, arbitration or any similar proceeding;

    **c.** Your loss of reputation or loss of customer confidence in you or the value imputed to such loss;

    **d.** Expenses you incur in establishing the amount of any "loss" covered under this endorsement; or

    **e.** Lost income.

11. "Private data" means data containing the following belonging to individuals:

    **a.** Drivers license or other state-issued identification number; social security number; unpublished telephone number; and/or financial account information that would permit access to that individual's financial account(s);

    **b.** *Nonpublic personal information* as defined in the Gramm-Leach Bliley Act of 1999, as amended, and regulations issued pursuant thereto;

    **c.** *Protected healthcare information* as defined in the Health Insurance Portability and Accountability Act of 1996 (HIPPA), as amended, and regulations issued pursuant thereto; and medical and healthcare information;

    **d.** Private personal information as defined under a "security breach notice law"; and

    **e.** Private personal information as defined under the law of a country other than the United States, which law is intended to provide for the protection of such private personal information;

    However, "private data" does not include any lawfully available data accessible by the general public.

12. "Security breach notice law" means any law, statute or regulation within the United States of America, its territories or possessions, Puerto Rico or Canada requiring you to notify individuals of the compromise or possible compromise of the security of their confidential information in your care, custody or control, and the European Union (EU) Data Protection Act of 1995.


All other terms and conditions remain unchanged.



# Evanston Insurance Company
POLICY NUMBER: MKLV2ENV100993

## CONTRACTOR'S POLLUTION LIABILITY
## SUPPLEMENTAL DECLARATIONS

**AMOUNTS INCURRED AS SUPPLEMENTARY PAYMENTS IN EXCESS OF THE DEFENSE EXPENSES AGGREGATE LIMIT WILL REDUCE THE LIMIT OF LIABILITY AVAILABLE AND WILL BE APPLIED AGAINST THE SELF-INSURED RETENTION OR DEDUCTIBLE.**

| Limits Of Insurance And Self-Insured Retention Or Deductible | |
|---|---|
| **LIMITS OF INSURANCE** | |
| Coverage Form Aggregate Limit | $5,000,000 |
| ☒ Each Contractor's Pollution Condition Limit | $5,000,000 |
| ☒ Each Transportation Pollution Condition Limit | $5,000,000 |
| ☒ Each Non-Owned Disposal Site Pollution Condition Limit | $5,000,000 |
| ☒ Each Crisis Management And Emergency Response Limit | $250,000 |
| Defense Expenses Aggregate Limit | $1,000,000 |

| | |
|---|---|
| ☒ **SELF-INSURED RETENTION** | |
| ☐ **DEDUCTIBLE** | |
| Each Pollution Condition | $10,000 |

| Retroactive Date (Not applicable with MEEI 0007) | |
|---|---|
| Retroactive Date (Claims-Made And Reported Coverage Only)    12/28/2017 | |
| This insurance does not apply to injury or damages that occurs before the Retroactive Date shown above. | |

| Endorsements |
|---|
| Forms and Endorsements applying to this Coverage Form and made a part of this policy at time of issue: |
| **SEE FORMS SCHEDULE MDIL 1001 ATTACHED** |

ENVIRONMENTAL



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CONTRACTOR'S POLLUTION LIABILITY COVERAGE FORM
### (CLAIMS-MADE AND REPORTED COVERAGE)

## TABLE OF CONTENTS

SECTION I – COVERAGES……………………………………………….....................................................…..............2

    A.   Insuring Agreements………………………………………………….....................................................……………2

        1. Contractor's Pollution Liability……………………………………………….....................................……2

        2. Transportation Pollution Liability……………………………………………….......................................2

        3. Non-Owned Disposal Site Liability………………………….....…...........................................................3

        4. Crisis Management And Emergency Response Costs……………….........................................................3

    B.   Claims And Defense…………………………………………………........................................................……… 3

    C.   Supplementary Payments………………………………………….............................................…. ..............4

SECTION II – EXCLUSIONS…………………………………………….........................................................………5

SECTION III – WHO IS AN INSURED……………………………………………….....................................………. 8

SECTION IV – LIMITS OF INSURANCE AND SELF-INSURED RETENTION OR DEDUCTIBLE……………………………………………….......................................................................................... 9

    A.   Limits Of Insurance…………………………………………….......................................................……… 9

    B.   Self-Insured Retention………………………………………………........................................................…… 9

    C.   Deductible…………………………………………………....................................................................………10

SECTION V – CONDITIONS………………………………………….....…............................................................…10

SECTION VI – EXTENDED REPORTING PERIODS……………………………............................................……13

SECTION VII – DEFINITIONS…………………………………………………..........................................................14

**ENVIRONMENTAL**

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CONTRACTOR'S POLLUTION LIABILITY COVERAGE FORM
### (CLAIMS-MADE AND REPORTED COVERAGE)

**THIS COVERAGE FORM PROVIDES CLAIMS-MADE AND REPORTED COVERAGE. CLAIMS-MADE AND REPORTED COVERAGE REQUIRES THAT A CLAIM BE FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND REPORTED TO US IN WRITING DURING THE POLICY PERIOD OR ANY APPLICABLE EXTENDED REPORTING PERIOD WE PROVIDE UNDER SECTION VI – EXTENDED REPORTING PERIODS.**

**VARIOUS PROVISIONS IN THIS POLICY MAY RESTRICT OR EXCLUDE COVERAGE. PLEASE READ THE ENTIRE POLICY CAREFULLY TO DETERMINE THE INSURED'S RIGHTS AND DUTIES AND WHAT IS AND IS NOT COVERED.**

**AMOUNTS INCURRED AS SUPPLEMENTARY PAYMENTS IN EXCESS OF THE DEFENSE EXPENSES AGGREGATE LIMIT SHOWN IN THE DECLARATIONS WILL REDUCE THE LIMIT OF INSURANCE AVAILABLE AND WILL BE APPLIED AGAINST THE SELF-INSURED RETENTION OR DEDUCTIBLE, IF APPLICABLE.**

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **III** – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **VII** – Definitions.

**SECTION I – COVERAGES**

**A.  Insuring Agreements**

The following Insuring Agreements apply only if indicated by an "X" in the Declarations, and the "pollution condition" that causes a "loss" takes place in the "coverage territory". The amount we will pay is limited as described in Section **IV** – Limits Of Insurance And Self-Insured Retention Or Deductible.

**1.  Contractor's Pollution Liability**

We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage" or "cleanup costs" caused by a "pollution condition" to which this insurance applies, provided:

**a.**  The "pollution condition" arises out of "your work";

**b.**  "Your work" was performed during the policy period or after the Retroactive Date, if any, shown in the Declarations, except for a "pollution condition" arising out of the "completed operations" of "your work"; and

**c.**  The "pollution condition" results in a "claim" for damages that is first made against any insured during the policy period and reported to us in writing during the policy period or any applicable extended reporting period we provide under Section **VI** – Extended Reporting Periods.

With respect to "bodily injury", "property damage" or "cleanup costs" caused by legionella, there must be a direct relation to a documented case of a legionella outbreak for coverage to apply.

**2.  Transportation Pollution Liability**

We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage" or "cleanup costs" resulting from a "transportation pollution condition" to which this insurance applies, provided the "transportation pollution condition":

**a.** First commences during the policy period or after the Retroactive Date, if any, shown in the Declarations;

**b.** Arises out of "transported cargo" that is transported, delivered or shipped by you in a "covered conveyance", or by a "carrier" on your behalf; and

**c.** Results in a "claim" for damages that is first made against any insured during the policy period and reported to us in writing during the policy period or any applicable extended reporting period we provide under Section **VI** – Extended Reporting Periods.

This coverage shall not be utilized to evidence financial responsibility of any insured under any applicable federal, state, provincial or local law.

**3. Non-Owned Disposal Site Liability**

We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage" or "cleanup costs" resulting from a "pollution condition" to which this insurance applies, originating at, on or under, or migrating from, a covered "non-owned disposal site", provided the "pollution condition":

**a.** First commences during the policy period or after the Retroactive Date, if any, shown in the Declarations;

**b.** Arises from waste or material generated by "your work"; and

**c.** Results in a "claim" for damages that is first made against any insured during the policy period and reported to us in writing during the policy period or any applicable extended reporting period we provide under Section **VI** – Extended Reporting Periods.

**4. Crisis Management And Emergency Response Costs**

We will indemnify you for:

**a.** "Crisis management costs" you incur as a direct result of a "crisis management event", provided that the "crisis management event":

**(1)** Arises directly from a "pollution condition" that has resulted or is reasonably likely to result in a "loss" covered under this policy;

**(2)** Commences during the policy period; and

**(3)** First becomes known to a "responsible insured" during the policy period and is reported to us in writing as soon as practical, but in any event during the policy period or within 30 days after the end of the policy period.

We will pay those "crisis management costs" you incur even if coverage hereunder is still to be confirmed by us, but we will stop paying such "crisis management costs" as soon as it becomes evident, to either you or us, that this insurance does not apply. "Crisis management costs" are not subject to the self-insured retention or deductible; and

**b.** "Emergency response costs" you incur as a direct result of the "pollution condition" that has resulted in a "loss" covered under this policy.

**B. Claims And Defense**

**1.** A "claim" by a person or organization seeking damages will be deemed to have been made at the earlier of the following times:

**a.** When notice of such "claim" is received and recorded by any insured or by us, whichever comes first; or

**b.** When we make settlement in accordance with Paragraph **B.2.** below.

All "claims" for damages arising out of the same, related or continuous "pollution condition" will be considered a single "claim" and will be deemed to have been first made and reported or incurred at the time of the first "claim" is made against any insured.

Any "claim" for damages to the same person, including damages claimed by any person or organization for care, loss of services or death resulting at any time, will be deemed to have been made at the time the first of those "claims" is made against any insured.

**2.** We will have the right and duty to defend the insured against any "suit" seeking those damages to which this insurance applies. However, we will have no duty to defend the insured against any "suit" seeking damages to which this insurance does not apply. We may, at our discretion, investigate any "pollution condition" and settle any "claim" that may result. But:

    **a.** The amount we will pay for damages is limited as described in Section **IV** – Limits Of Insurance And Self-Insured Retention Or Deductible; and

    **b.** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments, settlements or supplementary payments.

**C. Supplementary Payments**

**1.** We will pay, with respect to any "claim" we investigate or settle, or any "suit" against an insured we defend:

    **a.** All expenses we incur.

    **b.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the "claim", including actual loss of earnings up to $500 a day because of time off from work.

    **c.** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

    **d.** Pre-judgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any pre-judgment interest based on that period of time after the offer.

    **e.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

    **a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

    **b.** This insurance applies to such liability assumed by the insured;

    **c.** The obligation to defend, or the cost of the defense of, that indemnitee has also been assumed by the insured in the same "insured contract";

    **d.** The allegations in the "suit" and the information we know about the "pollution condition" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

    **e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

    **f.** The indemnitee:

      **(1)** Agrees in writing to:

        **(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

        **(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

        **(c)** Notify any other insurer whose coverage is available to the indemnitee; and

        **(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

      **(2)** Provides us with written authorization to:

        **(a)** Obtain records and other information related to the "suit"; and

        **(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as supplementary payments.

We may, at our option, appoint one counsel to defend all of the insureds and indemnitees of the insureds who are or may be involved with respect to such "suit".

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as supplementary payments ends when we have used up the applicable limit of insurance in the payment of judgments, settlements or supplementary payments, or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

Amounts paid as supplementary payments as described in Paragraphs **1.** and **2.** above will reduce the Defense Expenses Aggregate Limit shown in the Declarations. Once that limit has been exhausted, amounts paid as supplementary payments will reduce the applicable limits described in Section **IV – Limits Of Insurance And Self-Insured Retention Or Deductible.**

## SECTION II – EXCLUSIONS

This insurance does not apply to:

1. **Communicable Disease**

   "Loss" due to the presence of a communicable disease, which means an illness, sickness, physical condition, or an interruption or disorder of bodily functions, systems, or organs that is transmissible by infection or contagion directly or indirectly through human contact or contact with human fluids, waste or similar agents.

   However, this exclusion does not apply to the discharge, dispersal or release of "mold" or legionella.

2. **Contractual Liability**

   "Loss" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. However, this exclusion does not apply to liability for damages:

   **a.** That the insured would have in the absence of the contract or agreement; or

   **b.** Assumed in a contract or agreement that is an "insured contract", provided the "loss" occurs subsequent to the execution of the contract or agreement.

3. **Damage To Property**

   "Property damage" in any way related to any real property or facility that is or was at any time owned, operated or occupied by, or rented to, you. However, this exclusion does not apply if the real property or facility is operated or occupied by you for the purpose of performing "your work".

4. **Damage To Your Product Or Your Work**

   "Property damage" to "your product" or "your work" or any part of "your product" or "your work". This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

5. **Employer's Liability**

   "Bodily injury" to:

   **a.** An "employee" of the insured arising out of and in the course of:

      **(1)** Employment by the insured; or

      **(2)** Performing duties related to the conduct of the insured's business; or

   **b.** The spouse, child, parent, brother or sister of that "employee" as a consequence of this exclusion **5.**

   This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

   However, this exclusion does not apply to liability assumed by you under an "insured contract".

6. **Expected Or Intended Injury**

   "Bodily injury" or "property damage" expected or intended from the standpoint of a "responsible insured".

**7. Fines And Penalties**

Punitive damages, exemplary damages, multiplied damages, fines or penalties.

**8. Impaired Property**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**a.** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**b.** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**9. Insured Versus Insured**

Any "claim" made by or on behalf of an insured against any other insured. However, this exclusion does not apply with respect to "claims" against you by any insured seeking coverage or indemnification pursuant to a written contract or agreement.

**10. Intentional Acts**

"Loss" arising out of intentional, willful or deliberate:

**a.** Injury to persons or property; or

**b.** Failure to comply with any permit, administrative complaint, notice of violation, notice letter, executive order or instruction of any governmental or public agency or body either before or after the beginning of the policy period.

However, this exclusion does not apply to an insured who did not commit, participate in or have knowledge of any of the acts described above.

**11. Known Circumstances**

"Loss" caused by, arising out of or in any way related to a "pollution condition", including any subsequent continuation or resumption of or changes in such "pollution condition", that existed prior to the policy period, or that was known to any "responsible insured" at any time before the beginning of the policy period.

**12. Nuclear Energy Liability**

"Loss":

**a.** With respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by the Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability;

**b.** Resulting from the "hazardous properties" of "nuclear material" and with respect to which:

**(1)** Any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof; or

**(2)** The insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization; or

**c.** Resulting from the "hazardous properties" of "nuclear material", if:

**(1)** The "nuclear material":

**(a)** Is at any "nuclear facility" owned by, or operated by or on behalf of, an insured; or

**(b)** Has been discharged or dispersed therefrom;

**(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

**(3)** The "loss" arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is

located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

As used in this exclusion:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "special nuclear material" or "by-product material".

"Source material", "special nuclear material" and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material:

**a.** Containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content; and

**b.** Resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

**a.** Any "nuclear reactor";

**b.** Any equipment or device designed or used for:

    **(1)** Separating the isotopes of uranium or plutonium;

    **(2)** Processing or utilizing "spent fuel"; or

    **(3)** Handling, processing or packaging "waste";

**c.** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**d.** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

**13. Other Enterprises**

"Loss" arising out of any business enterprise owned, operated or managed by the insured or its parent company or the affiliate, successor or assignee of such company not named in the Declarations.

**14. Professional Services**

"Loss" arising out of any alleged or actual act, error or omission in the rendering of or failure to render "professional services" by you or any contractor or subcontractor working on your behalf. This exclusion applies even if the "claims" against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "pollution condition" which caused the "loss" involved the rendering of or failure to render "professional services".

However, this exclusion does not apply to a "claim" in which you committed an actual or alleged act, error or omission relating to improper or inadequate supervision, direction or control of any subcontractors for which you are legally liable when performing operations on your behalf at a job site.

**15. Property Damage To Cargo**

"Property damage" to "transported cargo".

**16. Property Damage To Conveyances**

"Property damage" to any "auto", railcar, train, watercraft or aircraft operated by or on behalf of any insured resulting from a "pollution condition" caused by "transported cargo". However, this exclusion does not apply to any "claim" brought by any "carrier" for "property damage" arising out of the insured's negligence.

**17. Vehicles**

"Loss" arising out of the ownership, maintenance, use, operation or entrustment to others of any aircraft, "unmanned aircraft", "auto" or watercraft. Use includes "loading or unloading".

However, this exclusion does not apply to:

**a.** "Loading or unloading" within the boundaries of any location covered under this policy; or

**b.** Insuring Agreement **A.2.** Transportation Pollution Liability, if shown as covered in the Declarations.

**18. War**

"Loss", however caused, arising, directly or indirectly, out of:

**a.** War, including undeclared or civil war;

**b.** Warlike action by a military force, including action taken in the hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**c.** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**19. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**20. Your Product**

"Loss" arising out of "your product".

**SECTION III – WHO IS AN INSURED**

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**2.** Each of the following is also an insured:

**a.** Your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of "your work".

**b.** In the event of your bankruptcy, your trustees, and in the event of your death or incapacity, your legal representatives or executors, but only with respect to each such trustee's, representative's or executor's vicarious liability resulting from "your work".

**3.** Any organization, other than a partnership, joint venture or limited liability company, you newly acquire or form during the policy period and over which you maintain ownership or majority interest, will qualify as an insured but only with respect to "your work" rendered on or after the acquisition or formation date of such organization. However coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier.

**4.** Any client for whom you perform or performed "your work" and with whom you have agreed to provide additional insured status in a written contract or agreement is an insured under this policy, provided the written contract or agreement was executed prior to the:

**a.** Commencement of "your work"; and

**b.** Date the "pollution conditions" first commenced.

Such client is an insured only with respect to "bodily injury" or "property damage" caused by a "pollution condition" for which the client is liable because of "your work". There is no coverage under this insurance for any "claims" arising out of the sole negligence of your clients.

Any insurance afforded to an insured described in Paragraph **4.** above only applies to the extent permitted by law, will not be broader than that which you are required by the contract or agreement to provide for such insured, and is limited to the lesser of the Limits Of Insurance shown in the Declarations or the amount required by the written contract or agreement.

Paragraph **4.** does not apply to any client specifically named as an additional insured in an endorsement attached to this policy.

## SECTION IV – LIMITS OF INSURANCE AND SELF-INSURED RETENTION OR DEDUCTIBLE

### A. Limits Of Insurance

**1.** The Limits Of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of insureds, "claims" made, or persons or organizations making "claims".

**2.** The Coverage Form Aggregate Limit is the most we will pay for the sum of all "loss" and supplementary payments arising out of all "pollution conditions" under all Insuring Agreements.

**3.** Subject to Paragraph **2.** above:

**a.** The Each Contractor's Pollution Condition Limit is the most we will pay under Insuring Agreement **A.1.** for the sum of all "loss" and supplementary payments arising out of any one "pollution condition".

**b.** The Each Transportation Pollution Condition Limit is the most we will pay under Insuring Agreement **A.2.** for the sum of all "loss" and supplementary payments arising out of any one "transportation pollution condition".

**c.** The Each Non-Owned Disposal Site Pollution Condition Limit is the most we will pay under Insuring Agreement **A.3.** for the sum of all "loss" and supplementary payments arising out of any one "pollution condition" at a "non-owned disposal site".

**d.** The Each Crisis Management And Emergency Response Limit is the most we will pay under Insuring Agreement **A.4.** for the sum of all "loss" and supplementary payments arising out of any one "pollution condition".

**4.** Amounts paid as supplementary payments will reduce the Defense Expenses Aggregate Limit shown in the Declarations. Once that limit has been exhausted, amounts paid as supplementary payments will reduce the applicable limits described in Paragraphs **2.** and **3.** above.

The limits of insurance of this Coverage Form apply separately to each policy period, unless the policy period is extended after issuance for an additional period. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the limits of insurance.

### B. Self-Insured Retention

The following applies only if Self-Insured Retention is selected in the Declarations:

**1.** You agree to assume the Self-Insured Retention shown in the Declarations. Our obligation to pay damages or supplementary payments under this insurance and the applicable limit shown in the Declarations will apply in excess of the self-insured retention.

**2.** Regardless of whether or not there is any other insurance, whether or not collectible, applicable to a "claim" or "pollution condition" within the self-insured retention, you must make actual payment of the full self-insured retention before the limits of insurance will apply. Compliance with this clause is a condition precedent for coverage under this insurance. We will make no payments of any type in the event you fail to comply with this clause.

3.  You must not incur costs other than adjusting expenses without our written consent in the event of any "claim" or "pollution condition" which appears likely to exceed the self-insured retention.

4.  We have the right and duty in all cases to assume control of the investigation, defense and settlement of any "claim" or "pollution condition" to which this insurance applies. When we exercise this right, the following apply:

    a.  You will remain responsible for the cost of all damages and supplementary payments within the self-insured retention;

    b.  At our request, you will advance to us any portion of the applicable self-insured retention that we deem reasonable to pay for any "claim" or "pollution condition";

    c.  If you have paid to us all or part of the applicable self-insured retention and the total amount of damages and supplementary payments that we pay for that "claim" or "pollution condition" is less than the applicable self-insured retention, then we will reimburse you the amount you paid in excess of the amount we pay; and

    d.  We will have the sole and absolute right to settle the "claim" for any amount we deem reasonable, including any amount within the self-insured retention. Although we agree to attempt to advise and consult with you prior to making any settlement, we will have no obligation to obtain your consent or the consent of any other insured, to any settlement we make that requires payment from you of any amount within the self-insured retention. You and any other insured hereby waive any claim or defense against us resulting from our entering into any such settlement without your approval.

## C. Deductible

The following applies only if Deductible is selected in the Declarations:

1.  Our obligation to pay damages for "loss" on your behalf applies only to the amount of damages in excess of the Deductible shown in the Declarations.

2.  The deductible applies separately to each "pollution condition", and may be applied to supplementary payments, settlements or indemnification.

3.  The terms of this insurance, including those with respect to:

    a.  Our right and duty to defend the insured against any "claims" seeking those damages; and

    b.  Your duties in the event of a "pollution condition";

    apply irrespective of the application of the deductible.

4.  At our sole election and option, we may either:

    a.  Pay any part or all of the deductible to effect settlement of any "claim", and upon notification of the action taken, you must promptly reimburse us for that part of the deductible as has been paid by us; or

    b.  Simultaneously upon receipt of notice of any "claim" or at any time thereafter, call upon you to pay or deposit with us all or any part of the deductible, to be held and applied by us as herein provided.

5.  In the event that you do not promptly comply with Paragraph **4.** above, any cost we incur in collection of the deductible including, but not limited to, collection agency fees, attorneys' fees, and interest, will be added to and applied in addition to the deductible without limitation to such costs.

6.  If the same, related or continuous "pollution condition" results in coverage under more than one Insuring Agreement under this policy, then only the highest Deductible shown in the Declarations of all Insuring Agreements applicable to the "pollution condition" will apply.

## SECTION V – CONDITIONS

### 1. Bankruptcy

Bankruptcy or insolvency of the insured or the insured's estate will not relieve us of our obligations or increase our liability under this Coverage Form.

### 2. Duties In The Event Of A Pollution Condition Or Claim

a.  You must see to it that we are notified as soon as practicable in writing of a "pollution condition". To the extent possible, notice must contain:

    (1) How, when and where the "pollution condition" took place;

**(2)** The names and addresses of any claimants, injured persons and witnesses;

**(3)** The nature and location of any injury or damage arising out of the "pollution condition";

**(4)** The date and details of "your work" that may have caused the "pollution condition";

**(5)** Copies of any contracts that have been entered into by any insured that are related to "your work" performed; and

**(6)** Details explaining how the insured first became aware of the "pollution condition".

Notice of a "pollution condition" is not notice of a "claim". However, any such reported "pollution condition" that subsequently becomes a "claim" made against any insured and reported to us in writing will be deemed to have been first made on the date that the written notice of "pollution condition" was first reported to us and will be subject to all of the terms and conditions of this Coverage Form.

As a condition precedent to the rights afforded you under this provision, such written notice to us of any "pollution condition" must contain the information shown above.

We will determine, at our sole discretion, whether your written notice satisfies the condition precedent above.

**b.** If a "claim" is made against any insured:

**(1)** You must record and notify us as soon as practicable in writing the specifics of the "claim" and the date received; and

**(2)** You and any other involved insured must:

**(a)** Send us copies as soon as practicable of any demands, notices, summons or legal papers received in connection with the "claim";

**(b)** Authorize us to obtain records and other information;

**(c)** Cooperate with us in the investigation, settlement or defense of the "claim"; and

**(d)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**c.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, without our written consent. However, written consent is not required with respect to:

**(1)** "Crisis management costs" that have been reported in accordance with Paragraph **a.(3)** of Insuring Agreement **A.4.** Crisis Management Or Emergency Response Costs; or

**(2)** "Emergency response costs" that have been reported and approved by us or our appointed representative by use of the emergency response hotline.

**3. Legal Action Against Us**

No person or organization has a right under this Coverage Form:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this Coverage Form unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this Coverage Form or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for "loss" we cover under this Coverage Form, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. In that case, we will share with all such other insurance by the method described in Paragraph **c.** below.

**b. Excess Insurance**

**(1)** This insurance is excess over:

    **(a)** Any other insurance, whether primary, excess, contingent or on any other basis that is effective prior to the beginning of the policy period shown in the Declarations of this insurance and applies to "your work" or "completed operations" of "your work" on other than a claims-made basis, if:

        **(i)** No Retroactive Date is shown in the Declarations of this insurance; or

        **(ii)** The other insurance has a policy period which continues after the Retroactive Date shown in the Declarations of this insurance;

    **(b)** Any other insurance, whether primary, excess, contingent or on any other basis if you are an insured on an insurance policy that applies to "your work" or "completed operations" of "your work" performed at a specific job site and that insurance policy applies to a specific job site;

    **(c)** Any other valid and collectible insurance available to you covering liability for damages arising out of "your work" or "completed operations" of "your work", including that work for which you have been added as an additional insured by an endorsement, or by definition in a contract or agreement, or by combination thereof;

    **(d)** Any other valid and collectible insurance available to any person or entity performing functions for others on your behalf as defined in "your work" in this Coverage Form;

    **(e)** Any valid and collectible project-specific insurance policy, owner's protective insurance policy, owner-controlled insurance policy, contractor-controlled insurance policy, wrap-up policy or similar insurance program under which an insured is covered; or

    **(f)** Any other valid and collectible insurance, whether primary, excess, contingent or on any other basis, covering a:

        **(i)** "Transportation pollution condition", if Insuring Agreement **A.2.** Transportation Pollution Liability is shown as covered in the Declarations; or

        **(ii)** "Pollution condition" on a "non-owned disposal site", if Insuring Agreement **A.3.** Non-Owned Disposal Sites is shown as covered in the Declarations.

**(2)** When this insurance is excess, we will have no duty to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the damages, if any, that exceeds the sum of:

    **(a)** The total amount that all such other insurance would pay for the damages in the absence of this insurance; and

    **(b)** The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining damages, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits Of Insurance shown in the Declarations of this Coverage Form.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the damages remain, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

    **a.** We will compute all premiums for this Coverage Form in accordance with our rules, rates, rating plans and minimum premium requirements.

    **b.** Premium shown as Advance And Deposit Premium in the Declarations is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured

shown in the Declarations. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is more than the greater of the earned premium or Minimum Retained Premium shown in the Declarations, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the applications, other materials submitted to us and Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the limits of insurance, and any rights or duties specifically assigned to the first Named Insured shown in the Declarations, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom a "claim" is made.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this insurance, those rights are transferred to us. The insured must do nothing after "loss" to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**SECTION VI – EXTENDED REPORTING PERIODS**

**1.** We will provide one or more extended reporting periods, as described below, if:

**a.** This Coverage Form is cancelled or not renewed; or

**b.** We renew or replace this Coverage Form with insurance that:

**(1)** Has a retroactive date later than the date shown in the Declarations; or

**(2)** Does not apply to "claims" that result from a "pollution condition" on a claims-made basis.

**2.** Extended reporting periods do not extend the policy period or change the scope of coverage provided. They apply only to "claims" that result from "pollution conditions" that occur before the end of the policy period but not before the Retroactive Date, if any, shown in the Declarations, provided the "claim" is first made during the policy period and reported to us during the extended reporting period.

Once in effect, extended reporting periods may not be cancelled.

**3.** Extended reporting periods do not reinstate or increase the limits of insurance.

**4.** A Basic Extended Reporting Period is automatically provided without additional charge. This period starts with the end of the policy period and lasts for 90 days.

The Basic Extended Reporting Period does not apply to "claims" that are covered under any subsequent insurance you purchase, or that would be covered but for exhaustion of the amount of insurance applicable to such "claims".

**5.** An Optional Extended Reporting Period is available, subject to Paragraph **6.** below, but only by an endorsement for an extra charge. This Optional Extended Reporting Period starts when the Basic Extended Reporting Period, set forth in Paragraph **4.** above, ends.

You must give us a written request for the endorsement within 90 days after the end of the policy period. The Optional Extended Reporting Period will not go into effect unless you pay the additional premium promptly when due.

We will determine the additional premium in accordance with our rules and rates. In doing so we may take into account the following:

**a.** The exposures insured;

   **b.** Previous types and amounts of insurance;

   **c.** Limits of insurance available under this Coverage Form for future payment of damages; and

   **d.** Other related factors.

This endorsement will set forth the terms, not inconsistent with this section, applicable to the Optional Extended Reporting Period, including a provision to the effect that the insurance afforded for "claims" first received during such period is excess over any other valid and collectible insurance available under policies in force after the Optional Extended Reporting Period starts.

**6.** We do not have to provide an Optional Extended Reporting Period if:

   **a.** There is any failure to pay any outstanding premiums when due;

   **b.** You fail to repay any self-insured retention or deductible amount we have paid;

   **c.** You have purchased any other insurance to replace the insurance provided under this endorsement; or

   **d.** The application for this policy, including any addenda thereto, contains any material misrepresentation of fact.

## SECTION VII – DEFINITIONS

**1.** "Auto" means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment.

**2.** "Bodily injury" means physical injury, sickness, disease, mental anguish or emotional distress sustained by any person, including medical monitoring or death resulting from any of these at any time.

**3.** "Cargo" means waste, products or materials carried or delivered by a "covered conveyance".

**4.** "Carrier" means a person or an entity, other than any insured or any subsidiary or affiliate company of any insured, engaged by the insured to transport material by aircraft, "auto" or watercraft, but only if such person or entity is properly licensed to transport such material and in the business of transporting such material.

**5.** "Claim" means a written request or demand received by any insured or us for money or services including, but not limited to, the institution of "suit" or arbitration proceedings against any insured, seeking damages.

**6.** "Cleanup costs" means reasonable and necessary expenses incurred in the investigation, evaluation, monitoring, testing, removal, containment, treatment, response, disposal, remediation, detoxification or neutralization of any "pollutants":

   **a.** To the extent required by federal, state, local or provincial laws, including but not limited to statutes, rules, ordinances, guidance documents, regulations and all amendments thereto, including state voluntary clean up or risk-based corrective action guidance, governing the liability or responsibilities of the insured; or

   **b.** Which have been actually incurred by the government or any political subdivision of the United States of America or any state thereof, or by third parties.

"Cleanup costs" includes "restoration costs".

**7.** "Completed operations" means "your work" that has been completed. "Completed operations" does not include "your work" that has been abandoned or has not yet been completed. "Your work" will be deemed completed at the earliest of the following times:

   **a.** When all work to be performed under the contract has been completed;

   **b.** When all of the work to be done at the site has been completed if the contract calls for work at more than one site; or

   **c.** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

"Your work" that may require further service, maintenance, correction, repair or replacement, but is otherwise complete, will be deemed completed.

**8.** "Coverage territory" means:

   **a.** The United States of America (including its territories and possessions), Puerto Rico and Canada; and

   **b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above.

"Coverage territory" does not include military bases or installations not located in Paragraph **a.** above.

**9.** "Covered conveyance" means any conveyance operated by or on behalf of an insured used for transporting property.

**10.** "Crisis management consultant" means a professional firm or consultant that provides crisis management services and has been approved in writing by us, the approval for which will not be unreasonable withheld.

**11.** "Crisis management costs" means those reasonable and necessary fees and expenses:

   **a.** Incurred by you within 90 days after the "crisis management event" is discovered by you, or thereafter as approved by us in writing; and

   **b.** For services provided to you by a "crisis management consultant" for the sole purpose of assisting you with:

     **(1)** Managing the media in direct response to a "crisis management event" to which this insurance applies; or

     **(2)** Minimizing the economic harm to you caused by a "crisis management event" to which this insurance applies by consulting with you with respect to maintaining and restoring your company's public image or reputation.

You must take reasonable steps to minimize "crisis management costs".

**12.** "Crisis management event" means the public announcement by a third party that a "pollution condition" for which you are legally responsible has caused:

   **a.** "Bodily injury" involving third parties; or

   **b.** "Property damage", but only to the extent resulting in actual physical damage to real property owned by third parties;

provided that one of your "executive officers" has proffered, in our sole discretion, a good faith opinion that the public announcement or accusation has caused or is reasonably likely to cause economic harm to, or a material adverse effect on, your company's image or goodwill.

**13.** "Emergency response costs" means reasonable and necessary costs incurred to mitigate a "pollution condition" constituting an emergency situation whereby in the absence of such mitigation:

   **a.** "Bodily injury" or "property damage" to third parties is imminent; or

   **b.** "Cleanup costs" pursuant to environmental law are incurred.

**14.** "Employee" includes temporary and leased staff working on your behalf and under your direct supervision, but only with respect to "your work".

**15.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

**16.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   **a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   **b.** You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

**17.** "Insured contract" means:

   **a.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality; or

   **b.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization, provided the "bodily injury" or "property damage" is caused, in whole or in part, by you or by those acting on your behalf. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **b.** does not include that part of any contract or agreement:

**(1)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

   **(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

   **(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(2)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render "professional services", including those listed in **(1)** above and supervisory, inspection, architectural or engineering activities.

18. "Loading or unloading" means the handling of property:

   **a.** After it is moved from the place where it is accepted for movement into or onto a vehicle;

   **b.** While it is in or on a vehicle; or

   **c.** While it is being moved from a vehicle to the place where it is finally delivered.

19. "Loss" means:

   **a.** "Bodily injury", "property damage" or "cleanup costs", with respect to Insuring Agreements **A.1.** through **A.3.**; or

   **b.** "Crisis management costs" or "emergency response costs", with respect to Insuring Agreement **A.4.**;

   as applicable when shown as covered in the Declarations.

20. "Mold" means any permanent or transient fungus, mold, mildew or mycotoxin or any of the spores, scents or by-products produced or released by fungus.

21. "Natural resource damages" means physical injury to or destruction of, as well as the assessment of such injury or destruction, including the resulting loss of value of land, fish, wildlife, biota, air, water, groundwater, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States of America, any state or local government, any Native American tribe or, if such resources are subject to a trust restriction on alienation, any member of a Native American tribe.

22. "Non-owned disposal site" means a location you use for the treatment, storage or disposal of waste or material, provided the "non-owned disposal site":

   **a.** Is not managed, operated, owned or leased by any insured or any subsidiary or affiliate of any insured;

   **b.** Is permitted or licensed by the applicable federal, state, local or provincial authorities to accept such waste or material as of the date the waste or material is treated, stored or disposed of at the "non-owned disposal site"; and

   **c.** Is not listed on a proposed or final Federal National Priorities List or any state or provincial equivalent National Priority List, Superfund or Hazardous Waste List prior to the treatment, storage or disposal of the waste or material at the "non-owned disposal site".

23. "Pollutants" means, but is not limited to, any solid, liquid, gaseous, thermal, biological or radioactive substance, material or matter, irritant or contaminant including smoke, vapors, soot, silt, sedimentation, fumes, acids, alkalis, chemicals and waste.

   With respect to Insuring Agreements **A.1.** Contractor's Pollution Liability and **A.4.** Crisis Management And Emergency Response Costs only, "pollutants" includes "mold" and legionella.

24. "Pollution condition" means the discharge, dispersal, seepage, migration, release or escape of "pollutants". With respect to Insuring Agreements **A.2.** Transportation Pollution Liability and **A.4.** Crisis Management And Emergency Response Costs only, if shown as covered in the Declarations, "pollution condition" includes "transportation pollution condition".

25. "Professional services" means those functions performed for others by you or any contractor or subcontractor working on your behalf that are related to your practice as a consultant, engineer, architect, surveyor, laboratory, project or construction manager and as disclosed on the application including, but not limited to, the preparation or approval of maps, drawings, opinions, reports, surveys, designs, specifications or engineering services.

26. "Property damage" means:

    **a.** Physical injury to tangible property, including all resulting loss of use or diminution in value of that property. All such loss of use or diminution in value will be deemed to occur at the time of the physical injury that caused it;

    **b.** Loss of use or diminution in value of tangible property that is not physically injured. All such loss of use or diminution in value will be deemed to occur at the time of the "claim"; or

    **c.** "Natural resource damages".

**27.** "Responsible insured" means:

    **a.** Your "executive officer", director, partner, member or manager;

    **b.** Any insured who has responsibility, in whole or in part, for risk control, risk management, health and safety or environmental affairs, control or compliance; or

    **c.** Any insured who signed or who has responsibility, in whole or in part, for completing the application on which we relied in issuing this Coverage Form.

**28.** "Restoration costs" means reasonable and necessary costs incurred by the insured with our consent, which will not be unreasonably withheld or delayed, to restore, repair or replace real or personal property to substantially the same condition it was in prior to being damaged during work performed in the course of incurring "cleanup costs". However, such "restoration costs" will not exceed the actual cash value of such property immediately prior to incurring "cleanup costs" or include costs associated with improvements or betterments, ordinance or law.

**29.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "cleanup costs" to which this insurance applies are alleged. "Suit" includes:

    **a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

    **b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**30.** "Temporary storage" means storage of materials in a locked and secure storage container with clearly posted warning signs for a period of up to 30 days at a premise you own or rent. "Temporary storage" does not include storage of materials at any site at which you are performing "your work".

**31.** "Transportation pollution condition" means the emission, discharge, dispersal, release or escape of "pollutants" from a "covered conveyance" which occurs beyond the boundaries of a "covered location".

**32.** "Transported cargo" means the insured's "cargo" after it is moved from the place where it is accepted by or on behalf of an insured for movement into or onto a "covered conveyance", until the "cargo" is moved from the "covered conveyance" to the place where it is finally delivered on behalf of the insured.

"Transported cargo" also includes the insured's "cargo" during "loading or unloading" to or from a "covered conveyance".

"Transported cargo" does not include "cargo" at rest for a period longer than 72 hours after it has been accepted on behalf of the insured for movement into or onto a "covered conveyance" but before it reaches the place of final delivery.

**33.** "Unmanned aircraft" means an aircraft that is not designed, manufactured or modified after manufacture to be controlled directly by a person from within or on the aircraft.

**34.** "Your product":

    **a.** Means:

        **(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

            **(a)** You;

            **(b)** Others trading under your name; or

            **(c)** A person or organization whose business or assets you have acquired; and

        **(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

    **b.** Includes:

    **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

    **(2)** The providing of or failure to provide warnings or instructions.

  **c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**35.** "Your work":

  **a.** Means:

    **(1)** Contracting work or contracting operations as disclosed in the application or specifically endorsed hereon performed by you or on your behalf for others at a location that you do not own, control, rent or occupy other than for the purpose of performing "your work"; and

    **(2)** Materials, parts or equipment furnished in connection with such work or operations.

  **b.** Includes:

    **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work";

    **(2)** The providing of or failure to provide warnings or instructions;

    **(3)** The "completed operations" of "your work"; and

    **(4)** With respect to Insuring Agreement **A.1.** Contractor's Pollution Liability, the "temporary storage" of asbestos, or any material or substance containing asbestos, asbestos fibers or asbestiform talc that was removed in the course of "your work".

COMMERCIAL GENERAL LIABILITY
CG 21 67 12 04

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# FUNGI OR BACTERIA EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

**b.** Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**B.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Personal and advertising injury" which would not have taken place, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury.

**b.** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

**C.** The following definition is added to the **Definitions** Section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

 © ISO Properties, Inc.,  2003

**COMMERCIAL GENERAL LIABILITY**
**CG 21 96 03 05**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SILICA OR SILICA-RELATED DUST EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**Silica Or Silica-Related Dust**

**a.** "Bodily injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, or ingestion of, "silica" or "silica-related dust".

**b.** "Property damage" arising, in whole or in part, out of the actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

**c.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Silica Or Silica-Related Dust**

**a.** "Personal and advertising injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

**b.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**C.** The following definitions are added to the **Definitions** Section:

**1.** "Silica" means silicon dioxide (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.

**2.** "Silica-related dust" means a mixture or combination of silica and other dust or particles.

    © ISO Properties, Inc., 2004

POLICY NUMBER: MKLV2ENV100993

**MARKEL®**

# EVANSTON INSURANCE COMPANY

## MINIMUM EARNED AND MINIMUM RETAINED PREMIUM

This endorsement modifies all Coverage Forms included in the policy:

### SCHEDULE

| | |
|---|---|
| Minimum Earned Premium Percentage: | 25% |
| Minimum Retained Premium Percentage: | 90% |
| Fully Earned Date: | 12/28/2019 |

The following Condition is added and supersedes any provisions to the contrary.

**Minimum Earned And Retained Premium**

The total policy premium and minimum earned premium(s) due for this policy will be calculated in accordance with the following:

**A. Total Policy Premium**

The total policy premium is calculated as: The Grand Total premium shown in the Common Policy Declarations, plus any premium adjustment by endorsement, plus any additional premium developed by audit. The premium shown in the Common Policy Declarations as Grand Total is a deposit premium only and is subject to adjustment in accordance with our rules, rates, and premium audit provisions of this policy.

**B. Minimum Earned Premium**

If this policy is canceled either at your request or due to non-payment of premium, we will retain a minimum earned premium or the short rate earned premium, whichever is greater. The minimum earned premium will be calculated by multiplying the total policy premium, calculated as described in Paragraph **A.** above, by the Minimum Earned Premium Percentage shown in the Schedule of this endorsement.

However, if this policy remains in effect until the Fully Earned Date shown in the Schedule of this endorsement, the total policy premium, calculated as described in Paragraph **A.** above, will be fully earned. There will be no return of premium if this policy is canceled at your request or for non-payment of premium on or after the Fully Earned Date shown in the Schedule of this endorsement.

**C. Minimum Retained Premium**

If this policy was issued on an adjustable basis, the policy also has a minimum amount of premium that applies to the policy period. The minimum retained premium will be calculated by multiplying the total policy premium, calculated as described in Paragraph **A.** above, by the Minimum Retained Premium Percentage shown in the Schedule of this endorsement.

At the completion of the audit, if the audit premium is:

**1.** Greater than the total policy premium, calculated as described in Paragraph **A.** above, the additional premium is due and payable upon notice to you.

**2.** Less than the total policy premium, calculated as described in Paragraph **A.** above, we will retain the minimum retained premium or the audit premium, whichever is greater.

All other terms and conditions remain unchanged.



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## TRADE OR ECONOMIC SANCTIONS

The following is added to this policy:

**Trade Or Economic Sanctions**

This insurance does not provide any coverage, and we (the Company) shall not make payment of any claim or provide any benefit hereunder, to the extent that the provision of such coverage, payment of such claim or provision of such benefit would expose us (the Company) to a violation of any applicable trade or economic sanctions, laws or regulations, including but not limited to, those administered and enforced by the United States Treasury Department's Office of Foreign Assets Control (OFAC).

All other terms and conditions remain unchanged.

INTERLINE


**MARKEL**®

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# POLICY CHANGES

CHANGE NUMBER: 1

| POLICY NUMBER:<br>MKLV2ENV100993 | POLICY CHANGES<br>EFFECTIVE:<br>12/28/2018 | COMPANY:<br>EVANSTON INSURANCE COMPANY |
|---|---|---|

| NAMED INSURED:<br><br>Seven Point Energy Services, Inc.<br>222 Elm Drive<br>Unit #1 & 2<br>Waynesburg              PA 15370 | AUTHORIZED REPRESENTATIVE:<br><br>CRC Insurance Services, Inc.<br>5555 Triangle Parkway, Suite 400<br><br>Norcross                    GA 30092 |
|---|---|

COVERAGE PARTS AFFECTED:
Commercial General Liability

The following item(s):

| | | |
|---|---|---|
| ☐ Insured's Name/Additional Named Insureds | ☐ Insured's Mailing Address | ☐ Policy Number |
| ☐ Effective/Expiration Date/Policy Period | ☐ Company | ☐ Locations/Location Description |
| ☐ Insured's Legal Status/Business Description | ☐ Minimum Earned Premium | ☐ Rates |
| ☒ Coverage Forms and Endorsements | ☐ Policy Cancel/Reinstatement | ☐ Limits/Exposures/Premium Basis |
| ☒ Additional Insureds, Loss Payees, Mortgagees | ☐ Buildings/Personal Property | ☐ Deductibles |
| ☐ Aggregate Cap | ☐ Classification/Class Codes | ☐ Underlying Insurance Information |
| ☐ Per Vehicle Limit | ☐ Vehicle | ☐ Drivers |
| ☐ Vehicle Description (Type/Year/Make/Model/<br>Vehicle Identification Number/Cost New/Value) | ☐ Equipment | ☐ Other (describe below) |

is (are) ☐ changed  ☒ added  ☐ deleted as shown below:
Policy form MEGL 1542 05 16 (Blanket Additional Insured - Owners, Lessees, or Contractors) is
hereby added as per attached.

The above amendments result in a change in the premium as follows:

| | | | |
|---|---|---|---|
| ☒ **NO CHANGES** | ☐ **TO BE ADJUSTED AT AUDIT** | ☐ **ADDITIONAL PREMIUM**<br>$ | ☐ **RETURN PREMIUM**<br>$ |
| ☐ **NO RETURN PREMIUM - CLAIM STILL IN PROCESS** | ☐ **NO RETURN PREMIUM - TOTAL LOSS TO INSURED ITEM** | ☐ **NO RETURN PREMIUM - FULLY EARNED PROVISION APPLIES** | ☐ **OTHER (DESCRIBE):** |

All other terms and conditions remain unchanged.

_Bryan W. Sales_

Authorized Representative Signature



**COMMERCIAL GENERAL LIABILITY**

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## BLANKET ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

**A.** Section **II** – Who Is An Insured is amended to include as an additional insured any person(s) or organization(s) to whom the insured agrees to provide additional insured status in a written contract, provided such written contract is signed by both parties and executed prior to the commencement of operations, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

    **1.** Your acts or omissions; or

    **2.** The acts or omissions of those acting on your behalf;

in the performance of your ongoing operations for the additional insured.

However, the insurance afforded to such additional insured:

    **1.** Only applies to the extent permitted by law; and

    **2.** Will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

This insurance does not apply to "bodily injury", "property damage", or "personal and advertising injury" occurring after:

    **1.** All work on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured at the location of the covered operations, including materials, parts or equipment furnished in connection with such work, has been completed; or

    **2.** That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to Section **III** – Limits Of Insurance:

The most we will pay on behalf of the additional insured is the amount of insurance:

    **1.** Required by the contract or agreement; or

    **2.** Available under the applicable Limits Of Insurance shown in the Declarations;

whichever is less.

This endorsement will not increase the applicable Limits Of Insurance shown in the Declarations.

All other terms and conditions remain unchanged.

**MEGL 1542 05 16**     Includes copyrighted material of Insurance Services Office, Inc., with its permission.     **Page 1 of 1**

POLICY NUMBER: MKLV2ENV100993

**MARKEL®**

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## POLICY CHANGES

CHANGE NUMBER: 2

| POLICY NUMBER:<br>MKLV2ENV100993 | POLICY CHANGES<br>EFFECTIVE DATE:<br>06/19/2019 | COMPANY:<br>EVANSTON INSURANCE COMPANY |
|---|---|---|
| NAMED INSURED:<br>Seven Point Energy Services, Inc.<br>222 Elm Drive<br>Unit #1 & 2<br>Waynesburg,PA,15370 | AUTHORIZED REPRESENTATIVE<br><br>Abiy Dadi<br>CRC Insurance Services, Inc.<br>5555 Triangle Parkway, Suite 400<br>Norcross, GA  30092 | |
| COVERAGE PART(S) AFFECTED:<br>Commercial General Liability<br>Contractors Pollution Liability | | |

The following item(s):

| | | | | | |
|---|---|---|---|---|---|
| ☐ | Insured's Name/Additional Named Insureds | ☐ | Insured's Mailing Address | ☐ | Policy Number |
| ☐ | Effective/Expiration Date/Policy Period | ☐ | Company | ☐ | Locations/Location Description |
| ☐ | Insured's Legal Status/Business Description | ☐ | Minimum Earned Premium | ☐ | Rates |
| ☒ | Coverage Forms and Endorsements | ☐ | Policy Cancel/Reinstatement | ☐ | Limits/Exposures/Premium Basis |
| ☐ | Additional Insureds, Loss Payees, Mortgagees | ☐ | Buildings/Personal Property | ☐ | Deductibles |
| ☐ | Aggregate Cap | ☐ | Classification/Class Codes | ☐ | Underlying Insurance Information |
| ☐ | Per Vehicle Limit | ☐ | Vehicle | ☐ | Drivers |
| ☐ | Vehicle Description (Type/Year/Make/Model/ Vehicle Identification Number/Cost New/Value) | ☐ | Equipment | ☐ | Other (describe below) |

is (are) ☐ changed ☒ added ☐ deleted as shown below:

The following forms are hereby added as per attached:
    CG 2404 05 09 (Waiver of Transfer of Rights of Recovery Against Others to Us)
    IL 12 01 11 85 (Policy Change B)

The above amendments result in a change in the premium as follows:

MEIL 1203 03 12                                          Page 1 of 2

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☐ | **NO CHANGES** | ☐ | **TO BE ADJUSTED AT AUDIT** | ☒ | **ADDITIONAL PREMIUM** $750.00 | ☐ | **RETURN PREMIUM** |
| ☐ | **NO RETURN PREMIUM – CLAIM STILL IN PROCESS** | ☐ | **NO RETURN PREMIUM – TOTAL LOSS TO INSURED ITEM** | ☐ | **NO RETURN PREMIUM – FULLY EARNED PROVISION APPLIES** | ☐ | **OTHER (DESCRIBE):** |

All other terms and conditions remain unchanged.

_Bryn W. Sachs_

_____
Authorized Representative Signature

POLICY NUMBER: MKLV2ENV100993

**COMMERCIAL GENERAL LIABILITY**
**CG 24 04 05 09**

# WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Person Or Organization: |
| --- |
| EQT Corporation, its subsidiaries and affiliates<br>625 Liberty Avenue, Suite 1700<br>Pittsburgh, PA 15222 |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

The following is added to Paragraph **8. Transfer Of Rights Of Recovery Against Others To Us** of **Section IV – Conditions:**

We waive any right of recovery we may have against the person or organization shown in the Schedule above because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a contract with that person or organization and included in the "products-completed operations hazard". This waiver applies only to the person or organization shown in the Schedule above.

© Insurance Services Office, Inc., 2008

**Page 1 of 1**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# POLICY CHANGES

Policy Change Number B

| POLICY NUMBER<br>MKLV2ENV100993 | POLICY CHANGES<br>EFFECTIVE<br>06/19/2019 | COMPANY<br>Evanston Insurance Company |
|---|---|---|
| NAMED INSURED<br><br>Seven Point Energy Services, Inc.<br>222 Elm Drive<br>Unit #1 & 2<br>Waynesburg, PA 15370 | | AUTHORIZED REPRESENTATIVE<br><br>Abiy Dadi<br>5555 Triangle Parkway,<br>Suite 400 Norcross, GA 30092 |

COVERAGE PARTS AFFECTED:

Contractors Pollution Liability

**CHANGES**

**SECTION V – CONDITIONS**, Item **8. Transfer Of Rights Of Recovery Against Others To Us** is deleted and replaced in its entirety with the following:

**8. Transfer Of Rights Of Recovery Against Others To Us**

**SCHEDULE**

| **Name Of Person(s) Or Organization(s):**<br>EQT Corporation, its subsidiaries and affiliates<br>625 Liberty Avenue, Suite 1700<br>Pittsburgh, PA 15222 |
|---|

If the insured has rights to recover all or part of any payment we have made under this insurance, those rights are transferred to us. The insured must do nothing after "loss" to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

We waive any right of recovery we may have against the person or organization shown in the Schedule above because of payments we make for injury or damage arising out of your "your work" done under a contract with that person or organization. This waiver applies only to the person or organization shown in the Schedule above.

All other terms and conditions remain unchanged.

Authorized Representative Signature

INTERLINE

**MARKEL**®

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# POLICY CHANGES

CHANGE NUMBER: 3

| POLICY NUMBER:<br>MKLV2ENV100993 | POLICY CHANGES<br>EFFECTIVE:<br>04/11/2019 | COMPANY:<br>EVANSTON INSURANCE COMPANY |
|---|---|---|

| NAMED INSURED:<br><br>Seven Point Energy Services, Inc.<br>222 Elm Drive<br>Unit #1 & 2<br>Waynesburg　　　　　　　PA 15370 | AUTHORIZED REPRESENTATIVE:<br><br>CRC Insurance Services, Inc.<br>5555 Triangle Parkway, Suite 400<br><br>Norcross　　　　　　　　　GA 30092 |
|---|---|

COVERAGE PARTS AFFECTED:
Commercial General Liability
Contractors Pollution Liability

The following item(s):

| | | |
|---|---|---|
| ☐ Insured's Name/Additional Named Insureds | ☐ Insured's Mailing Address | ☐ Policy Number |
| ☐ Effective/Expiration Date/Policy Period | ☐ Company | ☐ Locations/Location Description |
| ☐ Insured's Legal Status/Business Description | ☐ Minimum Earned Premium | ☐ Rates |
| ☒ Coverage Forms and Endorsements | ☐ Policy Cancel/Reinstatement | ☐ Limits/Exposures/Premium Basis |
| ☐ Additional Insureds, Loss Payees, Mortgagees | ☐ Buildings/Personal Property | ☐ Deductibles |
| ☐ Aggregate Cap | ☐ Classification/Class Codes | ☐ Underlying Insurance Information |
| ☐ Per Vehicle Limit | ☐ Vehicle | ☐ Drivers |
| ☐ Vehicle Description (Type/Year/Make/Model/Vehicle Identification Number/Cost New/Value) | ☐ Equipment | ☐ Other (describe below) |

is (are) ☒ changed　☐ added　☐ deleted as shown below:

Endorsement #2 is hereby deleted in its entirety and replaced with the following:

The following forms CG 2404 05 09 (Waiver of Transfer of Rights and Recovery Against Other to Us) and IL 12 01 11 15 (Policy Change Form C) are hereby added as per attached.

| ☒ | NO CHANGES | ☐ | TO BE ADJUSTED AT AUDIT | ☐ | ADDITIONAL PREMIUM $ | ☐ | RETURN PREMIUM $ |
| ☐ | NO RETURN PREMIUM - CLAIM STILL IN PROCESS | ☐ | NO RETURN PREMIUM - TOTAL LOSS TO INSURED ITEM | ☐ | NO RETURN PREMIUM - FULLY EARNED PROVISION APPLIES | | OTHER (DESCRIBE): |

All other terms and conditions remain unchanged.

_____
Authorized Representative Signature

POLICY NUMBER: MKLV2ENV100993

**COMMERCIAL GENERAL LIABILITY**
**CG 24 04 05 09**

# WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

| |
|---|
| **Name Of Person Or Organization:** |
| EQT Corporation, its subsidiaries and affiliates |
| 625 Liberty Avenue, Suite 1700 |
| Pittsburgh, PA 15222 |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

The following is added to Paragraph **8. Transfer Of Rights Of Recovery Against Others To Us** of **Section IV – Conditions:**

We waive any right of recovery we may have against the person or organization shown in the Schedule above because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a contract with that person or organization and included in the "products-completed operations hazard". This waiver applies only to the person or organization shown in the Schedule above.

**CG 24 04 05 09**        © Insurance Services Office, Inc., 2008        **Page 1 of 1**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# POLICY CHANGES

Policy Change Number C

| POLICY NUMBER<br>MKLV2ENV100993 | POLICY CHANGES EFFECTIVE<br>04/11/2019 | COMPANY<br>Evanston Insurance Company |
|---|---|---|

| NAMED INSURED | AUTHORIZED REPRESENTATIVE |
|---|---|
| Seven Point Energy Services, Inc.<br>222 Elm Drive<br>Unit #1 & 2<br>Waynesburg, PA 15370 | Abiy Dadi<br>5555 Triangle Parkway,<br>Suite 400 Norcross, GA 30092 |

COVERAGE PARTS AFFECTED:

Contractors Pollution Liability

| CHANGES |
|---|

**SECTION V – CONDITIONS**, Item **8. Transfer Of Rights Of Recovery Against Others To Us** is deleted and replaced in its entirety with the following:

**8. Transfer Of Rights Of Recovery Against Others To Us**

**SCHEDULE**

> **Name Of Person(s) Or Organization(s):**
> EQT Corporation, its subsidiaries and affiliates
> 625 Liberty Avenue, Suite 1700
> Pittsburgh, PA 15222

If the insured has rights to recover all or part of any payment we have made under this insurance, those rights are transferred to us. The insured must do nothing after "loss" to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

We waive any right of recovery we may have against the person or organization shown in the Schedule above because of payments we make for injury or damage arising out of your "your work" done under a contract with that person or organization. This waiver applies only to the person or organization shown in the Schedule above.

All other terms and conditions remain unchanged.

Authorized Representative Signature

Copyright, Insurance Services Office, Inc.,   1983
Copyright, ISO Commercial Risk Services, Inc.,   1983

INTERLINE



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# POLICY CHANGES

CHANGE NUMBER: 4

| POLICY NUMBER:<br>MKLV2ENV100993 | POLICY CHANGES<br>EFFECTIVE:<br>06/26/2019 | COMPANY:<br>EVANSTON INSURANCE COMPANY |
|---|---|---|

| NAMED INSURED:<br><br>Seven Point Energy Services, Inc.<br>222 Elm Drive<br>Unit #1 & 2<br>Waynesburg           PA 15370 | AUTHORIZED REPRESENTATIVE:<br><br>CRC Insurance Services, Inc.<br>5555 Triangle Parkway, Suite 400<br><br>Norcross              GA 30092 |
|---|---|

COVERAGE PARTS AFFECTED:
Commercial General Liability
Contractors Pollution Liability NEW

The following item(s):

| | | |
|---|---|---|
| ☐ Insured's Name/Additional Named Insureds | ☐ Insured's Mailing Address | ☐ Policy Number |
| ☐ Effective/Expiration Date/Policy Period | ☐ Company | ☐ Locations/Location Description |
| ☐ Insured's Legal Status/Business Description | ☐ Minimum Earned Premium | ☐ Rates |
| ☒ Coverage Forms and Endorsements | ☐ Policy Cancel/Reinstatement | ☐ Limits/Exposures/Premium Basis |
| ☐ Additional Insureds, Loss Payees, Mortgagees | ☐ Buildings/Personal Property | ☐ Deductibles |
| ☐ Aggregate Cap | ☐ Classification/Class Codes | ☐ Underlying Insurance Information |
| ☐ Per Vehicle Limit | ☐ Vehicle | ☐ Drivers |
| ☐ Vehicle Description (Type/Year/Make/Model/<br>Vehicle Identification Number/Cost New/Value) | ☐ Equipment | ☐ Other (describe below) |

is (are) ☐ changed  ☒ added  ☐ deleted as shown below:
The following forms are hereby added as per attached:

CG 2404 05 09 (Waiver of Transfer of Rights of Recovery Against Others to Us)
IL 12 01 11 15 (Policy change from D)

| ☐ | **NO CHANGES** | ☐ | **TO BE ADJUSTED AT AUDIT** | ☐ | **ADDITIONAL PREMIUM** $250 | ☐ | **RETURN PREMIUM** $ |
|---|---|---|---|---|---|---|---|
| ☐ | **NO RETURN PREMIUM - CLAIM STILL IN PROCESS** | | **NO RETURN PREMIUM - TOTAL LOSS TO INSURED ITEM** | ☐ | **NO RETURN PREMIUM - FULLY EARNED PROVISION APPLIES** | | **OTHER (DESCRIBE):** |

All other terms and conditions remain unchanged.

_____
Authorized Representative Signature

POLICY NUMBER: MKLV2ENV100993

**COMMERCIAL GENERAL LIABILITY**
**CG 24 04 05 09**

# WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

| |
|---|
| **Name Of Person Or Organization:** |
| Equitrans Midstream Corporation, its parent, affiliates, and subsidiarie |
| 625 Liberty Avenue, Suite 1700 |
| Pittsburgh, PA  15222 |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

The following is added to Paragraph **8. Transfer Of Rights Of Recovery Against Others To Us** of **Section IV – Conditions:**

We waive any right of recovery we may have against the person or organization shown in the Schedule above because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a contract with that person or organization and included in the "products-completed operations hazard". This waiver applies only to the person or organization shown in the Schedule above.

**CG 24 04 05 09**          © Insurance Services Office, Inc., 2008          **Page 1 of 1**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# POLICY CHANGES

Policy Change Number D

| POLICY NUMBER<br>MKLV2ENV100993 | POLICY CHANGES EFFECTIVE<br>06/26/2019 | COMPANY<br>Evanston Insurance Company |
|---|---|---|
| **NAMED INSURED**<br><br>Seven Point Energy Services, Inc.<br>222 Elm Drive<br>Unit #1 & 2<br>Waynesburg, PA 15370 | | **AUTHORIZED REPRESENTATIVE**<br><br>Abiy Dadi<br>5555 Triangle Parkway,<br>Suite 400 Norcross, GA 30092 |

COVERAGE PARTS AFFECTED:
Contractors Pollution Liability

| CHANGES |
|---|

**SECTION V_  CONDITIONS**, Item **8. Transfer Of Rights Of Recovery Against Others To Us** is deleted and replaced in its entirety with the following:

**8. Transfer Of Rights Of Recovery Against Others To Us**

SCHEDULE

> **Name Of Person(s) Or Organization(s):**
> **Equitrans Midstream Corporation, its parent, affiliates, and subsidiaries**
> **625 Liberty Avenue, Suite 1700**
> **Pittsburgh, PA  15222**

If the insured has rights to recover all or part of any payment we have made under this insurance, those rights are transferred to us. The insured must do nothing after "loss" to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

We waive any right of recovery we may have against the person or organization shown in the Schedule above because of payments we make for injury or damage arising out of your "your work" done under a contract with that person or organization. This waiver applies only to the person or organization shown in the Schedule above.

All other terms and conditions remain unchanged.

Authorized Representative Signature

# EXHIBIT D

**A STOCK COMPANY**



# EVANSTON INSURANCE COMPANY

10 Parkway North
Deerfield, IL 60015

**INSURANCE POLICY**

**Coverage afforded by this policy is provided by the Company (Insurer) and named in the Declarations.**

In **Witness Whereof**, the company (insurer) has caused this policy to be executed and attested and countersigned by a duly authorized representative of the company (insurer) identified in the Declarations.

**Secretary**                                                    **President**



EXCESS/UMBRELLA

# EVANSTON INSURANCE COMPANY

## COMMERCIAL EXCESS LIABILITY POLICY
## ADVISORY NOTICE TO POLICYHOLDERS

This is a summary of the major changes in your policy. No coverage is provided by this summary nor can it be construed to replace any provision of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided. If there is any conflict between the policy and this summary, **THE PROVISIONS OF THE POLICY SHALL PREVAIL.**

The major areas within the policy that broaden or reduce coverage, and other changes, are highlighted below. This notice does not reference every editorial change made in your policy.

**Not all forms addressed in this notice are included in a particular policy.**

---

## MULTISTATE ENDORSEMENTS

### A. BROADENING OF COVERAGE

**MAUB 1648** Exclusion – Municipality was revised to remove the exclusion for public officials' activities and volunteer firefighters' or police officers' activities.

### B. REDUCTION OF COVERAGE

**MAUB 1258** Limitation Of Coverage To Designated Premises Or Project was revised by adding new Paragraphs 5. and 6. to the Insuring Agreement. These paragraphs separately address bodily injury and property damage versus personal and advertising injury as follows:

- For bodily injury and property damage, the occurrence must happen during the policy period, and the injury or damage must occur on the premises scheduled, or the grounds or structures appurtenant to those premises, or arise out of the project scheduled. "Ownership, maintenance or use" language and "and operations necessary or incidental to those premises" was removed from this insurance agreement to further clarify that the injury or damage must happen on the premises.
- For personal and advertising injury, the offense must be committed during the policy period, and the offense must arise out of business performed on the premise scheduled or in connection with the project scheduled. It further states that if personal and advertising injury is caused by false arrest, detention or imprisonment, or the wrongful eviction from, entry into or invasion of the right of private occupancy, then such offense must occur on the premises scheduled or on the grounds or structures appurtenant to those premises.

### C. OTHER CHANGES

1. **MAUB 1222** Adjustable Rate And Minimum Retained Premium was revised as follows:

   - The title of the form was revised from Changes To Conditions – Adjustable Rate;
   - The Schedule was revised to show a minimum retained premium percentage and earned premium computations;
   - The Adjustable Rate condition was replaced by a new Minimum Retained Premium condition which describes how the minimum retained premium and earned premium will be calculated; and
   - A provision regarding the amount of premium retained in the event of cancellation was added.

2. **MAUB 1264** 25% Minimum Earned Premium was revised as follows:

   - In Paragraph A., a statement was added that we will send the first Named Insured any premium refund;
   - In Paragraph B., the Premium Audit provision was removed as it is not applicable.

3. **MAUB 1310** Exclusion – Prior Incidents And Prior Construction Defects was revised to add the following statement: "When coverage does not apply for the Named Insured, no coverage or defense will be afforded to any additional insured under this policy."

---

**MAPUB 1013 04 17**                                                                                    **Page 1 of 2**

4. **MAUB 1513** Contractors And Subcontractors - Indemnification And Insurance Conditions was revised as follows:

- Removed the Aggregate limits in the Schedule;

- Removed the defined term lead-in;

- Removed the insured warranty language;

- Removed paragraphs a.(2)-(4) regarding insurance requirements.



# EVANSTON INSURANCE COMPANY

## PRIVACY NOTICE

We are committed to safeguarding your privacy. We understand your concerns regarding the privacy of your nonpublic personal information. No nonpublic personal information is required to be collected when you visit our websites; however, this information may be requested in order to provide the products and services described. We do not sell nonpublic personal information to non-affiliated third parties for marketing or other purposes. We only use and share this type of information with non-affiliated third parties for the purposes of underwriting insurance, administering your policy or claim and other purposes as permitted by law, such as disclosures to insurance regulatory authorities or in response to legal process. Notwithstanding the foregoing, we may use this information for the purpose of marketing our own products and services to you.

We collect nonpublic personal information about you from the following sources:

- Information we receive from you on applications or other forms;

- Information about your transactions with us, our affiliates, or others; and/or

- Information we receive from consumer reporting agencies and inspection reports.

We do not disclose any nonpublic personal information about our customers/claimants or former customers/claimants to anyone, except as permitted by law.

We may disclose nonpublic personal information about you to the following types of third parties:

- Service providers, such as insurance agents and/ or brokers and claims adjusters; and/or

- Other non-affiliated third parties as permitted by law.

We restrict access to nonpublic personal information about our customers/claimants to those individuals who need to know that information to provide products and services to our customers/claimants or as permitted by law. We maintain physical, electronic, and procedural safeguards to guard your nonpublic personal information.

*Residents of California:*

You may request to review and make corrections to recorded non-public personal information contained in our files. A more detailed description of your rights and practices regarding such information is available upon request. Please contact your agent/broker for instructions on how to submit a request to us.



# HOW TO REPORT A CLAIM

**<u>How to report a new claim:</u>**

- **Email:  newclaims@markelcorp.com**
- **FAX:    (855) 662-7535**
- **\*Phone:  (800) 362-7535**
- **Mail:    P.O. Box 2009, Glen Allen, VA 23058-2009**

Please complete the appropriate ACORD form in detail and include the name and phone number of the contact person at the location of the reported incident. If possible, please attach a copy of the facility incident report. When reporting an auto claim, please identify the unit # on the schedule along with the VIN#. If the loss/claim involves a building or damage to property, please provide the physical address of the property.

**\*Please refer to your specific policy language for new claim reporting requirements. Some policies require you to report all claims in writing only.**


**<u>How to send Supplemental Information / Questions on an existing claim:</u>**

- **Email:  markelclaims@markelcorp.com**
- **FAX:    (855) 662-7535**
- **Phone: (800) 362-7535**
- **Mail:    P.O. Box 2009, Glen Allen, VA 23058-2009**


**If you have questions about a claim, please call 1-800-362-7535.**

**Inquiries may also be faxed to 1-855-662-7535.**

**INTERLINE**



# EVANSTON INSURANCE COMPANY

## U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.



# EVANSTON INSURANCE COMPANY

## COMMERCIAL EXCESS LIABILITY POLICY DECLARATIONS

POLICY NUMBER: MKLV2EUL103021          RENEWAL POLICY NUMBER: MKLV2EUL102139

Named Insured and Mailing Address (No., Street, Town or City, County, State, Zip Code)

Seven Point Energy Services, Inc.
222 Elm Drive, Unit 1 & 2
Waynesburg                    PA      15370

Policy Period: From: <u>December 28, 2018</u> to <u>December 28, 2019</u> at 12:01 A.M. Standard Time at your mailing address shown above.

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

| Limits of Insurance | |
|---|---|
| Each Occurrence Limit: | $ 5,000,000 |
| Aggregate Limit: | $ 5,000,000 |

| Premium | |
|---|---|
| Policy Premium: | $ ███████ |
| Terrorism Premium: | $ Not Applicable |
| Fees (Where Applicable) | $ Not Applicable |
| Total Premium: | $ ███████   Payable At Inception |

Audit Period:   ☐ Not Applicable   ☒ Annual   ☐ Semi-Annual   ☐ Quarterly   ☐ Monthly
Rating Basis (If Subject to Audit)   Premium Basis: _____   Rate: _____

### Producer Number, Name and Mailing Address

CRC Insurance Services, Inc.
5555 Triangle Parkway, Suite 400
Norcross                    GA   30092

### Endorsements

Forms and Endorsements applying to this Coverage Part and made part of this policy at time of issue:
Per Forms Schedule

### Schedule of Underlying Insurance

Per Schedule Of Underlying Insurance

**These declarations, together with the Coverage Form and any Endorsement(s), complete the above numbered policy.**

Countersigned: _____01/16/2019_____     By: _____
                    **DATE**                         **AUTHORIZED REPRESENTATIVE**





# EVANSTON INSURANCE COMPANY

## FORMS SCHEDULE

| Form Number | Form Name |
|---|---|
| MJIL 1000 08 10 | POLICY JACKET |
| MAPUB 1013 04 17 | COMMERCIAL EXCESS LIABILITY POLICY ADVISORY NOTICE TO POLICYHOLDERS |
| MPIL 1007 03 14 | PRIVACY NOTICE |
| MPIL 1041 02 12 | HOW TO REPORT A CLAIM |
| MPIL 1083 04 15 | U.S. TREASURY DEPT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS |
| MADUB 1000 04 17 | COMMERCIAL EXCESS LIABILITY POLICY DECLARATIONS |
| MDIL 1001 08 11 | FORMS SCHEDULE |
| MEIL 1200 10 16 | SERVICE OF SUIT |
| MEIL 1225 10 11 | CHANGES - CIVIL UNION |
| MIL 1214 09 17 | TRADE OR ECONOMIC SANCTIONS |
| MADUB 1003 04 17 | SCHEDULE OF UNDERLYING INSURANCE |
| MAUB 0001 01 15 | COMMERCIAL EXCESS LIABILITY POLICY |
| MAUB 1222 04 17 | ADJUSTABLE RATE AND MINIMUM RETAINED PREMIUM |
| MAUB 1243 04 17 | UNIMPAIRED AGGREGATE LIMIT |
| MAUB 1255 01 15 | NON-DROP DOWN PROVISION |
| MAUB 1264 04 17 | 25% MINIMUM EARNED PREMIUM |
| MAUB 1310 04 17 | EXCLUSION - PRIOR INCIDENTS AND PRIOR CONSTRUCTION DEFECTS |
| MAUB 1338 01 15 | EXCLUSION - AIRCRAFT PRODUCTS AND GROUNDING |
| MAUB 1355 01 15 | EXCLUSION - NUCLEAR ENERGY LIABILITY |
| MAUB 1402-PA 01 15 | PENNSYLVANIA AMENDATORY |
| MAUB 1615 01 15 | EXCLUSION - DAMAGE TO PROPERTY |
| MAUB 1638 01 15 | EXCLUSION - FUNGI OR BACTERIA |
| MAUB 1642 01 15 | EXCLUSION - LEAD |
| MAUB 1663 01 15 | EXCLUSION - PROFESSIONAL SERVICES |
| MAUB 1665 01 15 | EXCLUSION - AUTO NO-FAULT AND SIMILAR LAWS |
| MAUB 1666 01 15 | EXCLUSION - WAR LIABILITY |
| MAUB 1678 01 15 | EXCLUSION - POLLUTION |
| MAUB 1696 01 15 | EXCLUSION - CERTIFIED ACTS OF TERRORISM |
| MAUB 1804 01 15 | EXCLUSION - SILICA OR MIXED DUST |
| MAUB 1813 01 15 | EXCLUSION - ASBESTOS |
| MAUB 1822 04 17 | EXCLUSION - UNMANNED AIRCRAFT |
| MUB TERR-2 01 15 | CONFIRMATION OF EXCLUSION OF CERTIFIED ACTS OF TERRORISM COVERAGE |

**INTERLINE**



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SERVICE OF SUIT

Except with respect to any policy issued in any state in which the Insurer is licensed as an admitted insurer to transact business, it is agreed that in the event of the failure of the Company to pay any amount claimed to be due hereunder, the Company, at the request of the Named Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such court. Nothing in this clause constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon Secretary, Legal Department, Markel Service, Incorporated, Ten Parkway North, Deerfield, Illinois 60015, and that in any suit instituted against the Company upon this policy, the Company will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner or Director of Insurance or other official specified for that purpose in the statute, or his/her successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Named Insured or any beneficiary hereunder arising out of this policy, and hereby designates the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

INTERLINE



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CHANGES – CIVIL UNION

All references to "spouse" or "family member" in any Coverage Part or policy form made part of this insurance shall include a party to a civil union or domestic partnership law recognized under any applicable statute.

All other terms and conditions remain unchanged.



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TRADE OR ECONOMIC SANCTIONS

The following is added to this policy:

**Trade Or Economic Sanctions**

This insurance does not provide any coverage, and we (the Company) shall not make payment of any claim or provide any benefit hereunder, to the extent that the provision of such coverage, payment of such claim or provision of such benefit would expose us (the Company) to a violation of any applicable trade or economic sanctions, laws or regulations, including but not limited to, those administered and enforced by the United States Treasury Department's Office of Foreign Assets Control (OFAC).

All other terms and conditions remain unchanged.

**MIL 1214 09 17**                                                                                                      **Page 1 of 1**



**EXCESS/UMBRELLA**
POLICY NUMBER:  MKLV2EUL103021

# EVANSTON INSURANCE COMPANY

## SCHEDULE OF UNDERLYING INSURANCE

| Type of Policy/Carrier | Limits Of Liability | |
|---|---|---|
| General Liability | Occurrence | $1,000,000 |
| Carrier: Evanston Insurance Company | | |
| Effective Date: 12/28/2018 | General Aggregate | $2,000,000 |
| Expiration Date: 12/28/2019 | Products and Completed Operations Aggregate | $2,000,000 |
| | Personal and Advertising Injury | $1,000,000 |
| | | |
| Automobile Liability | Combined Single Limit | $1,000,000 |
| Carrier: Plaza Insurance | | |
| Effective Date: 12/28/2018 | | |
| Expiration Date: 12/28/2019 | | |

All Limits Of Insurance are Each Occurrence and Aggregate, if applicable.

**MADUB 1003 04 17**                                                                                       **Page 1 of 1**



# EVANSTON INSURANCE COMPANY

## COMMERCIAL EXCESS LIABILITY POLICY

Various provisions in this policy restrict coverage. Read the entire policy and any "underlying insurance" carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations and any other person or organization qualifying as an Insured under the "underlying insurance". The words "we" and "us" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meanings. Refer to Section **V.** Definitions.

### SECTION I. INSURING AGREEMENT

**1.** We will pay those sums in excess of the limits shown in the Schedule Of Underlying Insurance that you become legally obligated to pay as damages because of injury to which this insurance applies, provided that the "underlying insurance" also applies, or would apply but for the exhaustion of its applicable Limits Of Insurance.

**2.** This policy is subject to the same terms, conditions, agreements, exclusions and definitions as the "underlying insurance", except:

    **a.** We will have no obligation under this policy with respect to any claim or suit that is settled without our consent; and

    **b.** With respect to any provisions to the contrary contained in this policy.

**3.** The amount we will pay for damages shall not exceed the Limits Of Insurance shown in the Declarations.

**4.** We will have the right to participate in the defense of claims or suits against you seeking damages because of injury to which this insurance may apply. We will have a duty to defend such claims or suits when the applicable limit of insurance of the "underlying insurance" has been exhausted by payment of judgments, settlements and any cost or expense subject to such limit. We may, at our discretion, investigate and settle any claim or suit. Our right and duty to defend ends when the applicable limit shown in the Declarations has been used up by our payment of judgments or settlements.

### SECTION II. EXCLUSIONS

The exclusions applicable to the "underlying insurance" also apply to this policy.

### SECTION III. LIMITS OF INSURANCE

**1.** The Limit Of Insurance shown in the Declarations as the Each Occurrence Limit is the most we will pay for damages arising out of any one occurrence or offense.

**2.** If a Limit Of Insurance is shown in the Declarations as the Aggregate Limit, that amount will apply in the same manner as the aggregate limits shown in the Schedule Of Underlying Insurance.

### SECTION IV. CONDITIONS

If any of the following conditions are contrary to conditions contained in the "underlying insurance" the provisions contained in this policy apply.

**1. Appeals**

    In the event the underlying insurer(s) elects not to appeal a judgment in excess of the limits of the "underlying insurance", we may elect to make such an appeal. If we so elect, we shall be liable, in addition to the applicable Limits Of Insurance, for all defense expenses we incur.

**2. Maintenance Of Underlying Insurance**

   **a.** You agree to maintain the "underlying insurance" in full force and effect during the term of this policy, and to inform us within 30 days of any replacement or material change of that "underlying insurance" by the same or another company. Failure to maintain the "underlying insurance" in full force and effect or to meet all conditions and warranties of such "underlying insurance" will not invalidate insurance provided under this policy, but insurance provided under this policy shall apply as if the "underlying insurance" were available and collectible.

   **b.** Reduction or exhaustion of the aggregate limit of any "underlying insurance" by payments for judgments, settlements or any costs or expenses subject to that limit, will not be a failure to maintain "underlying insurance" in full force and effect.

   **c.** No statement contained in this condition limits our right to cancel or not renew this policy.

For purposes of this policy, if any "underlying insurance" is not available or collectible because of:

   **a.** The bankruptcy or insolvency of the underlying insurer(s) providing such "underlying insurance"; or

   **b.** The inability or failure for any other reason of such underlying insurer(s) to comply with any of the obligations of its policy;

then this policy shall apply and amounts payable hereunder shall be determined as if such "underlying insurance" were available and collectible.

**3. Other Insurance**

This insurance is excess over any other valid and collectible insurance whether primary, excess, contingent or any other basis, except other insurance written specifically to be excess over this insurance.

**4. Cancellation**

   **a.** The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering advance written notice of cancellation to us.

   **b.** We may cancel this policy by mailing or delivering written notice of cancellation to the first Named Insured at least:

      **(1)** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

      **(2)** 60 days before the effective date of cancellation if we cancel for any other reason.

   **c.** We will mail or deliver our notice to the Named Insured's last mailing address known to us.

   **d.** Notice of cancellation will state the effective date of cancellation. The policy will end on that date.

   **e.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

   **f.** If notice is mailed, proof of mailing will be sufficient proof of notice.

**5. Policy Period**

This insurance will respond to injury or damage that occurs, or arises from an offense committed, during the Policy Period shown in the Declarations.

**SECTION V. DEFINITIONS**

"Underlying insurance" means the policies or self-insurance shown in the Schedule Of Underlying Insurance, any replacements thereof and other policies purchased or issued for newly acquired or formed organizations. Policies purchased or issued replacements of policies or self-insurance listed in the Schedule Of Underlying Insurance or for newly acquired or formed organizations shall not be more restrictive than those listed in the Schedule Of Underlying Insurance. All "underlying insurance" shall be maintained by you in accordance with the Maintenance Of Underlying Insurance condition of this policy.



**EXCESS/UMBRELLA**
POLICY NUMBER: MKLV2EUL103021

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## ADJUSTABLE RATE AND MINIMUM RETAINED PREMIUM

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

### SCHEDULE

| |
|---|
| **Minimum Retained Premium Percentage:** 100% |

| **Earned Premium Computation** |
|---|
| Rate of $ ███     Per $ 1,000.00     Of revenue     , |
| based on an estimated $18,000,000.00 |
| |
| Split rate, if applicable: |
| Rate of $            Per $            Of            in excess of $            . |

The following is added to the Conditions section:

**Minimum Retained Premium**

**a.** This policy was issued on an adjustable rate basis. The minimum retained premium will be calculated by multiplying the Total Premium shown in the Declarations by the Minimum Retained Premium Percentage shown in the Schedule of this endorsement. Upon expiration of the policy, we will compute the earned premium by applying the applicable rate shown in the Schedule of this endorsement to your audited exposure. If the audit premium is:

**(1)** Greater than the Total Premium shown in the Declarations, the additional premium is due and payable upon notice to you;

**(2)** Less than the minimum retained premium, we shall retain the minimum retained premium.

**b.** In the event of cancellation, we will retain the greater of:

**(1)** The minimum earned premium;

**(2)** Short rate or pro rata, as applicable, of the Total Premium shown in the Declarations; or

**(3)** The final calculated audit premium, per the Earned Premium Computation shown in the Schedule of this endorsement.

The Minimum Retained Premium provision in this endorsement replaces any other similar provisions included within the policy.

All other terms and conditions remain unchanged.

**MAUB 1222 04 17**                                                                                   **Page 1 of 1**

EXCESS/UMBRELLA



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## UNIMPAIRED AGGREGATE LIMIT

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Limits Of Insurance section:

The aggregate limits on "underlying insurance" shall be unimpaired as of the inception date of this policy.

Only "occurrences" that take place during the policy period of this policy shall be considered in determining the extent of any exhaustion of the aggregate limits on "underlying insurance".

If any "underlying insurance" is written on a claims made basis, the aggregate limits on "underlying insurance" will only be reduced or exhausted by claims for that insurance that are made during the policy period, or any Extended Reporting Period, of this policy.

All other terms and conditions remain unchanged.

**MAUB 1243 4 17**                                                                                                **Page 1 of 1**

EXCESS/UMBRELLA



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## NON-DROP DOWN PROVISION

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The aggregate limits on "underlying insurance" shall not be reduced as respects coverage excluded hereunder. It shall be the insured's sole responsibility to provide other insurance or self-insurance for any impairment of the underlying aggregate limit.

All other terms and conditions remain unchanged.

**MAUB 1255 01 15**                                                      **Page 1 of 1**



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## 25% MINIMUM EARNED PREMIUM

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

**A.** Paragraph **e.** of Condition **4.** Cancellation under Section **IV.** Conditions is replaced by the following:

  **e.** If this policy is cancelled by:

    **(1)** The first Named Insured and the policy is not subject to audit, we will retain no less than 25% of the Total Premium shown in the Declarations.

    **(2)** The first Named Insured and the policy is subject to audit, the earned premium will be determined by the final audit. However, in no event will we retain less than 25% of the Total Premium as described in the Minimum Earned Premium condition.

    **(3)** Us for any reason other than for nonpayment of premium, the refund will be pro-rata. However, in no event will we retain less than 25% of the Total Premium as described in the Minimum Earned Premium condition.

    We will send the first Named Insured any premium refund due. The cancellation will be effective even if we have not made or offered a refund.

**B.** The following is added to Section **IV.** Conditions:

**Minimum Earned Premium**

  **a.** The minimum earned premium for the policy period is 25% of the Total Premium, shown on the Declarations, plus any premium adjustment for endorsements and any additional premium developed by audit.

  **b.** Audits that indicate a return premium will not reduce the minimum earned premium as stated in Paragraph **a.** above.

All other terms and conditions remain unchanged.

        

EXCESS/UMBRELLA



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – PRIOR INCIDENTS AND PRIOR CONSTRUCTION DEFECTS

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

The following is added to the Exclusions section:

This policy does not apply to:

**Prior Incidents And Prior Construction Defects**

Loss, cost or expense arising from a claim which first occurred or is alleged to have begun to occur prior to the effective date of this policy. This exclusion applies regardless of whether repeated or continued exposure to conditions which were a cause of such loss, cost or expense occur during the period of this policy and cause additional, progressive or further loss, cost or expense, all of which are excluded from coverage.

This exclusion shall apply whether or not the insured's legal obligation to pay damages has been established as of the inception date of this policy.

If this policy is renewed or extended by us for more than one annual period, the most we will pay for loss, cost or expense arising from a claim which first occurred during one of the policy periods is the applicable limit of insurance available for the policy period during which the injury or damage first occurred, regardless of whether such injury or exposure to it existed before or continues after the policy period in which it first occurred.

When coverage does not apply for the Named Insured, no coverage or defense will be afforded to any additional insured under this policy.


All other terms and conditions remain unchanged.



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – AIRCRAFT PRODUCTS AND GROUNDING

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

**A.** The following is added to the Exclusions section:

This policy does not apply to:

**Aircraft Products And Grounding**

Liability arising out of your "aircraft products" or the "grounding" of any aircraft, missile or spacecraft.

**B.** The following are added to the Definitions section with respect to this exclusion:

**1.** "Aircraft products":

**a.** Means:

**(1)** Aircraft, missiles or spacecraft and their ground support or control equipment;

**(2)** Any other goods or products, other than those specified in Paragraph **1.a.(1)** above, that you manufacture, sell, handle or distribute for any services you, or others trading under your name, provide or recommend for use in the manufacture, repair, operation, maintenance or use of any item specified in **1.a.(1)** above; or

**(3)** Any goods, products or spare parts you furnish, install or use in connection with any item specified in **1.a.(1)** above, including but not limited to:

**(a)** Ground handling tools and equipment;

**(b)** Training aids, instruction manuals or blueprints;

**(c)** Engineering or other data or advice; or

**(d)** Service or labor relating to such aircraft or articles.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of your "aircraft product", and

**(2)** The providing of or failure to provide warnings or instructions.

**2.** "Grounding" means the withdrawal of one or more aircraft, missiles or spacecraft from flight operations or the imposition of speed, passenger or load restrictions on aircraft, missiles or spacecraft because of the existence or alleged existence of any defect, fault or condition affecting the safe operation of such aircraft, missile or spacecraft.

All other terms and conditions remain unchanged.

**MAUB 1338 01 15**                                                                      **Page 1 of 1**



EXCESS/UMBRELLA

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – NUCLEAR ENERGY LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

**A.** The following is added to Section **II.** Exclusions:

This policy does not apply to:

**Nuclear Energy Liability**

Any liability resulting from the "hazardous properties" of "nuclear material".

**B.** As used in this exclusion:

"Hazardous properties" include radioactive, toxic or explosive properties;

"Nuclear material" means "source material", "special nuclear material" or "by-product material"; and

"Source material", "special nuclear material" and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or any law amendatory thereof.

All other terms and conditions remain unchanged.



EXCESS/UMBRELLA

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## PENNSYLVANIA AMENDATORY

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

**A.** Paragraphs **a., b., c., d.,** and **f.** of the **Cancellation** Condition are replaced by the following:

**Cancellation**

**a.** The first Named Insured shown in the Declarations may cancel this policy by writing or giving notice of cancellation.

**b. Cancellation Of Policies In Effect**

**(1) For Less Than 60 Days**

We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least 30 days before the effective date of cancellation.

**(2) For 60 Days Or More**

If this policy has been in effect for 60 days or more or if this policy is a renewal of a policy we issued, we may cancel this policy only for one or more of the following reasons:

**(a)** You have made a material misrepresentation which affects the insurability of the risk. Notice of cancellation will be mailed or delivered at least 15 days before the effective date of cancellation.

**(b)** You have failed to pay a premium when due, whether the premium is payable directly to us or our agents or indirectly under a premium finance plan or extension of credit. Notice of cancellation will be mailed at least 15 days before the effective date of cancellation.

**(c)** A condition, factor or loss experience material to insurability has changed substantially or a substantial condition, factor or loss experience material to insurability has become known during the policy period. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

**(d)** Loss of reinsurance or a substantial decrease in reinsurance has occurred, which loss or decrease, at the time of cancellation, shall be certified to the Insurance Commissioner as directly affecting in-force policies. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

**(e)** Material failure to comply with policy terms, conditions or contractual duties. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

**(f)** Other reasons that the Insurance Commissioner may approve. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

This policy may also be cancelled from inception upon discovery that the policy was obtained through fraudulent statements, omissions or concealment of facts material to the acceptance of the risk or to the hazard assumed by us.

**c.** We will mail or deliver our notice to the first Named Insured's last mailing address known to us. Notice of cancellation will state the specific reasons for cancellation.

**d.** Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

**e.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata and will be returned within 10 business days after the effective date of cancellation. If the first Named Insured cancels, the refund may be less than pro rata and will be returned within 30 days after the effective date of cancellation. The cancellation will be effective even if we have not made or offered a refund.

**f.** If notice is mailed, it will be by registered or first class mail. Proof of mailing will be sufficient proof of notice.

The following is added to the **Cancellation** Condition:

If we cancel, any premium refund due will be returned within 10 business days after the effective date of cancellation. If the first Named Insured cancels, any premium refund due will be returned within 30 days after the effective date of cancellation.

**B.** The following is added to **SECTION IV. CONDITIONS:**

**a. When We Do Not Renew**

If we decide not to renew this policy, we will mail or deliver written notice of nonrenewal, stating the specific reasons for nonrenewal, to the first Named Insured at least 60 days before the expiration date of the policy.

**b. Increase of Premium**

If we increase your renewal premium, we will mail or deliver to you written notice of our intent to increase the premium at least 30 days before the effective date of the premium increase.

Any notice of nonrenewal or renewal premium increase will be mailed or delivered to you at the mailing addresses last known to us.  If notice is mailed, it will be by registered or first class mail.  Proof of mailing will be sufficient proof of notice.

All other terms and conditions remain unchanged.



EXCESS/UMBRELLA

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – DAMAGE TO PROPERTY

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

The following is added to Section **II.** Exclusions:

This policy does not apply to:

**Damage To Property**

Property damage to:

**a.** Property you use, own, rent or occupy, including any costs or expenses incurred by you or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**b.** Property loaned to you;

**c.** Real or personal property in the care, custody or control of any insured (as respects real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, only excluding property damage to that particular part of real property on which operations are being performed, if the property damage arises out of those operations);

**d.** Property transported by the insured; or

**e.** Premises you sell, give away or abandon, if the property damage arises out of any part of those premises, and occurred from hazards that were known by you, or should have reasonably been known by you, at the time the property was transferred or abandoned.

All other terms and conditions remain unchanged.

**MAUB 1615 01 15**



EXCESS/UMBRELLA

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – FUNGI OR BACTERIA

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

**A.** The following is added to the Exclusions Section:

This policy does not apply to:

**Fungi Or Bacteria**

**a.** Any liability arising out of the actual, alleged or threatened  inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

**b.** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for consumption.

**B.** The following is added to the Definitions section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

All other terms and conditions remain unchanged.



EXCESS/UMBRELLA

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – LEAD

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Exclusions section:

This policy does not apply to:

**Lead**

Any loss, claim or expense caused by, resulting from or arising out of lead, paint containing lead, or any other material or substance containing lead.

We have no duty or obligation to provide or pay for the investigation or defense of any loss, cost, expense, claim or "suit" excluded herein.

All other terms and conditions remain unchanged.



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – PROFESSIONAL SERVICES

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Exclusions section:

This policy does not apply to:

**Professional Services**

"Bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or failure to render professional services or advice by an insured or by any person for whose acts or omissions the insured is legally responsible, whether or not that service or advice is ordinary in your profession and regardless of whether a claim or "suit" is brought by a client or any other person or organization.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or failure to render any professional service.

All other terms and conditions remain unchanged.



EXCESS/UMBRELLA

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – AUTO NO-FAULT AND SIMILAR LAWS

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

The following is added to Section **II.** Exclusions:

**Auto No-Fault And Similar Laws**

This policy does not apply to:

Any liability payable under or resulting from any no-fault, personal injury protection, uninsured motorists, underinsured motorists or similar law or statute.

All other terms and conditions remain unchanged.



EXCESS/UMBRELLA

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – WAR LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

The following is added to Section **II.** Exclusions:

This policy does not apply to:

**War Liability**

Any liability, however caused, arising directly or indirectly out of:

**a.**    War, including undeclared or civil war; or

**b.**    Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**c.**    Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

All other terms and conditions remain unchanged.

**EXCESS/UMBRELLA**



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – POLLUTION

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

**A.** The following is added to Section **II.** Exclusions:

This policy does not apply to:

**Pollution**

**a.** Any liability arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**b.** Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**B.** The following is added to Section **V.** Definitions:

"Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

All other terms and conditions remain unchanged.



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

**A.** The following is added to the Exclusions section:

This policy does not apply to:

**Terrorism**

"Any injury or damage" arising, directly or indirectly, out of a "certified act of terrorism".

**B.** For the purposes of this endorsement, the following are added to the Definitions section:

"Any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**a.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**b.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

All other terms and conditions remain unchanged.

EXCESS/UMBRELLA



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – SILICA OR MIXED DUST

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

**A.** The following is added to Section **II.** Exclusions:

This policy does not apply to:

**Silica Or Mixed Dust**

**a.** Liability caused by, resulting from, or arising out of or in any way related to the actual, alleged or threatened discharge, dispersal, emission, release, escape, handling, contact with, exposure to or inhalation, ingestion or respiration of "mixed dust", silica, silica-related dust or products or substances containing silica. This includes, but is not limited to any:

**(1)** Supervision, instructions, recommendations, warnings or advice given or which should have been given in connection with the above; and

**(2)** Obligation to share damages with or repay someone else who must pay damages because of such injury or damage.

**b.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "mixed dust", silica, silica-related dust or products or substances containing silica, by any insured or by any other person or entity.

**B.** As respects this exclusion, the following is added to Section **V.** Definitions:

"Mixed dust" means inorganic or organic dusts that have harmful effects on human beings.

All other terms and conditions remain unchanged.



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – ASBESTOS

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

The following is added to Section **II.** Exclusions:

This policy does not apply to:

**Asbestos**

**a.** The actual, alleged or threatened:

**(1)** Inhalation of, ingestion of, or prolonged physical exposure to asbestos or products or work containing asbestos;

**(2)** Use of asbestos in your work or your product or the work or product of any person or organization for whom you may be legally responsible; or

**(3)** Exposure to asbestos or products containing asbestos which are at any time removed from a building or a structure, transported, handled, stored, treated, disposed of, processed or manufactured by you or any person or any organization for whom you may be legally responsible.

**b.** Any loss, cost or expense arising out of any:

**(1)** Request, demand or order that any insured or others test for, monitor, clean up, remove or contain, or in any way respond to or assess the effects of asbestos; or

**(2)** Claim or suit by or on behalf of any person, organization or governmental authority for damages because of testing for, monitoring, cleaning up or removing, containing or in any way responding to, or assessing the effects of asbestos.

All other terms and conditions remain unchanged.



EXCESS/UMBRELLA

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – UNMANNED AIRCRAFT

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

**A.** The following is added to Section **II.** Exclusions:

This policy does not apply to:

**Unmanned Aircraft**

Bodily injury, property damage or personal and advertising injury arising out of the ownership, maintenance, use or entrustment to others of any "unmanned aircraft". Use includes operation and loading or unloading.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the occurrence which caused the bodily injury or property damage or the offense which caused the personal and advertising injury involved the ownership, maintenance, use or entrustment to others of any "unmanned aircraft".

As used in this exclusion, loading or unloading means the handling of property:

**a.** After it is moved from the place where it is accepted for movement into or onto an "unmanned aircraft";

**b.** While it is in or on an "unmanned aircraft"; or

**c.** While it is being moved from an "unmanned aircraft" to the place where it is finally delivered;

but loading or unloading does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the "unmanned aircraft".

Regarding personal and advertising injury, this exclusion does not apply to:

**a.** The use of another's advertising idea in your advertisement; or

**b.** Infringing upon another's copyright, trade dress or slogan in your advertisement.

**B.** The following is added to Section **V.** Definitions:

"Unmanned aircraft" means an aircraft that is not:

**a.** Designed;

**b.** Manufactured; or

**c.** Modified after manufacture;

to be controlled directly by a person from within or on the aircraft.

All other terms and conditions remain unchanged.



EXCESS/UMBRELLA
POLICY NUMBER: MKLV2EUL103021

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

## CONFIRMATION OF EXCLUSION OF CERTIFIED ACTS OF TERRORISM COVERAGE – TERRORISM RISK INSURANCE ACT

### SCHEDULE

| | |
|---|---|
| Terrorism Premium: | ██████ |
| Federal Share Of Terrorism Losses: | 85% In 2015 |
| | 84% In 2016 |
| | 83% In 2017 |
| | 82% In 2018 |
| | 81% In 2019 |
| | 80% In 2020 |

**Disclosure Of Premium**

We have notified you that under the Terrorism Risk Insurance Act we must make certified acts of terrorism coverage available in the policies we offer. At that time we advised you that the premium for such terrorism coverage would be the amount shown in the Schedule of this notice.

**Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals a percentage (as shown in the Schedule of this notice) of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

If you have not indicated to us or your agent that certified acts of terrorism coverage is desired, a certified act of terrorism exclusion will be attached to your policy and we will not charge your policy for terrorism coverage.

If you desire to purchase terrorism coverage, please contact us or your agent.

# EXHIBIT E



**MARKEL**

May 3, 2021

**FIRST CLASS & CERTIFIED MAIL – RETURN RECEIPT REQUESTED**

Gregory Krock (gkrock@mcguirewoods.com)
McGuireWoods LLP
Tower Two-Sixty
260 Forbes Avenue, Suite 1800
Pittsburgh, PA 15222

Re:     Insured:              Seven Point Energy Services, Inc.
        Issuing Company:      Evanston Insurance Company
        Plaintiffs:           William and Tammy Burkey
        Policy No:            MKLV2ENV100993
        Policy Period:        12/28/2018 to 12/28/2019
        Our File No:          EV401330

<u>**RESERVATION OF RIGHTS**</u>

Dear Mr. Krock:

Markel Service, Incorporated, as claim service manager for Evanston Insurance Company ("Evanston"), acknowledges receipt of the tender from your office on behalf of your clients, EQT Production Company and EQT Corporation (collectively the "EQT entities"). The tender request relates to the suit filed by Plaintiffs, William J. Burkey and Tammy Burkey. This suit captioned *William J. Burkey and Tammy Burkey, Husband and Wife vs. Equitrans Midstream Corporation; EQT Midstream Corporation – Eurpoa CS; Equitrans Midstream Corporation – Halo CS; EQM Midstream Partners LP; EQT Production Company; Equitrans, Inc; EQT Midstream; EQT Corporation; John Doe 1; John Doe 2; John Doe 3; and John Doe 4* bears case # 6D-21-920 and was filed in the Court of Common Pleas of Allegheny County (the "Burkey lawsuit").

Based upon a review of the allegations made in the Burkey lawsuit, the policy, and the investigation to date, Evanston has agreed to defend the EQT entities under a full Reservation of Rights, which is specifically set forth below. By handling this matter under a Reservation of Rights, Evanston reserves the right to further investigate this matter and disclaim coverage for any claims and damages that are not covered under the policy referenced above.

Pursuant to the terms of the policy, Joseph Lesinski of the law firm Marshall Dennehey has been appointed to defend the EQT entities. Please continue to provide this firm with your full cooperation. All questions concerning the defense or representation of the EQT entities should be directed to the above attorney handling this matter, who can be reached at (412) 803-2006.

<u>**SUMMARY OF FACTUAL BACKGROUND**</u>

The Burkey lawsuit alleges that on 2/3/19, Plaintiff, William Burkey, was employed as a water truck driver for Seven Point Energy Services, Inc. and was in the course of his employment when he

**Evanston - Claims**
**Arizona · California · Illinois · Nebraska · New Jersey · New York · Texas · Virginia · Wisconsin**
P.O. Box 2009, Glen Allen, VA 23058-2009   (800) 362-7535   Fax (855) 662-7535   evanstonclaims@evanston.com
California License: Evanston West Insurance Services #OD95581
www.evanston.com

Please review our privacy policy at www.evanston.com/privacy-policy.



**MARKEL**

Seven Point Energy Services, Inc.
May 24, 2021
Page 2

entered a containment area at an oil and gas well known as "the Pettit Pad". It is further alleged that EQT owned, leased, developed, constructed, managed, operated, maintained and/or performed services at the Pettit Pad. The Burkey lawsuit states that Mr. Burkey slipped and fell on ice which accumulated on the surface of the containment area resulting in multiple injuries, including but not limited to the following: Cervical injury requiring surgery; Right shoulder, rotator cuff, biceps and labral tears, requiring surgery; Fracture of right elbow; Injury to throat and breathing passageway from neck surgery; Scarring and disfigurement. The Burkey lawsuit seeks damages from the Defendants based on theories of Negligence and Loss of Constorium.

## EVANSTON'S POLICY INFORMATION

Evanston Insurance Company insures Seven Point Energy Services, Inc. under an Environmental Common Policy, designated as policy number MKLV2ENV100993 for the policy term of 12/28/2018 to 12/28/2019 (the "Policy"). The Policy provides Commercial General Liability coverage on an occurrence basis, which is subject to a $10,000 self-insured retention ("SIR") per claim, as well as the following Limits of Liability:

| | | |
|---|---|---|
| (i) | $2,000,000 | General Aggregate Limit (Other than Products/Completed Operations); |
| (ii) | $2,000,000 | Products/Completed Operations Aggregate Limit; |
| (iii) | $1,000,000 | Personal and Advertising Injury Limit (Any One Person or Organization); |
| (iv) | $1,000,000 | Each Occurrence Limit; |
| (v) | $50,000 | Damage to Premises Rented to You Limit (Any One Premises); |
| (vi) | $5,000 | Medical Expense (Any One Person). |

## AN EXPLANATION OF EVANSTON'S RESERVATION OF RIGHTS

Based upon a review of the Policy and the investigation to date, Evanston concludes that some or all of the claims may not be covered under the Policy. Evanston is relying upon its entire policy in informing you of this potential lack of coverage. For purposes of Evanston's coverage analysis in this matter, we direct your attention to the following pertinent provisions of the Policy, which includes the relevant policy provisions, as well as various other Definitions, Endorsements, Conditions and/or Exclusions as set forth below.

The Policy contains the following Additional Insured endorsement:

*BLANKET ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS*

*This endorsement modifies insurance provided under the following:*

*COMMERCIAL GENERAL LIABILITY COVERAGE FORM*

*A. **Section II – Who Is An Insured** is amended to include as an additional insured any person(s) or organization(s) to whom the insured agrees to provide additional insured status in a written contract, provided such written contract is signed by both parties*



Seven Point Energy Services, Inc.
May 24, 2021
Page 3

*and executed prior to the commencement of operations, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:*

1. *Your acts or omissions; or*
2. *The acts or omissions of those acting on your behalf;*

*in the performance of your ongoing operations for the additional insured.*

*However, the insurance afforded to such additional insured:*
1. *Only applies to the extent permitted by law; and*
2. *Will not be broader than that which you are required by the contract or agreement to provide for such additional insured.*

**B.** *With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:*

*This insurance does not apply to "bodily injury" or "property damage" occurring after:*

1. *All work on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured at the location of the covered operations, including materials, parts or equipment furnished in connection with such work, has been completed; or*
2. *That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as part of the same project.*

**C.** *With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:***

*The most we will pay on behalf of the additional insured is the amount of insurance:*

1. *Required by the contract or agreement; or*
2. *Available under the applicable Limits of Insurance shown in the Declarations;*

*whichever is less.*

*This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.*



**MARKEL**

Seven Point Energy Services, Inc.
May 24, 2021
Page 4


There is a contract (the Master Services Agreement) between Seven Point Energy Services, Inc. EQT Production Company effective 1/8/18, which includes various provisions regarding the obligations of Seven Point Energy Services, Inc., including provisions related to indemnification and insurance. The EQT entities, however, would only qualify as additional insureds under the Policy to the extent that Seven Point Energy Services, Inc. is liable for Plaintiff's injuries caused, in whole or in part, by its own acts or omissions. Should discovery reveal that the Plaintiff's injuries were not caused, in whole or in part, by any acts or omissions of Seven Point Energy Services, Inc., the EQT entities would not qualify as additional insureds under the Policy. Accordingly, Evanston reserves its right to disclaim coverage to the EQT entities based on the Additional Insured endorsement noted above.

## CONCLUSION

This letter will serve to advise you of the potential bars or limitations to the coverage afforded to the EQT entities for the damages sought by the Plaintiffs under the Policy based upon the investigation completed to date. Evanston will continue to investigate this matter under a full Reservation of Rights to limit or deny payment of damages on the various grounds detailed above.

The foregoing discussion of grounds for Evanston's Reservation of Rights is not intended to be necessarily exhaustive or complete. Our investigation is ongoing and this letter is based on presently available information. We reserve the right to supplement this coverage position and assert additional grounds for disclaimer of coverage if new or additional information becomes available.

This letter quotes the Policy in part. The language cited herein is not meant to change, supplement, add or subtract from the policy terms. The language in the Policy itself is controlling.

Should you have any questions or wish to discuss any issue raised in this letter or any other aspect of this matter, please do not hesitate to contact us.

If any of the factual information relied upon by us in this letter is materially incorrect, or if you possess any additional information which you believe impacts the coverage position taken herein, please immediately contact the undersigned at (212) 898-6614.

Please reference our File Number EV401330 on all future correspondence.

Sincerely,

**Evanston Service, Incorporated**

*Audley Harris*

Audley Harris
Senior Claims Specialist
Audley.Harris@evanston.com


**MARKEL**

Seven Point Energy Services, Inc.
May 24, 2021
Page 5


cc:     James Cooney (jcooney@lampllaw.com)

        Joseph Lesinski (jvlesinski@MDWCG.com)

        Melanie Moore (melanie.moore@assuredpartners.com)

        CRC Insurance Services, Inc.
        5555 Triangle Parkway, Suite 400
        Norcross, GA 30092

# EXHIBIT F



February 12, 2024

<u>VIA REGULAR CERTIFIED MAIL - RETURN RECEIPT REQUESTED AND EMAIL</u>
Receipt No.9414 8149 0339 7574 0626 06

McGuireWoods LLP
Tower Two-Sixty
260 Forbes Avenue, Suite 1800
Pittsburgh, PA 15222

Attention: Gregory Krock, Esq. (<u>gkrock@mcguirewoods.com</u>)

Re:    Named Insured: Seven Point Energy Services, Inc
        Additional Insured:  EQT Production Company
        Issuing Company:   Evanston Insurance Company
        Plaintiffs:          William and Tammy Burkey
        Our File No:        EV401330
        Policy No:         MKLV2ENV100993 (Primary)
                           MKLV2EUL103021 (Excess)
        Policy Period:     12/28/2018 to 12/28/2019

<u>SUPPLEMENTAL RESERVATION OF RIGHTS</u>

Dear Mr. Krock:

Markel Service, Incorporated, is the claim service manager for Evanston Insurance Company ("Evanston"). The purpose of this letter is to supplement Markel's letter to you dated May 3, 2021 (the "May 2021 Letter"), in connection with the lawsuit captioned *William J. Burkey and Tammy Burkey v. Equitrans Midstream Corporation, et al.*, in the Court of Common Pleas of Allegheny County and assigned docket number 6D-21-920 (the "Burkey Lawsuit"). We understand that the claims against all named defendants except EQT Production Company ("EQT") have been dismissed.

I write to you as the person authorized to address insurance coverage issues on behalf of EQT. If you are not that person, please let me know immediately and provide me with the name and contact information of the appropriate person to whom this and other communication should be directed.

As previously explained, Evanston issued an Environmental Common Policy with policy number MKLV2ENV100993 for the policy period 12/28/2018 to 12/28/2019 to Named Insured Seven Point Energy Services, Inc. ("Seven Point"). This policy provides certain Commercial General Liability coverage with a $1,000,000.00 each occurrence and a $2,000,000.00 General Aggregate Limit, subject to a $10,000 self-insured retention (the "Primary Policy")[1].

---

[1] The $10,000 self-insured retention has been met.

Markel - Claims
Arizona · California · Illinois · Nebraska · New Jersey · New York · Texas · Virginia · Wisconsin
P.O. Box 2009, Glen Allen, VA 23058-2009  (800) 362-7535  Fax (855) 662-7535  markelclaims@markel.com
California License: Markel West Insurance Services #0D95581
www.markel.com

Please review our privacy policy at www.markel.com/privacy-policy.

In addition, Evanston issued a follow-form Commercial Excess Liability Policy to Seven Point with policy number MKLV2EUL103021 for the policy period 12/28/2018 to 12/28/2019 (the "Excess Policy"). The Excess Policy will pay those sums in excess of the limits in the Primary Policy that an insured "become[s] legally obligated to pay as damages because of injury to which this insurance applies, provided that the 'underlying insurance' also applies, or would apply but for exhaustion of its applicable Limits Of Insurance." The Excess Policy "is subject to the same terms, conditions, agreements, exclusions and definitions as the 'underlying insurance'" with certain exceptions. The Excess Policy has an Each Occurrence Limit of $5,000,000.00 and an Aggregate Limit of $5,000,000.00. The Excess Policy specifically provides that "[t]he exclusions applicable to the 'underlying insurance' also apply to this policy."

The Primary Policy and the Excess Policy will be referred to herein collectively as the "Policy."

Evanston provides you with this supplemental letter to address additional information that has come to light since the May 2021 Letter. Evanston will continue to defend EQT in the Burkey Lawsuit subject to a full and complete reservation of rights, but we write to advise you of certain additional policy provisions that may limit or preclude coverage for some or all of the damages sought and/or claims alleged in the Burkey Lawsuit. While we mention certain policy provisions in the May 2021 Letter and this letter, Evanston reserves the right to rely on any term, condition, exclusion and/or definition in its Policy and you should consult the Policy for the full language of all terms, conditions, exclusions and definitions.

<u>SUMMARY OF ADDITIONAL FACTS DEVELOPED</u>

We understand that discovery[2] in the Burkey Lawsuit has shown that Mr. Burkey was inside the containment area on EQT's property, known as the "Pettit Pad." Mr. Burkey, a truck driver for Seven Point, had just opened the valves on the last two tanks and was returning to open the pumpkin valve to load water on to the truck when he slipped on ice. A Seven Point manager arrived shortly after the fall and found Mr. Burkey at the rear of the truck preparing to stop the flow of water as the truck was nearly full.

We further understand that Seven Point was aware that the Pettit Pad area was not maintained by anyone for ice or snow because it was generally an unmanned area, but that Mr. Burkey had the right to stop work if there was a dangerous condition, and that all Seven Point employees are trained to only work in those areas where they can work safely. Seven Point's work for EQT was to collect water from various wellsites.

We further understand that Mr. Burkey requested light or sedentary duties after the accident but Seven Point had no such positions available and that Mr. Burkey has not worked since the day of the accident. We understand that Mr. Burkey was 41 at the time of the accident and the wage loss claim could exceed $1,000,000. We further understand the Mr. Burkey either had or was likely to have one or more surgeries and will likely assert that injuries to his neck, shoulder and elbow are permanent and will require future medical treatment. It is our understanding that the workers compensation lien exceeds $400,000. We further understand that Plaintiff has made a demand of $2,500,000 but no settlement discussions have taken place.

<u>EXPLANATION OF EVANSTON'S SUPPLEMENTAL RESERVATION OF RIGHTS</u>

Evanston will not repeat its prior reservation of rights contained in its May 2021 Letter but incorporates that letter as though fully set forth at length herein. As explained in the May 2021 Letter, if the Plaintiffs' injuries were not caused, in whole or in part, by any acts or omissions of Seven Point, EQT would not qualify as an additional insured under the Policy and there may be no coverage available for EQT under the Policy. Additionally, we call your attention to the terms of the two Endorsements in the Evanston Primary Policy with respect to the Evanston Policy being Primary and Non-Contributory (see Form MEEI 2274 05 16, AUTOMATIC PRIMARY AND NON-CONTRIBUTORY INSURANCE, and Form MEEI 2541 11 17, PRIMARY AND NON-CONTRIBUTORY – OTHER INSURANCE CONDITION – OIL AND GAS INDUSTRY), both of which provide that these provisions do not apply where the additional insured is solely negligent. To the extent that EQT is found solely negligent for the claims asserted by Burkey, Evanston reserves the right

---

[2] We understand that Plaintiffs have not been deposed and discovery is likely to continue until at least June 2024.

to seek contribution, indemnity, and recovery of litigation expenses, including costs of defense, from EQT's insurer(s).

In light of the additional evidence produced in discovery, we call to your attention the Endorsement to the Primary Policy on Form MEGL 2301 11 17 adding to the Policy "EXCLUSION – AIRCRAFT, AUTO OR WATERCRAFT WITH LIMITED NON-OWNED WATERCRAFT EXCEPTION" ("Auto Exclusion") which provides:

> Exclusion 2.g. Aircraft, Auto Or Watercraft under Section I – Coverages, Coverage A – Bodily Injury And Property Damage Liability is replaced by the following:
>
> This insurance does not apply to:
>
> g.  Aircraft, Auto Or Watercraft
>
> > (1) "Bodily injury" or "property damage" arising out of any aircraft, "auto" or watercraft; or
> >
> > (2) "Bodily injury" or "property damage" arising out of "loading or unloading" of any aircraft, "auto" or watercraft;
>
> whether or not owned, maintained, used, rented, leased, or borrowed by any insured and whether or not hired, contracted, loaned or entrusted to others by any insured.
>
> This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, contracting, screening, training or monitoring of others by any insured.
>
> However, this exclusion does not apply to a watercraft you do not own that is less than 75 feet long and not being used to carry persons or property for a charge.
>
> All other terms and conditions remain unchanged.

"Auto" is defined in the Policy to mean:

> a.  A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or
>
> b.  Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.
>
> However, "auto" does not include "mobile equipment".

The term "loading or unloading" is defined in the Policy to mean:

> ... the handling of property:
>
> a.  After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";
>
> b.  While it is in or on an aircraft, watercraft or "auto"; or

    c.   While it is being moved from an aircraft, watercraft or "auto" to the place where it nis finally delivered;

But "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

Facts developed during discovery indicate that Mr. Burkey's injuries arose out of the "loading or unloading" of an "auto" as those terms are defined in the Policy.  Moreover, as to the subject "auto," the exclusion applies "Whether or not owned, maintained, used, rented, leased, or borrowed by any insured and whether or not hired, contracted, loaned or entrusted to others by any insured."  Thus, there is no coverage under the Policy to any insured to the extent that Mr. Burkey's injuries arose out of the "loading or unloading" of an "auto."

Accordingly, Evanston reserves its right to disclaim coverage, or to deny coverage as to any damages arising out of, the "loading or unloading" of an "auto" to EQT based on the Auto Exclusion, and Evanston reserves the right to seek contribution, indemnity, and recovery of litigation expenses, including costs of defense, from EQT's insurer(s).

The Excess Policy contains an "EXCLUSION – AUTO NO-FAULT AND SIMILAR LAWS" added to that policy by Endorsement on Form MAUB 1665 01 15.  This exclusion provides:

The following is added to Section II. Exclusions:

Auto No-Fault And Similar Laws

This policy does not apply to:

Any liability payable under or resulting from any no-fault, personal injury protection, uninsured motorists, underinsured motorists or similar law or statute.

As discussed above, the accident arose out of the use of a Seven Point truck that was driven by Mr. Burkey and specifically the loading of water from the EQT wellsite on to the Seven Point truck.  Accordingly, Evanston reserves its right to disclaim coverage, or to deny coverage as to any damages arising out of "[a]ny liability payable under or resulting from any no-fault, personal injury protection, uninsured motorists, underinsured motorists or similar law or statute."  Moreover, Evanston reserves the right to seek contribution, indemnity, and recovery of litigation expenses, including costs of defense, from EQT's insurer(s).

<u>CONCLUSION</u>

This letter will serve to advise you of the potential bars or limitations to the coverage afforded to the EQT entities for the damages sought by the Plaintiffs under the Policy based upon the investigation completed to date.  Evanston will continue to investigate this matter and provide a defense under a full reservation of rights to limit or deny payment of damages on the various grounds detailed above.

The foregoing discussion of grounds for Evanston's reservation of rights is not intended to be necessarily exhaustive or complete. Our investigation is ongoing and this letter is based on presently available information. We reserve the right to supplement this coverage position and assert additional grounds for disclaimer of coverage if new or additional information becomes available.

Because some or all of the claims or damages sought may not be covered under the Policy, EQT may want, at its own expense, to hire counsel of its own choice to represent it with respect to any such uncovered claims or damages.

Evanston further reserves the right to initiate a declaratory judgment proceeding to determine the rights and obligations of the parties under the Policy, and/or any other implicated policy, in connection with the Burkey Lawsuit, including, but not limited to seeking a declaration that it may withdraw the defense. In addition, if this matter proceeds to trial, it may be necessary to seek an allocated verdict, through the use of a special verdict sheet, to identify what portion, if any, of any verdict (and resulting judgment) is allocable to uncovered claims and damages. Special jury interrogatories may also be necessary to resolve factual issues that affect insurance coverage. EQT should take whatever steps are necessary to achieve these objectives. Evanston reserves the right to seek to intervene in this case, and to take other action, for purposes of, among other things, pursuing a special verdict and/or interrogatories.

This letter quotes the Policy in part. The language cited herein is not meant to change, supplement, add, or subtract from the policy terms. The language in the Policy itself is controlling.

Should you have any questions or wish to discuss any issue raised in this letter or any other aspect of this matter, please do not hesitate to contact us.

If any of the factual information relied upon by Evanston is materially incorrect or incomplete, or if you possess any additional information which you believe impacts the coverage position taken herein, please promptly send them to me for consideration.

Sincerely,

Markel Service, Incorporated

*Suzanne Braun*

Suzanne Braun
Executive Claims Specialist & Senior Counsel
Complex Claims
(732) 450-8735
Suzanne.Braun@Markel.com


cc:    Jeff Roberts, Esq. JDRoberts@eqt.com

       James Cooney, Esq. (jcooney@lampllaw.com) Counsel for Seven Point Energy Services, Inc.

       Joseph Lesinski, Esq. (jvlesinski@MDWCG.com)

       Ms. Melanie Moore (melanie.moore@assuredpartner.com)

       CRC Insurance Services, Inc.
       5555 Triangle Parkway, Suite 400
       Norcross, GA 30092

# EXHIBIT G

**Page 1**

```
 1          IN THE COURT OF COMMON PLEAS OF
 2            ALLEGHENY COUNTY, PENNSYLVANIA
 3   WILLIAM J. BURKEY and TAMMY      )
     BURKEY, husband and wife,       ) CIVIL DIVISION
 4                                   )
             Plaintiffs,             ) No. GD-21-000920
 5                                   )
         VS.                         ) ISSUE NO. 205480
 6                                   )
     EQT PRODUCTION COMPANY; JOHN DOE )
 7   1; JOHN DOE 2; JOHN DOE 3; JOHN )
     DOE 4,                          )
 8                                   )
             Defendants,             )
 9                                   )
         VS.                         )
10                                   )
     SEVEN POINT ENERGY SERVICES,    )
11   INC.,                           )
                                     )
12          Additional Defendants.   )
13                    * * *
14
15      DEPOSITION OF WILLIAM J. BURKEY, a PLAINTIFF
16   herein, taken pursuant to the Pennsylvania Rules of
17   Civil Procedure No. 4007.1, by and before Diana C.
18   Clark, a Professional Court Reporter and Notary Public
19   in and for the Commonwealth of Pennsylvania, at the
20   Law Offices of Meyer, Darragh, Buckler, Benenek & Eck,
21   PLLC, US Steel Tower, Suite 4850, 600 Grant Street,
22   Pittsburgh, Pennsylvania, on Friday, November 8, 2024,
23   at 11:00 a.m.
24
25                    * * *
```

**Page 2**

```
 1   APPEARANCES:
 2   On behalf of the Plaintiffs:
 3                Paul R. Robinson, Esq.
                  Meyer Darragh Buckler Bebenek & Eck
 4                US Steel Tower, Suite 4850
                  600 Grant Street
 5                Pittsburgh, PA 15219
                  (412) 261-6600
 6                probinson@mdbbe.com
 7   On behalf of the Defendant, EQT Production Company:
 8                Joseph V. Lesinski, Esq.
                  Marshall Dennehey, P.C.
 9                Union Trust Building, Suite 700
                  501 Grant Street
10                Pittsburgh, PA 15219
                  (412) 803-1140
11                jvlesinski@mdwcg.com
12                Gregory J. Krock, Esq.
                  McGuireWoods, LLP
13                Tower Two-Sixty, Suite 1800
                  260 Forbes Avenue
14                Pittsburgh, PA 15222-3142
                  (412) 667-6042
15                gkrock@mcguirewoods.com
16   On behalf of the Additional Defendant, Seven Point
     Energy Services, Inc.:
17
                  Phillip J. Binotto, Esq.
18                Vorys Sater Seymour & Pease, LLP
                  500 Grant Street, Suite 4900
19                Pittsburgh, PA 15219
                  (412) 904-7689
20                pjbinotto@vorys.com
21
22
23                    * * *
24
25
```

**Page 3**

```
 1                    I-N-D-E-X
 2   WITNESS:                                    5
 3   WILLIAM J. BURKEY
 4          EXAMINATION                          5
 5   BY MR. LESINSKI
 6          EXAMINATION                        210
 7   BY MR. BINOTTO
 8          EXAMINATION                        211
 9   BY MR. ROBINSON
10          RE-EXAMINATION                     215
11   BY MR. LESINSKI
12
13
14                    * * *
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1                  E-X-H-I-B-I-T
 2   Exhibit No. 1 - Uniontown Chiropractic -     61
 3   Case History 6/7/2018
 4   Exhibit No. 2 - Chiropractic Office Visit    68
 5   1/26/2019
 6   Exhibit No. 3 - Chiropractic Office Visit    72
 7   8/23/2018
 8   Exhibit No. 4 - Chiropractic Office Visit    72
 9   9/6/2018
10   Exhibit No. 5 - Photo of Water Truck         95
11   Exhibit No. 6 - Aerial Photo of Containment 104
12   Area w/ Markings
13   Exhibit No. 7 - Seven Point Incident Report 152
14   Exhibit No. 8 - Safety Alert Document       167
15   Exhibit No. 9 - Seven Point 2018            170
16   Performance Data
17   Exhibit No. 10 - Seven Point Performance    171
18   Improvement Plan
19   Exhibit No. 11 - 2016 1040 Tax Return       192
20
21
22                    * * *
23
24
25
```



WILLIAM J. BURKEY
BURKEY vs EQT PROD CO

November 08, 2024
25–28

Page 25
1 because I can't remember.
2        The following job I had after that, I
3 worked for Argon putting fiberoptic cables together
4 for Navy ships.
5    Q.    Before you move onto the Argon job, the
6 position that you told me about where you had worked
7 delivering parts to wells --
8    A.    Yeah.
9    Q.    -- how long did you work in that job?
10    A.    A year.  A little over a year.
11    Q.    And then the job where you worked on a gas
12 rig, I know you don't remember the name of that
13 company, but how long were you at that position?
14    A.    I went for training in Texas and they got
15 rid of me.
16    Q.    In training?
17    A.    Yeah.
18    Q.    Why did they -- do you know the reason for
19 that?
20    A.    I guess I could not perform the job that
21 was required.
22    Q.    Were you provided with anymore detail as
23 to what part of the job you couldn't perform?
24    A.    No.
25    Q.    Was it a physical restriction; do you

Page 26
1 know?
2    A.    No, it wasn't a physical restriction.  It
3 was just testing, whatever they would verbally
4 question you on.  You would go out on a site and work
5 at nighttime and then before daytime, you'd come back
6 down and you'd go to a classroom and it was a lot of
7 the testing that I got nervous and I missed a lot of
8 questions and they verbally tested us, and then I
9 just had a brain fart on a lot of the questions.  The
10 last thing I remember is they just brought in one of
11 the instructors and he said, well, we're going to
12 have to let you go and I was put on a plane and sent
13 back home.  We were told that -- because it was in
14 Texas and they pretty much told us when we left, you
15 know, hey, they don't like you PA guys being here.
16 So do your best and, you know, study and do your job
17 the best you can.  So I did.  I failed out of it I
18 guess.
19    Q.    What city in Texas was this in?
20    A.    Tyler.
21    Q.    And do you recall approximately the year
22 where you would have been down in Tyler?
23    A.    I believe I was around 45 years old, so it
24 would be about nine years ago.  Around 2016, I would
25 say.

Page 27
1    Q.    So if that was in 2016, I'm trying to
2 piece together your job history between pretty much
3 when you got out of high school and at least before
4 you went to Argon.  So I understand you worked at the
5 HVAC company, and how long were you working there?
6    A.    I wasn't there long.  I was there maybe a
7 month.
8    Q.    And then you worked delivering parts to
9 gas wells?
10    A.    Yes.
11    Q.    How long did you work in that position?
12    A.    That was like a little over a year.
13    Q.    There seems like there's a gap there.  I'm
14 just trying to figure out if there are any other jobs
15 in there that you can remember before Argon?
16    A.    I can't remember.  I'm sorry.  It's been
17 so long ago.  I can't remember.
18    Q.    Let's focus on what you did after Argon.
19 If you were terminated from Argon, what did you do
20 next for employment?
21    A.    I wasn't terminated from Argon.  I was
22 terminated from the rig company.
23    Q.    I'm sorry, I thought that was the same.
24    A.    No.
25    Q.    Do you remember the name of the rig

Page 28
1 company?
2    A.    This got me stumped.  I'm not for certain.
3 I would have to actually look back on it.  I'm not
4 for certain.
5    Q.    If it comes to you at any point today,
6 just stop me and let me know.
7    A.    Yeah, I'm sorry.
8    Q.    And then Argon, I see here I have that
9 wrong.  That was the fiberoptic company?
10    A.    Yeah.  Yeah.
11    Q.    Did you work out of this area?
12    A.    Smithfield, PA.
13    Q.    How long did you work for Argon?
14    A.    I was there for two years, I believe.
15    Q.    So if I'm tracking this employment history
16 correctly, that would have been roughly 2016 to 2018?
17    A.    Yeah, I would say.  Yeah.
18    Q.    And can you tell me again what were your
19 day-to-day duties when you worked at Argon?
20    A.    Peel cables, reel cables off of spindles.
21 They were 2200-foot cables, and we put fiberoptics in
22 these naval cables that they went on the Navy ships
23 to control torpedoes, I guess.  Like if there was a
24 torpedo shot at a ship, the ship would leave out this
25 cable out in the ocean and if a torpedo was shot at



WILLIAM J. BURKEY                                       November 08, 2024
BURKEY vs EQT PROD CO                                              133–136

Page 133

1  chocks, your cones.  Finishing up any of the
2  paperwork or any of the tablet work that I had to do
3  before I even got out of the truck.  Do the walk
4  around the truck like I said.  Check the tires.  Make
5  sure you didn't pull in and go to load with a low
6  tire.  You know, you didn't know you had a low tire,
7  so you check your tires and make sure everything is
8  secure.  Then I would -- my flashers.  I'm trying to
9  think of what else we would put out.  The plastic
10 containments underneath the pumps and then I would
11 start unstrapping my hoses.  And then before that, I
12 would walk around the back of the truck, make sure
13 everything was clear back there.  And then I would
14 start and figure out where the tank was at before I
15 would even go in.  And I would do the hook-up, if it
16 was a single hook-up from here to here, point A to
17 point B, I would do that hook-up.
18     Q.    When you say hook-up, you mean from your
19 truck --
20     A.    From the truck to the pumpkin where I
21 would hook it up.  Then I would go back up and turn
22 my pump on so I had suction.  Then I would walk from
23 there up into the containment, go back to find the
24 production tank that is needed to be pulled from.
25 Once I get back there, open that valve and then as I

Page 134

1  was heading back to the pumpkin, the other valve,
2  that's where the incident happened.
3      Q.    Thank you.  The work you were doing that
4  day, were you supposed to just drain one tank?
5      A.    I believe so.
6      Q.    Do you remember which tank it was?
7      A.    No.  I know it wasn't that far back
8  because I remember going through the center.
9      Q.    You walked through the center of the tank?
10     A.    Yeah, I walked through -- yeah, I come up
11 and walked through the center up to here and walked
12 back this way (indicating on exhibit).  So I can't
13 remember if it was the last three or last two or even
14 the last one.
15     Q.    Do you believe it was one of those though
16 in that area?
17     A.    Yeah, in the back there, yeah, because I
18 remember cutting across and then coming up because I
19 had to come back up to the pumpkin.
20     Q.    And for the record, when you're referring
21 to which tanks you believe you would have had to hook
22 up to drain before looking at that Exhibit 6, you're
23 talking about if you look at the tanks as being like
24 two vertical rows of five, you're talking about the
25 row on the right; correct?

Page 135

1      A.    Yeah.  Yeah.
2      Q.    And the last, what did you say two or
3  three at the bottom, you're not sure which, but
4  somewhere in there?
5      A.    Yeah.
6      Q.    Where would the valve on those tanks have
7  been located?
8      A.    They would either be -- they would either
9  be -- they would either be -- well, depending on how
10 they run the piping because I can't remember that
11 either.
12     Q.    Well, let me ask you this.  Do you
13 remember where the valves were located on those tanks?
14     A.    No.  But I know that it was off, one on
15 the other side, because I remember going across to
16 head back out.
17     Q.    When you parked your truck and got out
18 before entering the containment area, I assumed you
19 turned your lights on?
20     A.    Yeah.
21     Q.    Did you have any concerns with regard to
22 the lighting that was being provided at that time?
23     A.    Well, the lighting only covers -- no.
24 I'll just say no.
25     Q.    Okay.  You had your headlamp too; right?

Page 136

1      A.    Yes.
2      Q.    Did that provide visibility to you as you
3  were moving around the containment area?
4      A.    As much as it could.
5      Q.    So just in terms of like your path until
6  the time you fell, you went through the containment
7  area using, what, steps near where you parked your
8  truck?
9      A.    Yes.
10     Q.    And if we look at Exhibit 6, those two
11 rectangular pads there to the left, would the steps be
12 located sort of in between those?
13     A.    No.
14          MR. ROBINSON:  Are you asking where
15 he entered?
16 BY MR. LESINSKI:
17     Q.    Yeah.  Where the steps were where you
18 entered?
19     A.    I believe the steps were over here, on the
20 side over here (indicating).
21          MR. ROBINSON:  Pointing to the top
22 end of the rectangle of the containment area.
23          MR. LESINSKI:  Okay.  Thank you.
24     A.    I believe.
25



WILLIAM J. BURKEY
BURKEY vs EQT PROD CO

November 08, 2024
217–220

Page 217

```
1                   CERTIFICATE
2
   COMMONWEALTH OF PENNSYLVANIA )
3                              ) SS.
   COUNTY OF WESTMORELAND      )
4
        I, Diana C. Clark, a Court Reporter - Notary Public
5   in and for the Commonwealth of Pennsylvania, do hereby
    certify that the witness, WILLIAM J. BURKEY, was by me
6   first duly sworn to tell the truth, the whole truth,
    and nothing but the truth, and that the above
7   deposition was recorded in stenotype by me and reduced
    to typewriting under my direction.
8
        I further certify that the said deposition
9   constitutes a true record of the testimony given by
    said witness; that the foregoing deposition was taken
10  at the time and place stated herein.
11       I further certify that the inspection, reading and
    signing of said deposition were not waived by counsel
12  for the respective parties and by the witness.
13       I further certify that I am not a relative,
    employee or attorney or counsel of any of the parties,
14  or a relative or employee of such attorney or counsel
    or financially interested directly or indirectly in
15  this action.
16       IN WITNESS WHEREOF, I have hereunto set my hand and
    affixed my seal of office this 29th day of November,
17  2024.
18
19
20                    _____
21                         Diana C. Clark
22
23
24  My Commission Expires July 6, 2028
    Commission No. 1027350
25
```

Page 218

```
1                 DEPOSITION ERRATA SHEET
2
3   Our Assignment No. J11807285
4   Case Caption:  William J. Burkey and Tammy Burkey vs.
5   EQT Production Company, et al.
6
7           DECLARATION UNDER PENALTY OF PERJURY
8                I declare under penalty of perjury that
9   I have read the entire transcript of my Deposition
10  taken in the captioned matter or the same has been
11  read to me, and the same is true and accurate, save
12  and except for changes and/or corrections, if any, as
13  indicated by me on the DEPOSITION ERRATA SHEET hereof,
14  with the understanding that I offer these changes as
15  if still under oath.
16           Signed on the _____ day of _____,
17  20___.
18
19       _____
20           William J. Burkey
21
22
23
24
25
```

Page 219

```
1                 DEPOSITION ERRATA SHEET
2   Page No._____Line No._____Change to:_____
3   _____
4   Reason for change:_____
5   Page No._____Line No._____Change to:_____
6   _____
7   Reason for change:_____
8   Page No._____Line No._____Change to:_____
9   _____
10  Reason for change:_____
11  Page No._____Line No._____Change to:_____
12  _____
13  Reason for change:_____
14  Page No._____Line No._____Change to:_____
15  _____
16  Reason for change:_____
17  Page No._____Line No._____Change to:_____
18  _____
19  Reason for change:_____
20  Page No._____Line No._____Change to:_____
21  _____
22  Reason for change:_____
23
24  SIGNATURE:_____DATE:_____
25           William J. Burkey
```

Page 220

```
1                 DEPOSITION ERRATA SHEET
2   Page No._____Line No._____Change to:_____
3   _____
4   Reason for change:_____
5   Page No._____Line No._____Change to:_____
6   _____
7   Reason for change:_____
8   Page No._____Line No._____Change to:_____
9   _____
10  Reason for change:_____
11  Page No._____Line No._____Change to:_____
12  _____
13  Reason for change:_____
14  Page No._____Line No._____Change to:_____
15  _____
16  Reason for change:_____
17  Page No._____Line No._____Change to:_____
18  _____
19  Reason for change:_____
20  Page No._____Line No._____Change to:_____
21  _____
22  Reason for change:_____
23
24  SIGNATURE:_____DATE:_____
25           William J. Burkey
```

